# EXHIBIT 3

March 3, 2025 Affidavit of Dan Bilzerian

This is the 1st affidavit of
Dan Brandon Bilzerian in this case and was
made on 03/Mar/2025

No. S-251196
Vancouver Registry

IN THE SUPREME COURT OF BRITISH COLUMBIA

BETWEEN

**IGNITE INTERNATIONAL BRANDS LTD.**

PLAINTIFF

AND

**DAN BRANDON BILZERIAN also known as DAN BILZERIAN**

DEFENDANT

**AFFIDAVIT**

I, **Dan Brandon Bilzerian**, of 5990 Patrick Lane, Las Vegas, Nevada 89118, United States, businessman, AFFIRM THAT:

1. I am an American citizen and a resident of Nevada. I am the majority shareholder and a former CEO of the plaintiff Ignite International Brands, Ltd. (the "**Company**"), a lifestyle company selling disposable vapes, spirits, and apparel under the lifestyle brand "Ignite" that I founded in 2017. The Company is incorporated in the British Columbia, with a principal place of business in Texas, the United States. To the best of my knowledge, the Company does not sell any products in British Columbia. I am the undisputed largest shareholder of the Company.

2. I have read the Notice of Civil Claim filed on February 14, 2025, the Notice of Application filed on February 19, 2025 and the Affidavit of Gurjinder Dhadwar filed on February 20, 2025 ("**GD's Affidavit**") in the proceeding. I make this affidavit in response to the application for an injunction against me.

3. I have personal knowledge of the facts and matters deposed to herein, except where stated to be based on information and belief, and where so stated, I verily believe them to be true.

**The Evolution of the Company**

4. The evolution of the Company's business is set out in my Affidavit#1 filed July 11, 2024 in proceedings with Action No. S-244508. For ease of reference, I extract certain paragraphs below:

*[3] The Company is a lifestyle brand selling disposable vapes, spirits, and apparel under the "Ignite" brand that I founded in 2017. That brand, including the related intellectual property, were controlled by Vulcan Enterprises Ltd. ("Vulcan"), a company in which I was a majority shareholder.*

...

*[7] Attached as Exhibit "C" hereto is a true copy of the Description and Overview of Business section from the Company's Management Discussion & Analysis ("MD&A") prepared as at January 19, 2018, which sets out the following historical information about the Company:*

*(a) after its incorporation, the Company became a junior mineral exploration company focused on gold projects in B.C.;*

*(b) from 1991 to 1999, the Company was listed on the Vancouver Stock Exchange and, in August, 2013, it became listed on the TSX Venture Exchange (the "TSX") under the trading symbol "ALQ";*

*(c) on September 19, 2016, the Company voluntarily delisted from the TSX and became listed on the Canadian Securities Exchange ("CSE") under the same trading symbol;*

*(d) on August 25, 2017, trading of the Company's shares was halted as the Company made an application to the CSE of its intention to change its business focus from being a mineral resource exploration company to an investment company seeking investment opportunities in the global cannabis sector; and*

...

*[8] In the fall of 2018, the Company began a multi-step reverse take-over transaction (the "RTO") with Vulcan Enterprises US Ltd., which subsequently changed its name to Ignite International, Ltd. ("Ignite US")., and two of its shareholders, including me.*

*[9] On October 30, 2018, the Company changed its name to Green Axis Capital Corp. and started trading on the CSE under the stock symbol "BILZ".*

*[10] Further to the RTO, on January 2, 2019, the Company replaced its board of directors, and, among other appointments, I was appointed as a director, Chairman and CEO…*

...

*[12] On January 10, 2019, the Company changed its name to Ignite International Brands, Ltd.*

*[13] Since 2018, my brand, "Ignite", as well as my name, likeness, personality, and life story, have been essence of the Company's business, and I have been the "public face" of the Company.*

*[14] On May 30, 2019, the Company completed the RTO by, among other steps, acquiring all shares of and combining with Ignite US, Ignite International Brands, Ltd., 1203238 B.C. Ltd., and 1203243 B.C. Ltd…*

*[15] On August 24, 2022, at a special meeting of the shareholders, the shareholders approved a going private transaction, as well as set the number of directors to five. The going private transaction was completed by August 29, 2022. I remained a director and Chairman of the Company.*

**My Involvement in the Company**

5. I have been involved with the Company since around 2017. I brought about (a) the change of business focus from mineral exploration to the cannabis/nicotine sector, that the Company announced in August 2017, and (b) the reverse take-over plan that the Company implemented in 2018 and 2019.

6. Since 2018, my brand "Ignite", as well as my name, likeness, personality, and life story, have been the essence of the Company's business, and I have been the "public face" of the Company. I allowed the Company to use my name, likeness, image, signature, and distinctive marks on a goodwill basis – at no cost to the Company – for the purpose of marketing the Company's products and driving the Company's sales and growth. It was never the case that I was transferring these to Ignite permanently or that I was relinquishing ownership of them.

7. Until December 2023, I served as the nominal CEO of the Company. I was not directly involved in the Company's operations except for product developments and marketing.

8. My father, Paul Bilzerian, exercises *de facto* control at the Company through his proxies and agents. He frequently appointed and replaced the Company's CEOs and general counsel. The *de facto* CEO of the Company was Scott Rohleder, long-term accountant and proxy of Paul Bilzerian. Scott Rohleder was the Company's director, CEO, CFO, and COO at different times.

9. Paul Bilzerian is a convicted felon. In 1989, he was convicted for securities fraud in the U.S. District Court for the Southern District of New York and sentenced to prison. In 1993, the United States Securities and Exchange Commission (the "**SEC**") obtained civil judgments against Paul Bilzerian for his fraudulent activities. There is a court order in Florida preventing Paul Bilzerian from filing lawsuits due to filing a multiplicity of vexatious and frivolous lawsuits.

10. At times, I complained about the mismanagement of the Company and how Scott Rohleder and other agents of Paul Bilzerian caused harm to the Company's business. For example, Paul Bilzerian and Scott Rohleder refused to bring on alternative manufacturers and insisted on using a small manufacturer with insufficient output capacity to meet the Company's needs. That small manufacturer produced inferior vape products, resulting in multiple market recalls, and at a higher cost. Further, Paul Bilzerian and Scott Rohleder also introduced products that are not related to vapes, such as energy drinks, alcohol, male-enhancement pills, and hand sanitizers, without my approval. Those products were inferior and cheapened the "Ignite" brand that I personally founded. None of these products are profitable. My

complaints about the Company's mismanagement and mis-operations were met with threats by Scott Rohleder and agents of Paul Bilzerian that they would fire me from the position of CEO.

11. As of late December 2023, the Company's board consisted of myself, Gregory Gilpin-Payne, Ralph Gilpin-Payne, Thomas Bunker, Robin Rodriguez, and an individual Lester Lee. Gregory Gilpin-Payne, Ralph Gilpin-Payne, Thomas Bunker, Robin Rodriguez, and Lester Lee are all agents of Paul Bilzerian.

12. I had written to Scott Rohleder on multiple occasions telling him to stop knowingly selling expired vape devices. He refused, so in December 2023, I fired him as COO. Scott Rohleder and agents of Paul Bilzerian again threatened to fire me from the position of CEO. In response to the threat, I, on December 18, 2023, expressly warned the then-board of directors that if they fired me as the CEO of Ignite, they would "*lose the multimillion-dollar benefit of my media posting*" and "*lose the rights to use my name and likeness*".

13. On December 21, 2023, the Company's board resolved to terminate me as the Company's CEO. The board then rehired Scott Rohleder and even promoted him to be the Company's CEO. At that board meeting, I again informed the board that given that they had terminated me as the Company's CEO, they should stop using my name, likeness, image, signature, and distinctive marks.

14. Afterwards, I planned to put forward some resolutions for vote at the AGM. Paul Bilzerian knew that he did not have enough proxies to counter my votes and he did not want to explain the ownership of some corporate shareholders, he agreed that I would be the sole director and Chairman of the company.

15. On January 17, 2024, Gregory Gilpin-Payne, Ralph Gilpin-Payne, Thomas Bunker, Robin Rodriguez, and Lester Lee resigned as directors. From then to the beginning of June 2024, I was the sole director of the Company.

16. As set out below, I was unlawfully ousted from the Company's board in the beginning of June 2024.

17. On September 26, 2024, Paul Bilzerian, Scott Rohleder, and the Company were indicated by the United States of America in the U.S. District Court for the Central District of California on federal charges – one count of conspiracy to defraud the United States, one count of conspiracy to commit wire fraud and securities fraud, and four counts of wire fraud. Attached to this affidavit and marked **Exhibit "A"** is a true copy of the Indictment filed on September 26, 2024 and a printout of the press release of September 27, 2024 on the U.S. Department of Justice's website. The indictment refers to various emails that Paul Bilzerian in 2021 sent to Scott Rohleder (CFO and President of the Company at the time) giving the latter instructions as to how to book certain transactions between the Company and International Investments, Ltd (a major shareholder of the Company controlled by Paul Bilzerian).

18. On September 27, 2024, Paul Bilzerian, Scott Rohleder, the Company, a few other individuals, and International Investments, Ltd were sued by the SEC in the United States District Court for the Southern District of New York. The SEC alleges the existence of a scheme to create false invoices and falsely inflate revenues. Attached to this affidavit and marked **Exhibit "B"** is a printout of a litigation release of September 27, 2024 on the SEC's website.

19. After the indictments, Scott Rohleder resigned as the Company's CEO and the Company's board of directors appointed Gurjinder Dhadwar (also known as Rupy Dhadwar) as the acting CEO. Gurjinder Dhadwar is also a proxy of Paul Bilzerian. To my understanding, Gurjinder Dhadwar is an accountant and does not have any experience running any company.

20. The "Ignite" brand that I founded and own has been indicted and irreparably harmed by the criminal activities perpetuated by Paul Bilzerian and Scott Rohleder.

**I founded the "Ignite" brand and own the name, logo and trademarks**

21. I founded the "Ignite" brand in 2017. The "Ignite" brand and the related intellectual property were initially controlled by Vulcan Enterprises Ltd. ("**Vulcan**"), a company in which I was the majority shareholder. Ignite has historically used marks and logos that looks like a goat skull, which I will refer to as the "Goat Skull Logo". Ignite does not own these marks and logos as described below.

22. As part of the reverse take-over transactions, Vulcan transferred the "Ignite" brand and the related intellectual property to Blitz NV, LLC ("**Blitz**"), a company wholly owned by me.

23. In September 2018, Blitz as Licensor and Vulcan as Licensee entered into a Trademark and Copyright License Agreement (the "**Initial License Agreement**") where Blitz granted to Vulcan (i) a non-exclusive, worldwide, right and license to use the "Ignite" mark in connection with the development, manufacture, packaging and sale of cannabis products for the purpose of marketing, promoting, selling, and distributing of such products; and (ii) a non-exclusive, worldwide, right and license to copy, perform, publish, distribute and creative derivative works based on the goat skull logo, solely on the cannabis products and on the related packaging and marketing materials, on the condition that Vulcan would seek Blitz's approval on any use of the "Ignite" mark and the Goat Skull Logo. Attached to this affidavit and marked **Exhibit "C"** is a true copy of the Initial License Agreement of September 28, 2018.

24. The Initial Licensing Agreement was amended on May 16, 2019 and subsequently on September 28, 2019. Attached to this affidavit and marked **Exhibit "D"** are true copies of the amendments.

25. As stated in Section 4 above, Vulcan subsequently changed its name to Ignite International Ltd. ("**Ignite US**"), and through the reverse take-over, became a wholly-owned subsidiary of the Company in May 2019.

26. On July 1, 2022, due to Paul Bilzerian's insistence and direction, Blitz and Ignite US entered into an Assignment and License Agreement (the "**Subsequent Assignment and License Agreement**"). Attached to this affidavit and marked **Exhibit "E"** is a true copy of the Subsequent Assignment and License Agreement of July 1, 2022.

27. The Subsequent Assignment and License Agreement states that:

(a) The Subsequent Assignment and License Agreement is governed by the laws of the State of Nevada.

(b) Blitz would sell, transfer, and assign the marks enumerated in Exhibit A to Ignite US;

(c) Blitz would sell, transfer, and assign the copyright of the works enumerated in Exhibit B to Ignite US;

(d) All prior licenses and consents relating to the marks and works, including the Initial License Agreement as amended, are terminated;

(e) Ignite US understands and acknowledges that the works are used, have been used, and will continue to be used as my personal symbol, and appear on a variety of online properties, social media accounts and postings, and promotional materials related to my celebrity and public appearances activities ("Personal Uses");

(f) Ignite US understands and acknowledges that the works, and variations thereof, have appeared, do appear, and will appear in the future in various websites, photos, movies, videos and artistic works featuring or relating to myself, my property, my life, and my celebrity ("Publication Uses");

(g) Ignite US understands and acknowledges that I have engaged, or may engage, in personal appearances, host events, appear in videos and movies, publicize my life and lifestyle, write books, stories or screenplays, produce videos, series or movies, commission works of art and architecture ("Promotional Uses"); and

(h) Ignite US grants me an unlimited, royalty-free, perpetual, irrevocable, and worldwide right and license to use the works for current and future Personal Uses, Publication Uses and Promotional Uses relating to me.

28. Blitz's position is that the Subsequent Assignment and License Agreement is invalid, as Ignite US did not provide any consideration to Blitz at all. Blitz is still the rightful owner of the marks and works.

29. Even if the Subsequent Assignment and License Agreement is valid, I am still free to use the marks and works for the uses permitted under the Subsequent Assignment and License Agreement. The Company has not alleged a breach of the Subsequent Assignment and License Agreement in the proceeding.

**I created and continue to own the @Ignite Instagram Account**

30. I created and continue to own the @Ignite Instagram account. I refer to and adopt my Affidavit#3 filed on February 27, 2025 in proceedings with Action No. S-245663. Attached to this affidavit and marked **Exhibit "F"** is a true copy of the said affidavit together with exhibits.

31. In March 2016, even before the "Ignite" brand was created, I myself created an Instagram account that has a current handle @Ignite (the "**IG Account**"), using my personal information including my personal cell phone number. An Instagram handle is a unique identifier that people use to find you on Instagram, a popular social networking service.

32. I first created the IG Account in March 2016 under a different handle. To the best of my recollection, the initial handle of the IG Account was @DiscountVape or something similar. DiscountVape was a vape company that I founded at the end of 2015.

33. I personally changed the handle of the IG Account two or three times, before I personally changed the handle of the IG Account to @Ignite in around 2018.

34. Since its creation in March 2016, I have solely operated and controlled the IG Account including approving all content, given that the IG Account is my property, using and portraying my name, picture and likeness. I have solely and exclusively maintained possession and control over access, including the log-in and password to the IG Account.

35. Since its creation in March 2016, I have personally created most of the content posted on the IG Account. I have paid a significant amount of marketing expenses associated with the creation of content that I posted on the IG Account and with the Company in general. For example, I branded my personal jet, trucks, motorcycles, and other vehicles "Ignite" and these were actively used in a variety of social media posts at no cost to Ignite. I personally absorbed costs of about USD 600,000 for yacht-renting solely for the purpose of creating content for Ignite's social media accounts. This is admitted by Scott Rohleder in emails of June 7, 2020. Attached to this affidavit and marked **Exhibit "G"** are true copies of two emails from Scott Rohleder of June 7, 2020.

36. I have never transferred or assigned the right, title or ownership of the IG Account to the Company. No assignment documents have ever been executed by me in favour of the Company. I have never authorized or given permission for the Company to use, in whole or in part, the IG Account. I have never signed any written agreement or orally agreed with the Company that the IG Account belongs to the Company, or that I transferred ownership of the IG Account to the Company. I have not received any compensation for the transfer, assign, license or use the IG Account.

37. At no time do I recall the Company having a company social media policy that addresses the ownership of, and access to, social media accounts including the IG Account, as well as all information and communications associated with those accounts.

38. The Company claims that its subsidiary Ignite US invested a total of approximately CAD 43.2 million on marketing and promotion from 2019 through 2023 and that a signification portion of the spending on marketing and promotion was in relation to social media content. The Company's claims are completely false and not supported by any evidence. In GD's Affidavit, Gurjinder Dhadwar exhibits as Exhibit A excerpts from financial statements of the Company and Ignite US showing the amount spent on marketing and promotion for each year from 2019 through to 2023. These financial statements only showed the total amount of marketing and promotion expenses, they do not show the amount, if any, the Company and Ignite US have allegedly spent on creating content for the social media accounts, let alone the content on @Ignite Instragram account specifically.

39. The Company also makes a very broad claim that all images posted on the Company's social media accounts are its property. The Company does not support that claim with any specific evidence. Instead, the Company only points to one single photo where I am at a laptop with a woman next to me in a bikini with the Goat Skull Logo on it and a similar photo with the woman's bikini now having a bunny logo on it (posted on @s3xaddict.latam Instagram account, an Instagram account that I do not own, post on or have any affiliation to). They give no evidence of the ownership of the original photo and I reject the claim that it is the Company's property.

40. The Company does not own the images that I have posted on the IG Account that I created and own. I am content to not use any images lawfully owned by the Company but require that the Company establish the ownership rights to those images with specificity rather than a broad general claim to all photos and contents on my Instagram accounts.

**I was unlawfully ousted from the Company in June 2024**

41. On June 1, 2024, I received a letter of that date, written on the letterhead of International Investments, Ltd (a major shareholder of the Company controlled by Paul Bilzerian) and signed by Gregory Gilpin-Payne. Gregory Gilpin-Payne purported to write on behalf of certain shareholders representing 51.8% of the shares of the Company. In this letter, Gregory Gilpin-Payne demanded that I resign as the Company's director by June 3, 2024. Attached to this affidavit and marked **Exhibit "H"** is a true copy of the letter of June 1, 2024.

42. I did not agree to this demand and did not resign as the director of the Company.

43. First, I do not agree that the shareholders of the Company that Gregory Gilpin-Payne listed in his letter represent 51.8% of the shares of the Company. I am the majority shareholder of Ignite holding at least 56% of the shares of the Company.

44. Second, Section 14.10 of the articles of the Company clearly stipulates that a director can only be removed by way of a special resolution (a vote representing 66.66% of the votes cast). Attached to this affidavit and marked **Exhibit "I"** is a true copy of the Company's articles.

45. On June 2, 2024, Gregory Gilpin-Payne sent me a letter of that date. In this letter, Gregory Gilpin-Payne purported to write "based on the authority and consent provided to [him] by the majority of Ignite shareholders…representing 51.8% of the shares" of the Company, claimed to "terminate" me as the director of the Company, and asserted that "*a new Board of Directors is being formed which will be announced shortly.*" Attached to this affidavit and marked **Exhibit "J"** is a true copy of the letter of June 2, 2024.

46. It is beyond doubt that my removal as the Company's director is unlawful, even if Gregory Gilpin-Payne did represent the purported 51.8% of the shares of the Company.

47. In the months that followed, the Company (controlled by Paul Bilzerian and his agents) purported to hold an AGM for the purpose of electing new directors. An AGM was purportedly held on August 22, 2024 via MS Teams. I was however not allowed to speak, participate or vote. Another AGM was purportedly held on December 19, 2024 via MS Teams. I never received the link to that meeting and was unable to attend.

48. Ignite has provided an email that was sent to me and others saying that I should confirm my attendance at the meeting prior to being sent a link. I am not required to confirm my attendance in advance. Ignite has provided no evidence that all of the other individuals who attended the meeting (and therefore were sent the link in advance) confirmed their attendance in advance via email.

**I only started pursuing alternative business opportunities after I was ousted from the Company**

49. After I was unlawfully ousted from the Company on June 2, 2024, I decided to pursue alternative business opportunities in the vaping industry, which included selling lifestyle products under my own separate brand "Sex Addict".

50. I never entered into any non-compete agreement or restrictive covenant with the Company preventing me from participating in the vaping industry in British Columbia or beyond.

51. Prior to the date on which I was ousted from the Company, I did not take any steps to pursue any alternative business opportunities in the vaping industry. SAVH LLC ("**SAV**") was incorporated on August 29, 2024, almost three months after June 2, 2024. Even on the Company's own case as set out in Section 15 of the Notice of Application, SAV only placed an order to manufacture "Sex Addict" brand vapes in November 2024, five months after June 2, 2024. The Sex Addict vapes were only launched in Paraguay in around December 2024, six months after June 2, 2024. SAV does not do business in or sell products in British Columbia.

52. In Section 14 of the Notice of Application, the Company claims to be the registered owner of the "Sex Addict" brand in Paraguay. This is incorrect. The Company only applied to register the "Sex Addict" trademark in Paraguay on October 7, 2024, upon learning that I had started an alternative business under the "Sex Addict" brand after being unlawfully removed from the Company.

53. Attached to this affidavit and marked **Exhibit "K"** is a printout from a search of the intellectual property marks on the National Directorate of Intellectual Property in Paraguay on March 3, 2025. The search results indicate that Ignite US first applied to register "Sex Addict" trademark for Class 34 on October 7, 2024, and filed subsequent applications to register the trademark for other classes in November and December 2024. I can confirm that prior to June 2, 2024, the Company had no "Sex Addict" brand and had no plan to develop one.

54. The Company's applications to register the trademark in Paraguay have not been granted as SAV is objecting the Company's applications on the basis that the Company filed the registration applications in bad faith, with full knowledge that I created the "Sex Addict" brand after I was ousted from the Company.

55. Michael Voulelis, a sales executive of the Company, in his Affidavit#2 filed February 12, 2025 in proceedings with Action No. S-245663 refers to a banner featuring "Sex Addict" vapes in a store at an unidentified location in an unidentified country in South America. I can confirm that neither myself nor SAV produced this banner. I can further confirm that I have never instructed anyone from SAV or its distributors to use the Goat Skull Logo for the distribution of "Sex Addict" vapes. I had previously terminated Michael Voulelis for knowingly selling expired products and dishonesty.

56. In Section 15 of his Affidavit#1 filed on October 10, 2024 in proceedings with Action No. S-245663, Gurjinder Dhadwar refers to a PowerPoint presentation that the Company obtained. Gurjinder Dhadwar states that the PowerPoint presentations were prepared for SAV by China First Union and FEELM, a subsidiary of Smoore International. Gurjinder Dhadwar suggests that these are "*Ignite's vape manufacturers*" and the Notice of Application by implication suggests that this is confidential information.

57. These two manufacturers are large global companies that are not secret or exclusive to Ignite. For example, Smoore International Holdings Limited is a publicly traded company on the Hong Kong Stock Exchange with a current market cap in the billions.

58. China First Union describes itself as follows on its public Linkedin page:

"*First Union Group founded in 2004, is a Shenzhen-based leading company in global electronic vaporization industry. First Union is committed to providing a one-stop solution for customers with world-leading electronic vaporization technologies.*

*We are honored to partner with over 200 brands across more than 80 countries and regions worldwide.*

*Empowered by independent research and development capabilities, we have established key technological platforms, including nicotine atomization, non-combustion heating and functional substance atomization, which enable us to cover a wide range of products such as atomized electronic cigarettes, heat-not-burn (HNB) devices, and CBD products.*

*With seven leading innovation laboratories and six production bases located across key domestic and international markets, First Union has obtained multiple international management system certifications and qualifications, and our products have won various prestigious international design awards.*"

Attached to this affidavit and marked **Exhibit "L"** is a printout from China First Union's Linkedin page.

59. In any event, both of these companies I introduced to Ignite in the first place. China First Union has produced no products for SAV.

**Use of my name, likeness, image, signature, and distinctive marks**

60. I am an American citizen and a resident of Nevada, the United States. I have never agreed to transfer or assign rights to my own name, likeness, image, signature, and distinctive marks, in whole or in part, to the Company for any purposes.

61. Gurjinder Dhadwar claims in Section 18 of his Affidavit#2 filed October 22, 2024 in proceedings with Action No. S-245663 that the Company does not intend to use my name, likeness or image for the purposes of marketing the Company's products on the Company's social media accounts. This is far from the truth.

62. Despite unlawfully removing me from the Company, the Company, without my consent, continues to use my name, likeness, image in the form of pictures and videos on their social media accounts to promote sales of the Company's products, including vapes, alcohol, clothing, and other products. For example, the Company continues to use my name, likeness, image on numerous websites and social media accounts that the Company controls (such as the Ignite International account on X, formerly Twitter). The Company even uses photographs personally taken by me on the Company's social media accounts. Attached to this affidavit and marked **Exhibit "M"** are screenshots of examples that the Company still uses my name, likeness, image on their social media accounts.

63. The Company has used my pictures and videos at tradeshows and have lied to distributors saying that we are still working together. The Company recently has used my name to promote vodka in Las Vegas. Attached to this affidavit and marked **Exhibit "N"** is an image of that promotion.

64. From June to November 2024, I requested personally and through my counsel that the Company cease and desist from using my name and likeness and otherwise exploiting my property rights, but to no avail. On November 12, 2024, I commenced a proceeding in Nevada against *inter alia* the Company to protect my statutory and common law right of publicity and property rights over my own name, likeness, image, signature, and distinctive marks. Attached to this affidavit and marked **Exhibit "O"** is a true copy of the Complaint filed in Neveda.

**I did not use any of the Company's confidential information**

65. The Company alleges that I have:

(a) used confidential information regarding the Company's suppliers, manufacturers and distributors that I was privy to in my role as CEO and director in order to develop the "Sex Addict" vapes;

(b) used confidential information regarding the Company's marketing strategies, business model and financial information that I was privy to in my role as CEO and director in order to develop the "Sex Addict" vapes;

(c) used confidential information and business contacts I gained through my role as CEO and director to develop, manufacture and market the "Sex Addict" vapes.

66. I categorically deny these allegations.

67. I owned a vape company prior to joining the Company. I had knowledge of the major manufacturers, distributors, and retailers in the industry prior to joining the Company. In fact, such information is widely known in the industry and is not confidential to the Company. There are certain large manufacturers in China that to my knowledge dominate the market for most nicotine vape brands including the Company and its major competitors. In fact, I was the one that brought Smoore International to the Company's attention and insisted that the Company change its manufacturer to Smoore International. There are also certain large distributors and retailers for vape products that to my knowledge dominate the market, and they distribute and sell vape products of many different brands.

68. The vape industry is heavily reliant on marketing and promotion rather than product differentiation. Disposable vape devices are battery-operated devices that vaporize e-juice into an inhalable aerosol. They are simple products, consist of a coil, battery, e-juice and plastic casing. The major Chinese manufacturers have a host of common and standard features for customization, and most vape companies offer vape devices with similar features. There is nothing proprietary, there are no secret formulations. These devices are mass produced and thrown away after a couple days

of use. The product differentiation in this market occurs through the branding, which is in public view. There is nothing that SAV has done that is not readily available on the open market.

69. The Company does not have any confidential marketing strategies or business model that I used in any way. I am the founder of "Ignite". My social media posts that I created are what made the "Ignite" brand famous. End users bought Ignite's products because of me. I allowed the Company to use my name, image and likeness to promote the Company's products – at no cost to the Company.

70. I did not use any financial information that I was privy to in order to develop SAV.

71. Michael Voulelis in his Affidavit#2 filed February 12, 2025 in proceedings with Action No. S-245663 exhibits as Exhibit B two pictures showing the front and back views of an Ignite's vape device, a Sex Addict vape device, and the vape devices of three other brands. Michael Voulelis alleges that the Sex Addict vape devices were purposely designed to be similar to Ignite's vape devices.

72. I deny this allegation. My signature and the "Sex Addict" brand are distinctively and visibly printed on the front and back of the plastic casing. There is no reference to "Ignite" at all on the products under the "Sex Addict" brand.

73. Michael Voulelis in his Affidavit#2 filed February 12, 2025 in Action No. S-245663 also refers to a new device proposal that the Company received in March 2024 but he did not exhibit that proposal. I now cannot recall what new device proposal that the Company received in March 2024 but I recall that the Company launched new devices in March 2024 and June 2024. Attached to this affidavit and marked **Exhibit "P"** are printouts from the Company's blog. The designs and features of these new devices are public once the new devices are launched.

**The injunctive relief sought is extremely broad and onerous**

74. I am a professional poker player and social media influencer. A very significant portion of my income comes from utilizing my public image for the sale of vape products.

75. The Company seeks to enjoin me from lending my name or likeness to the marketing of vape products other than the Company's products. As stated above, I have never agreed to transfer or assign rights to my own name, likeness, image, signature, and distinctive marks, in whole or in part, to the Company for any purposes. Enjoining me from using my name, likeness, image, signature and distinctive marks will prevent me from earning a living and practicing my livelihood.

76. The Company also seeks to enjoin me from directly or indirectly competing with the Company until a final order is made in this proceeding, including refraining from (a) permitting SAV to manufacture, distribute, market or sell or transfer vape products, and (b) promoting vape products other than those marketed by the Company. Again, this will significantly restrict my ability to engage in my chosen vocation and to earn a livelihood.

AFFIRMED BEFORE ME at Las Vegas, Nevada on 03/March/2025

A Commissioner for taking Affidavits

Dan Brandon Bilzerian

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

This is Exhibit "....A......" referred to in the affidavit
of .Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025..............................

~~A Commissioner for taking affidavits for British Columbia~~ NV

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

FILED
CLERK, U.S. DISTRICT COURT
9/26/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: CDO DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2024 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PAUL A. BILZERIAN,<br>SCOTT ROHLEDER, and<br>IGNITE INTERNATIONAL BRANDS, LTD.,<br><br>Defendants. | CR 2:24-cr-00569-MEMF<br><br><u>I N D I C T M E N T</u><br><br>[18 U.S.C. § 371: Conspiracy to Defraud the United States; 18 U.S.C. § 371: Conspiracy to Commit Wire Fraud and Fraud in Connection with Purchase and Sale of Securities; 18 U.S.C. § 1343: Wire Fraud; 26 U.S.C. § 7206(2): Assisting in the Preparation of False Tax Return; 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

The Grand Jury charges:

COUNT ONE

[18 U.S.C. § 371]

[ALL DEFENDANTS]

A. <u>INTRODUCTORY ALLEGATIONS</u>

1. At times relevant to this Indictment:

a. Defendant PAUL A. BILZERIAN was a resident of St. Kitts and Nevis and previously an American businessman and corporate raider. In 1989, defendant BILZERIAN was convicted of securities

fraud, among other charges, in the United States District Court for the Southern District of New York and sentenced to four years' imprisonment.

b. In 1989, the United States Securities and Exchange Commission ("SEC") brought a civil action against defendant BILZERIAN in the United States District Court for the District of Columbia based on the same underlying conduct as the criminal case (the "SEC Case"). In 1993, the SEC obtained civil judgments totaling approximately $62,337,600 against defendant BILZERIAN (the "SEC Judgment"), including more than $33 million in disgorgement and more than $29 million in prejudgment interest. Since then, defendant BILZERIAN has evaded enforcement of the judgments.

c. In 2000, the United States District Court for the District of Columbia found defendant BILZERIAN in contempt of the SEC Judgment and appointed a receiver to collect defendant BILZERIAN's assets to effectuate the SEC Judgment. In 2001, when defendant BILZERIAN continued to evade the SEC Judgment, the same court held defendant BILZERIAN in contempt of the receivership order. Since then, the SEC has reported that it has only been successful in recovering a net amount of approximately $547,000 toward satisfaction of the SEC Judgment. With interest, the amount of the SEC Judgment now exceeds $180 million.

d. D.B. was defendant BILZERIAN's son. D.B. was a professional poker player and social media influencer who gained notoriety for portraying his conspicuous lifestyle on social media, including photographs and videos depicting him partying with scantily clad women, jet-skiing, drinking, smoking, shooting large guns, spending time on boats and beaches, and flying around the world in

private jets. D.B.'s primary residence was a mansion located on West Patrick Lane in Las Vegas, Nevada (the "Patrick Lane Mansion").

e. Defendant SCOTT ROHLEDER was a resident of North Carolina and Florida and a certified public accountant. Since at least 2018, defendant ROHLEDER worked for defendant BILZERIAN and his various business interests in a number of roles. Defendant ROHLEDER also regularly assisted in the preparation of D.B.'s tax returns.

f. Defendant IGNITE INTERNATIONAL BRANDS, LTD. ("IGNITE") was a publicly traded company that marketed itself as a "lifestyle brand," selling vape pens, liquor, clothing, cannabidiol products, and various other products inspired by the persona that D.B. portrayed on his social media accounts. Beginning in 2019, shares of defendant IGNITE were publicly traded over the counter in United States securities markets under the symbol "BILZF" and constituted "securities" within the meaning of the Securities Exchange Act of 1934. Soon after going public, defendant IGNITE completed a reverse takeover with Ignite International Ltd. ("Ignite US"), formerly Vulcan Enterprises Ltd., making Ignite US a wholly owned subsidiary of defendant IGNITE. Defendant IGNITE primarily operated out of its offices in Los Angeles, California, and Vaughan, Canada. Putatively, D.B. was the Chief Executive Officer ("CEO"), founder, and Chairman of defendant IGNITE. Defendant ROHLEDER held various roles at defendant IGNITE, including Chief Financial Officer.

g. G.G.-P. was a resident of St. Kitts and Nevis and an associate of defendant BILZERIAN. G.G.-P. was elected to defendant IGNITE's board of directors in July 2020.

h. International Investments Ltd. ("International Investments") was a business entity based in St. Kitts and Nevis and

originally incorporated in February 2007. Initially, International Investments was nominally owned by V.V. and defendant BILZERIAN's other son, A.B. Eventually, nominal ownership in International Investments was transferred to Another Dimension Ltd., which was owned by G.G.-P. In truth, G.G.-P. served as a straw owner for International Investments, which operated at the direction of and for the benefit of defendant BILZERIAN. Through International Investments and other corporate entities, defendant BILZERIAN funneled millions of dollars into defendant IGNITE.

i. Rohleder, Inc., was a Florida corporation operating out of North Carolina. While defendant ROHLEDER was nominally the president and director of Rohleder, Inc., he operated the company at the direction of and for the benefit of defendant BILZERIAN.

B. CONSPIRACY TO DEFRAUD THE UNITED STATES

2. Beginning no later than in or about December 2018, and continuing through at least September 26, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendants BILZERIAN, ROHLEDER, and IGNITE, knowingly and willfully conspired with one another, and with others known and unknown to the Grand Jury, to defraud the United States and agencies thereof, namely, the SEC, by impeding, impairing, obstructing, and defeating the lawful government functions of the SEC with respect to collection of the SEC Judgment by deceitful and dishonest means.

C. MANNER AND MEANS OF THE CONSPIRACY

3. The object of the conspiracy was carried out, and was to be carried out, in substance, as follows:

a. Defendant BILZERIAN would cause the incorporation of businesses operated at his direction and for his benefit but

nominally under the ownership of other individuals, including but not limited to International Investments, Vulcan Enterprises, Ltd., and Veritas Investments (the "PAUL BILZERIAN Entities").

b. To avoid satisfying his obligation in the SEC case, defendant BILZERIAN would falsely represent that he was indigent and unable to pay the SEC Judgment, including through filing an application to proceed in forma pauperis, claiming in that the only asset he possessed was a purported federal tax refund claim, and providing tax returns and financial disclosures omitting the considerable assets he held in the PAUL BILZERIAN Entities.

c. To continue to deploy his considerable wealth in the United States while evading the SEC Judgment, defendant BILZERIAN would funnel millions of dollars of his assets to capitalize defendant IGNITE while concealing his role in defendant IGNITE's ownership and management through nominees.

i. Defendant BILZERIAN would invest millions of dollars to acquire shares in defendant IGNITE through the PAUL BILZERIAN Entities. With assistance from defendant ROHLEDER, defendant BILZERIAN also would lend millions of dollars more to defendant IGNITE through the PAUL BILZERIAN Entities, including more than a dozen promissory notes totaling more than $20 million for short-term or convertible debt.

ii. Although D.B. was nominally the CEO of defendant IGNITE, in truth, defendant BILZERIAN exercised de facto control at defendant IGNITE. Together with defendant ROHLEDER, defendant BILZERIAN would oversee operations, strategy, marketing, and fundraising at defendant IGNITE, to the point of holding daily management meetings. As a beneficial owner of defendant IGNITE,

defendant BILZERIAN also would exert significant influence in decisions to hire and fire defendant IGNITE's executives and members of the board of directors.

iii. At defendant BILZERIAN's direction, defendant ROHLEDER would assist in deploying defendant BILZERIAN's assets to capitalize defendant IGNITE, including by using entities controlled by defendant ROHLEDER, including Rohleder, Inc., as a vehicle to hold and transfer assets belonging to International Investments.

iv. Despite defendant BILZERIAN's prominent leadership role at defendant IGNITE, defendants BILZERIAN, ROHLEDER, and IGNITE would conceal his role, including by omitting his name in publicly filed disclosures. Additionally, while defendant IGNITE would publicly disclose the numerous promissory notes it entered into with International Investments, it would conceal that International Investments and its assets were controlled by and belonged to defendant BILZERIAN and that defendant BILZERIAN was a major shareholder in defendant IGNITE through shares held by the PAUL BILZERIAN Entities.

d. After learning federal authorities had become aware of defendant BILZERIAN's involvement in defendant IGNITE, defendant IGNITE would seek to misleadingly downplay that involvement by issuing a press release mischaracterizing defendants BILZERIAN and ROHLEDER as "unpaid consultants" to defendant IGNITE. In truth, as defendant IGNITE then knew, defendant BILZERIAN was the de facto head and beneficial owner of defendant IGNITE, and defendant ROHLEDER was a de facto executive of defendant IGNITE.

D. OVERT ACTS

4. On or about the following dates, in furtherance of the conspiracy and to accomplish its object, defendants BILZERIAN, ROHLEDER, and IGNITE, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1: On April 16, 2018, defendant BILZERIAN filed a motion to proceed in forma pauperis in the SEC case in which he listed $740 in gross monthly wages, $260 held in checking and savings accounts, and a purported joint tax refund claim for $8,243,125.

Overt Act No. 2: On July 3, 2018, defendant BILZERIAN sent an email to the SEC offering to resolve the SEC Judgment by giving the SEC 90 percent of a purported federal tax refund, which defendant BILZERIAN stated "is essentially the only asset I have to work with."

Overt Act No. 3: On July 10, 2018, defendant BILZERIAN submitted to the SEC an IRS Form 433-A in which he listed a gross monthly income of $2,738, cash holdings of $10, no personal bank accounts, no investments, no real property, no personal assets, and no credit.

Overt Act No. 4: On May 16, 2019, defendant BILZERIAN caused International Investments to make a $3 million loan to Ignite Distribution, LLC, a subsidiary of defendant IGNITE.

Overt Act No. 5: On July 15, 2019, defendant BILZERIAN sent an email to the SEC asking the agency to stop garnishing his Social Security payments, stating "As you know, I have filed bankruptcy twice and a receiver confiscated and liquidated all my assets, including my wages . . . ."

Overt Act No. 6: On June 8, 2020, defendant BILZERIAN caused International Investments to make a $5 million (Canadian or "CAD") loan to defendant IGNITE.

Overt Act No. 7: On June 11, 2020, defendant BILZERIAN caused International Investments to make a $3.35 million loan to defendant IGNITE.

Overt Act No. 8: On November 16, 2020, defendant BILZERIAN caused International Investments to make a $6.5 million CAD loan to defendant IGNITE.

Overt Act No. 9: On January 27, 2021, defendant BILZERIAN caused International Investments to make a $3.2 million CAD loan to defendant IGNITE.

Overt Act No. 10: On February 6, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN directed defendant IGNITE's CFO to account for the $4.63 million accounts receivable owed by International Investments for defendant IGNITE's vape product inventory by offsetting a $5 million note obligation that defendant IGNITE owed to International Investments.

Overt Act No. 11: On March 7, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN directed defendant IGNITE's CFO that "All invoices and payments will need to go to Rohleder, Inc. (Scott) which will collect the funds on behalf of [International Investments]."

Overt Act No. 12: On May 24, 2021, defendant BILZERIAN caused International Investments to make a $1.5 million loan to defendant IGNITE.

Overt Act No. 13: On October 14, 2021, defendant BILZERIAN caused International Investments to make a $1.886 million loan to defendant IGNITE.

Overt Act No. 14: On December 21, 2021, defendant IGNITE issued a press release misleadingly characterizing defendants BILZERIAN and ROHLEDER as having served as "unpaid consultants" for defendant IGNITE.

Overt Act No. 15: On a date before September 19, 2024, defendant BILZERIAN wrote in an email to a journalist that he had never owned shares in, or controlled, International Investments.

COUNT TWO

[18 U.S.C. § 371]

[ALL DEFENDANTS]

5. The Grand Jury realleges paragraph 1 of this Indictment here.

A. INTRODUCTORY ALLEGATIONS

6. At times relevant to this Indictment:

a. Beginning in or around October 2020, defendant IGNITE contracted with Company 1, a company located in Phoenix, Arizona, to serve as both a distributor and a third-party logistics company ("3PL") for defendant IGNITE's products, including vaping products, which largely were imported into the United States from foreign nations, including the People's Republic of China. In its role as 3PL, Company 1 would store defendant IGNITE's products in a designated 3PL section of Company 1's warehouse. When defendant IGNITE notified Company 1 of a purchase order placed by a customer, Company 1 would package and ship defendant IGNITE's products to the customer. By contrast, when Company 1 purchased defendant IGNITE products in its role as a distributor, Company 1 would submit a purchase order to defendant IGNITE and would move the purchased products from defendant IGNITE's 3PL section of the warehouse over to Company 1's designated section.

b. In or around November 2020, defendant IGNITE began ordering large shipments of vape products from China and storing them in its designated 3PL section of Company 1's warehouse. On or about December 15, 2020, Company 1 clarified to defendant IGNITE that Company 1 was storing the inventory in defendant IGNITE's 3PL section, not purchasing it. Defendant IGNITE's then-President

confirmed his understanding that Company 1 had not purchased this inventory.

c. On or about January 16, 2021, in response to an email from defendant BILZERIAN on behalf of defendant IGNITE, Company 1's principal reiterated to defendants BILZERIAN and IGNITE that Company 1 had not purchased the large quantity of vape product inventory being stored at Company 1's warehouse and that the inventory still belonged to defendant IGNITE.

B. <u>OBJECTS OF THE CONSPIRACY</u>

7. Beginning no later than in or about October 2020, and continuing through September 26, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendants BILZERIAN, ROHLEDER, and IGNITE conspired with one another and with others known and unknown to the Grand Jury to commit the following offenses:

a. Wire Fraud, in violation of Title 18, United States Code, Section 1343; and

b. Fraud in Connection with the Purchase and Sale of Securities, in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

C. <u>MANNER AND MEANS OF THE CONSPIRACY</u>

8. The objects of the conspiracy were carried out, and were to be carried out, in substance, as follows:

a. To create the false impression among investors that its sales were both sizeable and growing, thereby increasing the value of its shares, defendant IGNITE would issue press releases that

inflated sales figures in 2020 by including unsold inventory stored by Company 1 in its capacity as defendant IGNITE's 3PL.

b. When Company 1 refused to certify to defendant IGNITE's auditor that it had purchased the unsold inventory, defendant BILZERIAN, through foreign wire communications, would cause defendant IGNITE to sell approximately $4.63 million in vape product inventory to International Investments in exchange for extinguishing an equal amount of defendant IGNITE's debt that International Investments held in various convertible notes.

c. Notwithstanding the sale of the vape product inventory to International Investments, at defendant BILZERIAN's direction, defendant IGNITE would continue to track the inventory and produce invoices for subsequent sales of the vape products -- behavior inconsistent with a bona fide sale to International Investments -- with all invoices and payments going through defendant ROHLEDER and Rohleder, Inc.

d. Knowing that neither Company 1 nor International Investments had purchased the vape product inventory in December 2020, defendant ROHLEDER would falsely inform defendant IGNITE's auditor that the sale occurred in December 2020 and that International Investments stepped into the shoes of Company 1 as purchaser.

e. Defendants BILZERIAN, ROHLEDER, and IGNITE would mislead investors into believing the sale to International Investments was a profitable, arms-length transaction, by:

i. continuing to falsely backdate the sale of vape products to 2020 in public statements;

ii. concealing the fact that International Investments was a shell company controlled by defendant BILZERIAN, and that defendant BILZERIAN also controlled defendant IGNITE; and

iii. failing to disclose that International Investments was not a distributor or vendor or vape products and therefore could only sell the inventory in competition with defendant IGNITE, thereby undermining the latter's future sales.

9. On January 19, 2021, after issuing its false and misleading press release, defendant IGNITE's share price increased from approximately $0.42 to $1.20 per share, representing a gain of approximately $84 million in market capitalization.

D. OVERT ACTS

10. On or about the following dates, in furtherance of the conspiracy and to accomplish its objects, defendants BILZERIAN, ROHLEDER, and IGNITE, and others known and unknown to the Grand Jury, committed the following overt acts, among others, in the Central District of California and elsewhere:

Overt Act No. 1: On January 19, 2021, defendant IGNITE issued a press release stating, "Revenue grew steadily throughout the fourth quarter beginning with a $1.2 million in October and increasing to $3.7 million in November, followed by revenue of $5.2 million in December."

Overt Act No. 2: On January 28, 2021, defendant BILZERIAN stated on a phone call with Company 1 personnel and others that, if Company 1 refused to take financial responsibility for defendant IGNITE's vape product inventory, then defendant BILZERIAN would pay for the vape product inventory out of his own pocket.

Overt Act No. 3: On February 6, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN directed defendant IGNITE's CFO to account for the $4.63 million accounts receivable owed by International Investments for defendant IGNITE's vape product inventory by offsetting a $5 million note obligation that defendant IGNITE owed to International Investments.

Overt Act No. 4: On March 7, 2021, in an email to defendant IGNITE's CFO, President, and defendant ROHLEDER, defendant BILZERIAN instructed defendant IGNITE's CFO that "[a]ll invoices and payments will need to go to Rohleder, Inc. (Scott) which will collect the funds on behalf of [International Investments]."

Overt Act No. 5: On April 6, 2021, in an email to members of defendant IGNITE's auditor, defendant ROHLEDER claimed, as CFO for International Investments, that latter had "stepped into the shoes of [Company 1]" with respect to the purchase of vape products from defendant IGNITE.

Overt Act No. 6: On April 30, 2021, defendant IGNITE publicly released consolidated financial statements for 2019 and 2020, listing total sales of approximately $16,944,159 in 2020 and claiming that International Investments "made purchases of product from Ignite of $5,878,244 in 2020."

COUNTS THREE THROUGH SIX

[18 U.S.C. § 1343]

[ALL DEFENDANTS]

11. The Grand Jury realleges paragraphs 1, 6, 8, 9 and 10 of this Indictment here.

A. THE SCHEME TO DEFRAUD

12. Beginning no later than in or about October 2020, and continuing through September 26, 2024, in Los Angeles County, within the Central District of California, and elsewhere, defendants BILZERIAN, ROHLEDER, and IGNITE, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud victim-investors as to material matters, and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises.

13. The scheme to defraud operated, in substance, as described in paragraphs 6, 8, 9, and 10 of this Indictment.

B. USE OF INTERSTATE AND FOREIGN WIRES

14. On or about the dates set forth below, within the Central District of California, and elsewhere, for the purpose of executing the scheme to defraud described above, defendants BILZERIAN, ROHLEDER, and IGNITE transmitted and caused the transmission of the following items by means of wire communication in interstate and foreign commerce:

| COUNT | DEFENDANTS | DATE | INTERSTATE OR FOREIGN WIRE TRANSMISSION |
|---|---|---|---|
| THREE | BILZERIAN, IGNITE | 01/19/2021 | Press Release published on Canada's System for Electronic Document Analysis and Retrieval ("SEDAR") from defendant IGNITE falsely representing that "Revenue grew steadily throughout the fourth quarter beginning with a $1.2 million in October and increasing to $3.7 million in November, followed by revenue of $5.2 million in December." |
| FOUR | BILZERIAN, ROHLEDER, IGNITE | 02/06/2021 | Email from defendant BILZERIAN to defendant IGNITE's CFO, President, and defendant ROHLEDER, with subject line "Company 1 Reconciliation," directing CFO to account for International Investments' purchase of vape inventory by offsetting debt that defendant IGNITE owed to International Investments. |
| FIVE | BILZERIAN, ROHLEDER, IGNITE | 03/07/2021 | Email from defendant BILZERIAN to defendant IGNITE's CFO, President, and defendant ROHLEDER, with subject line "Aspire/II Sales," directing that "All invoices and payments will need to go to Rohleder, Inc. (Scott) which will collect the funds on behalf of II." |
| SIX | BILZERIAN, ROHLEDER, IGNITE | 04/30/2021 | Press Release published on SEDAR from defendant IGNITE falsely representing that "International Investments had principal and interest due to it of $10,719,785 as of December 31, 2020 and made purchases of product from Ignite of $5,878,244 in 2020." |

COUNTS SEVEN THROUGH NINE

[26 U.S.C. § 7206(2)]

[DEFENDANT ROHLEDER]

15. The Grand Jury realleges paragraph 1 of this Indictment here.

16. In or around May 2018, D.B. decided to purchase the Patrick Lane Mansion. Ignite US paid approximately $8.5 million in cash for the property and, during escrow, assigned the property to a single-member LLC owned by D.B. ("LLC 1").

17. In or around November 2018, with the initial public offering of defendant IGNITE looming, defendant ROHLEDER drafted two agreements, both backdated to June 2018, concerning the Patrick Lane Mansion. One was a promissory note stating that Ignite US loaned LLC 1 approximately $8.5 million with an interest rate of 5 percent. The second was a lease agreement to give the appearance that LLC 1 leased the Patrick Lane Mansion to Ignite US for a monthly rent of approximately $35,000. As defendant ROHLEDER intended, these two agreements effectively cancelled each other out, as 5 percent interest on a $8.5 million loan amounts to roughly $35,000 per month. By making it appear that D.B. was renting the Patrick Lane Mansion back to Ignite US, defendant ROHLEDER obviated the need for D.B. to make monthly payments to repay Ignite US.

18. Defendant ROHLEDER assisted D.B. in the preparation of his personal tax returns for tax years 2018, 2019, and 2020. Despite knowing that the Patrick Lane Mansion was D.B.'s primary residence during this period, defendant ROHLEDER knowingly provided D.B.'s tax preparer with financial statements for LLC 1 for tax years 2018, 2019, and 2020, that reported rental income and interest expenses in

connection with the Patrick Lane Mansion. As a result, the Schedules E attached to D.B.'s Forms 1040 reported rental income, interest expenses, and/or depreciation for the Patrick Lane Mansion, resulting in improper deductions in D.B.'s tax returns. For D.B.'s home address, defendant ROHLEDER provided D.B.'s tax preparer with an address that corresponded to a hangar at Harry Reid International Airport in Las Vegas, Nevada.

19. To repay the promissory note between LLC 1 and Ignite US, defendant ROHLEDER drafted a Share Purchase Agreement dated November 20, 2018 between D.B. and Ignite US, whereby D.B. sold 2.5 million of his Ignite US shares back to Ignite US at the price of $4.00 per share for a total of $10 million. Under the agreement, approximately $8.7 million of the sale proceeds were used to pay off the promissory note to LLC 1 and its interest. Because D.B. first acquired the Ignite US shares no earlier than December 28, 2017, the stock sale constituted a short-term capital gain that was supposed to be taxed as ordinary income. Upon realizing this, and despite knowing that the stock sale occurred in November 2018, defendant ROHLEDER knowingly and falsely informed D.B.'s tax preparer that the stock sale occurred on December 30, 2018 so that it would appear to qualify as a "long-term" capital gain -- that is, capital held for more than one year -- which, for D.B., was taxable at a lower rate than ordinary income.

20. On or about the dates set forth below, in Los Angeles County, within the Central District of California, and elsewhere, defendant ROHLEDER willfully aided and assisted in, and procured, counseled, and advised, the preparation and presentation to the Internal Revenue Service, under, and in connection with a matter

arising under, the internal revenue laws, of the tax returns for taxpayer D.B. and other documents set forth below, which were fraudulent and false as to material matters, and thereby resulting in losses over the three years to the Internal Revenue Service of approximately $1,536,949:

| COUNT | CALENDAR YEAR | FILING DATE | TAX RETURNS CONTAINING MATERIALLY FALSE ITEMS |
|---|---|---|---|
| SEVEN | 2018 | 08/08/2019 | A 2018 United States Individual Income Tax Return, Form 1040, including (1) a fraudulent Schedule E form wherein the Patrick Lane Mansion is falsely alleged to be "rental real estate" and have been subject to 214 "fair rental days"; and (2) a fraudulent Form 8949 listing a false sale date of December 30, 2018, for shares of Vulcan Enterprises Ltd. |
| EIGHT | 2019 | 07/15/2020 | A 2019 United States Individual Income Tax Return, Form 1040, including a fraudulent Schedule E form wherein the Patrick Lane Mansion is falsely alleged to be "rental real estate" and have been subject to 365 "fair rental days" |
| NINE | 2020 | 10/15/2021 | A 2020 United States Individual Income Tax Return, Form 1040, including a fraudulent Schedule E form wherein the Patrick Lane Mansion is falsely alleged to be "rental real estate" and have been subject to 366 "fair rental days" |

FORFEITURE ALLEGATION

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

21. Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of any of the offenses set forth in Counts One through Six of this Indictment.

22. Any defendant, if so convicted, shall forfeit to the United States of America the following:

a. All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to the offense; and

b. To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

23. Pursuant to Title 18, United States Code, Section 981(a)(1)(c), as incorporated by Title 28, United States Code, Section 2461(c), any defendant, if so convicted, shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as the result of any act or omission of that defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has

been commingled with other property that cannot be divided without difficulty.

A TRUE BILL

/S/
Foreperson

E. MARTIN ESTRADA
United States Attorney

MACK E. JENKINS
Assistant United States Attorney
Chief, Criminal Division

BRETT A. SAGEL
Assistant United States Attorney
Chief, Corporate and Securities Fraud Strike Force

ALEXANDER B. SCHWAB
Assistant United States Attorney
Deputy Chief, Corporate and Securities Fraud Strike Force

DAVID H. CHAO
Assistant United States Attorney
Deputy Chief, General Crimes Section

PRESS RELEASE

# Convicted Corporate Raider, His Longtime Accountant, and Vaping Company Charged in Indictment Alleging Conspiracy and Fraud

Friday, September 27, 2024

**For Immediate Release**

U.S. Attorney's Office, Central District of California

*LOS ANGELES* – A corporate takeover specialist and convicted felon has been indicted on federal charges for his alleged years-long avoidance of a judgment – now exceeding $180 million – to the U.S. Securities and Exchange Commission (SEC) while running a cannabis and lifestyle brand company purportedly helmed by his social media influencer son – a company whose investors he allegedly cheated, the Justice Department announced today.

The nine-count indictment returned on Thursday charges the following defendants with one count of conspiracy to defraud the United States, one count of conspiracy to commit wire fraud and securities fraud, and four counts of wire fraud:

- Paul A. Bilzerian, 74, a resident of St. Kitts and Nevis and a former U.S. citizen who was convicted in 1989 in the Southern District of New York of securities fraud and was sentenced to four years in federal prison for that crime; and
- Ignite International Brands Ltd., a formerly publicly traded, Canada-based cannabis company that previously operated out of Los Angeles and whose CEO was Bilzerian's son, a social media influencer identified in the indictment as "D.B."

A third defendant charged – and arrested today – is:

- Scott Rohleder, 61, of Morrisville, North Carolina, Bilzerian's long-time accountant who held various roles at Ignite, including chief financial officer, is charged with one count of conspiracy to defraud the United States, one count of conspiracy to commit wire fraud and securities fraud, three counts of wire fraud, and three counts of assisting with the preparation of false tax returns.

"This indictment alleges a long-running pattern of criminal behavior to avoid a regulator's judgment, mislead investors, and cheat the IRS," said United States Attorney Martin Estrada. "My office will continue to use all tools available to protect investors and ensure the security of our nation's economy."

According to the indictment, the SEC in 1989 brought a civil action against Bilzerian based on the same securities violations that led to his criminal conviction in the Southern District of New York, for which defendant was sentenced to four years in prison. In 1993, the SEC obtained civil judgments totaling approximately $62,337,600 against Bilzerian. Since then, Bilzerian has evaded enforcement of the judgments. In 2000, a federal court found Bilzerian in contempt of the SEC judgments and appointed a receiver to collect his assets to satisfy them. The SEC has only recovered approximately $547,000 toward satisfaction of the judgments, which now – with interest – exceed $180 million.

From December 2018 to September 2024, Bilzerian, Rohleder, and Ignite allegedly conspired to impede the SEC from collecting on the judgments. To do so, Bilzerian operated numerous shell companies, including International Investments Ltd., in the United States while concealing his interest in and control over those companies by using various nominee owners. To continue to deploy his wealth in the United States while evading the SEC judgments, Bilzerian – with Rohleder's help – funneled millions of dollars of his assets through his shell companies to fund Ignite while concealing his role in the company's ownership and management. Meanwhile, to avoid paying the SEC judgments, Bilzerian falsely represented that he was indigent, including by providing false financial disclosures that omitted his considerable assets.

On paper, Ignite's CEO was Bilzerian's son D.B. – a professional poker player who gained notoriety on social media for his glamorous and ostentatious lifestyle. In fact, Bilzerian exercised de facto control of the company. Together with Rohleder, Bilzerian oversaw Ignite's operations, strategy, marketing, and fundraising, to the point of holding daily management meetings. Bilzerian also exerted significant influence in decisions to hire and fire Ignite's executives and members of its board of directors.

Despite Bilzerian's prominent leadership role at Ignite, the defendants concealed his involvement, including by omitting his name in publicly filed disclosures. After learning that federal law enforcement had become aware of Bilzerian's involvement in Ignite, the company

also issued a press release that misleadingly characterized Bilzerian and Rohleder as "unpaid consultants" for Ignite.

The defendants also allegedly misled Ignite's investors by making materially false statements about the company's revenues for the fourth quarter of 2020, inflating sales figures by including unsold inventory stored by a different business. In January 2021, after Ignite issued a false and misleading press release about its sales, its share price increased from 42 cents to $1.20 per share, representing a gain of approximately $84 million in market capitalization.

Months later, when Ignite's auditor could not verify the sale of the unsold inventory, Bilzerian caused Ignite to "sell" approximately $4.63 million in vape products to a shell company he controlled. Bilzerian and Rohleder backdated the sale to make it falsely appear that it occurred in 2020. In later reporting the "sale" to Ignite's investors, the defendants concealed Bilzerian's ownership of the shell company and the fact that the shell company was not a vape product distributor, meaning it could only sell the inventory by competing with Ignite.

Finally, Rohleder allegedly assisted in the preparation of D.B.'s tax returns, which included false and fraudulent representations that caused a tax loss of approximately $1,536,949 to the IRS for the tax years 2018 to 2020. Rohleder did so by falsely characterizing D.B.'s Las Vegas mansion, which he purchased in 2018 for $8.5 million, as a rental property. When listing D.B.'s personal address on the tax returns, Rohleder used an address corresponding to a hangar at Harry Reid International Airport. Rohleder also lied to D.B.'s tax preparer by stating that D.B.'s November 2018 sale of Ignite stock was a "long-term" capital gain (to be taxed at a lower rate) instead of being a "short-term" capital gain, which would have resulted in a higher tax bill.

"This indictment sends a strong message that no matter how criminals try to hide, the FBI will aggressively investigate those who commit such financial fraud and shirk their obligation to make American taxpayers whole" said Akil Davis, Assistant Director in Charge of the FBI Los Angeles Field Office. "These individuals will now face justice for fraudulently profiting from this elaborate scheme and hopefully the public's trust in a fair market will be restored."

"The allegations against Mr. Bilzerian and his co-defendants paint a picture of a long-running, complex scheme to avoid their financial obligations," said Special Agent in Charge Tyler Hatcher, IRS Criminal Investigation, Los Angeles Field Office. "Playing a shell game with money may work in the short term, but IRS Criminal Investigation is the best in the business at finding and following the trail that money always leaves and, especially when our skillsets are paired with those of our fellow law enforcement agencies, there is little chance of evading indictments such as this one."

*An indictment contains allegations that a defendant has committed a crime. Every defendant is presumed to be innocent until and unless proven guilty in court.*

If convicted of all charges, Bilzerian and Rohleder would face a statutory maximum sentence of five years in federal prison for each conspiracy count and up to 20 years in federal prison for each wire fraud count. Rohleder would face up to three years in federal prison for each tax fraud count.

The SEC today filed civil charges against Bilzerian, Rohleder, and Ignite in connection with the facts alleged in this criminal case.

The FBI and IRS Criminal Investigation are investigating this matter.

Assistant United States Attorneys Alexander B. Schwab of the Corporate and Securities Fraud Strike Force and David H. Chao of the General Crimes Section are prosecuting this case.

**Contact**

Ciaran McEvoy
Public Information Officer
ciaran.mcevoy@usdoj.gov
(213) 894-4465

*Updated September 27, 2024*

**Topics**

FINANCIAL FRAUD | SECURITIES, COMMODITIES, & INVESTMENT FRAUD | TAX

**Component**

USAO - California, Central

Press Release Number: 24-242

## Related Content

PRESS RELEASE



## LA Woman Sentenced to 5 Years in Prison for $2.3 Million COVID Loan Scheme and Falsely Seeking Nearly $1.3 Million in Pandemic Tax Credits

A woman from the Mid-City area of Los Angeles was sentenced to 60 months in federal prison for fraudulently obtaining more than $2 million in COVID-19 government loans and to...

February 28, 2025

PRESS RELEASE

## Two Southern California Men Arrested on Indictment Alleging Scheme Targeting Elderly Victims and Causing $10 Million in Losses

Two men living in Southern California were arrested today for allegedly leading a complex money laundering scheme that targeted more than 100 victims, many of whom were targeted because they...

February 27, 2025

PRESS RELEASE

## Corona Man Who Sold Stan Lee Memorabilia Agrees to Plead Guilty to Tax Fraud of More Than $1.2 Million in Income

A Riverside County man has agreed to plead guilty to filing false income tax returns after selling Stan Lee-signed memorabilia and receiving more than $1.2 million in proceeds which he...

February 27, 2025

**Central District of California**
312 N. Spring St. Suite 1200
Los Angeles, CA 90012

Phone: (213) 894-2400
Fax: (213) 894-0141

This is Exhibit "....B......." referred to in the affidavit
of .Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025..............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01

U.S. Securities and
Exchange Commission



# Ignite International Brands, Ltd. et al.

## U.S. SECURITIES AND EXCHANGE COMMISSION Litigation Release No. 26138 / September 27, 2024

### *Securities and Exchange Commission v. Ignite International Brands, Ltd. et al.*, No. 1:24-cv-07331 (S.D.N.Y. filed September 27, 2024)

### SEC Charges Canadian Company, Recidivist Paul Bilzerian, and Others with Scheme to Falsely Inflate Revenues

On September 27, 2024, the Securities and Exchange Commission charged Canadian consumer goods company Ignite International Brands, Ltd., recidivist Paul Bilzerian, and six other defendants for improperly recognizing and reporting revenue in 2020.

The SEC's complaint alleges that from late 2020 to 2021, Ignite engaged in a scheme, orchestrated primarily by Bilzerian, who controls Ignite's finances and operations, to report approximately $5 million in non-existent sales of disposable vape pens as part of the company's fourth quarter 2020 results. According to the complaint, Ignite issued a series of false invoices to one of its customers for the vape pens in November and December 2020, despite the fact that the customer had never ordered the product. In fact, the SEC claims, the customer repeatedly disputed the invoices after receiving them, including voicing its objections directly to Bilzerian and to Ignite's then-President and COO, John Schaefer. Nevertheless, Ignite allegedly went on to tout its historic 2020 performance in a January 2021 press release, which noted that the company's fourth quarter revenue

"exceeded revenue for the previous three quarters combined." The SEC further alleges that, once the customer refused to confirm the accuracy of the false invoices to Ignite's auditor, Ignite retroactively shifted supposed responsibility for the purchases to International Investments, Ltd., another entity also controlled by Bilzerian. The complaint further alleges that despite the purported sale to International Investments, Schaefer continued to track the inventory and issue invoices nominally on behalf of International Investments, as the product was subsequently sold to ultimate customers. The complaint claims that Ignite, Bilzerian, Ignite's then-CFO Paul Dowdall, and Bilzerian's deputy Scott Rohleder concocted and relayed a false story about International Investments' purchase of the vape pens to Ignite's auditor, Accell Audit & Compliance, PA, and its engagement partner, Christopher Hiestand. According to the complaint, in April 2021, Ignite publicly released its 2020 audited financial statements, including the false sales figures. The SEC further alleges that despite numerous red flags concerning the sale to International Investments, and despite knowing or being reckless in not knowing that International Investments had not agreed to the supposed purchase until 2021, Accell and Hiestand issued a report opining that the 2020 audited financial statements fairly presented Ignite's financial position as of year end.

The complaint, filed in the U.S. District Court for the Southern District of New York, charges Ignite, Bilzerian, Dowdall, Rohleder, Schaefer, International Investments, Accell, and Hiestand with violating the antifraud provisions of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 thereunder. The complaint seeks permanent injunctive relief and civil penalties, as well as officer and director bars against Bilzerian, Dowdall, Rohleder, and Schafer.

In a parallel action, the Fraud Section of the Department of Justice and the U.S. Attorney's Office for the Central District of California today announced charges against Ignite, Bilzerian, and Rohleder.

The SEC's investigation was conducted by Patricia Pei and Deborah Russell, with assistance from Robert Nesbitt, and was supervised by Spencer E. Bendell and Rhoda Chang. The litigation will be led by Charles Canter and supervised by Douglas Miller.

## RESOURCES

- SEC Complaint

This is Exhibit "....C......." referred to in the affidavit
of .Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025..............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

# 1

## TRADEMARK AND COPYRIGHT LICENSE AGREEMENT

This TRADEMARK AND COPYRIGHT LICENSE AGREEMENT (this "**Agreement**") is entered into by and between BLITZ NV, LLC, a Nevada limited liability company ("**Licensor**"), and Vulcan Enterprises US, LTD, a Wyoming Corporation ("**Licensee**"), each a "**Party**" and collectively, the "**Parties**", and effective as of the 28th day of September, 2018 ("**Effective Date**").

### WHEREAS

A. Licensor has the right to license the use of certain trademarks and service marks, as set forth in Schedule "A" (the "**Marks**"), and certain copyrights in certain works of authorship, as set forth in Schedule "B" (the "**Works**");

B. Licensee and Licensor are commonly controlled entities; and

C. Licensee and Licensor both desire that Licensee be permitted to use the Marks and the Works in connection with Licensee's business, but only in manners that are mutually agreed to by the Parties.

**NOW THEREFORE,** in consideration of the foregoing recitals and the mutual consideration and promises contained in this Agreement, the receipt and sufficiency of which is hereby acknowledged by all Parties, the Parties hereby agree as follows:

### 1. GRANT OF LICENSE

1.1 **Trademark License**. Licensor hereby grants to Licensee a non-exclusive, worldwide, right and license to use the Marks, in connection with the development, manufacture, packaging and sale of products derived from, or containing, cannabis, cannabinoids, or CBD oil (collectively "**Products**") for the purpose of marketing, promoting, selling, and distributing such CBD Products, provided that the Products and all associated promotion and advertising comply with all applicable laws and regulations relating to such Products in each jurisdiction in which they are advertised, manufactured, shipped, offered for sale, or sold.

1.2 **Copyright License**. Licensor hereby grants to Licensee a non-exclusive, worldwide, right and license to copy, perform, publish, distribute and create derivative works based on the Works, solely on Products and on packaging, signage, advertising, marketing and promotional materials related to the Products.

1.3 **Approvals.** Licensor will approve Products and related materials in connection with which the Marks are used, and Licensee agrees not to use the Marks on any goods or services not pre-approved by Licensor. Licensor will also approve packaging, advertising, signage, marketing materials and other materials on which the Works are used, and Licensee agrees not to use the Works on materials not pre-approved by Licensor. Licensee will submit Products and materials bearing the Works for approval and Licensor will promptly approve or dis-approve such items. In the event no dis-approval is received within seven (7) days, the items will be deemed approved.

1.4 **Sublicensing**. Licensee may sublicense any of its rights under this Agreement with Licensor's prior written consent provided that Licensee is responsible for ensuring that all uses of the Marks and Works by all sublicensees are limited to those uses permitted under this Agreement.

1.5 **Retained Rights**. All rights in the Marks and Works that are not expressly granted herein are reserved to, and retained by, Licensor. Licensee agrees to make no use of the Marks or the Works other than as expressly permitted in this Agreement.

1.6 **Future Marks, Works, and Uses**. Licensor and Licensee may amend Exhibit A and Exhibit B at any time to include additional trademarks, service marks and works of authorship, such amendments serving to extend the licenses and rights granted herein to Licensee to such additional trademarks, service marks and works of authorship as of the date of the amendment, or retroactively if so agreed by the Parties and noted on the amended Exhibits.

1.7 **Territorial Restrictions**. To the extent Licensor determines, in its reasonable discretion, that additional license agreements or restrictions are necessary in a given jurisdiction, Licensor and Licensee may enter into a separate territory-specific license agreement in such jurisdiction. To the extent any separate license is executed and/or recorded in connection with the Marks or Works, such separate license shall be deemed to be a memorialization of the rights and obligations described herein and, to the extent any such separate license or other document is inconsistent with this Agreement, the separate license or other document and this Agreement shall be interpreted together such that the maximum possible rights and goodwill in the Marks and Works are preserved for the benefit of Licensor, while granting Licensee the full scope of rights to use the Marks and Works as set forth in this Agreement that are permissible in the applicable jurisdiction or field of use.

## 2. QUALITY CONTROL

2.1 Upon request, after approval, Licensee will provide Licensor with a reasonable number of current samples of any approved Products (where legal) and materials displaying the Works for the purpose of on-going review and quality monitoring by Licensor. In the event Licensor reasonably determines that the quality of the samples is not consistent with the quality of the approved Products or materials, Licensor will notify Licensee in a writing describing the alleged inconsistency in reasonable detail. The Parties will then negotiate in good faith for no less than thirty (30) days in an effort to resolve the allegation. If the Parties are unable to resolve the allegation, then Licensee shall cease production or use of the Products and/or materials at issue within ninety (90) days. In the event Licensee (or its sublicensees) have remaining inventory of the CBD Products and/or materials at issue, Licensee (or its sublicensees) shall have no less than one hundred eighty (180) days after the expiration of the ninety (90) day period to sell or dispose of such remaining inventory irrespective of any inconsistency or allegation.

3. **USE OF TRADEMARKS AND WORKS**

3.1 Licensee will use the Marks and Works in compliance with any guidelines for use provided by Licensor, provided that (i) once approval has been obtained, Licensee will not be required to alter any Products or materials in inventory or in the process of being produced or packaged as a result of any request by Licensor to alter such guidelines, and (ii) Licensor agrees to act reasonably and request alterations in such guidelines after initial approval only when reasonably required for a legitimate business purpose.

3.2 Any use of the Marks or Works by Licensee shall be accompanied by a notice that the use is a licensed use by Licensee and that Licensor is the owner of the Marks and Works.

4. **OWNERSHIP**

4.1 Licensee recognizes Licensor's right, ownership and title to the Marks and Works. All goodwill associated with the Marks and Works shall, at all times, inure to the benefit of Licensor and Licensee shall gain no rights in the Marks or Works by virtue of use or otherwise other than as expressly granted in this Agreement.

4.2 Licensee will cooperate with Licensor, at Licensor's expense and option, for the purposes of registering or otherwise protecting the Marks and the Works in registries designated by Licensor and protecting, preserving and enhancing Licensor's interest in the Marks and Works.

5. **TERM**

5.1 This Agreement and all licenses granted hereunder will commence on the Effective Date, continue in full force and effect for an initial term of fifteen (15) years ("**Initial Term**") and will automatically renew for recurring one year terms thereafter (each a "**Renewal Term**") unless one Party gives the other Party written notice of its intent not to renew and does so at least sixty (60) days prior to the expiration of the then-current Initial Term or Renewal Term. The "**Term**" shall commence on the Effective Date and end on the later of the end of the Initial Term and the end of the last Renewal Term (if any).

5.2 In addition to termination by notice of non-renewal as set forth above, this Agreement and the licenses granted hereunder may be terminated as follows:

(a) immediately by either Party giving the other Party written notice of termination in the event the other Party becomes insolvent, commits an act of bankruptcy, or makes an assignment for the benefit of creditors, or if a receiver or receiver-manager is appointed for Licensee or for any of its assets, or if any proceeding in bankruptcy, receivership, winding up, or liquidation is initiated in respect of such Party, or if such Party ceases to carry on business; or

(b) by either Party by giving the other Party written notice of termination in the event of the breach of any term or condition of this Agreement, which breach is not cured within 30 days after receiving written notice of such breach.

## 6. INDEMNIFICATION

**6.1 Indemnification.**

(a) Each Party agrees to indemnify the other Party and undertakes to defend the other Party against and hold such Party harmless from any third party claims, suits, costs and expenses (including reasonable legal fees and expenses), liability, loss or damage arising out of a breach of this Agreement.

(b) Licensor further agrees to indemnify Licensee and undertakes to defend Licensee against and hold Licensee harmless from any third party claims, suits, costs and expenses (including reasonable legal fees and expenses), liability, loss or damage claiming or alleging that use of the Marks and Works by Licensee (or its sublicensees) as permitted hereunder infringes, misappropriates, or violates the rights of any third party.

(c) Licensee further agrees to indemnify Licensor and undertakes to defend Licensor against and hold Licensor harmless from any fine or penalty, or any third party claims, suits, costs and expenses (including reasonable legal fees and expenses), liability, loss or damage arising from Licensee's (or its sublicensees') use of the Marks or Works that is not otherwise covered by Sections 6.1(a) or 6.1(b) above.

6.2 **Limitation of Liability.** Except to the extent of indemnification obligations otherwise provided in this Section 6, in no event shall either Party be liable to the other, regardless of the form of action or theory of recovery, for any indirect, special, exemplary, consequential, incidental, or punitive damages, or for lost profits or business interruption losses arising from or in connection with this Agreement.

## 7. EFFECT OF TERMINATION

7.1 Upon expiration or termination of this Agreement for any reason:

(a) Licensee shall immediately cease all manufacturing of the Products and any related displays, packaging or materials, and shall provide an accurate inventory of all remaining Products and associated marketing materials to Licensor;

(b) Licensee shall, subject to Section 7.1(a) have a period of six months (6 months) (the "**Sell-off Period**") to dispose of then-existing approve Products and materials displaying or using the Works that are in Licensee's (or its sublicensees') possession or control as of the effective date of termination; and

(c) Upon conclusion of the Sell-Off Period: (i) Licensee will immediately discontinue use of the Marks and Works; and (ii) without limiting any other provision of this Agreement, all rights in the Marks and Works will remain the property of Licensor.

7.3 All provisions of this Agreement that, by their nature, should survive termination or expiration, shall survive termination or expiration of this Agreement.

8. **INFRINGEMENT.** Licensee agrees that Licensee will promptly call to the attention of Licensor the use of any marks or works by any third party which Licensee considers might be an infringement or passing off. Licensor shall have the sole right to decide whether or not any action shall be brought against such third parties. In the event that Licensor decides action should be taken against such third parties Licensor may take such action in its own name and Licensee agrees to cooperate fully with Licensor to whatever extent it is necessary to prosecute such action, all expenses being borne by Licensor and all damages which may be recovered being solely for the account of Licensor.

9. **ROYALTY AND PAYMENT.** Licensee shall pay to Licensor the fixed amount of fifty thousand dollars ($50,000.00) within seven (7) days of the execution of this Agreement by all parties as full payment in advance for the rights and licenses granted herein during the first twelve (12) months of the Term. Thereafter, on each anniversary of the Effective Date (beginning on September 28, 2019 and each September 28th thereafter during the Term), Licensee shall pay an up-front, annual, fixed license fee of fifty thousand dollars ($50,000.00) as payment in advance for following twelve (12) months of the Term. For the avoidance of doubt, it is understood that once a Party provides notice of non-renewal as set forth in Section 5.1 above, no additional payments will be required after the date of such notice. In the event of any delay or failure of payment under this Agreement, Licensor shall give written notice to Licensee, and Licensee shall have seven (7) days after receipt of such notice to cure such payment delay. If payment is not made within the cure period, the Term (and all licenses and rights granted herein) shall terminate automatically thirty (30) days after the receipt of such notice, subject to the provisions of Section 7 above.

10. **GENERAL**

10.1 Amendments. No Party will claim any amendment, modification, or release from any provision hereof by mutual agreement, acknowledgement or acceptance, unless in writing signed by an authorized representative from each Party.

10.2 Assignment. Neither Party may assign this Agreement or any license granted hereunder without the prior, written consent of the other Party. Any assignment made absent both Parties prior written consent shall be null and void.

10.3 Entire Agreement. This Agreement, including the Exhibits, constitutes the entire agreement between the Parties in respect of the subject matter hereof and supersedes all previous representations, warranties, dealings, agreements, undertakings and expectations of the Parties whether provided verbally, in writing or in any other manner.

10.4 Waiver. No waiver of any provision of this Agreement is binding unless it is in writing and signed by the Party entitled to grant the waiver. No failure to exercise, and no delay in exercising, any right or remedy under this Agreement will be deemed to be a waiver of that right or remedy. No waiver of any default, breach or non-compliance of any provision of this Agreement will be deemed to be a waiver of any continuing or subsequent breach of that provision, whether of the same or any other nature

10.5 Governing Law. This Agreement, each transaction entered into under this Agreement, and all matters arising out of or related to this Agreement shall be governed in all respects by the laws of the State of Nevada, without giving effect to its rules relating to conflict of laws.

10.6 Severability. If any provision of this Agreement is held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired.

10.7 Notices. Any notice or other written communication required by this Agreement will be deemed given the next business day when delivered by email to the following addresses:

(a) Licensor:
  (i) Attention: Michael Feder
  (ii) Email: Michael@DanBilzerian.com

(b) Licensee:
  (i) Attention: Todd Thompson
  (ii) Email: Todd@ignite.co

10.8 Counterparts. This Agreement may be executed in two or more counterparts each of which will be deemed an original, all of which together constitute one and the same instrument.

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized representatives to execute this Agreement as of the Effective Date.

| LICENSOR | LICENSEE |
|---|---|
| Blitz NV | VULCAN ENTERPRISES US, LTD |
| By: DocuSigned by: Michael Feder | By: DocuSigned by: [signature] |
| Name: Michael Feder | Name: Todd Thompson |
| Title: President | Title: President |
| Date: 9/28/2018 4:21:56 PM PDT | Date: 9/28/2018 9:15:59 PM PDT |

**SCHEDULE "A"**

**MARKS**

SCHEDULE "B"

WORKS



This is Exhibit "....D........" referred to in the affidavit
of Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025..............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-0372-01
MY APPT. EXPIRES MARCH 23, 2026

# AMENDMENT TO TRADEMARK AND COPYRIGHT LICENSE AGREEMENT

This AMENDMENT TO THE TRADEMARK AND COPYRIGHT LICENSE AGREEMENT ("**Agreement**") entered into by and between BLITZ NV, LLC, a Nevada limited liability company ("**Licensor**"), and Vulcan Enterprises US, LTD (now doing business as Ignite International LTD), a Wyoming Corporation ("**Licensee**"), each a "**Party**" and collectively, the "**Parties**", effective as of the 28th day of September, 2018 ("**Effective Date**"), represents a change to the aforementioned Agreement, hereby amending section 1.1 to read:

1.1 **Trademark License**. Licensor hereby grants to Licensee a non-exclusive, worldwide, right and license to use the Marks, in connection with the development, manufacture, packaging and sale of products derived from, or containing, cannabis, cannabinoids, nicotine, or CBD oil (collectively "**Products**") for the purpose of marketing, promoting, selling, and distributing such CBD Products, provided that the Products and all associated promotion and advertising comply with all applicable laws and regulations relating to such Products in each jurisdiction in which they are advertised, manufactured, shipped, offered for sale, or sold.

The Parties further agree to amend the "Notices" Section 10.7(b) to read:

(b) Licensee:
- (i) Attention: James McCormick
- (ii) Email: Jim@ignite.co

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized representatives to execute this Agreement as of the Effective Date.

| **LICENSOR** | **LICENSEE** |
|---|---|
| **Blitz NV** | **IGNITE INTERNATIONAL LTD** |
| By: DocuSigned by: Michael Feder A9160F6681EB40F... | By: DocuSigned by: James McCormick 6B4061B0D4324E5... |
| Name: Michael Feder | Name: Jim McCormick |
| Title: President | Title: President |
| Date: 5/16/2019 | Date: 5/16/2019 |

## AMENDMENT TO TRADEMARK AND COPYRIGHT LICENSE AGREEMENT

This AMENDMENT TO THE TRADEMARK AND COPYRIGHT LICENSE AGREEMENT ("**Agreement**") entered into by and between BLITZ NV, LLC, a Nevada limited liability company ("**Licensor**"), and Vulcan Enterprises US, LTD (now doing business as Ignite International LTD), a Wyoming Corporation ("**Licensee**"), each a "**Party**" and collectively, the "**Parties**", effective as of the 28th day of September, 2018 ("**Effective Date**"), represents a change to the aforementioned Agreement.

1. **Amendments to Section 1**. Section 1 of the Agreement is hereby amended as follows:

(a) By replacing Section 1.1 of the Agreement with the following:

1.1 **Trademark License**. Licensor hereby grants to Licensee a non-exclusive right and license to use the Marks, in and only in the United States of America, in connection with the development, manufacture, packaging and sale of (a) products derived from, or containing, cannabis, cannabinoids, nicotine, or CBD oil, and (b) non-cannabis products (collectively "**Products**") for the purpose of marketing, promoting, selling, and distributing such Products, provided that the Products and all associated promotion and advertising comply with all applicable laws and regulations relating to such Products in each jurisdiction in which they are advertised, manufactured, shipped, offered for sale, or sold.

(b) By inserting after Section 1.1 the following new Section 1.1.1:

1.1.1 **Trademark License**. Licensor hereby grants to Licensee an exclusive right and license to use the Marks, worldwide except in the United States of America, in connection with the development, manufacture, packaging and sale of (a) products derived from, or containing, cannabis, cannabinoids, nicotine, or CBD oil, and (b) non-cannabis products (collectively "**Products**") for the purpose of marketing, promoting, selling, and distributing such Products, provided that the Products and all associated promotion and advertising comply with all applicable laws and regulations relating to such Products in each jurisdiction in which they are advertised, manufactured, shipped, offered for sale, or sold.

(c) By replacing Section 1.2 with the following:

1.2 **Copyright License**. Licensor hereby grants to Licensee a non-exclusive right and license to copy, perform, publish, distribute and create derivative works based on the Works, in and only in the United States of America, solely on Products and on packaging, signage, advertising, marketing and promotional materials related to the Products.

(d) By inserting after Section 1.2 the following new Section 1.2.1:

1.2.1 **Copyright License**. Licensor hereby grants to Licensee an exclusive right and license to copy, perform, publish, distribute and create derivative works based on the Works, worldwide except in the United States of America, solely on Products

and on packaging, signage, advertising, marketing and promotional materials related to the Products.

(e) By replacing Section 1.5 with the following:

1.5 **Retained Rights**. The rights and licenses granted under Section 1.2 and Section 1.2.1 extend only to use of the Works when displayed in conjunction with the word "Ignite", or as otherwise approved in writing by Licensor. Licensee agrees that any use of a trademark or work of authorship by Licensor or its licensees, when displayed in conjunction with text other than "Ignite" but not confusingly similar to "Ignite", does not infringe upon the rights or licenses provided herein by Licensor to Licensee to use the Marks and Works. All rights in the Marks and Works that are not expressly granted herein are reserved to, and retained by, Licensor. Licensee agrees to make no use of the Marks or Works, other than as expressly permitted in this Agreement or as otherwise approved in writing by Licensor.

(e) By replacing Section 1.6 with the following:

1.6 **Future Marks, Works, and Uses**. Licensor and Licensee may amend Schedule "A" and Schedule "B" at any time to include additional trademarks, service marks and works of authorship, such amendments serving to extend the licenses and rights granted herein to Licensee to such additional trademarks, service marks and works of authorship as of the date of the amendment, or retroactively if so agreed by the Parties in the agreement instituting the amendment.

2. **Amendments to Schedule "A"**. Schedule "A" of the Agreement is hereby amended by appending the following:

IGNITE

IGNITE
INTERNATIONAL, LTD.

*[Signature page to follow]*

IN WITNESS WHEREOF, the Parties hereto have caused their duly authorized representatives to execute this Agreement as of the Effective Date.

**LICENSOR**

**BLITZ NV**

By: DocuSigned by: Dan Bilzerian C81768E8D1DC46C...

Name: Dan Bilzerian

Title: Managing Member

Date:

**LICENSEE**

**IGNITE INTERNATIONAL, LTD.**

By: DocuSigned by: Jim McCormick 6B4061B0D4324E5...

Name: Jim McCormick

Title: President

Date:

This is Exhibit "....E........" referred to in the affidavit
of .Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025 ..............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada

# ASSIGNMENT AND LICENSE AGREEMENT

This Assignment and License Agreement (this "Agreement"), by and between Blitz NV, LLC ("Assignor"), and Ignite International, Ltd. ("Assignee") shall be effective as of July 1, 2022_ ("Effective Date").

## WITNESSETH:

**WHEREAS**, Assignor has certain rights in the trademark applications, trademark registrations, trademarks, and service marks identified on Exhibit A attached hereto (the "Marks");

**WHEREAS**, Assignor has certain rights in the works of authorship and copyright registration(s) identified on Exhibit B attached hereto (the "Works");

**WHEREAS**, Assignee and Assignor are parties to a separate written agreement that licenses use of the Marks and Works to Assignee entitled TRADEMARK AND COPYRIGHT LICENSE AGREEMENT, effective September 28, 2018, and then amended on May 16, 2019, and again on or about September 28, 2019 (as amended, the "Original License"); and

**WHEREAS**, Assignor and Assignee hereby wish to terminate the Original License by mutual consent as of the Effective Date, assign all rights in and to the Marks and the Works from Assignor to Assignee as set forth herein, and grant a license back from Assignee to Assignor according to the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants herein, and other good and valuable consideration, receipt, adequacy, and legal sufficiency of which are hereby acknowledged by Assignor and Assignee, and all parties intending to be legally bound hereby, Assignor and Assignee agree as follows:

## SECTION 1. TRADEMARK ASSIGNMENT

1.1 Assignor hereby irrevocably contributes, grants, sells, conveys, transfers, assigns, releases, and delivers to Assignee, and its successors and assigns, any and all right, title, and interest Assignor has or may have in or to the Marks, including without limitation all common law rights, rights acquired through use, license or assignment, state law rights, rights in foreign nations, all registrations and applications for registration thereof, in all states, nations, communities, and regions worldwide, and all goodwill associated therewith, together with all liabilities, duties and obligations relating to the Marks and the Registrations and Applications, all rights to file applications directed to and obtain and maintain registrations for the Marks worldwide, and all rights to bring actions and recover damages for any and all past, present and future infringements of the Marks in any and all jurisdictions throughout the world, including all rights as opponents in any opposition.

## SECTION 2. COPYRIGHT ASSIGNMENT

2.1 Assignor hereby irrevocably contributes, grants, sells, conveys, transfers, assigns, releases, and delivers to Assignee, and its successors, assigns, all right, title and interest Assignor has or may have in or to the Works in all forms and all media now existing or future-created. For avoidance of doubt, the foregoing assignment (i) is intended to include each identified work of authorship as it exists today, and any prior versions thereof or derivative works based thereon, that may exist now or in the future, and (ii) includes, without limitation, all copyright rights, performance rights, distribution rights and rights to seek damages for past, present and future infringements or performances thereof. Assignor consents to the filing of copyright registrations in the Works and any derivatives thereof in the name of Assignee and

agrees to cooperate with Assignee, without charge, in connection with any such filings.

2.2 Assignor, on behalf of itself, and to the extent legally permitted, on behalf of its officers, employees, contractors and representatives, hereby waives all moral rights, attribution rights, and related rights pertaining to the Works and applications for the registration thereof.

## SECTION 3. ONGOING DISPUTES AND FURTHER ASSURANCES

3.1 Assignor understands and agrees that certain Marks or Works identified as "Opposed" in the attached exhibits are, or may be, the subject of legal disputes in their respective jurisdictions ("Disputed Marks or Works"). For all Disputed Marks and Works, the assignment of right, title and interests herein shall be effective on the earlier of (i) the date Assignee notifies Assignor of its intent to have such assignment made effective, and (ii) the date on which the applicable dispute is fully and finally resolved or settled. For all other Marks and Works, the assignment of rights herein shall be effective as of the Effective Date.

3.2 Assignor agrees to cooperate with Assignee, upon Assignee's request, and for no additional consideration, to perfect, record, and otherwise document Assignee's rights in and to the Marks, Works and associated rights and goodwill, and all registrations and applications for registrations thereof throughout the world, including, without limitation, executing such separate assignments, certifications, and other documents as Assignee may reasonably deem necessary or desirable in maintaining such rights, filing, prosecuting or maintaining any registrations or applications, and recording and otherwise perfecting and enforcing Assignee's rights and title hereunder.

3.3 To the extent any separate assignments or similar documents are executed and/or recorded in connection with any registration or application, such separate assignment shall be deemed to be a memorialization of the transfer of rights, title, and interests described herein and, to the extent any such separate assignment or other document is inconsistent with this Assignment, the separate assignment or other document and this Assignment shall be interpreted together such that the maximum possible rights, title and interest are assigned and transferred to Assignee.

3.4 Assignor hereby authorizes Assignee, its successors and assigns, to take any appropriate action in connection with the Marks and the Works, and all related applications, registrations, goodwill, and rights assigned hereunder, in the name of the Assignor, but at Assignee's own expense. Any nation or state, or agency or representative thereof, or individual, partnership, corporation, or other entity, may rely without further inquiry upon the powers and rights granted to Assignee herein and upon any notarization, certification, verification, affidavit, or jurat by any notary public of any state relating to the authorization, execution, and delivery of this Assignment of the authenticity of any copy, conformed or otherwise, hereof.

3.5 Assignor shall, at the request and cost of Assignee, but at no charge, assist Assignee with any proceedings which may be brought by or against Assignee (or against any of the Marks or Works) by or against any third party in relation to the Marks or Works or any related application or registration.

3.6 Assignee shall bear the cost and expense of future registration of the Marks and Works, as well as the cost of future registration disputes, and the cost of enforcing rights in and to the Marks and Works against third parties provided, however, that Assignor shall continue to be responsible for all costs, expenses, and judgments resulting from, or in connection with, any enforcement action, registration action or legal dispute commenced prior to the Effective Date in which Assignor is a named party relating to the Marks or Works.

3.7 It is understood and agreed that the Works, the Marks, and the rights conveyed herein are AS IS with no warranties whatsoever, express or implied, including, without limitation, warranties of non-infringement, title, merchantability or fitness for a particular purpose.

## SECTION 4. TERMINATION AND RELEASE OF PRIOR AGREEMENT(S)

4.1 Except as set forth in Section 4.2 below, all prior licenses and consents between or among Assignor and Assignee in connection with the Marks and Works, including, without limitation, the Original License, are hereby terminated by mutual agreement of the parties. Each party acknowledges and agrees that, as between the parties, all obligations under such agreements have been duly and timely fulfilled, or are hereby forever released and discharged as of the Effective Date.

4.2 To the extent Assignor previously granted any consent, license or permission in connection with any Disputed Marks or Works, such license or permission shall remain in effect until such time as the assignment of such Mark or Work is made effective by Assignee pursuant to Section 3.1 above, provided that such license or permission shall remain in effect only in the jurisdiction in which the applicable Mark or Work is in dispute.

## SECTION 5. LICENSE TO ASSIGNOR

5.1 Assignee understands and acknowledges that the Works are used, have been used, and will continue to be used as a personal symbol of Mr. Dan Bilzerian, and appear on a variety of online properties, social media accounts and postings, personal possessions, real estate, body art, gifts, clothing articles, and promotional materials related to Mr. Bilzerian's celebrity and public appearance activities ("Personal Uses").

5.2 Assignee further understands and acknowledges that the Works, and variations thereof, have appeared, do appear, and will appear in the future in various websites, photos, movies, videos and artistic works featuring or relating to Mr. Bilzerian, his property, his life, and his celebrity ("Publication Uses"). For avoidance of doubt, Publication Uses includes, without limitation, the book entitled the "The Setup," authored by Mr. Bilzerian, and all videos and photographs posted by or for Mr. Bilzerian.

5.3 Assignee further understands and acknowledges that Mr. Bilzerian has engaged, or may engage, in personal appearances, host events, appear in videos and movies, publicize his life and lifestyle, write books, stories or screenplays, produce videos, series or movies, commission works of art and architecture, and enter into endorsement or similar arrangements in connection with certain third party products ("Promotional Uses").

5.4 Effective on the Effective Date, Assignee hereby grants to Assignor an unlimited, royalty-free, perpetual, irrevocable, and worldwide right and license to use the Works (including prior versions thereof and current and future derivative works based thereon) for current and future Personal Uses, Publication Uses and Promotional Uses relating to Mr. Bilzerian. The foregoing license may be assigned or sublicensed for value or otherwise, and may be exercised freely by Assignor in perpetuity.

5.5 Assignor understands and acknowledges that Assignee is, or may be in the future, party to certain settlement agreements, coexistence agreements, license agreements and other agreements with respect to the Marks and Works, and may enter into such agreements at any time in the future ("Third Party Agreements"). Assignee shall give notice to Assignor of all restrictions and limitations relating to uses of the Marks and Works set forth in such Third Party Agreements, after which Assignor shall comply with such restrictions and limitations to the extent applicable to licensed Personal Uses, Publication Uses and Promotional Uses. The parties agree that the licenses granted to Assignor herein shall be subject all such restrictions and limitations, whether now in existence, or future created. Assignee agrees to use

commercially reasonable efforts to avoid entering into any new Third Party Agreement that would materially restrict Assignor's rights under the license(s) granted herein without Assignor's prior consent, which consent will not be unreasonably withheld.

5.6 Neither Assignor nor Assignee shall have any right or entitlement to any accounting, reporting, royalty, fee or other compensation in connection with any use of the Marks or Works by the other party.

## SECTION 6. ENFORCEMENT

6.1 To the extent Assignor or Assignee are aware, or become aware of any third party infringement, misappropriation, unfair competition, or unauthorized use of any of the Marks or Works, the parties shall notify each other and cooperate, at no charge, to take appropriate action to protect the Marks and the Works and their respective rights therein.

6.2 Unless otherwise agreed in writing by both parties, any future action for infringement or other misuse of the Marks or Works against any third party will be brought only by Assignee, at its sole option. If requested by Assignee, Assignor will cooperate with Assignee in any such action at no charge, but at Assignee's cost, including by joining the action as a party if so requested.

## SECTION 7. MISCELLANEOUS

7.1 The terms and provisions of this Agreement shall be binding upon and shall extend to, and inure to the benefit of the parties and their successors and assigns. Either party may freely assign this Agreement, or may freely assign or sublicense its rights and obligations hereunder.

7.2 In the event that any term or provision of this Agreement is held to be invalid, illegal or unenforceable in any respect, such term or provision shall be deemed amended to the extent necessary to render it valid, legal and enforceable, and the parties agree to be bound by the same as thus amended, and the remaining terms and provisions of this Agreement shall not be affected or impaired thereby.

7.3 This Agreement shall be construed under the laws of the State of Nevada, without reference to principles of conflicts of laws.

7.4 This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**SIGNATURES ON FOLLOWING PAGE**

**IN WITNESS WHEREOF**, the parties have entered into this Agreement intending to be legally bound as of the Effective Date first written above.

**Assignor:** Blitz NV, LLC

**BY:**_______________________

**NAME: Dan Bilzerian**

**TITLE:_Manager**

**Assignee:** Ignite International, Ltd.

DocuSigned by:
**BY:** Scott Rohleder
0F0487741B4F477...

**NAME: Scott J. Rohleder**

**TITLE: CFO**

# Exhibit A

Marks

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| BILZERIAN ENTERTAINMENT LOGO | UNITED STATES | 87/940,058 | 5/29/2018 | 5,808,173 | 7/16/2019 | 041 | REGISTERED |
| BILZERIAN GOAT SKULL LOGO | IRAN | 139850140001072701 | 10/20/2019 | | | 18, 25, 34, 35, 39 | PENDING |
| BLITZ TV LOGO | UNITED STATES | 87/244,217 | 11/21/2016 | | | 041 | SUSPENDED |
| BLITZ TV LOGO | UNITED STATES | 87/244,205 | 11/21/2016 | | | 009 | SUSPENDED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.075 | 12/7/2018 | | | 01 | PUBLISHED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | ARGENTINA | 3.764.078 | 12/7/2018 | 3221773 | 10/21/2021 | 25 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.079 | 12/7/2018 | 3071125 | 4/24/2020 | 29 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.080 | 12/7/2018 | 3071126 | 4/24/2020 | 30 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.081 | 12/7/2018 | 3071127 | 4/24/2020 | 31 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.082 | 12/7/2018 | 3071128 | 4/24/2020 | 32 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | ARGENTINA | 3.764.083 | 12/7/2018 | 3071130 | 4/24/2020 | 33 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.084 | 12/7/2018 | 3071129 | 4/24/2020 | 34 | REGISTERED |
| GOAT SKULL LOGO | ARGENTINA | 3.764.077 | 12/7/2018 | 3071124 | 4/24/2020 | 05 | REGISTERED |
| GOAT SKULL LOGO | AUSTRALIA | 1999690 | 11/26/2018 | 1457985 | 1/10/2022 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352110 | 11/30/2018 | 916352110 | 9/17/2019 | 01 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | BRAZIL | 916352641 | 11/30/2018 | 916352641 | 9/17/2019 | 25 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352706 | 11/30/2018 | 916352706 | 9/17/2019 | 29 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352803 | 11/30/2018 | 916352803 | 9/17/2019 | 30 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352943 | 11/30/2018 | 916352943 | 9/17/2019 | 31 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916353028 | 11/30/2018 | 916353028 | 9/17/2019 | 32 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | BRAZIL | 916353117 | 11/30/2018 | 916353117 | 9/17/2019 | 33 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916353168 | 11/30/2018 | 916353168 | 9/17/2019 | 34 | REGISTERED |
| GOAT SKULL LOGO | BRAZIL | 916352510 | 11/30/2018 | 916352510 | 9/17/2019 | 05 | REGISTERED |
| GOAT SKULL LOGO | CANADA | 1,924,364 | 10/10/2018 | | | 01, 03, 05, 09, 10, 16, 18, 20, 21, 25, 28, 29, 30, 31, 32, 33, 34, 35, 40, 41, 44 | PUBLISHED |
| GOAT SKULL LOGO | CHILE | 1308993 | 12/10/2018 | 1329716 | 9/25/2020 | 01, 03, 05, 25, 29, 30, 31, 32, 33, 34 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | COLOMBIA | 1457985 | 11/26/2018 | 650838 | 6/4/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | EUROPEAN UNION (EUTM & RCD) | 17968145 | 10/15/2018 | 017968145 | 3/13/2019 | 01, 03, 05, 09, 10, 16, 18, 20, 25, 28, 29, 30, 31, 32, 33, 34, 35, 41 | REGISTERED |
| GOAT SKULL LOGO | INDIA | 1457985 | 11/26/2018 | | | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | OPPOSED |
| GOAT SKULL LOGO | ISRAEL | 1457985 | 11/26/2018 | 315,278 | 5/4/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | JAPAN | 1457985 | 11/26/2018 | 1457985 | 11/5/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | MEXICO | 2186952 | 11/26/2018 | 2332560 | 12/1/2021 | 005 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186953 | 11/26/2018 | 2332561 | 12/1/2021 | 025 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186954 | 11/26/2018 | 2045935 | 10/11/2019 | 029 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186955 | 11/26/2018 | 2045936 | 10/11/2019 | 030 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186956 | 11/26/2018 | 2045937 | 10/11/2019 | 031 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | MEXICO | 2186957 | 11/26/2018 | 2045938 | 10/11/2019 | 032 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186958 | 11/26/2018 | 2045939 | 10/11/2019 | 033 | REGISTERED |
| GOAT SKULL LOGO | MEXICO | 2186959 | 11/26/2018 | 2045940 | 10/11/2019 | 034 | REGISTERED |
| GOAT SKULL LOGO | NEW ZEALAND | 1457985 | 11/26/2018 | 1117094 | 3/24/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | NORWAY | 201904362 | 11/26/2018 | 1457985 | 10/15/2021 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | RUSSIA | 1457985 | 11/26/2018 | 1457985 | 10/10/2019 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35622 | 11/28/2018 | | | 01 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35625 | 11/28/2018 | | | 25 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35626 | 11/28/2018 | | | 29 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35627 | 11/28/2018 | | | 30 | PENDING |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35628 | 11/28/2018 | | | 31 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35629 | 11/28/2018 | | | 32 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35630 | 11/28/2018 | | | 33 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35631 | 11/28/2018 | | | 34 | PENDING |
| GOAT SKULL LOGO | SOUTH AFRICA | 2018/35624 | 11/28/2018 | | | 05 | PENDING |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | SOUTH KOREA | 1457985 | 11/26/2018 | 85-2020-1270164 | 3/9/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | SWITZERLAN D | 1457985 | 11/26/2018 | | | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | PENDING |
| GOAT SKULL LOGO | THAILAND | 1457985 | 11/26/2018 | | | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | PENDING |
| GOAT SKULL LOGO | TURKEY | 1457985 | 11/26/2018 | 1457985 | 12/9/2019 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | UNITED KINGDOM | UK00917968145 | 10/15/2018 | UK00917968145 | 3/13/2019 | 01, 03, 05, 09, 10, 16, 18, 20, 25, 28, 29, 30, 31, 32, 33, 34, 35, 41 | REGISTERED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO | VIETNAM | 1457985 | 11/26/2018 | 1457985 | 3/30/2020 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO | WIPO | 1457985 | 11/26/2018 | 1457985 | 11/26/2018 | 001, 003, 005, 025, 029, 030, 031, 032, 033, 034 | REGISTERED |
| GOAT SKULL LOGO (NO EYES) | ARMENIA | 20220544 | 3/2/2022 | | | 05, 33, 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | BELARUS | 20220411 | 2/28/2022 | | | 05, 33, 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | CANADA | 2,163,364 | 2/1/2022 | | | 33 | PENDING |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO (NO EYES) | CANADA | 2,163,365 | 2/1/2022 | | | 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | CHINA | 60087306 | 10/26/2021 | | | 34 | CLIENT MANAGED |
| GOAT SKULL LOGO (NO EYES) | EGYPT | 468922 | 2/22/2022 | | | 35 | PENDING |
| GOAT SKULL LOGO (NO EYES) | EGYPT | 468921 | 2/22/2022 | | | 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | INDIA | 5305009 | 1/29/2022 | | | 35 | PUBLISHED |
| GOAT SKULL LOGO (NO EYES) | IRAN | 1400501400010 41252 | 7/3/2021 | | | 32 | PENDING |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO (NO EYES) | KAZAKHSTAN | 107641 | 3/10/2022 | | | 05, 33, 34 | PENDING |
| GOAT SKULL LOGO (NO EYES) | MALAYSIA | TM2020029861 | 12/10/2020 | | | 001, 003, 005, 029, 030, 031, 032, 033, 034 | CLIENT MANAGED |
| GOAT SKULL LOGO (NO EYES) | MALAYSIA | | | | | 34 | CLIENT MANAGED |
| GOAT SKULL LOGO (NO EYES) | MALAYSIA | TM202029861-A1 | | | | 034 | CLIENT MANAGED |
| GOAT SKULL LOGO (NO EYES) | PARAGUAY | 27328 | 4/8/2022 | | | 34 | PENDING |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO (NO EYES) | PARAGUAY | 27332 | 4/8/2022 | | | 35 | PENDING |
| GOAT SKULL LOGO (NO EYES) | PARAGUAY | 27319 | 4/8/2022 | | | 05 | PENDING |
| GOAT SKULL LOGO (NO EYES) | PARAGUAY | 27324 | 4/8/2022 | | | 9 | PENDING |
| GOAT SKULL LOGO (NO EYES) | RUSSIA | 2022713553 | 3/3/2022 | | | 35 | PENDING |
| GOAT SKULL LOGO (NO EYES) (MADRID BASE 1, 5, 29 - 34) | UNITED STATES | 88/976,316 | 9/20/2018 | | | 001, 005, 009, 010, 016, 020, 028, 029, 030, 031, 032, 033, 034, 041 | PUBLISHED |

| Mark with Image | Country | Application # | File Date | Registration # | Registration Date | Classes | Status |
|---|---|---|---|---|---|---|---|
| GOAT SKULL LOGO (NO EYES) (MADRID BASE 3, 25) | UNITED STATES | 88/125,045 | 9/20/2018 | | | 003, 018, 025, 035 | ALLOWED |
| IGNITE | THAILAND | 220103470 | 1/27/2022 | | | 34 | PENDING |
| IGNITE GOAT SKULL LOGO | CHINA | 59894227 | 10/18/2021 | | | 34 | CLIENT MANAGED |
| IGNITE GOAT SKULL LOGO | JAPAN | 1457189 | 12/4/2018 | 1457189B | 12/10/2020 | 01, 03, 05, 29, 30, 31, 32, 33, 34 | REGISTERED |
| IGNITE GOAT SKULL LOGO | SOUTH KOREA | 1457189 | 12/4/2018 | 852020003646725 | 7/23/2020 | 01, 03, 05, 29, 30, 31, 32, 33, 34 | REGISTERED |
| IGNITE GOAT SKULL LOGO | THAILAND | 1457189 | 12/4/2018 | | | 01, 03, 05, 29, 30, 31, 32, 33, 34 | PENDING |

**Exhibit B**
Works

| Works |
| --- |
| |
| |
| IGNITE |
| IGNITE |

| Title | Registration No. | Registration Date | Application No. | Filing Date | Status | Client Name |
|---|---|---|---|---|---|---|
| CPY - US - GOAT SKULL LOGO (COPYRIGHT) | VA0002141891 | 03/11/2019 | | | REGISTERED | BLITZ NV, LLC |
| CPY - US - IGNITE GOAT SKULL LOGO NO EYES (COPYRIGHT) | VA0002171807 | 07/22/2019 | | | REGISTERED | BLITZ NV, LLC |
| CPY - CN - IGNITE GOAT SKULL | | | | | PENDING | BLITZ NV, LLC |
| CPY - CA - IGNITE GOAT SKULL | 1190082 | 01/24/2022 | | | REGISTERED | BLITZ NV, LLC |
| CPY - CA - GOAT SKULL (NO EYES) | 1190083 | 01/24/2022 | | | REGISTERED | BLITZ NV, LLC |
| CPY - IN - GOAT SKULL (NO EYES) | | | | | PENDING | BLITZ NV, LLC |
| CPY - CN - GOAT SKULL (NO EYES) | | | | | PENDING | BLITZ NV, LLC |
| CPY - PY - GOAT SKULL LOGO (NO EYES) App No. 22-12278 | | | 22-12278 | 02/23/2022 | PENDING | BLITZ NV, LLC |
| CPY - CN - IGNITE SHEEP HEAD (CHINESE CHARACTERS) | | | 2022-F-10002377 | | PENDING | BLITZ NV, LLC |
| CPY - CN IGNITE SHEEP HEAD (CHINESE CHARACTERS) | | | 2022-F-10002378 | | PENDING | BLITZ NV, LLC |
| CPY - CN - IGNITE SHEEPHEAD STRIPES (CHINESE CHARACTERS) | | | 2022-F-10002379 | | PENDING | BLITZ NV, LLC |
| CPY - CN - STRIPE (CHINESE CHARACTERS) | | | 2022-F-10002380 | | PENDING | BLITZ NV, LLC |

This is Exhibit "....F........" referred to in the affidavit
of .Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025..............

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

Vancouver
27-Feb-25
REGISTRY

This is the 3rd Affidavit
of Dan Bilzerian and was made
in this case on February 25, 2025

No. S-245663
Vancouver Registry

**IN THE SUPREME COURT OF BRITISH COLUMBIA**

Between

DAN BRANDON BILZERIAN also known as DAN BILZERIAN

Petitioner

and

IGNITE INTERNATIONAL BRANDS LTD., INTERNATIONAL INVESTMENTS LTD., GREGORY GILPIN-PAYNE, SCOTT ROHLEDER, ROBIN RODRIGUEZ, THOMAS BUNKER, and RALPH GILPIN-PAYNE

Respondents

**AFFIDAVIT**

I, **DAN BILZERIAN**, businessman, social media influencer and celebrity, of 5990 Patrick Lane, Las Vegas, Nevada 89118, United States, AFFIRM AND SAY THAT:

**Introduction**

1. I am a shareholder of the respondent Ignite International Brands, Ltd. (the "**Company**") and, as such, have personal knowledge of the facts and matters stated herein, unless such facts and matters are stated to be based on information and belief, in which case I believe them to be true.

2. I make this affidavit in support of my response to the Company's application filed on December 24, 2024 in these proceedings for a finding of contempt against me and sanctions, and my application for a direction and declaration that the @Ignite social media account is my property, not the Company's. At the time of making this affidavit, both of these applications are scheduled to be heard by Justice Tammen on March 14, 2025.

3. I am businessman, social media influencer and celebrity.

4. The Company is a private company incorporated under the laws of British Columbia.

5. Ignite is a lifestyle brand selling disposable vapes, spirits, and apparel.

**Background to Ignite Formation**

6. The background to the formation of Ignite is set out in my Affidavit#1 filed in proceedings with Action No. S-244508 (the "**Original Petition Proceedings**"), where below I am extracting certain paragraphs:

*[3] Company is a lifestyle brand selling disposable vapes, spirits, and apparel under the "Ignite" brand that I founded in 2017. That brand, including the related intellectual property, were controlled by Vulcan Enterprises Ltd. ("Vulcan"), a company in which I was a majority shareholder.*

...

*[7] Attached as Exhibit "C" hereto is a true copy of the Description and Overview of Business section from the Company's Management Discussion & Analysis ("MD&A") prepared as at January 19, 2018, which sets out the following historical information about the Company:*

*(a) after its incorporation, the Company became a junior mineral exploration company focused on gold projects in B.C.;*

*(b) from 1991 to 1999, the Company was listed on the Vancouver Stock Exchange and, in August, 2013, it became listed on the TSX Venture Exchange (the "TSX") under the trading symbol "ALQ";*

*(c) on September 19, 2016, the Company voluntarily delisted from the TSX and became listed on the Canadian Securities Exchange ("CSE") under the same trading symbol;*

*(d) on August 25, 2017, trading of the Company's shares was halted as the Company made an application to the CSE of its intention to change its business focus from being a mineral resource exploration company to an investment company seeking investment opportunities in the global cannabis sector; and*

...

*[8] In the fall of 2018, the Company began a multi-step reverse take-over transaction (the "RTO") with Vulcan Enterprises US Ltd., which subsequently changed its name to Ignite International, Ltd. ("Ignite US")., and two of its shareholders, including me.*

*[9] On October 30, 2018, the Company changed its name to Green Axis Capital Corp. and started trading on the CSE under the stock symbol "BILZ".*

> *[10] Further to the RTO, on January 2, 2019, the Company replaced its board of directors, and, among other appointments, I was appointed as a director, Chairman and CEO...*
>
> ...
>
> *[12] On January 10, 2019, the Company changed its name to Ignite International Brands, Ltd.*
>
> *[13] Since 2018, my brand, "Ignite", as well as my name, likeness, personality, and life story, have been essence of the Company's business, and I have been the "public face" of the Company.*
>
> *[14] On May 30, 2019, the Company completed the RTO by, among other steps, acquiring all shares of and combining with Ignite US, Ignite International Brands, Ltd., 1203238 B.C. Ltd., and 1203243 B.C. Ltd...*
>
> *[15] On August 24, 2022, at a special meeting of the shareholders, the shareholders approved a going private transaction, as well as set the number of directors to five. The going private transaction was completed by August 29, 2022. I remained a director and Chairman of the Company.*

7. I have been involved with the Company since around 2017.

8. From late December 2023 to the beginning of June 2024, I was the sole director and CEO of Ignite pursuant to an agreement reached at an AGM.

9. As set out in greater detail in my Affidavit#1 filed in the Original Petition Proceedings, I was unlawfully and forcibly removed as sole director and CEO by an improper and incomplete shareholder vote where I was not able to vote and they did not reach quorum, which method of removal was not in keeping with the corporate articles.

**The brand "Ignite"**

10. The brand "Ignite" uses my name, likeness, personality and life story.

11. For years, I have been the "public face" of the Company.

12. For years, I have been the basis for the Company's marketing campaigns.

**Ignite Social Media Account**

13. In March 2016, before Ignite was created, I, myself, created an Instagram account that is currently titled "@Ignite" (the "**Account**"), using my personal information to set it up, including my personal cell phone number.

14. I am the sole creator and owner of the Account.

15. The Account uses my name, picture and likeness in nearly every post. The photographs and videos depict me (the man with the beard) and my lifestyle.

16. I first created the Account in March of 2016 under a different name.

17. I recall that the initial username of the Account was @DiscountVape or something similar.

18. Before it was named @Ignite. I changed the username of the Account two or three times.

19. In around 2018. I, myself changed the username of the Account to @Ignite.

20. Until recently in these proceedings, Ignite never alleged ownership of the Account or demanded I transfer or assign the Account to Ignite.

21. Attached as **Exhibit "A"** to this my affidavit is a true copy of the screenshot that I took on February 11, 2025 of the "About this account" information page for the Account located at https://www.instagram.com/ignite/, showing I created the Account in March 2016, and that prior to being named @Ignite, the Account had 3 other user names.

22. I personally changed each and every name of the Account.

23. Attached as **Exhibit "B"** to this my affidavit is a true copy of the Instagram website that I took on February 22, 2025 titled "Create a new Instagram account" located at: https://help.instagram.com/155940534568753.

24. Attached as **Exhibit "C"** to this my affidavit is a true copy of the Instagram Term of Use that I gathered from the Instagram website located at https://help.instagram.com/581066165581870/ as of February 22, 2025.

25. At all material times, I have solely operated and controlled the Account including approving all content, given the Account is my property, using and portraying my name, picture and likeness.

26. At all materials times, I have solely and exclusively maintained possession and control over access, including the log-in and password to the Account.

27. At no time did I transfer or assign the right, title or ownership of the Account to the Company. No assignment documents have ever been executed by me, in favour of Ignite.

28. At no time did I authorize or give permission for the Company to use, in whole or in part, the Account.

29. At no time was the Company an authorized licensee of the Account.

30. At no time did I receive compensation to transfer, assign, license or use the Account.

31. At no time do I recall Ignite having a company social media policy that addresses the ownership of, and access to, social media accounts including the Account, as well as all information and communications associated with those accounts.

32. I never signed any written agreement or orally agreed with Ignite that the Account belongs to Ignite, or that I transferred ownership of the Account to Ignite.

33. As a matter of fact, pursuant to Instagram's Terms of Service, and Meta Platform Terms, I could not possibly transfer the ownership of the Account to Ignite, without prior Instagram's prior written consent.

34. Instagram was never asked for, nor did it ever issue such a written consent.

35. I can change the @ username (also known as the handle) on the Account to something different.

36. I would like to change the username of the Account to a new username.

37. The Company has its own social media accounts that the Company owns, operates and controls, which include on Instagram: @ignite.eu, @ignite_jp, @ignite_germany, on X: @Ignite_Intl.

38. Beginning in December of 2023, following my removal from the position of the CEO, and later from the position of the sole director of the Company that was unlawful and such method was not in keeping with the Company's articles, the respondents in this action continued to use my name and likeness, without my consent or authorization, including on Ignite's social media platforms.

39. In November 2024, I demanded that the respondents in this action cease and desist from using my name and likeness and otherwise exploiting my intellectual property rights.

40. Attached as **Exhibit "D"** to this my affidavit is a copy of a letter dated November 4, 2024, from Trevor McDonald at BD&P Law Firm, to Howard Mickelson and Arpal Dosanjh Gudmundseth Micklelson LLP and Mike Sheriff at Sugden, McFee & Roos LLP.

41. Following the respondents refusal to cease and desist from exploiting my likeness and intellectual property rights, on November 12, 2024, in the State of Nevada, I commenced legal proceedings against the Company, and Ignite International Ltd., Paul Bilzerian, Scott Rohleder and Rupy Dhadwar for, among other things, the unlawful use of my name and likeness by them and the companies they control, including the Company.

42. Attached as **Exhibit "E"** to this my affidavit is a true copy of the Complaint filed in the United States District Court, District of Nevada under Case No.: 2:24-cv-2101.

43. The Company continues to use my name and likeness, having posts of me on their social media accounts, without my consent and authorization.

44. Attached as **Exhibit "F"** to this my affidavit is a true copy of @Ignit_Intl Instagram page as of February 25, 2025, showing a video of me wakeboarding behind a large yacht and other photos of me.

45. The Account is a separate account, that I own and have always owned.

**Application by Ignite for Recovery of Social Media Account and Order**

46. On October 9, 2024, Ignite filed an application in these proceedings for an order that I return control of, or grant access to, the Account to Ignite.

47. I have reviewed the Affidavit #1 of Rupy Dhadwar made on October 9, 2024 filed in these proceedings, the "alleged" acting chief executive officer and chief financial officer of Ignite.

48. I do not agree with his statements at paragraph 11 that says Ignite should have control of "its" social media accounts and I have access to and control of "Ignite's" social media accounts. As stated above, I am the sole creator and owner of the Account, not Ignite.

49. The application of Ignite was heard by Justice Tammen between October 23-25, 2024, along with an application by the shareholders of Ignite for injunctive relief against me.

50. Attached as **Exhibit "G"** to this my affidavit is a true copy of the oral reasons for judgment from Justice Tammen dated October 30, 2024.

51. On December 24, 2024, Ignite filed an application in these proceedings for, among other things, an order to find me in contempt of the October 30, 2024 order of Justice Tammen.

52. I represented myself at the hearing held on January 17, 2025. Attached as **Exhibit "H"** to this my affidavit is true copy of the transcript from the January 17, 2025 hearing.

53. I would like to unconditionally apologize to Justice Tammen and the Court. My conduct in these proceedings has not been motivated by any disrespect to the Court.

54. Attached as **Exhibit "I"** to this my affidavit is true copy of the Memorandum Opinion by United States District Judge Royce C. Lambeth dated January 24, 2025 in case no. 1:89-cv-1854-RCL, in the United States District Court for the District of Columbia.

55. Attached as **"Exhibit J"** to this my affidavit is a true copy of Meta Platform Terms dated February 25, 2025, from website located at: https://developers.facebook.com/terms/dfc_platform_terms/.

SWORN OR AFFIRMED BEFORE ME )
at Las Vegas, Nevada on February 15, 2025 )

Commissioner

**DAN BILZERIAN**

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027

This is Exhibit "A" referred to in the affidavit
of Dan Bilzerian affirmed before me on
February 25, 2025 at Las Vegas, Nevada

[signature]
A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027


About this account
IGNITE
ignite
See why this
information is important.
Date joined
Account based in
Former usernames
Accounts with shared followers
Verified
age
481 following
dogroupre + 8 more
TAGGED

This is Exhibit "B" referred to in the affidavit of Dan Bilzerian affirmed before me on February 25, 2025 at Las Vegas, Nevada

A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027

Manage Your Account   Signing Up and Getting Started

# Create a new Instagram account

Computer Help   Android App Help   iPhone App Help   Mobile Browser Help

Note: you must be at least 13 years old to create an Instagram account.

## Ways to create an account

There are two ways to create an Instagram account. You can create a new account from the Instagram app or Instagram.com. If you already have an existing Facebook or Instagram account, you can use your existing account to create a new Instagram account. Both accounts will be added to the same Accounts Center and have access to connected experiences.

## How to create a new Instagram account

To create an account if you're new to Instagram and you don't have a Facebook account

1. Download the Instagram app from the App Store (iPhone) or Google Play Store (Android).
2. Once the app is installed, tap to open it.
3. Tap **Create New Account** and enter your email address or mobile number, then tap **Next**. Note: If you sign up with email, make sure you enter your email address correctly and choose an email address that only you can access. If you log out and forget your password, you'll need to be able to access your email to get back into your Instagram account.
4. Enter the confirmation code sent to your email address or mobile number, then tap **Next**.
5. Create a password, then tap **Next**.
6. Enter your birthday, then tap Next. Note: Use your own birthday, even if this account is for a business, a pet or something else. Learn more about why we ask for your birthday.
7. Add your name, then tap **Next**.
8. Create a username, then tap **Next**.

10. Add a profile picture, then tap **Next**. If you'd like to add a profile picture later, tap **Skip**.
11. If you want to share your profile picture as your first post, tap , then tap **Done**.

To create an account if you have a Facebook account

## Security & saving your login info

If you created your account recently, people on Instagram may see that you have a new account. Learn about keeping your account secure.

You may be asked to save your login info. If you choose to save your login information, you won't need to enter it the next time you log back into your account.

Was this helpful?

Yes No

### Related Articles

Add and switch between multiple Instagram accounts

Connect your Instagram professional account to a Meta ad account

Disabled Instagram account

Create a Spring account to open a shop on Instagram

Connect a loyalty membership account to Instagram

What is "About this account" on Instagram?

English (US)

About Us

API

Jobs

Privacy

from Meta

© 2025 Meta

This is Exhibit "C" referred to in the affidavit of Dan Bilzerian affirmed before me on February 25, 2025 at Las Vegas, Nevada

A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027

# Terms of Use

Welcome to Instagram!

These Terms of Use (or "Terms") govern your access and use of Instagram, except where we expressly state that separate terms (and not these) apply, and provide information about the Instagram Service (the "Service"), outlined below. The Meta Terms of Service do not apply to this Service.

The Instagram Service is one of the Meta Products, provided to you by Meta Platforms, Inc. These Terms of Use therefore constitute an agreement between you and Meta Platforms, Inc. If you do not agree to these Terms, then do not access or use Instagram.

## 1. The Instagram Service

We agree to provide you with the Instagram Service. The Service includes all of the Instagram products, features, applications, services, technologies, and software that we provide to advance Instagram's mission: To bring you closer to the people and things you love. The Service is made up of the following aspects:

- **Offering personalized opportunities to create, connect, communicate, discover and share.** People are different. So we offer you different types of accounts and features to help you create, share, grow your presence, and communicate with people on and off Instagram. We also want to strengthen your relationships through shared experiences that you actually care about. So we build systems that try to understand who and what you and others care about, and use that information to help you create, find, join and share in experiences that matter to you. Part of that is highlighting content, features, offers and accounts that you might be interested in, and offering ways for you to experience Instagram, based on things that you and others do on and off Instagram.

- **Fostering a positive, inclusive, and safe environment.**
  We develop and use tools and offer resources to our community members that help to make their experiences positive and inclusive, including when we think they might need help. We also have teams and systems that work to combat abuse and violations of our Terms and policies, as well as harmful and deceptive behavior. We use all the information we have-including your information-to try to keep our platform secure. We also may share information about misuse or harmful content with other Meta Companies or law enforcement. Learn more in the Privacy Policy.

- **Developing and using technologies that help us consistently serve our growing community.**
  Organizing and analyzing information for our growing community is central to our

give us the power to apply complex processes across our Service. Automated technologies also help us ensure the functionality and integrity of our Service. Learn more in the Privacy Policy.

- **Providing consistent and seamless experiences across other Meta Company Products.** Instagram is part of the Meta Companies, which share technology, systems, insights, and information-including the information we have about you (learn more in the Privacy Policy) in order to provide services that are better, safer, and more secure. We also provide ways to interact across the Meta Company Products that you use, and designed systems to achieve a seamless and consistent experience across the Meta Company Products depending on your choices.

- **Ensuring access to our Service.** To operate our global Service, we must store and transfer data across our systems around the world, including outside of your country of residence. The use of this global infrastructure is necessary and essential to provide our Service. This infrastructure may be owned or operated by Meta Platforms, Inc., Meta Platforms Ireland Limited, or their affiliates. For more information about how we transfer, store or process your information, please review our Privacy Policy.

- **Connecting you with brands, products, and services in ways you care about.** We use data from Instagram and other Meta Company Products, as well as from third-party partners, to show you ads, offers, and other sponsored content that we believe will be meaningful to you. And we try to make that content as relevant as all your other experiences on Instagram.

- **Research and innovation.** We use the information we have to study our Service and collaborate with others on research to make our Service better and contribute to the well-being of our community.

## 2. How Our Service Is Funded

Instead of paying to use Instagram, by using the Service covered by these Terms, you acknowledge that we can show you ads that businesses and organizations pay us to promot on and off the Meta Company Products. We use your personal data, such as information abou your activity and interests, to show you ads that are more relevant to you.

We show you relevant and useful ads without telling advertisers who you are. We don't sell your personal data. We allow advertisers to tell us things like their business goal and the kind of audience they want to see their ads. We then show their ad to people who might be interested.

We also provide advertisers with reports about the performance of their ads to help them understand how people are interacting with their content on and off Instagram. For example, we provide general demographic and interest information to advertisers to help them better understand their audience. We don't share information that directly identifies you (information

You may see branded content on Instagram posted by account holders who promote products or services based on a commercial relationship with the business partner mentioned in their content. You can learn more about this here.

## 3. The Privacy Policy

Providing our Service requires collecting and using your information. The Privacy Policy explains how we collect, use, and share information across the Meta Products. It also explains the many ways you can control your information, including in the Instagram Privacy and Security Settings. You must agree to the Privacy Policy to use Instagram.

## 4. Your Commitments

In return for our commitment to provide the Service, we require you to make the below commitments to us.

**4.1 Who Can Use Instagram.** We want our Service to be as open and inclusive as possible, but we also want it to be safe, secure, and in accordance with the law. So, we need you to commit to a few restrictions in order to be part of the Instagram community.

- You must be at least 13 years old or the minimum legal age in your country to use Instagram.
- You must not be prohibited from receiving any aspect of our Service under applicable laws or engaging in payments related Services if you are on an applicable denied party listing.
- We must not have previously disabled your account for violation of law or any of our policies.
- You must not be a convicted sex offender.

**4.2 How You Can't Use Instagram.** Providing a safe and open Service for a broad community requires that we all do our part.

- **You can't impersonate others or provide inaccurate information.**
  You don't have to disclose your identity on Instagram, but you must provide us with accurate and up to date information (including registration information), which may include providing personal data. Also, you may not impersonate someone or something you aren't, and you can't create an account for someone else unless you have their express permission.
- **You can't do anything unlawful, misleading, or fraudulent or for an illegal or unauthorized purpose.**

If you post branded content, you must comply with our Branded Content Policies, which require you to use our branded content tool. Learn how to report conduct or content in our Help Center.

- **You can't do anything to interfere with or impair the intended operation of the Service.**
  This includes misusing any reporting, dispute, or appeals channel, such as by making fraudulent or groundless reports or appeals.

- **You can't attempt to create accounts or access or collect information in unauthorized ways.**
  This includes creating accounts or accessing or collecting information in an automated way without our express permission, regardless of whether such automated access or collection is undertaken while logged-in to an Instagram account.

- **You can't sell, license, or purchase any account or data obtained from us or our Service, regardless of whether such data was obtained while logged-in to an Instagram account.**
  This includes attempts to buy, sell, or transfer any aspect of your account (including your username); solicit, collect, or use login credentials or badges of other users; or request or collect Instagram usernames, passwords, or misappropriate access tokens.

- **You can't post someone else's private or confidential information without permission or do anything that violates someone else's rights, including intellectual property rights (e.g., copyright infringement, trademark infringement, counterfeit, or pirated goods).**
  You may use someone else's works under exceptions or limitations to copyright and related rights under applicable law. You represent you own or have obtained all necessary rights to the content you post or share. Learn more, including how to report content that you think infringes your intellectual property rights, here.

- **You can't modify, translate, create derivative works of, or reverse engineer our products or their components.**

- **You can't use a domain name or URL in your username without our prior written consent.**

- **You can't do, or attempt to do, anything to circumvent, by-pass, or override any technological measures that control or limit access to the Service or data.**

**4.3 Permissions You Give to Us.** As part of our agreement, you also give us permissions that we need to provide the Service.

- **We do not claim ownership of your content, but you grant us a license to use it.**
  Nothing is changing about your rights in your content. We do not claim ownership of your content that you post on or through the Service and you are free to share your content with anyone else, wherever you want. However, we need certain legal permissions from you (known as a "license") to provide the Service. When you share, post, or upload content that is covered by intellectual property rights (like photos or videos) on or in connection with our Service, you hereby grant to us a non-exclusive,

end when your content is deleted from our systems. You can delete content individually or all at once by deleting your account. To learn more about how we use information, and how to control or delete your content, review the Privacy Policy and visit the Instagram Help Center.

- **Permission to use your username, profile picture, and information about your relationships and actions with accounts, ads, and sponsored content.**
  You give us permission to show your username, profile picture, and information about your actions (such as likes) or relationships (such as follows) next to or in connection with accounts, ads, offers, and other sponsored content that you follow or engage with that are displayed on Meta Products, without any compensation to you. For example, we may show that you liked a sponsored post created by a brand that has paid us to display its ads on Instagram. As with actions on other content and follows of other accounts, actions on sponsored content and follows of sponsored accounts can be seen only by people who have permission to see that content or follow. We will also respect your ad settings. You can learn more here about your ad settings.
- **You agree that we can download and install updates to the Service on your device.**

## 5. Additional Rights We Retain

- If you select a username or similar identifier for your account, we may change it if we believe it is appropriate or necessary (for example, if it infringes someone's intellectual property or impersonates another user).
- If you use content covered by intellectual property rights that we have and make available in our Service (for example, images, designs, videos, or sounds we provide that you add to content you create or share), we retain all rights to our content (but not yours).
- You can only use our intellectual property and trademarks or similar marks as expressly permitted by our Brand Guidelines or with our prior written permission.
- You must obtain written permission from us or under an open source license to modify, create derivative works of, decompile, or otherwise attempt to extract source code from us.

## 6. Content Removal and Disabling or Terminating Your Account

- We can remove any content or information you share on the Service if we believe that it violates these Terms of Use, our policies (including our Community Standards), or we are permitted or required to do so by law. We work with independent fact-checkers in many jurisdictions to combat misinformation. When content has been rated by fact-checkers, we may add a notice to provide additional context. You can find more

or services, or if you create risk or legal exposure for us, violate these Terms of Use or our policies (including our Community Standards), if you repeatedly infringe other people's intellectual property rights, or where we are permitted or required to do so by law. We can also terminate or change the Service, remove or block content or information shared on our Service, or stop providing all or part of the Service if we determine that doing so is reasonably necessary to avoid or mitigate adverse legal or regulatory impacts on us. If you believe your account has been terminated in error, or you want to disable or permanently delete your account, consult our Help Center. When you request to delete content or your account, the deletion process will automatically begin no more than 30 days after your request. It may take up to 90 days to delete content after the deletion process begins. While the deletion process for such content is being undertaken, the content is no longer visible to other users, but remains subject to these Terms of Use and our Privacy Policy. After the content is deleted, it may take us up to another 90 days to remove it from backups and disaster recovery systems.

- Content will not be deleted within 90 days of the account deletion or content deletion process beginning in the following situations:
  - where your content has been used by others in accordance with this license and they have not deleted it (in which case this license will continue to apply until that content is deleted); or
  - where deletion within 90 days is not possible due to technical limitations of our systems, in which case, we will complete the deletion as soon as technically feasible; or
  - where deletion would restrict our ability to:
    - investigate or identify illegal activity or violations of our terms and policies (for example, to identify or investigate misuse of our products or systems);
    - protect the safety and security of our products, systems, and users;
    - comply with a legal obligation, such as the preservation of evidence; or
    - comply with a request of a judicial or administrative authority, law enforcement or a government agency;
  - in which case, the content will be retained for no longer than is necessary for the purposes for which it has been retained (the exact duration will vary on a case-by-case basis).
- If you delete or we disable your account, and you stop accessing or using Instagram, or if this contract is otherwise terminated, then these Terms shall terminate as an agreement between you and us, but this section, the section above called "Your

## 7. Our Agreement and What Happens if We Disagree

### 7.1 Our Agreement.

- Your use of music on the Service is also subject to our Music Guidelines, and your use of our API is subject to our Meta Platform Terms and Developer Policies. If you use certain other features or related services, additional terms will be made available and will also become a part of our agreement. For example, if you use payment features, you will be asked to agree to the Community Payment Terms. If you use Avatars, then the Avatar Terms also apply. If you use our AI products and features, the Meta AI Terms also apply. If any of those terms conflict with this agreement, those other terms will govern.
- If any aspect of this agreement is unenforceable, the rest will remain in effect.
- Any amendment or waiver to our agreement must be in writing and signed by us. If we fail to enforce any aspect of this agreement, it will not be a waiver.
- We reserve all rights not expressly granted to you.

### 7.2 Who Has Rights Under this Agreement.

- This agreement does not give rights to any third parties.
- You cannot transfer your rights or obligations under this agreement without our consent.
- Our rights and obligations can be assigned to others. For example, this could occur if our ownership changes (as in a merger, acquisition, or sale of assets) or by law.

### 7.3 Who Is Responsible if Something Happens.

- Our Service is provided "as is," and we can't guarantee it will be safe and secure or will work perfectly all the time. TO THE EXTENT PERMITTED BY LAW, WE ALSO DISCLAIM ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT.
- We also don't control what people and others do or say, and we aren't responsible for their (or your) actions or conduct (whether online or offline) or content (including unlawful or objectionable content). We also aren't responsible for services and features offered by other people or companies, even if you access them through our Service.
- Our responsibility for anything that happens on the Service (also called "liability") is limited as much as the law will allow. If there is an issue with our Service, we can't

Terms, even if we know they are possible. This includes when we delete your content, information, or account.

7.4 How We Will Handle Disputes.

If you are a consumer, the laws of the country in which you reside will apply to any claim, cause of action, or dispute you have against us that arises out of or relates to these Terms ("claim"), and you may resolve your claim in any competent court in that country that has jurisdiction over the claim. In all other cases, you agree that the claim must be resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County, that you submit to the personal jurisdiction of either of these courts for the purpose of litigating any such claim, and that the laws of the State of California will govern these Terms and any claim, without regard to conflict of law provisions. Without prejudice to the foregoing, you agree that, in its sole discretion, Meta Platforms Inc. may also bring any claim we have against you related to efforts to abuse, interfere, or engage with our products in unauthorized ways in the country in which you reside that has jurisdiction over the claim.

7.5 Unsolicited Material.

We always appreciate feedback or other suggestions, but may use them without any restrictions or obligation to compensate you for them, and are under no obligation to keep them confidential.

## 8. Updating These Terms

We may change our Service and policies, and we may need to make changes to these Terms so that they accurately reflect our Service and policies. Unless otherwise required by law, we will notify you (for example, through our Service) before we make changes to these Terms and give you an opportunity to review them before they go into effect. Then, if you continue to access or use the Service, you will be bound by the updated Terms. If you do not agree to any updated Terms or wish to terminate your agreement to this contract, you can do so by deleting your account here and no longer accessing or using any part of the Instagram Service.

Was this helpful?

Yes

No

Related Articles

Intellectual Property

Why we added more information to our Terms

Why your account has been restricted for data scraping and what can you do

How long does copyright protection last?

More information about Standard Contractual Clauses

English (US)

About Us

API

Jobs

Terms

Privacy

Meta

© 2025 Meta

This is Exhibit "D" referred to in the affidavit of Dan Bilzerian affirmed before me on February 25, 2025 at Las Vegas, Nevada

[signature]

A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027

BD&P
LAW FIRM

Reply to: Trever McDonald
Direct Phone (403) 260-0378
Direct Fax (403) 260-0332
tmcdonald@bdplaw.com

Assistant: Faye Maguire
Direct Phone (403) 806-7864

**VIA EMAIL**

November 4, 2024

**Attention: Howard Mickelson and Arpal Dosanjh**
Gudmundseth Micklelson LLP
2525 – 1075 W. Georgia Street
Vancouver BC Canada V6E 3C9

**Attention: Mike Shireff**
Sugden, McFee & Roos LLP
700 – 375 Water Street, The Landing
Vancouver, BC V6B 5C6

Dear Sirs,

**Re: Demand to Cease & Desist From Using Dan Bilzerian's Name, Likeness, and Image**

As you are aware, we are Canadian counsel to Dan Bilzerian. It has come to our client's attention that your respective clients have been using, posting, sharing, or otherwise publishing content on Ignite's websites and social media platforms, including Instagram, using Mr. Bilzerian's name, likeness and image. Your clients have also been using and posting images that Mr. Bilzerian took personally, and are his property and not that of Ignite, on these same websites and platforms.

On December 18, 2023, Mr. Bilzerian expressly advised your clients that if they fired him as the CEO of Ignite they would "lose the multimillion dollar benefit of [his] social media posting" and "lose the rights to use [his] name and likeness". A copy of Mr. Bilzerian's December 18 email is enclosed for your reference.

Despite this, shortly thereafter your clients terminated Mr. Bilzerian as CEO of Ignite. At the meeting where this occurred, Mr. Bilzerian again told them that had no right to use his name, likeness and image. Your clients should have therefore immediately removed all references to Mr. Bilzerian's name, likeness and image from Ignite's websites and social media accounts at that time. They failed to do so.

Your clients then took things even further on June 2, 2024, when they purported to remove Mr. Bilzerian as the sole director of the company and unilaterally seized total control of the company. Regardless of whether they should have done so in December 2023, there can be no doubt that, pursuant to Mr. Bilzerian's December 18, 2023 email, they should have immediately removed

Mr. Bilzerian's name and likeness from all Ignite websites and all social media accounts within their control on June 2, 2024. They again failed to do so. As a result, your clients have been wrongfully using Mr. Bilzerian's name, image, likeness and copyrighted photographs without his permission or without providing him with any compensation.

Among other things, your clients have, without Mr. Bilzerian's consent:

- Kept his name and image on numerous Ignite webpages within their control, making him a central component of the Ignite brand, despite not compensating him for this and unlawfully removing him as a director; and

- Created an Instagram account called @ignite.intl (which they, and not Mr. Bilzarian, controls) and posted and pinned Mr. Bilzerian's name, likeness and image in various "stories" on that account;

- Used Mr. Bilzerian's name and image to promote the sale of vapes, alcohol, clothing and other products; and

- Used photographs personally taken by Mr. Bilzerian on social media accounts.

Examples of these webpages and social media posts are enclosed for your reference.

While the dispute between the parties regarding the control of Ignite and its marketing, promotion and social media is ongoing, Mr. Bilzerian does not consent to his name, image or likeness being used for the purpose of marketing the Ignite brand, or in any fashion whatsoever by your clients. He also does not consent to your clients using any photographs that he took personally for the purpose of marketing the Ignite brand, or in any fashion whatsoever.

The Order of Justice Tammen issued October 30, 2024, confirms that your clients are not to use Mr. Bilzerian's name, likeness or image for the purpose of marketing the Ignite brand.

**As such, we hereby demand that your clients (i) immediately archive and then delete and remove all posts relating to Mr. Bilzerian, or photographs taken by Mr. Bilzerian, as they exist on *any* Ignite website and on any Instagram, Facebook, TikTok, X or other social media platforms in your clients' control, and (ii) cease and desist from making any further posts relating to Mr. Bilzerian, his likeness or image, whether on social media or any other forum.**

We also demand that your clients do not make any new posts on any Ignite website or social media accounts until this dispute is resolved. Otherwise, this will create the false and misleading impression that Mr. Bilzerian—whose personal brand has been inextricably linked to Ignite since he founded the company, and who has historically used his significant social media following to promote Ignite—is still associated with or endorses any Ignite marketing efforts made by your clients, which will harm Mr. Bilzerian's personal brand. Ignite's websites and social media accounts are replete with references to, and images of, Mr. Bilzerian. Making any new posts on Ignite's websites or social media accounts amounts to a wrongful misuse of Mr. Bilzerian's name, likeness and image in the circumstances.

Without prejudice to any other steps Mr. Bilzerian may take to protect his rights or seek damages that we are currently assessing, if your clients do not agree to comply with all of the above by noon Vancouver time on November 5, 2024, Mr. Bilzerian will have no choice but to commence further legal action against your clients in British Columbia, as well as other jurisdictions in which his likeness is being unlawfully used, seeking, among other things, injunctive relief to prevent them from wrongfully continuing to use his name, image and likeness. We trust that this will not be necessary.

**BURNET, DUCKWORTH & PALMER LLP**

Trevor R. McDonald

cc. Andrew Sunter and Breanne Campbell (BD&P)

TRM/flm

14074602.3

[redacted]

[redacted]

**From:** Dan Bilzerian <dan@danbilzerian.com>
**Date:** December 18, 2023 at 5:32:13 PM PST
**To:** Robin Rodriguez <robinrodriguez@anglofinancial.com>
**Cc:** Vered Nisim <vnisim@icloud.com>, lester lee <flatlee01@gmail.com>, "greg internationalinvestmentsltd.com" <greg@internationalinvestmentsltd.com>, Ralph Payne <ralphpayne@rogers.com>, Tom Bunker <thomasbunker2020@gmail.com>
**Subject: Re: board resolution consistent with Lester's proposal**

The board transcript provided was in fact not accurate.
-I did not vote to reinstate Scott, and the vote was 4 in favor, 2 abstained and I voted against.
In addition so far upon his return, Scott fired our Canadian council without consulting HR, provided no replacement and did so without consulting me, the CEO of the company. He may be under the incorrect assumption that there was a board vote, however as was decided at that meeting by council the entire meeting was invalid and a new meeting was scheduled.
Regardless this type of action should have been strategically timed with bringing in new council, leaving the company without council is a huge mistake. I also strongly believe that the goal of firing him as council was in direct retaliation for his being on my side on multiple calls. Not as said "he made mistakes during the transfer from public to private - he would have been fired back then not now.

Also, now that scott has been reinstated by the board I've sent Scott 2 emails one about using Smoore and not VapeEZ for the new v120 as Smoore's is not only much cheaper, but better quality, and looks infinitely better. The second email was informing him of the boards and my new policy on hiring and firing Its been 5 days and he has ignored both emails.

On the last board call, Lester made a suggestion to help find a reasonable solution. He recommended that Vered be the liaison, or as I recommended the President of the company, and someone else recommended VP, was not to remove my ability to have a say in this company, but to make things smoother and create a chain of

command so I am just speaking and relaying my asks through primarily one person.
As I made clear, I would like to be included in the decisions of this company especially on items that I have a strong opinion about. Examples of that are:

-manufacturing of vapes - since our main consumer product is vapes I would not want to be just one vote amongst the board, but in my capacity as CEO I would want to continue to help identify new manufacturers, continue to be involved in the products they manufacture and review pricing, capacity timelines etc. I have no problem having Vered review those things and make recommendations to me, I would want her to discuss with our managers and different distributors and help come up with plans and solutions.

-Partnerships - I would like to have vered review each existing partnership or licensing agreement we currently have and bring me an overview of them as well as her opinion and the opinions of the managers. I would like to be a part of figuring out how to strengthen the existing one and see how to help make them successful. Leaving me out of those conversations ( for example not keeping me In the loop for packaging approvals ) would be to the detriment of the brand. Its the image I created so I definitely should have an input

-New partnerships - I would want to be part of the conversations for new categories or partnerships to understand what they bring to the table and what they can do for our brand. I have no problem doing that through vered as well
But Im not willing to be be a part of this and be at the mercy of the board, especially when its to the detriment of my brand.

Bottom line is I do not agree to this resolution as it stands, It wasn't about taking away my executive power as CEO it was to create a heirarchy so that there is a process we all follow. However it seems that all the board wants to due is find a way to completely remove me from my company, which I will not let happen.

Robin, you tried to compare me to the Marlboro man, but my situation couldn't be more different for many reasons. First being, the Marlboro was a paid ambassador and I am not only the founder, but the Chairman and CEO. Second I am the largest shareholder. I own around half of this company, so I have a bigger interest than any of you to see this business succeed.

Scott has made some really bad decisions and I am not going to just blindly follow what he and my Dad think is best for the company. They are losing control of the brand with all of these never ending white label deals that make no money done with rinky dink manufacturers. They've been knowingly selling expired vapes for the

last year direct to consumer. I went to our website and ordered some vapes to my house last week and the vapes I received were over 2 years old and they tasted AWEFUL. Barnhouse tested the ones at the warehouse so it is 100% confirmed we were selling shit product.
I don't know how much harm Scott has caused to the brand with these reckless actions but our abysmal US sales are probably a good reflection. The last thing, the one I'm not going to rest until it is fixed, is our manufacturing problem. Scott and my Dads blind alliance to VapeEZ could be at best considered extreme negligence. We've caught VapeEZ producing and selling our patented devices multiple times after receiving written notice to cease and desist. They are more expensive, they're quality is worse, production capacity is less and payment terms are worse. My forcing them to bring on alt manufactures has more than doubled our profit margin.
Scott and my Dad were adamantly against this and had we listened to them we wouldn't be competitive and the company would be worthless today.

I am not looking to be disruptive. I am going to help fix this Company. To do that Scott is going to have to follow the board and my directives.

You should all ask yourselves a simple question .... We have done hundreds of millions in sales but this company has lost money over the last 3 years.
Why is that ???

We have obviously made huge mistakes and things need to change. It is clear to me that I need to be more involved in the business not less involved.

I will not resign without a proper replacement , which is not Scott.

If you vote to fire me as the CEO, the company will not be sellable, you will lose the multimillion dollar benefit of my social media posting, you will lose the rights to use my name and likeness, and you will be causing irreparable harm to the brand. Taking this acting will be a breach of your fiduciary duty and you will each personally incur the liability of that obviously retaliatory action.
And in that case I highly suggest you each consult with personal council so you can each understand the liability of your actions

I am willing to find a reasonable solution and work together. However, your suggestions sent over so far are not going to work

> On Dec 17, 2023, at 9:38 AM, Robin Rodriguez <robinrodriguez@anglofinancial.com> wrote:
>
> Dan,

I think you're right that the Shareholders Agreement sent Friday went beyond what was required for Lester's motion. I have enclosed a copy of the transcript of the call if you want to confirm what was said.

I have attached what I think is required for Lester's motion. Please let me know if that's OK.

Robin

Begin forwarded message:

**From:** Dan Bilzerian <dan@danbilzerian.com>
**Date:** December 15, 2023 at 6:02:53 PM AST
**To:** "greg internationalinvestmentsltd.com" <greg@internationalinvestmentsltd.com>
**Subject: Re: Shareholders Agreement**

Don't insult my intelligence with this nonsense. When you have something reasonable let me know.
Dan Bilzerian

On Dec 15, 2023, at 1:01 PM, greg internationalinvestmentsltd.com <greg@internationalinvestmentsltd.com> wrote:

Dear
Dan,

Please
find
attach
ed
Share
holder'
s
Agree
ment
betwe
en you
and
myself
for
your
review
and
signat
ure.
Shoul
d you
have
any
questi
ons
please
feel
free to
call
me via
What's
App or
directl
y at
my

cell
numb
er
shown
below.

Sincer
ely,

Greg
Gilpin-
Payne
Preside
nt
IIC
Manag
ement
Compa
ny Ltd
858
Zenwa
y Blvd
Frigate
Bay
St.Kitts
Tel
(Work)
1-869-
466-
8000
Tel
(Cell &
Whats
App) 1-
869-
669-
2223

<Ignite
Shareh

olders
Agree
ment.1
21523.
docx>

<Board Resolution of Ignite International Brands, Ltd 12-17-23.docx><12-14-23 Board Meeting Transcript essential.docx>

Lifestyle April 29

jakeshields



jakeshields Fun day at the river with @iamjroc @danbilzerian @eric_xcmma @adventurechild

Send message...

jakeshields




jakeshields Paintball wars

Send message...


Lifestyle March 9
TikTok
Send message...

This website contains nicotine and alcohol products. 18+ Only

IGNITE
Powered by IGNITE Africa



# Your Life, Your Way

Ignite is the leading international

AA ignite-africa.co.za


Lifestyle May 2
Watch full reel >
7:37
steveaoki
Send message...



# Life Of The Party! Dan Bilzerian Dishes On The Launch Of His Company

SUBSCRIBE

Sign up to get the latest on sales, new releases and more ...

SIGN UP

IGNITE

IGNITE INTERNATIONAL BRANDS LTD.

SHOP

CUSTOMER SERVICE

# DAN BILZERIAN'S IGNITE BECOMES AN UNEXPECTED CORONAVIRUS RELIEF LEADER

Although more recognized for his lavish lifestyle and eccentric bad boy antics, Dan Bilzerian has emerged as one of the most effective business leaders in driving coronavirus relief.

Through his global lifestyle company , Bilzerian has responded to the pandemic in deft, agile fashion by expanding efforts to provide healthy, stress-relieving products to global markets with both ease and celerity.

At the forefront of his COVID-19 relief efforts have been IGNITE's premium CBD and Hemp line expansions. At the onset of the crisis, Bilzerian and IGNITE's Marketing Director Erin Drummond drastically expanded and evolved their CBD and Hemp lines to include an unprecedented range of new CBD, Hemp and apparel products, also adding a full line of personal protective equipment, including IGNITE branded gloves, masks, hand sanitizers and more. To learn about this new line of IGNITE products, visit buyignite.co.

And to compound the relief driven, IGNITE gave back a substantial amount of their personal protectant gear and PH balanced Alkaline water directly to health organizations on the front line in the defense against CBD, including LA Sherriffs department, the West Hollywood Fire Department and the LA Mission. To date, IGNITE has donated more than $25,000 worth of supplies to combat the COVID-19 impacts on local Los Angeles organizations.

Source:

51

# THE SETUP

DAN BILZERIAN




## ORDER YOUR COPY TODAY!

| | | |
|---|---|---|
| LEATHER-BOUND LIMITED EDITION<br>$94.95<br>ORDER NOW | HARDCOVER<br>$34.95<br>ORDER NOW | PAPERBACK<br>$19.95<br>ORDER NOW |
| AUDIOBOOK<br>$19.95<br>ORDER NOW | E-BOOK<br>$14.95<br>ORDER NOW | |

"[illegible]"

DAVID GOGGINS

[illegible]



[illegible]

Read the Book's Prologue Here

Let customers speak for us

★★★★★

| | | |
|---|---|---|
| ★★★★★ [illegible] | ★★★★★ [illegible] | ★★★★★ [illegible] |

‹ ›

FOLLOW US






ABOUT IGNITE

PUFF IGNITE NICOTINE AND PUSH EVERY LIMIT

SHOP NOW

Shop Ignite CBD

Puff Ignite Nicotine




IGNITE

This is Exhibit "E" referred to in the affidavit of Dan Bilzerian affirmed before me on February 25, 2025 at Las Vegas, Nevada

A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027

**JAKUB P. MEDRALA, ESQ.**
Nevada Bar No. 12822
**The Medrala Law Firm, Prof. LLC**
615 S. 6th Street
Las Vegas, Nevada 89101
(702) 475-8884
(702) 938-8625 Facsimile
jmedrala@medralaw.com
*Attorney for Plaintiff*
*Dan B. Bilzerian*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DAN BRANDON BILZERIAN, an Individual,<br><br>Plaintiff.<br><br>vs.<br><br>IGNITE INTERNATIONAL BRANDS, LTD., a Foreign Corporation; IGNITE INTERNATIONAL, LTD., a Foreign Corporation; PAUL BILZERIAN, an Individual; SCOTT ROHLEDER, an Individual; RUPY DHADWAR, an Individual,<br><br>Defendants. | **COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br>Case No.: 2:24-cv-2101 |

Plaintiff DAN BRANDON BILZERIAN ("Plaintiff" or "Dan") complains against Defendants IGNITE INTERNATIONAL BRANDS, LTD., IGNITE INTERNATIONAL, LTD., PAUL BILZERIAN, SCOTT ROHLEDER, and RUPY DHADWAR (collectively "Defendants") as follows:

**I.**

**NATURE OF THE ACTION**

This action has its origin in a dispute between the Plaintiff Dan Bilzerian and Defendants Paul Bilzerian ("Paul"), Scott Rohleder ("Rohleder"), and Rupy Dhadwar ("Dhadwar") over

control of Ignite International Brands, Ltd. ("Ignite"); Plaintiff's unlawful removal from Ignite, which was orchestrated by Paul, Rohleder, and Dhadwar; and the subsequent unlawful use of Plaintiff's name and likeness by the individual Defendants and the companies they control.

Plaintiff Bilzerian ("Dan") is the founder of Defendant Ignite and the majority shareholder who was unlawfully pushed out of Ignite through a series of unlawful acts orchestrated by Paul and executed by Rohleder and Dhadwar.

Paul and Rohleder are criminals who were recently indicted (together with Ignite) by the United States of America in the U.S. District Court for the Central District of California (Case No. 2:24-cr-00569). Dhadwar is Ignite's purported CEO; however, his main role at Ignite consists of executing orders from Paul and Rohleder.

Despite the Plaintiff's removal from Ignite, Defendants continued to use and exploit Dan's recognizable likeness for their own benefit while tarnishing his name and reputation on the backdrop of their criminal acts.

## II.

## JURISDICTION AND VENUE

1. Jurisdiction in this case is based on diversity of citizenship of the parties and the amount in controversy. Plaintiff is a resident of Nevada, and Defendants are foreign corporations and residents of foreign states and countries.

2. The amount in controversy exceeds the sum $75,000, exclusive of interest and cost.

3. Additionally, federal jurisdiction in this case is appropriate because this case centers on federal questions. Among other causes of action, Plaintiff brings this complaint pursuant to 17 U.S.C. § 501 and 15 U.S.C. § 1125. Federal district courts have original jurisdiction over such claims pursuant to 28 U.S.C. § 1338.

4. This Court has personal jurisdiction over Defendants because they are either a foreign corporation or residents of foreign states and/or countries with sufficient contacts with the U.S. to render jurisdiction proper in any U.S. court, including the United States District Court for the District of Nevada. Defendants purposefully availed themselves for doing business in the United States and are subject to jurisdiction in any U.S. court.

5. In addition, this Court has personal jurisdiction over Defendants because the claims in this Complaint relate to their maintenance and operation of many websites and social media accounts that are interactive and fully accessible to residents of this District.

6. Defendants have a large portion of customers in the United States, and much of the content distributed by Defendants on the World Wide Web originates from the U.S., including Plaintiff's content.

7. The illegal use of Plaintiff's name and likeness, as well distribution of his works takes place partially, if not entirely in the U.S.

8. Venue is proper under 28 U.S.C. § 1391(b) and (c).

## III.

## PARTIES

9. Plaintiff Dan is a resident of Nevada. Plaintiff is a world-famous professional poker player and social media influencer who gained fame for portraying a distinct, extravagant lifestyle, as well as founding Ignite. He is the son of Defendant Paul.

10. Defendant Ignite International Brands, Ltd. ("Ignite") is a Canadian corporation with a principal place of business in the State of Texas. Ignite sells electronic cigarettes, apparel, alcohol, water bottles, and other brand products.

11. Defendant Ignite International, Ltd. ("Ignite US") is a Wyoming corporation domiciled in California and Texas, and it is a wholly owned subsidiary of Ignite. Upon

information and belief. Ignite US, together with Ignite, markets Ignite's products and is a licensor of Ignite's intellectual property rights.

12. Defendant Paul Bilzerian ("Paul") is a resident of St. Kitts and Nevis, and he was previously an American businessman and corporate raider. In 1989, Paul was convicted for securities fraud in the U.S. District Court for the Southern District of New York and sentenced to prison.

13. In 1993, the United States Securities and Exchange Commission ("SEC") obtained civil judgments against defendant Paul for his fraudulent activities. Upon information and belief, Paul controls some of Ignite's shareholders, including International Investments, Ltd. ("International Investments").

14. Defendant Rohleder is a resident of Florida. He is Paul's "right-hand" and a proxy in the United States. At various times, Rohleder served as a CEO of Ignite. Rohleder acts at the direction and for the benefit of Paul.

15. Paul, Rohleder, and Ignite were recently indicted by the United States of America in the U.S. District Court for the Central District of California for their role in a conspiracy to defraud the United States, wire fraud, and securities fraud, to name a few.

16. Defendant Dhadwar is a citizen of Canada. He is the purported CEO of Ignite and a puppet of Rohleder and Paul. At all times relevant here, he acted at the direction and for the benefit of Paul and Rohleder.

## IV.

## GENERAL ALLEGATIONS

17. Plaintiff Dan is an internationally known poker player, businessman, and a social media influencer. He gained international fame for portraying a distinct, extravagant lifestyle, as well as founding Ignite. He is regularly offered from hundreds of thousands to millions of dollars

to promote lifestyle brands and makes a large part of his income from utilizing his public image.

18. In 2017, Dan founded Ignite. Ignite is a lifestyle brand selling disposable vapes, spirits, and apparel. While not directly involved in Ignite's operations, Dan's name, likeness, and personality became the essence of Ignite's brand, including all of the social media and other advertising and promotion.

19. Until December 2023, Dan served as the nominal CEO of Ignite. However, he was not directly involved in Ignite's operations and had a dispute with other Ignite shareholders—who later turned out to be Paul's agents—over the course of Ignite's business, the quality of Ignite's products, and Ignite's leadership. In essence, Dan complained about the mismanagement of Ignite and Rohleder and Paul's behind-the-scenes acts that caused harm to Ignite's business.

20. During the same time, he was threatened by Rohleder and Paul's other agents that he would be fired from the position of Ignite's CEO.

21. In response, on December 18, 2023, Dan expressly advised the then-board of directors of Ignite that if they fired him as the CEO of Ignite, they would "lose the multimillion-dollar benefit of [his] social media posting" and "lose the rights to use [his] name and likeness."

22. Despite this, on December 21, 2023, Ignite's board of directors, which was controlled by Rohleder and Paul, terminated Dan as the CEO of Ignite. At the regularly-scheduled board meeting where this occurred, Dan again told the board that Ignite had no right to use his name, likeness, and image.

23. In June 2024, Rohleder and Paul took things even further. On June 2, 2024, they purported to remove Dan from the position of chairman of the board with Ignite and unilaterally and unlawfully seize control of Ignite's operations. This was done without the necessary 67% shareholder vote to remove a director.

24. Despite this, Ignite and the remaining Defendants continued to use Dan's name, image, and likeness, as well as copyrighted photographs, without his permission and without providing him with any compensation.

25. Among other things, the Defendants, without Dan's consent:

- Kept his name and image on numerous Ignite websites within their control, making him a central component of the Ignite brand, despite not compensating him for this and unlawfully removing him from Ignite;
- Crated an Instagram account called @ignite.intl (which the Defendants, and not Dan, control) and posted and pinned Dan's name, likeness, and image in various "stories" on that account;
- Used Dan's name and image to promote sales of vapes, alcohol, clothing, and other products;
- Used photographs personally taken by Dan on social media accounts; and
- Attempted to seize, through Canadian court proceedings, Dan's Instagram account.

26. Moreover, because of Rohleder and Paul's criminal acts, on September 26, 2024, Ignite, Paul, and Rohleder were indicted by the United States of America in the U.S. District Court for the Central District of California (Case No. 2:24-cr-00569).

27. In addition, on September 27, 2024, Ignite, Paul, Rohleder, and its proxies Paul Dowdall, John Schaefer, and International Investment, were sued by the SEC in the United States District Court for the Southern District of New York (Case No. 1:24-cv-07331).

28. The indictment and the SEC lawsuit received extensive media coverage throughout the United States and the world.

29. This coverage, despite the lack of Dan's involvement in any criminal activities

perpetuated by Rohleder, Paul, and their proxies, brought Dan negative press specifically because of his affinity with Ignite's brand and his continued presence on Ignite's websites, social media, and marketing materials.

30. After the indictment, Rohleder resigned from the purported position of Ignite's CEO and appointed to this position his and Paul's puppet, Dhadwar, whose actions remain fully and illegally controlled by Rohleder and Paul.

31. Due to Ignite's continuing refusal to cease from using Dan's name and likeness, among other things, on November 4, 2024, through his counsel, Dan again demanded that Ignite cease and desist from using his name and likeness and otherwise exploiting his intellectual property rights, to no avail.

32. Dhadwar, now the purported CEO of Ignite, decided to continue to unlawfully exploit Dan's name and likeness and refused to remove it from Ignite's marketing materials.

33. Moreover, because of his unlawful removal from Ignite, Dan decided to pursue alternative business opportunities, which included, among other things, selling lifestyle products under his own, separate brands.

34. In response, Ignite, Paul, Rohleder, and Dhadwar engaged in a smear campaign against Dan in which they represented, and continue to represent, to potential suppliers and distributors of Dan's companies that Dan is legally prevented from competing in any way with Ignite's business.

35. Ignite, Paul, Rohleder, and Dhadwar have falsely represented to Dan's potential suppliers and distributors that Dan is allegedly subject to a noncompete agreement with Ignite that prevents him from conducting any business that is similar to Ignite's business.

36. These representations are utterly false and their sole aim is to discourage anyone from working with Dan or his entities and to prevent Dan from seizing any business opportunities

outside of Ignite.

V.

**FIRST CLAIM FOR RELIEF—MISAPPROPRIATION OF PLAINTIFF'S STATUTORY AND COMMON LAW RIGHT OF PUBLICITY**

37. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

38. Plaintiff is a universally known and highly recognizable personality who has received widespread recognition for his distinct lifestyle and social media presence that has been viewed by tens of millions of people throughout the United States and all over the world.

39. Through his hard work and use of his talents in the field of entertainment, Dan's likeness and persona have become very valuable and are invested with substantial goodwill in the eyes of the public. Accordingly, Dan licenses the right to use of his name and likeness for use in the United States and throughout the world—a property right with substantial commercial value—which he does not agree to transfer, in whole or in part, to Defendants for any purposes.

40. Defendants' use of Dan's likeness on their websites, social media posts, or other marketing materials without Dan's consent constitutes a violation and misappropriation of Plaintiff's common law right of publicity in that said Defendants, and each of them, misappropriated Dan's photograph, likeness, and persona and used it in a prominent and clearly recognizable manner for commercial purposes to advertise and promote Ignite and to generally promote and enhance Defendants' goodwill and increase their profits.

41. Defendants' misappropriation of Plaintiff's valuable publicity and property rights, as set forth herein above in violation of Nevada Revised Statutes ("NRS") 597.700 et seq. and other applicable law, has resulted in a dilution of the value of the aforesaid publicity and property rights, thereby diminishing the value of said publicity and property rights, all to the detriment and damage of Plaintiff and has resulted in the unjust enrichment of all of the

Defendants.

42. Unless temporarily, preliminarily, and permanently enjoined and restrained by order of this Court, Defendants' continued acts will cause Plaintiff severe and irreparable injury, which cannot adequately be compensated by monetary damages.

43. By reason of the foregoing, Plaintiff is entitled to preliminary and permanent injunctive relief, enjoining the further commercial exploitation of his name, likeness, and identity by any of the Defendants, including but not limited to an injunction against any further broadcast, exploitation or use of Dan's name, likeness, persona, or pictures.

44. As a direct and proximate result of the aforesaid wrongful acts of Defendants, and each of them, Plaintiff has been damaged in an amount that is not yet fully ascertainable but which is in excess of the jurisdictional limit of $75,000.

45. The wrongful conduct of Defendants, and each of them, was fraudulent, oppressive, and malicious and done with conscious disregard for the rights of Plaintiff. Therefore, Plaintiff is entitled to recover from Defendants, and each of them, exemplary and punitive damages.

## VI.

## SECOND CLAIM FOR RELIEF—UNFAIR COMPETITION AND DECEPTIVE TRADE PRACTICES

46. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

47. By virtue of the manner in which Defendants, and each of them, have improperly exploited the name, likeness, and identity of Dan, Defendants, and each of them, have committed acts of unfair, deceptive, confusing, untrue, and/or misleading advertising, unfair competition, and unfair business practices, and the acts of Defendants described herein above constitute unfair competition, deceptive trade practices, and false advertising in violation of, among other things,

NRS 598.0915(2). (3). and (5). In doing the things alleged, Defendants have misled or at least substantially confused the general public.

48. The conduct of Defendants alleged herein is such that Defendants falsely, unfairly, deceptively, unlawfully, and/or misleadingly stated, suggested, or implied that Dan endorsed the Defendants and/or their products and merchandise and that Dan consented to the exploitation of his name, likeness, and identity in the manner alleged in this Complaint, all in a manner likely to mislead the general public.

49. The use of his name, likeness, and identity in this context unlawfully and falsely misled, deceived, substantially confused, and/or misinformed the general public.

50. Defendants, and each of them, knew that their conduct alleged herein would mislead, deceive, substantially confuse, and/or misinform the general public, all for the Defendants' pecuniary gain and to enhance Defendants' goodwill through association with and the apparent endorsement by Dan.

51. As a direct and proximate result of the conduct of Defendants, and each of them, as alleged herein, Defendants have earned profits in an amount that has yet to be ascertained and have otherwise indirectly benefited or profited from the commercial use of Dan's name, likeness, and persona without his consent. Plaintiff is entitled to receive said profits and benefits that each of the Defendants should be required to disgorge, as a result of the conduct alleged in this complaint.

52. As a result of Defendants' wrongful conduct as alleged herein, Plaintiff seeks disgorgement from Defendants, and each of them, of any and all profits or other consideration obtained by or earned by each the Defendants as a proximate result of their deceptive trade practices, false advertising, and unfair competition in violation of NRS 598.0915 and other applicable statutes and common law. Plaintiff alleges that the amount of the wrongfully obtained

revenues is not yet fully ascertainable but is believed to be well in excess of the jurisdictional limit of $75.000.

53. Any continued, unauthorized commercial use by Defendants of Dan's name, likeness, or persona that is deceptive, misleading, and confusing to the viewing public will cause Plaintiff irreparable harm and cannot be adequately compensated in money damages. As a result of Defendants' wrongful conduct, Plaintiff seeks issuance of and is entitled to temporary, preliminary, and permanent injunction, enjoining Defendants, and each of them, and their agents and employees, from engaging in the conduct alleged herein constituting unlawful and unfair business practices, including but not limited to, Defendants' use of Dan's name, likeness, and identity for commercial purposes in a manner that is misleading and confusing to potential customers that injures Plaintiff and that unjustly enriches Defendants.

54. The aforementioned acts of Defendants, and each of them, were done knowingly, intentionally, or with a conscious or reckless disregard of Plaintiff's rights and with the intent to vex, injure, or annoy Plaintiff, such as to constitute oppression, fraud, or malice, thus entitling Plaintiff to exemplary and punitive damages in an amount appropriate to punish or make an example of Defendants, and each of them, and to deter such conduct in the future, the exact amount of such damages subject to proof at the time of trial.

**VII.**

**THIRD CLAIM FOR RELIEF—VIOLATION OF 15 U.S.C. § 1125(a) (LANHAM ACT)**

55. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

56. Defendants, and each of them, violated Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) and (c), by expressly and impliedly making false designations or representations of origin when engaging in the following acts, including (1) misappropriating Dan's photograph, likeness, and persona in advertising and promoting Ignite after December 21, 2023, including on

Ignite's websites, social media, and marketing materials, and (2) misappropriating Dan's photograph, likeness, and persona in generally enhancing the goodwill of Defendants.

57. As set forth above, Defendants, and each of them, have intentionally and knowingly misappropriated, exploited, and used Plaintiff's above-described valuable property in connection with the goods and services advertised and promoted by Defendants for their own gain, profits, promotion, and benefit.

58. Defendants' misappropriation of Plaintiff's valuable publicity and property rights as set forth above constitutes false and deceptive advertising and promotion that was intended to cause, and has caused, confusion and deception of the consuming public by falsely and fraudulently suggesting and representing by the aforesaid misappropriation, among other things, that after December 21, 2023, Dan endorsed, sponsored, sanctioned, authorized, or approved of Defendants' use of Dan's image and identity in Defendants' business enterprises and activities.

59. Defendants' misappropriation of Plaintiff's valuable publicity and property rights, as set forth hereinabove, has resulted in a dilution of the value of the aforesaid publicity and property rights, thereby diminishing the value of the aforesaid valuable publicity and property rights, all to the detriment and damage of Plaintiff.

60. As a direct and proximate result of the aforesaid wrongful acts of Defendants, and each of them, Plaintiff has suffered damage in an amount that is not yet fully ascertainable but which is in excess of the jurisdictional limit of $75,000.

61. Plaintiff is entitled pursuant to 15 U.S.C. § 1117(a) to three (3) times Defendants' profits, or actual damages, whichever is greater, plus costs of suit.

///

///

///

VIII.

**FOURTH CLAIM FOR RELIEF—VIOLATION OF 15 U.S.C. § 1125(c)**

**(LANHAM ACT)**

62. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

63. Dan's name and likeness, as well as other aspects of his identifiable persona, have, through regular, frequent, but carefully monitored and controlled commercial use, become famous trademarks and service marks.

64. Defendants have knowingly and willfully traded on and intended to trade on Dan's reputation and willfully and intentionally diluted Dan's trademarks and service marks by unlawfully using Dan's name, likeness, and distinctive marks to market, promote, and advertise Defendants' products and services and to enhance Defendants' goodwill.

65. Defendants' wrongful conduct and misappropriation and use of Dan's name, likeness, persona, and distinctive marks lessen the ability or capacity of the trademarks to identify, differentiate, and distinguish the services and/or goods advertised, sponsored, or offered by, or in conjunction with, Plaintiff.

66. Defendants' conduct is wrongful and in violation of 15 U.S.C. § 1125(c).

67. Through their wrongful conduct as alleged above, Defendants have damaged Plaintiff's business reputation and have diluted the quality as well as the uniqueness and distinctiveness of Dan's name, likeness, image, and distinctive marks. Defendants' wrongful conduct in violation of 15 U.S.C. § 1125(c) has damaged and caused irreparable injury to Plaintiff.

68. Plaintiff is entitled to a preliminary and permanent injunction issued against Defendants, and each of them, to enjoin and prohibit any continued use, exploitation, or dilution of Dan's name, likeness, image, or distinctive marks, all as provided in 15 U.S.C. § 1125(c).

69. Based on the intentional and willful conduct of Defendants, Plaintiff is entitled to three times the amount of Defendants' profits or three times the amount of Plaintiff's damages, whichever is greater. together with reasonable attorney fees pursuant to 15 U.S.C. § 1117(a) and (b); and. based on Defendants' willful conduct in violation of § 1125(c), Defendants should be ordered to turn over all tangible items that are in the possession of any of the Defendants and that bear the trademarks.

## IX.

## FIFTH CLAIM FOR RELIEF—ACCOUNTING

70. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

71. Based on the wrongful conducts of Defendants, and each of them, as alleged above. Plaintiff is entitled to a full accounting from each of the Defendants regarding each and every unauthorized use of Dan's name and/or likeness and identity for a commercial purpose and a full accounting regarding the gross revenue received by each of the Defendants as a direct or indirect result of said unauthorized and wrongful acts of each of the Defendants as alleged above.

## X.

## SIXTH CLAIM FOR RELIEF—UNJUST ENRICHMENT

72. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

73. As a result of the wrongful acts and conduct of Defendants, and each of them, as alleged above. Defendants have been unjustly enriched and should be required and ordered to disgorge to Plaintiff all of the revenues and profits received by each of the Defendants as a direct or indirect result of Defendants' wrongful conduct.

///

///

XI.

**SEVENTH CLAIM FOR RELIEF—INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

74. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

75. When the Defendants learned that the Plaintiff launched separate brands and business ventures from Ignite, they engaged in a campaign aimed at disrupting Dan's relationships with suppliers and distributors by misrepresenting to them that neither Dan nor his business ventures can enter into any business relationships with such distributors or suppliers because of Dan's alleged noncompete agreement with Ignite.

76. The Defendants specifically stated to such suppliers and distributors that Dan cannot produce or sell any products or services that compete in any way with Ignite, and they threatened that anyone who facilitates such competing ventures will be sued by Ignite.

77. The Defendants made such false representations with the intent to harm Dan and prevent him from entering into any business relationships with suppliers or distributors of his products.

78. Through their wrongful conduct as alleged above, Defendants have damaged Plaintiff's prospective business relationships and caused irreparable injury to the Plaintiff.

79. Plaintiff is entitled to a preliminary and permanent injunction issued against Defendants, and each of them, to enjoin and prohibit any continued representations to anyone that Dan cannot compete with Ignite's business.

80. As a direct and proximate result of the aforesaid wrongful acts of Defendants, and each of them, Plaintiff has been damaged in an amount that is not yet fully ascertainable but which is in excess of the jurisdictional limit of $75,000.

81. Plaintiff is informed and believes and thereon alleges that the wrongful conduct of Defendants, and each of them, was fraudulent, oppressive, and malicious and done with conscious disregard for the rights of Plaintiff. Therefore, Plaintiff is entitled to recover from Defendants, and each of them, exemplary and punitive damages.

## XII.

## EIGHTH CLAIM FOR RELIEF—DECLARATORY RELIEF

82. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

83. Despite the lack of any enforceable noncompete agreement, or other legal mandate. Defendants contest and publicly misrepresent that Dan is prevented from conducting any business activities that compete with Ignite's business.

84. As a result, Plaintiff is entitled to a declaration by this Court, in accordance with NRS 30.040, that Dan is not prevented from conducting any business activities that compete with Ignite's or other businesses of the Defendants.

## XIII.

## NINTH CLAIM FOR RELIEF—COPYRIGHT INFRINGEMENT

85. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

86. Plaintiff is the copyright owner of the various pictures and videos unlawfully used on Ignite's websites and social media platforms that are controlled by the Defendants.

87. Defendants have violated the exclusive rights of the Plaintiff as copyright owner as that term is used in 17 U.S.C. § 501.

88. Defendants have violated the copyright owner's exclusive rights to reproduce such pictures and videos and other materials of Plaintiff to prepare derivative works and to distribute copies as defined in 17 U.S.C. § 106(1)-(3).

89. Upon information and belief. Defendants have infringed on the copyright protection of other works belonging to Plaintiff.

90. Plaintiff seeks an injunction prohibiting Defendants from infringing on Plaintiff's copyrights pursuant to 17 U.S.C. § 502.

91. Plaintiff seeks monetary damages as provided for by statute. 17 U.S.C. § 504.

92. The exact amount of damages is presently unknown; however, upon information and belief, the infringement was substantial, ongoing, and willful. Accordingly, statutory damages of $150,000 per work infringed upon may be appropriate if actual damages are found to be less than this amount. 17 U.S.C. § 504(c)(2).

93. Plaintiff seeks an award of attorney fees as allowed by statute. 17 U.S.C. § 505.

## XIV.

## JURY DEMAND

94. Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand trial by jury on all issues raised in this action.

**WHEREFORE**, the Plaintiffs pray that this Court enter a judgment:

1. Awarding Plaintiff injunctive relief banning Defendants' continued infringement of the Plaintiff's right of publicity, trademarks, and copyrights;

2. Awarding Plaintiff injunctive relief banning Defendants' continued interference with the Plaintiff's prospective economic advantage;

3. Awarding Plaintiff economic damages in excess of $75,000, the exact amount to be determined at trial;

4. Awarding Plaintiff noneconomic damages in excess of $75,000, the exact amount to be determined at trial;

5. Awarding Plaintiff treble damages;

6. Awarding Plaintiff exemplary or punitive damages;

7. Awarding Plaintiff pre-judgment and post-judgment interest;

8. Awarding Plaintiff reasonable attorney fees and costs incurred in the prosecution of this action;

9. Awarding Plaintiff a declaratory judgment finding that he is not prevented from competing with Ignite or any of the other Defendants; and

10. Granting such other relief as the Court may deem just and proper.

DATED this 12th day of November, 2024.

THE MEDRALA LAW FIRM, PLLC

/s/ Jakub P. Medrala

**JAKUB P. MEDRALA, ESQ.**
Nevada Bar No. 12822
615 S. 6th Street
Las Vegas, Nevada 89101
*Attorney for Plaintiff*
*Dan B. Bilzerian*

This is Exhibit "F" referred to in the affidavit
of Dan Bilzerian affirmed before me on
February 25, 2025 at Las Vegas, Nevada

A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027


9:14
◂ Messages
Internati... 13 May 2024 Follow
IGNITE
ALTERNATIVE PRODUCTS EXPO
IGNITE BOOTH
PRODUCT INNOVATIONS!
Vape
DAN BILZERIAN
FOUNDER
BERRY BLAST
MEDELLÍN, COLOMBIA
PLAZA MAYOR
MAY 18-19
BOOTH #705
Send message...


9:15
◄ Messages
29
Lifestyle 9 March 2024
Follow
Send message...


9:15
◂ Messages
28
jakeshields
AMERICAN JIUJITSU
KARMY
jakeshields Paintball wars
Send message...

This is Exhibit "G" referred to in the affidavit of Dan Bilzerian affirmed before me on February 25, 2025 at Las Vegas, Nevada

A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027

ORIGINAL 144

# IN THE SUPREME COURT OF BRITISH COLUMBIA

Date: 20241030
Docket: S245663
Registry: Vancouver

Between:

**Dan Brandon Bilzerian also known as Dan Bilzerian**

Petitioner

And

**Ignite International Brands, Ltd., International Investments, Ltd., Gregory Gilpin-Payne, Scott Rohleder, Robin Rodriguez, Thomas Bunker and Ralph Gilpin-Payne**

Respondents

Before: The Honourable Justice Tammen

## Oral Reasons for Judgment

In Chambers

| | |
|---|---|
| Counsel for the Petitioner: | T. McDonald<br>B. Campbell<br>R. Yanke |
| Counsel for the Respondent, Ignite International Brands, Ltd.: | M.D. Shirreff |
| Counsel for the Respondents, International Investments, Ltd., Gregory Gilpin-Payne, Scott Rohleder, Robin Rodriguez, Thomas Bunker and Ralph Gilpin-Payne: | H.A. Mickelson, K.C.<br>A. Dosanjh<br>G. Boothroyd-Roberts |
| Place and Date of Trial/Hearing: | Vancouver, B.C.<br>October 23 - 25, 2024 |
| Place and Date of Judgment: | Vancouver, B.C.<br>October 30, 2024 |

This is Exhibit "F" referred to in the Affidavit of Gillian Morgan sworn before me at Vancouver this 12 day of December 2024

A Commissioner for taking Affidavits within British Columbia

[1] **THE COURT:** When this hearing commenced on October 23, 2024, there were four applications scheduled to be heard over the ensuing three days. At the conclusion of the hearing on October 25, 2024, I made various interim orders relating to some of those applications.

[2] What remains for determination are the following:

1. The application of a group of shareholders, said to constitute a majority, for fairly broad injunctive relief against the petitioner, Dan Bilzerian (hereafter "D.B."), a minority shareholder and former director and officer. In the main proceeding, D.B. seeks to be reinstated as sole director and CEO, relying primarily on the oppression remedy in the BC *Business Corporations Act*, S.B.C 2002, c 57.

2. The application of the company, Ignite International Brands Ltd., to have D.B. return control to the company of its social media accounts, specifically one Instagram account.

[3] The litigation to date has a tortured history, which I will not even attempt to summarize, much less describe in detail. At its core, this is a dispute over control of the company, Ignite, which primarily sells vaping and related products, largely by using the social media celebrity status of D.B. as its marketing platform.

[4] From late December 2023 to the beginning of June 2024, D.B. was the sole director and CEO of Ignite pursuant to an unusual agreement reached at the AGM, which commenced in December 2023 and concluded in January 2024.

[5] On June 2, 2024, D.B. was removed as sole director and CEO by a majority shareholder vote. There seems to be little doubt that such a method of removal was not in keeping with the corporate articles, and thus, D.B. has a strong case that his ouster was not properly done.

[6] Unfortunately, in his efforts to regain his positions with Ignite and, by extension, control of the company, D.B. and his original lawyers, *not* counsel who

appeared before me, have made a series of serious missteps which have led to D.B. either wittingly or unwittingly abusing the process of this court. It is those missteps which I will not outline. A thorough review of the pleading and litigation history will make plain the reasons I say D.B.'s overall conduct has been an abuse of the court process. Distilling that to its essence would produce a fine law school exam fact pattern, but would serve no useful purpose in these reasons.

[7] I have concluded that I should decline to grant the broad injunctive relief sought by the shareholder applicants, the IIL group, but, rather, should attempt to craft more surgical orders which will hopefully serve the broader interests of the company and permit it to conduct its corporate business in an orderly fashion.

[8] The primary reasons I have decided not to grant the broad injunctive relief to the petition respondent shareholders are these:

1. Their lack of clean hands based on the June 2, 2024, removal of D.B. as sole director and CEO.

2. I have judicial misgivings about the appropriateness of some of the relief they seek in the context of D.B.'s petition proceedings. For example, it is likely the company which must seek orders related to non-competition, not a different group of shareholders. A case could be made that perhaps the other shareholders should have filed their own petition alleging oppression and sought to have it joined with the D.B. petition.

3. I am far from persuaded that the shareholders have a claim in oppression against D.B., another minority shareholder. There is much merit to D.B.'s submission that he has no ability to oppress the other shareholders, particularly by the type of conduct which they seek to enjoin.

[9] The relief I am inclined to grant is this:

1. The return to the company of the social media passwords to restore control of any social media messaging to the company.

2. An order that an AGM be held and some ancillary directions in that regard.

3. Some very specific injunctive relief related to D.B.'s conduct between now and the AGM or the hearing of his petition.

[10] The reasons for each of those decisions follow.

Return of Social Media Passwords

[11] It is appropriate for the company to have control of its own social media messaging. I am not concerned with the ability of the company to bring this particular application in the context of D.B.'s petition proceedings. The reason the company was not able to assert this claim until comparatively recently relates directly to D.B.'s inappropriate earlier filings in which he purported to have initiated proceedings on behalf of the company, when he had no right or authority to do so.

Holding an AGM

[12] I make the direction pursuant to s. 186 of the *Business Corporations Act*, S.B.C. 2002, c 57. The primary reason I do so is to inject some clarity and stability to the status quo of the company governance, pending whatever litigation will next occur.

[13] I also tend to agree with the submission that it is appropriate to hold an AGM in light of the grand jury indictment filed in the US district court for the Central District of California on September 26, 2024, in which the company is one of the entities accused of criminal conduct.

[14] There is much force to D.B.'s submission that the respondents inappropriately stripped him of his position as sole director on June 2, 2024. I will not comment on the initial attempt to regularize that action by attempting to hold either an AGM or SGM in July 2024. Suffice it to say that D.B. attempted to forestall that meeting and, when it was ultimately held in early August, took the position that it was non-compliant with the corporate articles.

[15] D.B.'s application to have himself reinstated as sole director on an interim basis pending final resolution of his claims was heard by Justice Masuhara on October 7, 2024, and dismissed. Thus, the status quo is that he is no longer a director of the company.

[16] D.B. cannot have had a reasonable expectation that there would not be a proper AGM sometime in either 2024 or early 2025. Given that he at no material time has held more than 50% of the voting shares of the company, he could not have had a reasonable expectation that he could continue indefinitely as sole director. He could not have controlled the outcome of any election of directors at an AGM, given his proportionate shareholdings.

[17] D.B.'s argument that the IIL group does not legitimately hold more than 50% of the voting shares is extremely weak. It appears from the evidence that the option to convert to voting shares was solely that of the noteholder, IIL. Even had he remained the sole director, it is doubtful that D.B. could have prevented the conversion from occurring.

[18] In any event, approximately 3 to 5% of the shares are held by non-parties to this litigation. By holding an AGM and electing directors, those parties will have an opportunity to vote. That may be useful information for all those involved in this litigation to possess. If D.B. is correct that he holds 46% and IIL effectively controls 49% of the vote, the other 5% would be needed by DB to tip the scales in his favour.

<u>Injunctive Relief Against DB</u>

[19] I am going to grant some of the injunctive relief sought against D.B., but will attempt to be comparatively surgical in that regard. I do so to ensure that the company can function as smoothly as possible, at least until the AGM. The main reason I am making orders which proscribe certain conduct on the part of D.B. is that he, having sought the assistance of the court through his litigation, has nonetheless, demonstrated a pattern of conduct of attempting to gain the very relief he is seeking to have the court grant by other wholly inappropriate means. Here, I refer primarily to the following:

1. D.B.'s email to all Ignite employees on October 4, 2024, advising them that, in light of the indictment, he was installing two individuals as directors, and telling the employees their options were to either support his team or resign. D.B. then filed an *ex parte* application to appoint himself as sole director and the other two individuals as CEO and COO on October 4, 2024. D.B. then wrote to Mr. Dhadwar, the CEO of Ignite, and purported to instruct Mr. Dhadwar that a different individual had been appointed by D.B. as CEO and that Mr. Dhadwar should report to that individual. All of the above occurred after D.B. filed his original application seeking to be reinstated as sole director, which was unable to be fully heard in August 2024.

2. D.B.'s efforts to have the corporate registry of Ignite's British Columbia subsidiary changed to reflect himself as sole director on October 11, 2024, four days after Justice Masuhara heard and dismissed his application for injunctive relief.

[20] In conclusion, I make the following orders:

1. I grant the order of Ignite on the terms set out in the proposed draft provided by Mr. Shirreff at the commencement of his submissions, namely:

   a) The petitioner, Dan Brandon Bilzerian, also known as Dan Bilzerian, will return control of and grant access to Ignite's Instagram account ("@ignite") to Ignite, including by providing all usernames and passwords and approving any necessary account changes to effect the transfer, within three days of the making of this order.

   b) Subject to further order of the court or written consent of the petitioner, after the date of this order, Ignite will not post the petitioner's name, image, or likeliness on @ignite.

c) If the court orders that the petitioner is reinstated as the sole director of Ignite, on written request of the petitioner to Ignite within three days of the request, Ignite will transfer control of @ignite back to the petitioner.

d) During the course of this proceeding, all parties have liberty to seek further orders of the court with respect to the Ignite Instagram account.

2. I direct the company, Ignite International Brands Ltd., hold an annual general meeting no later than December 20, 2024, and that the company comply with all provisions of the *Business Corporations Act*, S.B.C. 2002, c 57 and its own corporate articles and bylaws, which pertain to the procedures for holding such a meeting.

3. Dan Bilzerian is prohibited from purporting to have authority to act on behalf of Ignite or its subsidiaries, including with respect to Ignite's or its subsidiaries' corporate records and in communication with employees of Ignite or its subsidiaries, until such time as one of the following events occurs:

a) he is elected as a director of Ignite or appointed as an officer of Ignite by its directors;

b) he receives written permission from the directors of Ignite;

c) there is a court determination of his petition proceedings in his favour; or

d) other further order of the court.

[21] Finally, with respect to costs, I am strongly of the view that the shareholder parties should bear their own costs. None of those parties came to this court with wholly clean hands. The company might be entitled to costs of its application against D.B. but, from my reading, has not sought costs in its notice of application.

[22] That concludes my reasons, but there are two things that I think warrant a little bit further discussion before we rise. First of all, with respect to costs, I want to be clear, I did not hear full submissions on costs against all the permutations that might occur in this case. Mr. Shirreff is not here, so I do not want to say too much about what I noticed in his notice of application, which is that he did not seek costs. I do not know if I have the authority to order those.

[23] And as much as I absolutely hate to encourage parties to make further submissions on costs, I do not see how I can avoid that in this case. If any party wishes to make any submissions on costs, they should do so in writing, after first exchanging any submissions they wish to make on costs. And if there are to be any submissions exchanged by the parties, that should be done within 30 days of the date of this order.

[24] But let me just go off script a bit here. Again, I am not encouraging voluminous filings about costs. I think it is a complete waste of time in the context of this litigation to be fussing over costs over something like this, so the parties are forewarned. And if you do submit written submissions to me on costs, I will give you some kind of written judgment in the fullness of time. It might be a very, very, long time before you have that judgment. It is going to go to the very bottom of my reserved judgment priority list, and I think counsel understand why.

[25] That is all that I have to say about costs.

[26] Finally, I wanted to say something primarily to counsel for Mr. Bilzerian about the injunctive relief I have granted. I was cognizant of the fact that I should be cautious in proscribing his ability to express himself. That is why the proscription on communication is very narrow. It proscribes him from purporting to have the authority to act as a director in communicating with employees of Ignite or its subsidiaries. It is very narrow.

[27] For instance, I am not encouraging this, but I did not want to put a complete social media gag on Dan Bilzerian. He has got his own personal accounts, and he is

free to say what he wants about this case and his belief that he was wrongly removed as a director. That is up to him. There is no prohibition, but he cannot purport to have the authority of a director until he actually does. I hope that is clear.

[28] Mr. Mickelson?

[29] CNSL H. MICKELSON: Yes. And just on that point -- I was just conferring with Mr. Dosanjh as you were speaking, and then just on that last clarification, I think earlier in your reasons, you were commenting about that direction in the context of sort of maintaining some order for the surgical order, you know, till we get to a next juncture, and you've got that Mr. Bilzerian is prohibited from purporting to have authority. And I understand that this is the purporting to have authority to act on behalf of Ignite or its subsidiaries, and then you say "including" and you mention those two. But I just want to just -- I think it's important to clarify he's also purported to have authority in writing to suppliers and distributors, and I take your orders as being inclusive of that, bearing in mind your comments about his social media commentary that he would say wrongfully removed. But I just wanted to be clear that I -- as I read what you're saying is consistent with your objects that it's -- like, you mentioned employees and, I think, the records office, but you did have -- also had evidence where he wrote to a supplier and said --

[30] THE COURT: Yes.

[31] CNSL H. MICKELSON: -- I'm the director, and then he wrote and said to -- you know, what do I do with this? Who's in charge? So I'm presuming your order -- you mentioned those two, but it's just between now and the next juncture, don't purport to people --

[32] THE COURT: Yes.

[33] CNSL H. MICKELSON: -- that you're the director. Thank you.

[34] THE COURT: And that part -- that specific wording you have just referenced, Mr. Mickelson -- that was directly from Mr. Dosanjh's proposed draft order.

[35] CNSL H. MICKELSON: Yes.

[36] THE COURT: And yes, that is what it means. So, for clarity, the order does proscribe him writing to suppliers and any other corporate entity purporting to have the authority of a director until such time as one of those triggering events occurs.

[37] CNSL H. MICKELSON: Thank you.

[38] THE COURT: All right. We will adjourn.

Tammen J.

This is Exhibit "H" referred to in the affidavit of Dan Bilzerian affirmed before me on February 25, 2025 at Las Vegas, Nevada

Allana Hill

A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027

# EXHIBIT A

EXHIBIT A

No. S245663
Vancouver Registry

# IN THE SUPREME COURT OF BRITISH COLUMBIA
(BEFORE THE HONOURABLE JUSTICE TAMMEN)

Vancouver, BC
January 17, 2025

BETWEEN:

Dan Brandon Bilzerian also known as Dan Bilzerian

Petitioner

AND:

Ignite International Brands, Inc.
International Investments, Ltd., Gregory Gilpin-Payne,
Scott Rohleder, Robin Rodriguez, Thomas Bunker, and
Ralph Gilpin-Payne

Respondents

## PROCEEDINGS IN CHAMBERS

COPY

No. S245663
Vancouver Registry

# IN THE SUPREME COURT OF BRITISH COLUMBIA
(BEFORE THE HONOURABLE JUSTICE TAMMEN)

Vancouver, BC
January 17, 2025

BETWEEN:

Dan Brandon Bilzerian also known as Dan Bilzerian

Petitioner

AND:

Ignite International Brands, Inc.
International Investments, Ltd., Gregory Gilpin-Payne,
Scott Rohleder, Robin Rodriguez, Thomas Bunker, and
Ralph Gilpin-Payne

Respondents

## PROCEEDINGS IN CHAMBERS

| | |
|---|---|
| Appearing on own behalf: | D. Blizerian |
| Counsel for the Respondents International Investments, Ltd., Gregory Gilpin-Payne, Scott Rohleder, Robin Rodriguez, Thomas Bunker, and Ralph Gilpin-Payne: | H. Mickelson, KC<br>A. Dosanjh |
| Counsel for the Respondent Ignite International Brands, Ltd.: | M. Shirreff |
| Former Counsel for the Petitioner: | T. McDonald |

# TABLE OF CONTENTS

## PROCEEDINGS IN CHAMBERS
## JANUARY 17, 2025

## PROCEEDINGS


| Witness | Proceedings | Page |
|---|---|---|
| | Discussion re preliminary matters | 1 |
| | Submissions re application for contempt by the Petitioner | 2 |
| | Submissions re application for contempt by Cnsl M. Shirreff | 18 |
| | Submissions re application for contempt by Cnsl H. Mickelson | 20 |
| | Discussion re scheduling | 25 |
| | Directions by the Court | 26 |
| | Reporter certification | 28 |


## EXHIBITS

| Exhibit | Description | Page |
|---|---|---|
| | No exhibits marked. | |

## RULINGS, REASONS, ORDERS


| Description | Page |
|---|---|
| Directions by the Court | 26 |

**January 17, 2025**
**Vancouver, BC**

**(PROCEEDINGS COMMENCED) ([9:02:10 AM])**

THE CLERK: In the Supreme Court of British Columbia, at Vancouver, this January 17th, 2025. In the matter of Bilzerian versus Ignite International Brands, Justice.
THE COURT: Could we have introductions of counsel, please?
CNSL M. SHIRREFF: I'll -- I'll go first, Justice. It's Mike Shirreff. Last name S-h-i-r-r-e-f-f. Counsel for the company, Ignite International Brands, Ltd., the applicant this morning.
CNSL H. MICKELSON: Justice, Howard Mickelson and Arpal Dosanjh, and we are on for the respondents International Investments, Ltd., Gregory Gilpin-Payne, Scott Rohleder, Robin Rodriguez, Thomas Bunker, and Ralph Gilpin-Payne.
CNSL T. McDONALD: Trevor McDonald, former counsel for Mr. Bilzerian. We have submitted an order to the court, Justice, to get off the record, but it hasn't come back yet. So we're still waiting for that. Mr. Bilzerian is representing himself.
THE COURT: Is that right, Mr. Bilzerian? You're on mute.
THE PETITIONER: Sorry. Yes, that's correct, Your Honour.
THE COURT: All right. Thank you. Mr. Shirreff, this was your application to have Mr. Bilzerian held in contempt for failure to comply with my order. Is that what you wish to proceed with this morning?
CNSL M. SHIRREFF: Yes, Justice.
THE COURT: All right. Mr. McDonald, what -- what is your position about your participation this morning?
CNSL T. McDONALD: Well, as I say, we're -- we've -- we're no longer retained by Mr. Bilzerian. We're no longer acting. Because technically we're still on the record because we didn't get the order back, that's why I'm here today.
THE COURT: All right. Are you content to remain simply, I suppose, as an observer, or did you wish to be formally removed from the record today and excused?
CNSL T. McDONALD: I'd like to be removed and excused,

sir.

THE COURT: Okay. So just before I do that, I have seen somewhere that there's been some objection filed to Mr. McDonald withdrawing as counsel, but I -- from what he's told me there's an order that's either pending or has been made in that regard.

CNSL T. McDONALD: Yeah, there was a consent signed by all after the objection was filed.

THE COURT: I see. All right. So, Mr. Shirreff, I take it then there's -- there's no issue with Mr. McDonald, having fulfilled his professional obligation this morning, being excused.

CNSL M. SHIRREFF: Yes. None at all, Justice. The parties executed a consent order on that actually quite some time ago now.

THE COURT: All right. Thank you for attending, Mr. McDonald. You're excused from further participation.

CNSL T. McDONALD: Thank you, sir.

THE COURT: Okay. Now, Mr. Bilzerian, as far as I can see, you've not filed a response to the notice of application seeking to have you held in contempt. Are you content to proceed this morning with Mr. Shirreff's application?

**SUBMISSIONS RE APPLICATION FOR CONTEMPT BY THE PETITIONER:**

THE PETITIONER: Yes, Your Honour. So I've -- unfortunately, I haven't appeared before you. I haven't had the opportunity. I've hired numerous counsel. I've spent over $500,000 and they just seem to be continuously dropping the ball. So I was wondering if I could have, like, just a minute or so to give you where I'm at with this case and what's going on.

THE COURT: Yes. I'll certainly [audio malfunction]... to do that, Mr. Bilzerian, but I just want to understand if you are content to proceed with Mr. Shirreff's application that you be held in contempt for failure to comply with my order, or if you wanted some more time to address it.

THE PETITIONER: I -- I mean, all the Canadian counsel that I have hired have been completely useless. To me this case is pretty simple. I mean, they were not allowed to remove me as per Canadian law

from the Board of Directors. I was the only Board -- you know, the only person on the Board. In order to remove somebody you have to have a 67 per cent shareholder vote. I hold 56 per cent shareholder vote and they say that I have 47. But, regardless, that's not enough for them to ever have 67. So they illegally removed me from the Board. And they purported to have an AGM which they're not, you know, legally allowed to call, and then they muted me during the AGM. They illegally appointed shareholders.

And then they just recently went against your order and had another AGM. They did not invite me and they did not invite another major shareholder who was opposing them. So they basically had an AGM and didn't invite the largest major shareholder, myself. They wouldn't allow me to vote. And they didn't invite Bill Perkins either and Bill Perkins is -- you know, he's invested six million dollars in Ignite, and because he opposed what they were doing. Because my dad is a convicted felon and he's been indicted by the DOJ for doing exactly what he's doing, which is running the company illegally.

And so I just don't understand what's happening. Because this is -- this is a full-on mutiny. It's illegal. They're not following Canadian law in any way, shape, or form. And I just don't understand how when Canadian law requires 67 per cent shareholder vote and I have 47 per cent and -- according to them -- 56 per cent according to myself, how they could ever remove me as the sole board member. Because the reason that we didn't completely remove them last -- sorry, in 20 -- the end of 2022 -- or, sorry, the end of 2023 was because they agreed to allow me to be the only board member. And so when they signed that agreement and all the shareholders voted and voted, you know, unanimously to make me the only board member, they can't just -- you know, when I disagree with them illegally kick me off the board without holding a legitimate AGM and having shareholders vote.

I mean, there's a process to removing a board member and they did not follow that process, and now they're trying to, you know, have me hand over a social media account that I created three years

prior to Ignite's existence. That is my asset that I have received zero compensation for whatsoever. And according to, you know, the caselaw, you have to receive compensation for an asset for it to be transferred. And the assumption of a social media account is assumed to be -- the owner is assumed to be the person that created the account and the person that's operating the account. So they haven't given me any compensation for that account. They have no right to that account.

That account was a vape account for a different company that I had started before Ignite. And I changed over to Ignite and I did that as a favour, much like many things that I've done for Ignite. I gave them millions of dollars of my book proceeds for free. I received no compensation for that. You know, I've let them use my -- my brand. I've done all sorts of things and I've -- you know, and I haven't asked for a dollar. So they -- they just don't have -- they're just not following Canadian law. And I don't understand how we've gotten here. I've hired numerous lawyers and they seem to all have dropped the ball. Some of them have had prejudice, but I -- you know, I don't know how the Canadian court system works, but I do know that Canadian law requires 67 per cent shareholder vote, which was impossible to achieve given that I have, even according to them, 47 per cent.

THE COURT: If I can just stop you there for a minute, Mr. Bilzerian. On that last point, it's -- my understanding is it's the Articles of Incorporation of the company itself that requires a 67 per cent -- but, in any event ...

THE PETITIONER: Sorry, Your Honour.

THE COURT: Yeah, no. Look, I made a -- it wasn't a hard finding because there wasn't a full proper evidentiary backdrop before me, but I did make a comment in my earlier reasons that you had a strong case that you were improperly removed because there wasn't a 67 per cent vote. Okay. So you've -- you've got that strong case. And you initiated those proceedings in this court but those have not concluded yet.

Now, what we're talking about right now is a different order that I made, and that order, in

essence, had two parts. One was directing the company to hold that AGM prior to December 20th. And I don't know if that occurred and that's not before me today. But the other part of that order was that I ordered that you return control of the company social media account to the company. And the evidence that was before me is that it's a social media account that specifically references the corporate entity Ignite. It's not your personal account. It's an Ignite account. And so I made an order that that must be returned to the company.

Now, your counsel filed an appeal of that order and that's currently before the Court of Appeal. I think you're going to need leave from the Court of Appeal to appeal that and I don't know what steps have been taken in that regard. But that's fine. You're perfectly entitled to appeal my order if you disagree with it. And then once you've appealed it you can seek a stay of the order either from me or from a judge of the Court of Appeal. But that, as far as I know, wasn't done. But the problem before me today is that that order that I made remains valid and you must comply with it unless one of two things happens: a judge grants you a stay of the order, or (2) you successfully appeal the order. So that's what we're concerned with today, Mr. Bilzerian.

THE PETITIONER: So they -- they had the AGM. They just didn't invite me, which is illegal because I'm the largest major shareholder in the corporation. They also didn't invite Bill Perkins. So they're not following your orders. And to me, you know, this is an account, like I said, that I created three years prior to Ignite. And I can prove that to you. And I can show you that that's an account that I own and I can change the name of that account in one second and then it no longer represents Ignite. And I would actually argue that they have no right to that account whatsoever because that account is using my name and likeness, which they were told over a year ago that they don't have authorization to use.

So my attorneys advised me not to turn over that account. Because we're currently suing them for using my name and likeness and if I give the account that has my name and likeness all over it

it would be, according to him, giving them consent to use my name and likeness, which they do not have authorization to use. Not to mention, like I said, I have caselaw that I can provide to you, but that account is only -- is only linked to Ignite because I haven't changed the name. But once that name changes that account has nothing to do with Ignite at all.

However, currently that account has pictures of my name and likeness that I own that I took and it has, you know, videos of me which are promoting the company, which I'm not authorizing the company to use because I revoked that a year ago when they, you know, have -- you know, they illegally removed me as a CEO, kicked me off the board. They've been doing tons of illegal things, which is why they are currently indicted. The company is indicted. My father is indicted. Scott was arrested. And so these -- you know, these criminals are conducting a mutiny right now of my organization.

And for some reason I just can't get any relief from Canada. I went to Canada to -- you know, to, you know, get some shareholder relief to protest this, and now they are telling me that I have to hand over an account that I created three years prior that they have no authorization to use. And my lawyer says if I give it to them it's consenting for them to use my name and likeness, which I absolutely don't authorize them to do.

THE COURT: Okay. Hang on. Stop there, Mr. Bilzerian. So, two things. Number one, you're saying that your lawyer is advising you. This is your lawyer in the United States.

THE PETITIONER: That's correct. 'Cause I --

THE COURT: Okay. But, so, unfortunately, Mr. Bilzerian, I must advise you as a judge of the Supreme Court of British Columbia that your -- your lawyer in the United States based on what you've told me is giving you advice to break the law in Canada, to breach a court order. So he cannot do that. He cannot give you that legal advice.

But that aside, my order is very clear. I'm looking at it right now. Dan Bilzerian shall return control of and grant access to Ignite's Instagram account -- and then it's defined as

@Ignite -- to Ignite, including by providing all user names and passwords to Ignite and approving any necessary account changes to effect the transfer within three days.

And then the second term is this: Subject to further order of the court or written permission granted by Dan Bilzerian, Ignite will not post Dan Bilzerian's name, image, or likeness to the Ignite Instagram account. Then there's a term that if you are successful in being reinstated as sole director of Ignite, on your request Ignite will transfer the control of the Instagram account back to you within three days. And then there's a further term that during the course of this proceeding -- and that's the proceeding that you instituted in this court, Mr. Bilzerian -- during the course of this proceeding all parties have liberty to seek further direction with respect to Ignite's Instagram account.

So, quite apart from seeking a stay of my order, you could have filed a different application seeking to present some of this evidence to me and have me reconsider it, but none of those things were done. You still haven't complied with the order and that's the problem we've got now.

THE PETITIONER: Your Honour, my -- my lawyers have done nothing but drain my bank account consistently and they have produced absolutely nothing and they are giving me conflicting advice. And I explained to them very simply that I created this account three years before Ignite started, so therefore it could not be the property of Ignite. Ignite has its own Instagram which they have owned and operated this entire time, and they've been illegally using my name and likeness for the last year even though I've told them on numerous occasions -- I believe my lawyer should have provided the court, at least, 67 to 80 different instances where they are using my name and likeness currently on their Instagram, even though I've told them -- even though I filed a lawsuit in the United States. So I absolutely could not trust that they wouldn't use my name and likeness on the current account which has my name and likeness all over. And by giving it to them I would be, according to my lawyer, giving them

authorization to use my name and likeness. Not to mention they have an Ignite Tik Tok account and an Ignite Snapchat account. They have all social media accounts for Ignite that they've been owning and operating this entire time.

This is a separate account that I own that I started three years prior to the company's existence for my other vape company and I plan on changing to my new vape company. Because they've illegally kicked me out of my -- the company that I started and founded and, you know, spent hundreds of millions of dollars and social media posts promoting that Ignite account that I own, that I plan on changing to SAV, my new vape company. It has all of my followers. It's using my name and likeness. The entire account has pictures of me on there. And, like I said, they are currently using my pictures in promotion of the company on their other Ignite International account which is their official account, which is the only account that they should have authorization to use. And -- and they've refused to, you know, remove it even though I've told them for over a year that they don't have authorization to use my name and likeness.

So my lawyer is advising me that if I give up an account that is mine, that is using my name and likeness in almost every single post in the entire account, it is, you know, according to him, giving them authorization to use my name and likeness. So I would like to change the name of the account that I currently possess to SAV, which is my new vape company, remove all pictures of myself and Ignite and start that account fresh, just like I did when I started Ignite, just like I had moved it from my previous vape company that's an asset that I've received no compensation for.

And, like I said, I have caselaw to show that when you create an asset, i.e., a social media account, that the company that you're, you know, currently representing does not own that account unless they give you compensation for that. That's an account that I created that I have brought my personal followers over to. And, like I said, they have their own Ignite International Instagram account that is not this.

And so I -- you know, I have what my lawyer

is advising me. I've got a current court case in the US, you know, fighting them on this and trying to get them to remove my name and likeness because they refuse to do it. I mean, they just don't care about the law. That's the problem. Just like they didn't invite me to the AGM that you told them to specifically hold. And according to the Canadian bylaws, you have to invite the largest major shareholder to an AGM in order to have a legitimate AGM. Well, they muted me. They kicked me off the last AGM three or four times. And then they didn't even send me an invite to the new one; nor did they send Bill Perkins an invite. So they're not following your orders in any way, shape, or form.

And so I -- like I'm -- I'm in a tough spot because I don't know -- my lawyer has advised me that if I give up my Instagram account that is currently named Ignite, which I want to change to SAV -- the only reason I haven't changed it yet is out of respect for you to, you know, have this hearing here. But my lawyer says immediately change the name of that account. It should not be Ignite. You should remove all your photos off of there. You cannot give them authorization to use your name and likeness or it's going to kill our court case saying that they don't have the authorization to use it, you know, and they haven't done that for the last year.

THE COURT: Okay. So, Mr. Bilzerian, it seems very clear to me that you need to get your lawyers in the United States who are giving you this advice to help you to find some lawyers in British Columbia that you can work -- that they can work with and you can work with to bring some kind of application either before me or before the Court of Appeal to put your case forward with some proper evidence. Because none of what you're telling me today is actually evidence. It's got to be in an affidavit for me to consider it as evidence.

THE PETITIONER: Yes. No, I'm happy, Your Honour, to submit that. I can -- I can show you -- you know, just for your, you know, knowledge here, you can see that this was created in 2016, early 2016. This is the Ignite account. That's when it was created. And it's only named Ignite because I

haven't changed it, you know. But I -- I have authorization to change that account. Once I change it it will have no affiliation with Ignite whatsoever. They have Ignite International Instagram right now. So that's their account. I -- I want to change this to my new vape company. They should not be able to stop me from earning a living and right now they're trying to stop me from earning a living. I have a new vape business. They've illegally kicked me out of the one that I created here, and so I have the right to earn an income and they're impeding that.

They also went around the world and they trademarked my new vape company. It's called SAV. And they went out and trademarked that logo that we created that we own the art for. They're trademarking it in all these different countries right now trying to impede my ability to, you know, own and operate a business. And if they're going to kick me off the Board, if they're going to kick me out of the company illegally and they're basically just going to, you know, run a mutiny, they're going to use my name and likeness illegally when I haven't given them authorization, the least I can have the opportunity to do is run my own company and compete with them. If they don't want me a part of that and they want to kick me out of the company I should be able to earn a living, according to US law. Like, they can't stop you from competing. I don't have enough --

THE COURT: Okay. But that -- but that -- that's a different issue and that's a different application, which I am not going to address today. But, look, back to the starting blocks on this one. The onus is on you, Mr. Bilzerian, to bring some kind of application in the BC courts to address my order. As of right now it's pretty clear to me you are in contempt of that order and you might leave me with no option but to make a finding that you are in contempt. I would impose a penalty for the contempt today, but that's going to create a bind for all of us.

THE PETITIONER: Your Honour, I did not want to do anything to disrespect you and I have the utmost respect for you and the court of Canada. I am just in this weird spot where I've spent over $500,000. I've now hired, like, five different

lawyers in Canada. They have all screwed this up. The current lawyer is now trying to bill me an extra $100,000 and my lawyer in the US is -- is telling me that, you know, I should absolutely unequivocally not hand over that account because it will ruin my court case here in the US, which is a valuable court case.

Because you know, it would be like, you know, operating Air Jordan without Michael Jordan's authorization. They're running around the world using my name and likeness, posting me on their Instagram, posting me on their account, using pictures of me at the trade show, telling people I'm affiliated with a brand that I have no control over, selling inferior vape devices, hurting my personal brand. And I -- and, you know, and my only recourse is to sue them and, you know, enforce, you know, my legal rights and not have them use my name and likeness without authorization, which they don't have authorization.

We have, you know, the documentation where I told them over a year ago to stop doing that. So, to hand over an account that I created that is all my name and likeness and all photos that I have curated, all photos that I own, all video that I own, I mean, like I said, my lawyer said that that would be essentially giving them the right to use my name and likeness and it would kill my court case. I don't know what to do. My lawyer is telling me one thing. You're telling me another thing.

I mean, I would love, Judge, if I could please just, you know, retain Canadian counsel that is competent. I mean, this is just so frustrating. Like I said, I came here to seek relief because they illegally kicked me off the Board of my company, and now they're trying to take the one asset I have to start my new vape company. I mean, I have to have an Instagram account that -- you know, to promote my new vape company and I -- you know, just like I did, I had this -- this Instagram account three years prior to -- Ignite was promoting a vape company before that. Then when I got involved with Ignite and I founded that I used that Instagram account to promote Ignite. And now I'd like to use that

Instagram account to promote my new vape company. This would be the third one.

And -- and like I said, I just -- I -- you know, look, I know this is not probably the proper way to do this, and I apologize for that. I really do. But just -- I mean, like I said, they're just draining me of money in the Canadian court and I don't know what to do. Because my US lawyer said if I -- if I do that it will absolutely kill my case and I'll be -- and they'll also now have an account which they, you know, may or may not return to me.

I mean, you told them to invite me to the AGM, obviously, as a major shareholder and they didn't do that. They've held two AGMs. The first one they muted me the entire time and kicked me off of the thing. I didn't get to vote my shares, which is half the company shares. And then the most recent AGM they appointed five or six Board members without allowing me to vote on any of them and then raised the issue of kicking me out without allowing me to vote on that either. And they didn't allow other shareholders to vote in this, too. So, I mean, they're -- they obviously don't care about the law, which is why they are indicted, which is why the DOJ and the SEC have indicted them. And they've indicted the company also because of this.

So, look, I mean, I -- I'm in a weird spot right now. You have to understand Your Honour. I'm not trying to be difficult. I'm not trying to, you know, disobey your order. I'm just -- my lawyer literally said that it will sink my case. And I -- I wanted to change this account to my new vape company months ago. I've only not done it out of respect for you. But this is hurting my ability to operate my new vape business. Because from my personal account what I do is then tag the new vape company which -- I would like to change that account that I own to SAV, to promote my new brand so that I can make money. Because they're not paying dividends. You know, they -- they did over $150 million in sales this year and they haven't paid a single dollar. And I believe that my father has been embezzling money out of the company. And I -- you know, and I'm in the court proceedings to stop that. The government is

trying to intervene.

But, I mean, until the -- I mean, please, Your Honour, we can't just hand them an account that they, you know, will use without my authorization and that's going to be further tying me to the company and that I don't believe that they will ever give up, which -- and I don't believe that they have any right to at all because it's an account that I started three years before Ignite was even a thought in my mind.

THE COURT: Right. But -- but, Mr. Bilzerian, I keep saying this, and I'm not sure if you're hearing me, but you need to do something. You need to bring an application in this court. Are you planning on doing that? And I think you need Canadian counsel to do that.

THE PETITIONER: If that's -- if that's what you're telling me to do that's what I'll do. Like I said, I can't afford to keep spending all this money 'cause I -- because of them I'm in, like, seven different legal battles. I've spent, like I told you, over $500,000 in the Canadian court and the only thing the Canadian court has done is -- you know, is ruled against me. And I'm -- like, I'm the victim here and I don't understand why I'm losing assets. I'm not getting any relief. I mean, this -- this should be a shareholder oppression thing and my lawyers messed up, and my new lawyer said that I should file a bar complaint. I asked them to do that. They didn't do that.

I mean, I just -- I don't know what to do because every single time it just -- it drains me. I just don't have the funds to continue to fight all these legal battles. And the problem with the Canadian battles is that none of them are -- you know, can -- will yield me any money. According -- I mean, according to my lawyer, the only legitimate one that I have that I can actually get paid for is the US, you know, court case. And if I hand over the account it's going to kill that. So I'm out $500,000. They've illegally kicked me off the Board of my company. And they're not inviting me to the shareholder meetings. They're not letting me vote my shares. They're using my name and likeness without my authorization. I mean -- I mean, listen, if you say that, you know,

hire another Canadian attorney and bring this, that's what I will do. Yeah, I will -- I will respect that, Your Honour. If that's what you say I got to do that's what I'll do.
THE COURT: Well, I'm -- I'm not directing you to do that, Mr. Bilzerian. I'm -- I'll simply say that it seems to me you have a little -- you have a few options. And to be blunt, you need to get some better advice from your American lawyers.
THE PETITIONER: Okay.
THE COURT: They can't -- they cannot ethically give you advice to continue to breach a lawful order of this court. That's completely unethical for a lawyer to give you that advice.
THE PETITIONER: Okay.
THE COURT: And you need to understand. You said a moment ago that your lawyers are telling you one thing and I'm telling you another. I'm not really telling you anything other than what I ordered, which I've just gone over with you in that -- that court order from the end of October this year. And so that's very different from lawyers giving clients advice. That's a judge making an order which you are bound to follow. Otherwise, you are breaking the law. And the consequence of that will be eventually I will be forced to find that you are in civil contempt of that court order and then I'll have to impose a penalty for that.
THE PETITIONER: Your Honour, listen, like I said, I know that this isn't the proper way to -- to submit this to you and to proceed, but I -- is there any way that you could, you know, provide me a little bit of relief given the situation that I'm in. Like I said, I founded this company. I spent six years on this company. They've illegally kicked me out. I mean, our letters of incorporation say that they have to have a 67 per cent shareholder vote. There is absolutely no way they could have that if they say that I have 47 and I say I have 56. So they've clearly not gone according to the company bylaws. They're not following US law. They're currently indicted.
I mean, these people are running a literal mutiny. They're not inviting me to the shareholder meetings. They're not letting me vote my shares. They're not letting anybody else vote their shares. They're illegally using my name and

likeness. Please, Your Honour, is there -- is there some way that you can give me some kind of relief here? I know that we have -- my lawyers have not proceeded correctly, but it's certainly not for a lack of trying on my part. I have spent so much money on this and I --

THE COURT: But, Mr. Bilzerian, the only relief I can grant you today is to adjourn the hearing to hold you in contempt and permit you to file whatever material you and your lawyers wish to file.

THE PETITIONER: What -- what should I have them -- what would it be called? I'm sorry to -- to bother you with this. I just don't know.

THE COURT: Well, but I can't answer those questions, Mr. Bilzerian. You -- you need to get proper legal advice from your lawyers in the United States. And, I'm sorry, but based on what you have told me so far, if what you're telling me is accurate you're not getting proper legal advice from those lawyers.

THE PETITIONER: I feel like that's a recurring theme here and in the United States.

THE COURT: You need to -- you need to get proper advice from your American lawyers and you need the American lawyers to help you find competent Canadian counsel to bring the right application on your behalf in the court in British Columbia.

THE PETITIONER: I mean, I have to tell you, Judge, I've literally just gotten nothing but bad legal advice, and that's in Canada as well. My Canadian lawyers had me proceed as Ignite when I should have proceeded as myself.

THE COURT: Yes.

THE PETITIONER: And they did that because they were Jewish and they didn't like my support of Palestine, and so they, you know, gave me bad advice.

THE COURT: Mr. Bilzerian, I can't -- I can't entertain that kind of rhetoric.

THE PETITIONER: Well, no, no. They --

TH COURT: I -- I already found that your lawyers made a mistake.

THE PETITIONER: No, no. He told me that's why. He said -- I did not want to -- I did not want to have to defend his anti-Israel pro-Palestinian tweets, so he said that the reason that he filed as Ignite and not as me personally is because he

didn't want to defend that. I mean, lawyers defend murderers. They should defend people standing up for humanity. But that's a separate thing. My point is that they -- they gave me bad legal advice. That is unequivocally bad legal advice, and in my other lawyer's opinion disbarrable. And so that's -- I mean, but it's not my fault that they told me that, you know.

So what I'm saying is they're giving me bad advice. And I have a track record of these lawyers telling me the wrong thing. So it's hard for me to know, I mean, who to hire and who I can trust. Because I should have absolutely unequivocally not sued them as Ignite. I should have sued them with shareholder oppression as myself. But because they didn't want to defend social media tweets they proceeded incorrectly. They literally told me that.

THE COURT: All right. But that -- that's a different issue, Mr. Bilzerian. You're going to -- how much time are you going to need to find counsel that can put the right application and right material before the court in British Columbia?

THE PETITIONER: Do you have any counsel that you would recommend or any --

THE COURT: I can't -- I can't do that. Mr. Bilzerian, I'm sorry. I have to be completely neutral in all of this.

THE PETITIONER: No, that makes total sense, Your Honour. How would -- how would you recommend me to just find proper counsel that's going to give me correct advice and is not going to drain my bank account and give me, you know, incorrect information? Because that's what's happened up to this point. And you have to understand, I've gone through five different lawyers in Canada. So I don't -- I am not a Canadian. I'm not up there. I don't -- you know, I'm just trying to figure out how to get Canadian counsel that's going to advise me correctly.

THE COURT: Well, I -- I would think that your American lawyers would be able to vet some Canadian lawyers.

THE PETITIONER: Well, but you said my American lawyer is bad as well, Your Honour, so ...

THE COURT: Well, all I -- all I can -- no, I didn't say that, Mr. Bilzerian. I said that if what

you're telling me is absolutely accurate that lawyer is giving you unethical advice. You are telling me that he's advising you to willfully breach a lawful order of this court and a lawyer cannot give that advice.

THE PETITIONER: He -- he said that basically -- and he gave me the US caselaw -- that that account is mine and that by giving them that account that would be authorizing their use of my name and likeness and that it would kill my US court case. And that if I did that I just wasted a bunch of money and I destroyed my ability to challenge their using my name and likeness.

THE COURT: But did you show that lawyer the physical copy of my order?

THE PETITIONER: I believe he saw that, but I don't -- he was -- he was communicating with my Canadian counsel. I was a liaison between them. So I would assume that he talked to them. But I can't speak to exactly what he saw. But, Your Honour, I'd never lie to you. That is literally what he told me. He said if I give that account -- which he said there is numerous caselaw, Canadian and US, saying that I own that account based on when it was created. And he said that if I -- if I gave that to them that it would be authorizing them to use my name and likeness. Because every picture on that entire account I own and it is of me.

THE COURT: All right. Well, the order says that Ignite will not post your name and your likeness on the Ignite Instagram account.

THE PETITIONER: But they are doing it on theirs and they have been doing it on theirs for over a year after I told them to stop doing it. And we've -- I gave my lawyers, I think it was, like, 76 or 86 different examples of them using it currently. I mean, I can pull it up right now and show you pictures of myself.

THE COURT: Well, I -- I can't -- I can't receive that evidence today, but it sounds to me like that's the exact sort of evidence you're going to need to put before the court here in British Columbia.

THE PETITIONER: I can't believe you haven't seen it, Your Honour. I literally spent hours and hours taking screen shots of every single one of those pictures, and I submitted those to my lawyers to

submit to you. So I apologize if they did not do that. But I assure you, I did all the work on my end and I gave them those 76 or 86 different images that they are currently using today of myself on the Instagram account that they are owning and operating, which is called Ignite International, which is the only Instagram that they should have authorization to use 'cause that's the one that they created. Mine, like I said, was created three years prior to the company's inception.

And, so, like I said, Your Honour, I really, really apologize about how I'm going about this, but I have tried everything in my power. I've spent $500,000. I've hired five or six different attorneys. I mean, everybody acknowledges that my attorneys have made mistakes. They didn't submit the proper evidence to you that I've given them to submit to you. They didn't proceed correctly as myself under shareholder oppression. They went -- they signed me up as Ignite.

I mean, it's -- there's no question that they have wasted my money and wasted the court's time, and for that I apologize. But I really had no control over what these lawyers do. You -- you would hope that you can trust your lawyer to do what is in the best interests of yourself and to not waste the court's time, but for some reason they seem to have just been doing that. And it's not just one. It's numerous. So, you know -- and I have to ask my US attorney who you say is giving me improper advice also to then, you know, bring on another counsel that might not be the right one. Like I said, I --

THE COURT: Well, the ball is in your court, Mr. Bilzerian. You're going to have to sort that out.

Mr. Shirreff, I know that you wanted to proceed today, but I have no choice but to adjourn this application to have Mr. Bilzerian held in contempt.

**SUBMISSIONS RE APPLICATION FOR CONTEMPT BY CNSL M. SHIRREFF:**

CNSL M. SHIRREFF: I would say this, Justice. I understand. I'm not pushing back on what you're

saying here. But I would say there's a couple of important points. We're now, you know, three months since the date of your order. I think as the evidence currently sits there's absolutely zero question that Mr. Bilzerian is currently in contempt of your order, as you have noted this morning. The concerns that Mr. Bilzerian has raised this -- this morning, there -- there are avenues to deal with that, you know, set out in the order itself. Particularly --
THE PETITIONER: How about an order to have me invited to the AGM or ...
THE COURT: Mr. Bilzerian, you've got to let Mr. Shirreff finish his submission without interruption.
THE PETITIONER: I apologize.
CNSL M. SHIRREFF: With respect to the AGM, my -- my friends, Mr. Mickelson and Mr. Dosanjh, might have some comments on that. I don't at this time. I'm speaking solely on the social media issues right now. Clause (4) of the order -- term (4) allows for the parties to come back and seek further directions, you know, with respect to the Instagram account. So that's always an option there. As you -- as you mentioned, Justice, there's also the appeal, right. So there are avenues that Mr. Bilzerian can pursue in court. But the starting point right now, as you properly noted, is that we have a valid properly issued order from the British Columbia court. Mr. Bilzerian had counsel during the course of the hearing before you and -- and so that court order for all the reasons set out in our application has to be, you know, complied with.
Now, if -- if we're -- if the court's decision at this point is to provide Mr. Bilzerian with some additional time by way of an adjournment, what I would -- what I would ask for on behalf of the company is that that time be very limited in terms of how much additional time he is provided at this point, and that we have a clear date set, hopefully, with you today, Justice, for when we are coming back to address the application.
THE COURT: All right.
THE PETITIONER: Your Honour, could you ask them why they didn't invite me to the AGM and why they

didn't follow your order to have a properly, you know, run AGM with all the shareholders invited.
THE COURT: That -- that specific issue is not before me today, Mr. Bilzerian, so I'm not going to go any further down that road. We are quickly running out of time for this hearing. So you want it to go over to a date certain, Mr. Shirreff.
CNSL M. SHIRREFF: Yes, I think that's the best course, subject to your views, Justice.
THE COURT: And when you say not a great deal of time, what -- what did you have in mind, Mr. Shirreff?
CNSL M. SHIRREFF: I -- I was thinking -- well, I was thinking no more than two weeks, Justice.
THE PETITIONER: I mean, I have to retain counsel and I have to file, you know, my lawsuit for you guys that you guys should be in contempt of court because you're not following the judge's order. So I have to be able to prepare that as well. Because you didn't invite me to the AGM. You guys didn't follow his order. Also, a part of this is that if I hand over the social media account that you guys will give that back, and you guys have not been following the judge's orders. So I -- I just need time to find counsel, have them prepare this, prepare a motion. Because there's no reason to not invite all the major shareholders to the AGM, especially when he required you guys to have a properly held AGM.
THE COURT: All right. So, look, madam registrar, are you going to be able to make a call to scheduling to see about -- I'm thinking about half a day, Mr. Shirreff. What's your view on that?
CNSL M. SHIRREFF: I think that's -- I think that's appropriate if we're dealing with a contested application.
THE COURT: All right.

**SUBMISSIONS RE APPLICATION FOR CONTEMPT BY CNSL H. MICKELSON:**

CNSL H. MICKELSON: Justice, if I can, and not to complicate things, just two -- two brief comments about timing. First of all, I do want to say in relation to the AGM -- and I won't say anything more -- there is evidence before you in this record of Mr. Bilzerian being given notice. Because we didn't know he was -- the evidence

that's before you is he was given notice of this and that there's evidence before you. And, also, the company retained the firm of Gowlings to run both the lead up to and the actual AGM. So if Mr. Bilzerian wants to now put that in issue, which is he had no notice of it, we'll have that evidence before you. But I didn't want that to sit without being answered and -- and so because I'm hearing this for the first time. The evidence that was before you went up to just prior to the AGM, but there are two documents in the materials that show particularly Mr. Dagmar ^ sent Mr. Bilzerian and others connected with him the annual general meeting notice. It's in the materials. But that's all I say, and just to let you know that what he is saying is contested.

The second thing I wanted to draw to your attention in terms of timing and management is we did file an application to reopen the application, our application for that interim injunction to compete, and then literally, like, two days after we filed that motion the court entered the order. So that obviously complicated things. And we aren't going to get into that today anyway.

But what's important, I think, for the court to understand and recall is that Mr. Bilzerian is referring to this new vape company he wants which is SAV, which I assume that I've heard for the first time stands for Sex Addict Vape. And you may recall that the evidence we were putting before you on that application was that there was evidence that he was trying to market a Sex Addict Vape brand in competition. And then he swore an affidavit to this court, to Your Lordship, which is found at tab 8 of our materials, in which he expressly stated that he is -- this is the quote:

> I am not promoting, marketing, or developing any competing brands or products to Ignite's brand and products.

And then after he swore that and after you ruled he started the Nevada lawsuit in which his whole -- part of -- a substantial part of his claim is I am competing and you're not letting me compete.

So that's what we would have -- I know we wouldn't have had time today. So the solution, in

our view, to that evidence he gave to the court which seems inconsistent now with what he is saying to you today and his conduct afterwards in the US is -- of course, we can't reopen. But if you're satisfied that the AGM was conducted properly you now have eliminated the previous concern about Ignite bringing a claim because you now have proper people pursuant to the court order having been elected.

And we would want to bring an application. It's Rule 22-1(7)(d). But it's the application under the *Rules* where you can convert an application into an action. So our thought would be that what -- what we were going to do, not knowing that Mr. Bilzerian was going to show up today and say what he said, is ask that Your Lordship hear our application to convert the Ignite application to an action, and in that context revisit the competition -- the interim application preventing him from competing with the Ignite brand as a former officer and director of Ignite in light of his testimony.

I appreciate there's nothing you can do with that today. I'm just saying that I don't know if -- it sounds to me like the first order of business is going to be Mr. Shirreff's application and whatever Mr. Bilzerian is going to apply for in response. But I just wanted to, you know, foreshadow to the court that in our view on the evidence he wasn't forthcoming to the court on our application. We wanted to reopen that. That's by the boards because the order got entered after we filed our application. But there is a way around that through the application I have raised. And so we would want some time as well to -- to bring that application. And, in my respectful submission, you ought to be seized of that application given your knowledge of that. And part of it arises out of statements under oath Mr. Bilzerian gave to the court essentially before you at that previous hearing. So I don't know if the thought would be we would grab a day or whether we do the contempt first and find another date. So I just wanted to raise that in terms of timing.

THE PETITIONER: He's not telling you the truth, Your Honour. I have the list of who they invited to

the shareholder meeting and I can forward you that as evidence. I'm absolutely not on that list. So he's lying about inviting me.
And as far as if I said that I was not competing with Ignite, this -- this court proceeding has been going on for over a year. So at the beginning of that I had no intentions of competing with them. I wanted to get my company back. But after the Canadian lawyers had screwed this up over and over and over again I had to make a living. So I -- you know, now I am going to compete with Ignite. And I am going to have my own vape company considering they completely kicked me out of my own. And they are operating illegally and now my company is indicted.
But I can show -- I can show you who they invited to that shareholder AGM and I was absolutely not on that list. There's about 20 or 30 different names here and I'm not on there and Bill Perkins is not on there. The only two people that opposed what they wanted to do are conveniently not on that invite list. So he's just not being honest with you.
CNSL H. MICKELSON: Justice, I don't think I have to respond to that except to say that if you look at Exhibit F. The affidavit at tab 3, Exhibit F is an email to Mr. Bilzerian inviting him to the -- to submit nominees for the election and the AGM. But I am hearing this now from Mr. Bilzerian for the first time, so we'll provide additional evidence. But the evidence that was before you had -- you'll see, for example, it's -- page 35 is an example of the email to Mr. Bilzerian.
THE PETITIONER: I was never given a link to that meeting and Bill Perkins was never given a link to the meeting. So how are we supposed to attend a meeting that we're never given a link to? You gave a link to all the other 24 different shareholders except for the two that opposed you. I find that very convenient.
THE COURT: All right. I've got to get on with scheduling some dates. But let me return to -- to your submission, Mr. Mickelson. My inclination today is to perhaps set, if we can, a full day, but that's for the contempt application and potentially any application that Mr. Bilzerian files that relates to those terms of my order.

That is the terms related to control of the social media account.

I'm not at this juncture, Mr. Mickelson, inclined to set aside any time to hear any application that you may bring. And I should tell you, Mr. Mickelson, that I have no intention -- even if that order had not been entered after you filed your application but prior to today's hearing, I had no intention of hearing your application. I did not give you *imprimatur* to file that application and bring it before me today. I was very express with scheduling that I thought that Mr. Shirreff was being very optimistic in thinking that the contempt application could conclude in an hour and I was skeptical that it could be properly done remotely, but based on Mr. Shirreff's express representations to scheduling I reluctantly agreed to schedule it remotely.

I'm sitting in Penticton today in the middle of a criminal trial. I agreed to hear it remotely between nine and ten a.m. on the understanding that it could conveniently be done and effectively be done remotely, and that it could complete within no more than one hour. And there was never going to be any time for any other application for you to piggyback on top of that, Mr. Mickelson. So that was never on the table from my perspective today; nor is any future application that you may wish to bring and seek to have me seize myself of anything that I'm going to consider scheduling today. I'll leave that completely with you.

CNSL H. MICKELSON: Thank you, Justice. I wasn't intending that this would get on, only that we had the application. We weren't going to piggyback. I was only going to tell you what was there and then, of course, it was superceded by the order. So I want to be clear that I wasn't expecting to -- to get my oar in in the hour.

THE COURT: All right. That's fine. But for now, madam registrar, are you able to -- to see if we can find a day for me to hear the continuation of this contempt application in Vancouver? And I'm looking at possibly one of these days: February 11 or February 19 or 20. Those are days when I -- I don't have anything assigned and I'm scheduled to be sitting in Vancouver.

CNSL M. SHIRREFF: All three -- all three of those are fine with me, Justice.
THE PETITIONER: And me.
THE COURT: All right.
CNSL H. MICKELSON: Justice, while we're waiting for the date, I want to be clear, and I don't want to trespass on your earlier comments, if Mr. Dosanjh and I proceed to prepare this other application for the conversion of the action it won't be heard or addressed on that day. I understand that. But if I have it prepared in advance -- and I appreciate you haven't decided whether you'd hear it or not, but I don't want to upset the court if I prepare this. At least, we'll have it and we'll know what it looks like.
THE COURT: I'm -- I'm content to have you speak to that narrow issue that day, Mr. Mickelson, whether I should be seized of that application or whether it should go before any -- any judge who is available to hear it.
CNSL H. MICKELSON: That would be helpful.
THE COURT: I think -- I think we will have time for that discrete piece on the day we're about to set.
CNSL H. MICKELSON: Thank you.

**DISCUSSION RE SCHEDULING:**

THE COURT: All right. All right. So that's what I'm going to do. I'm going to adjourn this application to have Mr. Bilzerian held in contempt to February 11, 2025 for a full day commencing at 10:00 a.m. at the Supreme Court in Vancouver. I will be there in person. I assume you'll be in person, Mr. Shirreff.
CNSL M. SHIRREFF: Yes.
THE COURT: All right. Mr. Bilzerian, you are obviously free to appear in person, but I'll grant you leave if you wish to appear by Microsoft Teams as you've done today, if that's your preference.
THE PETITIONER: Your Honour, thank you.
THE COURT: All right. And if you have counsel in place they have leave to appear by Microsoft Teams. My preference would be that if there is counsel, that counsel be there in person, but they -- they have leave to appear by Microsoft Teams if that's what you desire and what they desire. All right.

THE PETITIONER: Thank you, Your Honour. I appreciate that. I'm going to try and get counsel to actually be there. Hopefully, I can find proper Canadian counsel.
THE COURT: All right. And, Mr. Bilzerian, the other thing you need to understand is that if there's evidence you wish me to consider you must file it in advance of February 11.
THE PETITIONER: Okay.

**DIRECTIONS BY THE COURT:**

THE COURT: I'm going to make a direction that any additional material that anybody wishes to file and have me consider on February 11 should be filed and served on the other parties no later than 4:00 p.m. on February 7. All right. So if you want to -- if you want to swear an affidavit and attach various exhibits and other evidence, you're free to do that, but you've got to do that and have it filed with the court by the close of business February 7 and provide copies to the other side. All right.
THE PETITIONER: Okay. I will, Your Honour. Thank you.
THE COURT: Okay. All right. And -- and, Mr. Shirreff, any additional material that -- that you wish to file, that's your deadline as well. I'm not sure that there would be anything, but there you have it.
CNSL M. SHERRI FF: No. I -- I appreciate -- I appreciate that, Justice. We're not contemplating anything extra at this point.
THE COURT: Okay. And then I think I'll do this, Mr. Shirreff. I think with that in mind, if you could file a new application record by 4:00 p.m. on February 10th.
CNSL M. SHIRREFF: Certainly.
THE COURT: All right. So, madam registrar, this date is set in stone. I'm setting it now. But Mr. Shirreff has leave to file his new application record no later than 4:00 p.m. February 10th. Thank you. All right. Anything else then, Mr. Shirreff, from your perspective?
CNSL M. SHIRREFF: No. Thank you for accommodating us today, Justice.
THE COURT: All right. Mr. Bilzerian, please get your

tackle in order by February 7th and we'll see you back here on February 11th. All right.

THE PETITIONER: Okay. I'm on it. Thank you, Your Honour.

THE COURT: All right. Thank you. We'll adjourn.

**(PROCEEDINGS ADJOURNED TO FEBRUARY 11, 2025, AT 10:00 AM)([9:59:31 AM])**

28
Reporter certification

**REPORTER CERTIFICATION**

I certify that proceedings from timestamp 9:02:10 AM to timestamp 9:59:31 AM inclusive, are a true and accurate transcript of these proceedings, recorded on a sound recording apparatus, transcribed to the best of my skill and ability in accordance with applicable standards.

**ANNA LOUISE STENE**
Authorized Reporter

**$**

$100,000 [1] - 11:3
$150 [1] - 12:43
$500,000 [5] - 2:33, 10:47, 13:22, 13:42, 18:15

**1**

10:00 [2] - 25:32, 27:9
10th [2] - 26:37, 26:42
11 [5] - 24:45, 25:31, 26:8, 26:15, 27:8
11th [1] - 27:2
17 [1] - 1:1
17th [1] - 1:7
19 [1] - 24:45

**2**

2 [1] - 5:26
20 [3] - 3:35, 23:18, 24:45
2016 [2] - 9:45
2022 [1] - 3:35
2023 [1] - 3:36
2025 [4] - 1:1, 1:7, 25:31, 27:8
20th [1] - 5:2
22-1(7)(d) [1] - 22:11
24 [1] - 23:38

**3**

3 [1] - 23:26
30 [1] - 23:19
35 [1] - 23:32

**4**

4 [2] - 19:21
47 [4] - 3:5, 3:31, 4:30, 14:39
4:00 [3] - 26:17, 26:36, 26:42

**5**

56 [3] - 3:4, 3:31, 14:40

**6**

67 [8] - 3:3, 3:7, 3:30, 4:28, 4:35, 4:42, 7:39, 14:37

**7**

7 [2] - 26:17, 26:22
76 [2] - 17:36, 18:3
7th [1] - 27:1

**8**

8 [1] - 21:35
80 [1] - 7:39
86 [2] - 17:36, 18:3

**9**

9:02:10 [1] - 28:4
9:59:31 [1] - 28:4

**A**

a.m [2] - 24:22, 25:32
ability [4] - 10:18, 12:37, 17:12, 28:8
able [8] - 10:7, 10:28, 16:42, 20:18, 20:30, 24:41
absolutely [11] - 6:30, 7:29, 7:43, 11:4, 12:10, 14:38, 16:13, 17:1, 19:4, 23:2, 23:18
access [1] - 6:46
accommodating [1] - 26:45
accordance [1] - 28:8
according [12] - 3:31, 3:32, 4:3, 4:30, 6:1, 7:47, 8:29, 9:7, 10:29, 13:37, 13:38, 14:41
account [77] - 3:47, 4:6, 4:8, 4:9, 4:10, 4:11, 4:12, 5:6, 5:8, 5:10, 5:34, 5:37, 5:38, 5:40, 5:41, 5:45, 5:47, 6:5, 6:7, 6:9, 6:26, 6:47, 7:3, 7:9, 7:12, 7:19, 7:28, 7:32, 7:45, 8:2, 8:3, 8:6, 8:13, 8:16, 8:20, 8:21, 8:27, 8:29, 8:31, 8:34, 8:40, 8:41, 8:43, 8:46, 9:18, 9:23, 9:46, 10:2, 10:5, 11:5, 11:12, 11:24, 11:41, 11:43, 11:46, 12:1, 12:11, 12:34, 12:38, 12:40, 13:3, 13:9, 13:41, 16:33, 17:7, 17:8, 17:22, 17:24, 17:28, 17:32, 18:5, 19:24, 20:21, 24:2
accounts [1] - 8:4
accurate [3] - 15:19, 17:1, 28:5
achieve [1] - 4:29
acknowledges [1] - 18:16
acting [1] - 1:40
action [3] - 22:13, 22:18, 25:9
actual [1] - 21:4
Addict [2] - 21:29, 21:32
additional [5] - 19:37, 19:40, 23:30, 26:14, 26:27
address [4] - 2:43, 10:33, 10:37, 19:43
addressed [1] - 25:10
adjourn [4] - 15:8, 18:39, 25:29, 27:5
ADJOURNED [1] - 27:8
adjournment [1] - 19:38
advance [2] - 25:11, 26:8
advice [20] - 6:40, 6:43, 7:30, 9:32, 14:9, 14:12, 14:14, 14:23, 15:16, 15:19, 15:24, 15:30, 15:37, 16:5, 16:6, 16:10, 16:32, 17:2, 17:5, 18:32
advise [2] - 6:37, 18:39
advised [2] - 5:44, 9:17
advising [4] - 6:33, 8:26, 9:1, 17:3
affidavit [4] - 9:40, 21:34, 23:26, 26:18
affiliated [1] - 11:14
affiliation [1] - 10:3
afford [1] - 13:19
afterwards [1] - 22:3
AGM [26] - 3:8, 3:10, 3:13, 3:16, 3:42, 5:2, 5:29, 9:6, 9:9, 9:10, 9:11, 12:14, 12:19, 19:12, 19:17, 19:47, 20:2, 20:19, 20:27, 20:28, 20:44, 21:4, 21:11, 22:5, 23:17, 23:28
AGMs [1] - 12:15
ago [8] - 2:16, 5:42, 6:13, 11:23, 12:35, 14:17
agreed [3] - 3:36, 24:18, 24:21
agreement [1] - 3:38
Air [1] - 11:9
allow [3] - 3:17, 3:36, 12:23
allowed [2] - 2:47, 3:9
allowing [2] - 12:20, 12:22
allows [1] - 19:21
almost [1] - 8:28
AM [4] - 1:4, 27:9, 28:4
AM)([9:59:31 [1] - 27:9
American [5] - 14:9, 15:24, 15:25, 16:41, 16:44
ANNA [1] - 28:14
annual [1] - 21:14
answer [1] - 15:14
answered [1] - 21:8
anti [1] - 15:45
anti-Israel [1] - 15:45
anyway [1] - 21:24
apart [1] - 7:20
apologize [5] - 12:5, 18:1, 18:13, 18:24, 19:16
apparatus [1] - 28:7
appeal [5] - 5:13, 5:16, 5:19, 5:27, 19:26
Appeal [4] - 5:15, 5:16, 5:22, 9:37
appealed [1] - 5:20
appear [4] - 25:37, 25:38, 25:42, 25:45
appeared [1] - 2:31
applicable [1] - 28:8
applicant [1] - 1:15
application [47] - 1:31, 2:23, 2:25, 2:41, 7:22, 9:36, 10:33, 10:36, 13:14, 15:26, 16:22, 18:40, 19:33, 19:44, 20:35, 21:19, 21:20, 21:31, 22:10, 22:11, 22:13, 22:17, 22:18, 22:20, 22:26, 22:31, 22:33, 22:34, 22:36, 22:38, 23:45, 23:46, 24:5, 24:8, 24:10, 24:11, 24:15, 24:26, 24:29, 24:35, 24:43, 25:8, 25:18, 25:30, 26:36, 26:41
APPLICATION [3] - 2:27, 18:43, 20:38
apply [1] - 22:27
appointed [2] - 3:11, 12:19
appreciate [5] - 22:23, 25:12, 26:1, 26:31, 26:32
appropriate [1] - 20:34
approving [1] - 7:2
argue [1] - 5:40
arises [1] - 22:39
Arpal [1] - 1:16
arrested [1] - 6:19
art [1] - 10:16
Articles [1] - 4:33
aside [2] - 6:44, 24:4
asset [5] - 4:1, 4:5, 8:36, 8:39, 11:39
assets [1] - 13:26
assigned [1] - 24:46
assume [3] - 17:19, 21:28, 25:33
assumed [2] - 4:6, 4:7
assumption [1] - 4:6
assure [1] - 18:2
AT [1] - 27:9
attach [1] - 26:19
attend [1] - 23:36
attending [1] - 2:17
attention [1] - 21:18
attorney [2] - 14:1, 18:31
attorneys [3] - 5:44, 18:16, 18:17
audio [1] - 2:38
authorization [17] - 5:43, 6:3, 6:27, 8:1, 8:22, 8:24, 8:30, 9:25, 9:28, 10:2, 10:24, 11:10, 11:20, 11:21, 13:5, 13:46, 18:8
authorize [1] - 6:30
Authorized [1] - 28:15
authorizing [3] - 6:12, 17:9, 17:26
available [1] - 25:20
avenues [2] - 19:9, 19:27

**B**

backdrop [1] - 4:39
bad [6] - 15:29, 15:36, 16:4, 16:5, 16:9, 16:45
ball [3] - 2:34, 4:25, 18:35
bank [2] - 7:28, 16:33
bar [1] - 13:29
based [4] - 6:39, 15:17, 17:24, 24:17

battles [3] - 13:21, 13:35, 13:36
BC [2] - 1:2, 10:36
beginning [1] - 23:7
behalf [2] - 15:27, 19:39
best [3] - 18:27, 20:8, 28:7
better [1] - 14:9
between [2] - 17:18, 24:22
bill [1] - 11:2
Bill [6] - 3:18, 3:19, 5:32, 9:13, 23:20, 23:35
Bilzerian [49] - 1:8, 1:22, 1:25, 1:26, 1:31, 1:39, 2:21, 2:39, 4:32, 5:28, 6:31, 6:37, 6:45, 7:7, 7:16, 9:30, 10:35, 13:11, 14:6, 15:7, 15:15, 15:38, 16:20, 16:26, 16:47, 18:36, 18:40, 19:5, 19:7, 19:13, 19:27, 19:31, 19:36, 20:4, 20:46, 21:5, 21:13, 21:26, 22:15, 22:27, 22:40, 23:27, 23:29, 23:33, 23:46, 25:30, 25:36, 26:5, 26:47
Bilzerian's [1] - 7:8
bind [1] - 10:42
bit [1] - 14:33
blocks [1] - 10:34
blunt [1] - 14:8
Board [8] - 3:1, 3:2, 3:8, 10:20, 11:38, 12:19, 13:43
board [6] - 3:33, 3:37, 3:40, 3:42, 3:44, 6:15
boards [1] - 22:32
book [1] - 4:17
bother [1] - 15:13
bound [1] - 14:24
brand [7] - 4:19, 11:14, 11:16, 12:41, 21:33, 21:40, 22:21
brands [1] - 21:39
Brands [2] - 1:9, 1:15
breach [3] - 6:41, 14:12, 17:4
break [1] - 6:40
breaking [1] - 14:25
brief [1] - 20:42
bring [11] - 9:35, 10:36, 13:14, 14:1, 15:26, 18:32, 22:10, 22:35, 24:5, 24:11, 24:30
bringing [1] - 22:7
British [7] - 1:6, 6:38, 9:33, 15:27, 16:23, 17:43, 19:30
brought [1] - 8:44
bunch [1] - 17:11
Bunker [1] - 1:20
business [5] - 10:10, 10:19, 12:37, 22:26, 26:22
BY [4] - 2:27, 18:43, 20:38, 26:11
bylaws [2] - 9:8, 14:41

**C**

Canada [7] - 6:23, 6:41, 10:45, 11:1, 15:30, 16:36
Canadian [24] - 2:44, 2:47, 3:28, 3:29, 4:22, 4:27, 4:28, 9:8, 11:34, 12:7, 13:16, 13:22, 13:23, 13:36, 14:1, 15:26, 15:30, 16:37, 16:39, 16:42, 17:17, 17:23, 23:9, 26:4
cannot [5] - 6:42, 9:25, 14:11, 17:5
care [2] - 9:5, 12:25
case [14] - 2:36, 2:46, 4:41, 4:43, 9:1, 9:27, 9:37, 11:6, 11:7, 11:30, 12:10, 12:33, 13:40, 17:10
caselaw [5] - 4:4, 6:4, 8:38, 17:7, 17:23
cent [10] - 3:4, 3:30, 3:31, 3:32, 4:28, 4:30, 4:35, 4:42, 14:38
CEO [1] - 6:15
certain [1] - 20:7
certainly [3] - 2:38, 15:4, 26:38
CERTIFICATION [1] - 28:1
certify [1] - 28:3
challenge [1] - 17:12
change [9] - 5:37, 8:31, 9:19, 9:23, 10:2, 10:3, 10:6, 12:34, 12:39
changed [4] - 4:14, 6:6, 9:20, 10:1
changes [2] - 6:7, 7:3
changing [2] - 8:9, 8:14
choice [1] - 18:39
civil [1] - 14:27
claim [2] - 21:44, 22:7
clause [1] - 19:21
clear [8] - 6:44, 9:31, 10:38, 19:41, 24:38, 25:6
clearly [1] - 14:40
CLERK [1] - 1:6
clients [1] - 14:23
close [1] - 26:21
CNSL [27] - 1:12, 1:16, 1:21, 1:34, 1:38, 1:47, 2:8, 2:14, 2:20, 18:44, 18:46, 19:17, 20:8, 20:12, 20:33, 20:39, 20:41, 23:24, 24:33, 25:1, 25:5, 25:21, 25:24, 25:35, 26:31, 26:38, 26:45
Columbia [7] - 1:6, 6:38, 9:34, 15:27, 16:23, 17:43, 19:30
coming [1] - 19:43
COMMENCED)([9:02 :10 [1] - 1:4
commencing [1] - 25:31
comment [1] - 4:40
comments [3] - 19:19, 20:42, 25:7
communicating [1] - 17:17
company [45] - 1:14, 3:24, 4:13, 4:34, 5:2, 5:6, 5:12, 6:12, 6:17, 8:8, 8:9, 8:10, 8:15, 8:19, 8:33, 8:36, 8:40, 10:6, 10:14, 10:21, 10:26, 10:28, 11:38, 11:40, 11:42, 11:44, 12:1, 12:18, 12:27, 12:35, 12:39, 12:46, 13:6, 13:43, 14:34, 14:35, 14:41, 19:39, 21:3, 21:27, 23:8, 23:13, 23:15
company's [2] - 8:7, 18:11
compensation [6] - 4:2, 4:4, 4:10, 4:18, 8:37, 8:42
compete [4] - 10:26, 21:21, 21:45, 23:12
competent [2] - 11:35, 15:25
competing [6] - 10:30, 21:39, 21:45, 22:20, 23:5, 23:8
competition [2] - 21:33, 22:19
complaint [1] - 13:30
complete [1] - 24:24
completely [6] - 2:45, 3:34, 14:13, 16:27, 23:13, 24:32
complicate [1] - 20:42
complicated [1] - 21:23
complied [2] - 7:25, 19:34
comply [3] - 1:32, 2:42, 5:25
concern [1] - 22:7
concerned [1] - 5:28
concerns [1] - 19:7
conclude [1] - 24:15
concluded [1] - 4:45
conduct [1] - 22:3
conducted [1] - 22:5
conducting [1] - 6:20
conflicting [1] - 7:30
connected [1] - 21:13
consent [3] - 2:8, 2:15, 6:1
consenting [1] - 6:29
consequence [1] - 14:25
consider [4] - 9:40, 24:31, 26:7, 26:15
considering [1] - 23:13
consistently [1] - 7:29
contemplating [1] - 26:32
contempt [16] - 1:32, 2:23, 2:42, 10:38, 10:40, 10:41, 14:27, 15:9, 18:41, 19:6, 20:16, 22:43, 23:45, 24:14, 24:43, 25:30
CONTEMPT [3] - 2:27, 18:43, 20:38
content [4] - 1:43, 2:24, 2:40, 25:16
contested [2] - 20:34, 21:16
context [1] - 22:19
continuation [1] - 24:42
continue [2] - 13:34, 14:12
continuously [1] - 2:34
control [6] - 5:5, 6:46, 7:12, 11:14, 18:25, 24:1
convenient [1] - 23:40
conveniently [2] - 23:22, 24:23
conversion [1] - 25:9
convert [2] - 22:12, 22:17
convicted [1] - 3:22
copies [1] - 26:22
copy [1] - 17:15
corporate [1] - 5:9
corporation [1] - 5:32
correct [3] - 1:28, 6:35, 16:32
correctly [3] - 15:4, 16:40, 18:19
counsel [24] - 1:10, 1:14, 1:21, 2:4, 2:33, 2:44, 5:13, 11:34, 13:16, 15:26, 16:21, 16:24, 16:31, 16:39, 17:18, 18:33, 19:31, 20:14, 20:24, 25:41, 25:44, 26:2, 26:4
countries [1] - 10:17
couple [1] - 19:1
course [6] - 7:14, 7:17, 19:31, 20:8, 22:4, 24:37
Court [7] - 1:6, 5:14, 5:16, 5:21, 6:38, 9:36, 25:32
COURT [56] - 1:10, 1:26, 1:30, 1:35, 1:43, 2:2, 2:10, 2:17, 2:21, 2:38, 4:31, 4:37, 6:31, 6:36, 9:30, 10:31, 13:11, 14:5, 14:11, 14:16, 15:7, 15:14, 15:23, 15:33, 15:38, 15:41, 16:19, 16:26, 16:41, 16:46, 17:14, 17:30, 17:40, 18:35, 19:13, 19:45, 20:3, 20:10, 20:29, 20:36, 23:41, 24:40, 25:4, 25:16, 25:22, 25:28, 25:36, 25:41, 26:5, 26:11, 26:13, 26:26, 26:34, 26:39, 26:47, 27:5
court [43] - 1:23, 4:27, 4:44, 6:41, 7:6, 7:16, 7:39, 9:1, 9:27, 10:45, 11:6, 11:7, 11:29, 12:8, 12:46, 13:14, 13:22, 13:23, 13:40, 14:13, 14:21, 14:27, 15:27, 16:23, 17:4, 17:10, 17:43, 18:35, 19:27, 19:30, 19:32, 20:16, 21:22, 21:25, 21:34, 22:1,

22:8, 22:29, 22:30, 22:40, 23:5, 25:13, 26:21
court's [3] - 18:23, 18:28, 19:35
courts [1] - 10:36
create [2] - 8:39, 10:42
created [14] - 3:47, 4:8, 5:35, 6:26, 7:31, 8:43, 9:45, 9:47, 10:11, 10:16, 11:24, 17:25, 18:9, 18:10
criminal [1] - 24:21
criminals [1] - 6:20
curated [1] - 11:26
current [3] - 7:45, 9:1, 11:2

D

dad [1] - 3:21
Dagmar [1] - 21:12
Dan [3] - 6:45, 7:7
date [8] - 19:3, 19:42, 20:7, 22:44, 25:6, 26:39
dates [1] - 23:42
days [5] - 7:4, 7:13, 21:21, 24:44, 24:45
deadline [1] - 26:28
deal [2] - 19:9, 20:10
dealing [1] - 20:34
December [1] - 5:2
decided [1] - 25:12
decision [1] - 19:36
defend [5] - 15:45, 16:1, 16:2, 16:16
defined [1] - 6:47
desire [2] - 25:46
destroyed [1] - 17:12
developing [1] - 21:38
devices [1] - 11:15
different [17] - 4:13, 4:47, 7:21, 7:39, 10:17, 10:32, 10:47, 13:21, 14:22, 16:19, 16:36, 17:37, 18:3, 18:15, 23:19, 23:38
difficult [1] - 12:31
directing [2] - 5:1, 14:5
direction [2] - 7:18, 26:13
directions [1] - 19:23
DIRECTIONS [1] - 26:11
director [2] - 7:11, 22:21
Directors [1] - 3:1
disagree [2] - 3:41, 5:19
disbarrable [1] - 16:7
discrete [1] - 25:23
DISCUSSION [1] - 25:26
disobey [1] - 12:32
disrespect [1] - 10:44
dividends [1] - 12:42
documentation [1] - 11:22
documents [1] - 21:11
DOJ [2] - 3:22, 12:26
dollar [2] - 4:21, 12:44
dollars [3] - 3:20, 4:16, 8:12
done [12] - 4:16, 4:19, 5:23, 7:24, 7:28, 9:29, 12:35, 13:23, 24:16, 24:23, 24:24, 25:39
Dosanjh [3] - 1:17, 19:18, 25:7
down [1] - 20:5
drain [2] - 7:28, 16:32
draining [1] - 12:7
drains [1] - 13:33
draw [1] - 21:17
dropped [1] - 4:25
dropping [1] - 2:34
during [4] - 3:10, 7:14, 7:16, 19:31

E

early [1] - 9:45
earn [2] - 10:12, 10:28
earning [2] - 10:7, 10:9
effect [1] - 7:3
effectively [1] - 24:23
either [5] - 2:6, 3:18, 5:21, 9:36, 12:22
elected [1] - 22:9
election [1] - 23:28
eliminated [1] - 22:6
email [2] - 23:27, 23:33
embezzling [1] - 12:45
end [4] - 3:35, 3:36, 14:21, 18:3
enforce [1] - 11:18
entered [3] - 21:22, 22:32, 24:7
entertain [1] - 15:38
entire [6] - 7:35, 8:5, 8:16, 8:28, 12:16, 17:28
entitled [1] - 5:18
entity [1] - 5:9
especially [1] - 20:27
essence [1] - 5:1
essentially [2] - 11:28, 22:40
ethically [1] - 14:11
event [1] - 4:35
eventually [1] - 14:26
evidence [23] - 5:7, 7:23, 9:38, 9:39, 9:41, 17:41, 17:42, 18:18, 19:4, 20:45, 20:47, 21:2, 21:7, 21:9, 21:30, 21:32, 22:1, 22:30, 23:2, 23:31, 26:7, 26:19
evidentiary [1] - 4:39
exact [1] - 17:42
exactly [2] - 3:23, 17:20
example [2] - 23:32, 23:33
examples [1] - 17:37
except [2] - 23:25, 23:39
excused [4] - 1:46, 1:47, 2:13, 2:18
executed [1] - 2:15
Exhibit [2] - 23:26
exhibits [1] - 26:19
existence [2] - 4:1, 8:8
expecting [1] - 24:38
explained [1] - 7:31
express [2] - 24:12, 24:17
expressly [1] - 21:36
extra [2] - 11:3, 26:33

F

failure [2] - 1:32, 2:42
far [4] - 2:21, 5:22, 15:18, 23:4
father [2] - 6:18, 12:45
fault [1] - 16:8
favour [1] - 4:15
FEBRUARY [1] - 27:8
February [11] - 24:44, 24:45, 25:31, 26:8, 26:15, 26:17, 26:22, 26:37, 26:42, 27:1, 27:2
felon [1] - 3:22
few [1] - 14:7
FF [1] - 26:31
fight [1] - 13:34
fighting [1] - 9:2
figure [1] - 16:38
file [11] - 13:29, 15:9, 15:10, 20:15, 21:19, 24:11, 26:7, 26:14, 26:28, 26:36, 26:41
filed [12] - 2:4, 2:9, 2:22, 5:13, 7:21, 7:42, 15:46, 21:22, 22:33, 24:8, 26:16, 26:21
files [1] - 23:47
fine [3] - 5:18, 24:40, 25:2
finish [1] - 19:14
firm [1] - 21:3
first [8] - 1:12, 12:15, 20:43, 21:9, 21:29, 22:25, 22:43, 23:30
five [4] - 10:47, 12:19, 16:36, 18:15
follow [4] - 3:45, 14:24, 20:1, 20:20
followers [2] - 8:15, 8:44
following [7] - 3:27, 4:22, 5:33, 9:14, 14:42, 20:17, 20:23
FOR [3] - 2:27, 18:43, 20:38
forced [1] - 14:26
foreshadow [1] - 22:29
form [2] - 3:28, 9:15
formally [1] - 1:45
former [2] - 1:21, 22:21
forthcoming [1] - 22:30
forward [2] - 9:37, 23:1
founded [3] - 8:11, 11:46, 14:34
four [1] - 9:11
free [3] - 4:17, 25:37, 26:20
fresh [1] - 8:34
friends [1] - 19:18
frustrating [1] - 11:36
fulfilled [1] - 2:12
full [4] - 3:26, 4:38, 23:44, 25:31
full-on [1] - 3:26
funds [1] - 13:34
future [1] - 24:29

G

general [1] - 21:14
Gilpin [2] - 1:19, 1:20
Gilpin-Payne [2] - 1:19, 1:20
given [11] - 4:9, 4:29, 10:24, 14:33, 18:18, 20:46, 21:1, 22:38, 23:34, 23:35, 23:37
government [1] - 12:47
Gowlings [1] - 21:3
grab [1] - 22:42
grant [3] - 6:46, 15:8, 25:37
granted [1] - 7:7
grants [1] - 5:26
great [1] - 20:10
Gregory [1] - 1:18
guys [6] - 20:15, 20:16, 20:19, 20:22, 20:27

H

half [2] - 12:18, 20:31
hand [7] - 3:46, 6:26, 11:5, 11:24, 13:3, 13:41, 20:21
hang [1] - 6:31
happy [1] - 9:42
hard [2] - 4:38, 16:11
hear [6] - 22:17, 24:4, 24:21, 24:42, 25:12, 25:20
heard [2] - 21:28, 25:9
hearing [10] - 9:22, 13:12, 15:8, 19:32, 20:6, 21:9, 22:41, 23:29, 24:9
held [7] - 1:31, 2:23, 2:41, 12:15, 18:40, 20:28, 25:30
help [2] - 9:33, 15:25
helpful [1] - 25:21
himself [1] - 1:25
hire [2] - 14:1, 16:12
hired [5] - 2:32, 2:45, 4:24, 10:47, 18:15
hold [4] - 3:4, 5:2, 9:7, 15:8
holding [1] - 3:42
honest [1] - 23:23
Honour [22] - 1:29, 2:30, 4:36, 7:27, 9:42, 10:43, 12:30, 13:3, 14:3, 14:29, 15:1, 16:30, 16:45, 17:20, 17:45, 18:12, 19:46, 22:47, 25:40, 26:1, 26:24, 27:4
hope [1] - 18:26
hopefully [2] - 19:42, 26:3
hour [3] - 24:15, 24:25, 24:39
hours [2] - 17:45
Howard [1] - 1:16
humanity [1] - 16:3

hundreds [1] - 8:12
hurting [2] - 11:15, 12:36

I

i.e [1] - 8:39
Ignite [53] - 1:8, 1:14, 3:20, 4:14, 4:16, 5:9, 5:10, 5:35, 5:39, 6:6, 6:8, 7:1, 7:2, 7:7, 7:8, 7:11, 7:32, 7:33, 7:34, 8:2, 8:3, 8:4, 8:13, 8:19, 8:34, 8:35, 8:45, 9:19, 9:24, 9:46, 9:47, 10:3, 10:4, 11:44, 11:45, 11:47, 13:10, 15:31, 15:47, 16:14, 17:31, 17:32, 18:6, 18:21, 22:7, 22:18, 22:21, 22:22, 23:5, 23:12
Ignite's [4] - 4:1, 6:46, 7:19, 21:39
illegal [3] - 3:27, 5:30, 6:16
illegally [15] - 3:7, 3:11, 3:24, 3:41, 6:14, 7:36, 8:10, 10:10, 10:21, 10:24, 11:37, 13:42, 14:36, 14:47, 23:15
image [1] - 7:8
images [1] - 18:4
immediately [1] - 9:22
impede [1] - 10:18
impeding [1] - 10:12
important [2] - 19:2, 21:25
impose [2] - 10:40, 14:28
impossible [1] - 4:29
imprimatur [1] - 24:10
improper [1] - 18:32
improperly [1] - 4:41
inception [1] - 18:11
inclination [1] - 23:43
inclined [1] - 24:4
including [1] - 7:1
inclusive [1] - 28:4
income [1] - 10:12
inconsistent [1] - 22:2
incorporation [1] - 14:37
Incorporation [1] - 4:34
incorrect [1] - 16:33
incorrectly [1] - 16:17
indicted [9] - 3:22, 6:17, 6:18, 12:26, 12:27, 14:42, 23:15
inferior [1] - 11:15
information [1] - 16:34
initiated [1] - 4:44
injunction [1] - 21:20
Instagram [16] - 6:47, 7:9, 7:12, 7:19, 7:34, 7:41, 8:46, 9:18, 10:5, 11:12, 11:40, 11:43, 11:46, 12:1, 17:32, 18:5, 18:7, 19:24
instances [1] - 7:40
instituted [1] - 7:16
intending [1] - 24:34
intention [2] - 24:6, 24:9
intentions [1] - 23:7
interests [1] - 18:27
interim [2] - 21:20, 22:19
International [7] - 1:8, 1:14, 1:18, 8:19, 8:45, 10:4, 18:7
interruption [1] - 19:15
intervene [1] - 13:1
introductions [1] - 1:10
invested [1] - 3:19
investments [1] - 1:18
invite [15] - 3:13, 3:14, 3:16, 3:18, 5:30, 5:32, 9:6, 9:8, 9:12, 9:13, 12:13, 19:47, 20:19, 20:26, 23:22
invited [4] - 19:11, 20:2, 22:47, 23:17
inviting [4] - 13:44, 14:44, 23:3, 23:27
involved [1] - 11:45
Israel [1] - 15:45
issue [7] - 2:11, 10:32, 12:21, 16:20, 20:3, 21:5, 25:17
issued [1] - 19:29
issues [1] - 19:20
itself [2] - 4:34, 19:10

J

January [2] - 1:1, 1:7
Jewish [1] - 15:35
Jordan [1] - 11:9
Jordan's [1] - 11:9
judge [5] - 5:21, 5:26, 6:37, 14:23, 25:19
Judge [2] - 11:33, 15:28
judge's [2] - 20:17, 20:23
juncture [1] - 24:3
Justice [15] - 1:9, 1:12, 1:16, 1:23, 1:34, 2:14, 18:46, 19:25, 19:42, 20:9, 20:13, 24:33, 25:2, 26:32, 26:46
justice [3] - 20:41, 23:24, 25:5

K

keep [2] - 13:11, 13:19
kick [4] - 3:41, 10:20, 10:21, 10:27
kicked [9] - 6:15, 8:10, 9:11, 10:10, 11:37, 12:16, 13:42, 14:36, 23:14
kicking [1] - 12:21
kill [5] - 9:26, 11:29, 12:10, 13:41, 17:10
kind [4] - 9:35, 10:36, 15:2, 15:39
knowing [1] - 22:15
knowledge [2] - 9:44, 22:38

L

lack [1] - 15:5
largest [3] - 3:16, 5:31, 9:9
last [6] - 1:13, 3:34, 4:32, 7:36, 9:11, 9:29
law [11] - 2:47, 3:28, 3:29, 4:22, 4:28, 6:41, 9:5, 10:29, 12:25, 14:25, 14:42
lawful [2] - 14:12, 17:4
lawsuit [3] - 7:42, 20:15, 21:43
lawyer [24] - 6:28, 6:33, 6:39, 7:38, 7:47, 8:26, 8:47, 9:17, 9:22, 11:2, 11:3, 11:27, 11:30, 12:9, 12:33, 13:29, 13:38, 14:14, 16:44, 17:2, 17:4, 17:14, 18:26
lawyer's [1] - 16:6
lawyers [26] - 4:24, 7:27, 9:31, 9:33, 11:1, 13:28, 14:9, 14:17, 14:22, 15:3, 15:10, 15:16, 15:20, 15:24, 15:25, 15:31, 15:41, 16:1, 16:11, 16:36, 16:42, 16:43, 17:36, 17:47, 18:25, 23:9
lead [1] - 21:4
least [3] - 7:39, 10:25, 25:14
leave [7] - 5:15, 10:39, 24:32, 25:38, 25:42, 25:45, 26:41
legal [9] - 6:42, 11:18, 13:21, 13:35, 15:16, 15:19, 15:29, 16:5
legally [1] - 3:9
legitimate [3] - 3:42, 9:10, 13:39
letters [1] - 14:36
letting [4] - 13:45, 14:45, 14:46, 21:45
liaison [1] - 17:18
liberty [1] - 7:18
lie [1] - 17:21
light [1] - 22:22
likeness [29] - 5:42, 5:46, 5:47, 6:2, 6:10, 6:29, 7:8, 7:36, 7:41, 7:44, 7:46, 8:1, 8:16, 8:25, 8:28, 8:30, 9:3, 9:26, 10:23, 11:11, 11:19, 11:25, 11:29, 13:46, 15:1, 17:10, 17:13, 17:27, 17:31
limited [1] - 19:40
link [4] - 23:34, 23:35, 23:37, 23:38
linked [1] - 6:5
list [4] - 22:47, 23:2, 23:18, 23:22
listen [2] - 13:47, 14:29
literal [1] - 14:43
literally [6] - 12:33, 15:29, 16:18, 17:21, 17:45, 21:21
living [4] - 10:8, 10:9, 10:29, 23:11
logo [1] - 10:15
look [6] - 4:37, 10:34, 12:4, 12:29, 20:29, 23:25
looking [2] - 6:45, 24:44
looks [1] - 25:15
Lordship [2] - 21:34, 22:17
losing [1] - 13:26
LOUISE [1] - 28:14
love [1] - 11:33
Ltd [2] - 1:15, 1:18
lying [1] - 23:3

M

madam [3] - 20:29, 24:41, 26:39
major [6] - 3:14, 3:16, 5:31, 9:9, 12:14, 20:26
malfunction].. [1] - 2:38
management [1] - 21:18
market [1] - 21:32
marketing [1] - 21:38
material [4] - 15:10, 16:22, 26:14, 26:27
materials [3] - 21:11, 21:15, 21:35
matter [1] - 1:8
McDonald [10] - 1:21, 1:35, 1:38, 1:47, 2:4, 2:8, 2:12, 2:18, 2:20
mean [29] - 2:44, 2:46, 3:44, 9:4, 11:27, 11:33, 11:35, 11:40, 12:6, 12:13, 12:24, 12:29, 13:2, 13:27, 13:32, 13:38, 13:47, 14:36, 14:43, 15:28, 16:1, 16:7, 16:12, 17:38, 18:16, 18:22, 20:14
media [11] - 3:47, 4:6, 5:6, 5:8, 8:4, 8:12, 8:39, 16:17, 19:20, 20:21, 24:2
meeting [5] - 21:14, 23:1, 23:35, 23:36, 23:37
meetings [2] - 13:44, 14:45
member [4] - 3:33, 3:37, 3:40, 3:45
members [1] - 12:20
mention [2] - 6:3, 8:2
mentioned [1] - 19:25
messed [1] - 13:28
Michael [1] - 11:9
MICKELSON [8] - 1:16, 20:39, 20:41, 23:24, 24:33, 25:5, 25:21, 25:24
Mickelson [7] - 1:16, 19:18, 23:43, 24:3, 24:6, 24:27, 25:17
Microsoft [3] - 25:38, 25:42, 25:45
middle [1] - 24:20

might [3] - 10:39, 18:33, 19:18
Mike [1] - 1:13
million [2] - 3:20, 12:43
millions [2] - 4:16, 8:12
mind [3] - 13:10, 20:11, 26:35
mine [3] - 8:27, 17:8, 18:9
minute [2] - 2:35, 4:31
mistake [1] - 15:42
mistakes [1] - 18:17
moment [1] - 14:17
money [8] - 12:7, 12:41, 12:45, 13:20, 13:37, 15:6, 17:12, 18:23
months [2] - 12:35, 19:3
morning [7] - 1:15, 1:33, 1:37, 2:13, 2:24, 19:7, 19:8
most [1] - 12:19
motion [2] - 20:25, 21:22
moved [1] - 8:35
murderers [1] - 16:2
must [4] - 5:11, 5:24, 6:37, 26:7
mute [1] - 1:27
muted [3] - 3:10, 9:10, 12:16
mutiny [4] - 3:27, 6:20, 10:23, 14:44

**N**

name [35] - 1:13, 5:38, 5:41, 5:46, 5:47, 6:2, 6:6, 6:7, 6:10, 6:29, 7:8, 7:36, 7:40, 7:44, 7:45, 8:1, 8:16, 8:25, 8:27, 8:30, 8:31, 9:3, 9:23, 9:26, 10:23, 11:11, 11:19, 11:25, 11:29, 13:46, 14:47, 17:9, 17:13, 17:27, 17:31
named [2] - 9:19, 9:47
names [2] - 7:2, 23:19
narrow [1] - 25:17
necessary [1] - 7:3
need [15] - 5:15, 9:31, 13:13, 13:15, 14:8, 14:16, 15:15, 15:23, 15:24, 16:21, 17:42, 20:24, 26:6
neutral [1] - 16:27
Nevada [1] - 21:43
never [6] - 17:21, 23:34, 23:35, 23:37, 24:25, 24:28
new [18] - 8:9, 8:14, 8:32, 9:13, 10:6, 10:9, 10:14, 11:39, 11:41, 12:1, 12:34, 12:37, 12:39, 12:40, 13:29, 21:27, 26:36, 26:41
nine [1] - 24:22
nominees [1] - 23:28
none [4] - 2:14, 7:23, 9:38, 13:36
noted [2] - 19:6, 19:29
nothing [5] - 6:7, 7:28, 7:30, 15:29, 22:23
notice [5] - 2:22, 20:46, 21:1, 21:6, 21:14
number [1] - 6:32
numerous [5] - 2:32, 4:24, 7:37, 17:23, 18:30

**O**

oar [1] - 24:39
oath [1] - 22:39
objection [2] - 2:3, 2:9
obligation [1] - 2:13
observer [1] - 1:44
obviously [4] - 12:14, 12:24, 21:23, 25:37
occasions [1] - 7:38
occurred [1] - 5:3
October [1] - 14:21
officer [1] - 22:21
official [1] - 8:20
once [3] - 5:20, 6:7, 10:2
one [19] - 5:1, 5:25, 5:38, 6:32, 9:13, 10:11, 10:35, 11:31, 11:39, 12:2, 12:16, 13:39, 14:17, 17:46, 18:9, 18:30, 18:34, 24:25, 24:44
onus [1] - 10:35
operate [2] - 10:19, 12:37
operated [1] - 7:35
operating [5] - 4:9, 8:5, 11:9, 18:6, 23:14
opinion [1] - 16:6
opportunity [2] - 2:32, 10:25
opposed [3] - 3:20, 23:21, 23:39
opposing [1] - 3:15
oppression [3] - 13:28, 16:15, 18:20
optimistic [1] - 24:14
option [2] - 10:39, 19:24
options [1] - 14:8
order [52] - 1:22, 1:32, 1:41, 2:5, 2:15, 2:42, 3:3, 3:13, 4:47, 5:4, 5:11, 5:14, 5:19, 5:21, 5:24, 5:26, 5:27, 6:41, 6:44, 7:6, 7:21, 7:25, 9:9, 10:37, 10:38, 12:32, 14:12, 14:21, 14:23, 14:27, 17:4, 17:15, 17:30, 19:3, 19:6, 19:10, 19:11, 19:21, 19:30, 19:32, 20:1, 20:17, 20:20, 21:22, 22:8, 22:25, 22:32, 23:47, 24:7, 24:37, 27:1
ordered [2] - 5:5, 14:19
orders [3] - 5:33, 9:14, 20:23
organization [1] - 6:21
otherwise [1] - 14:24
ought [1] - 22:37
own [17] - 5:37, 6:10, 7:34, 8:6, 8:13, 8:41, 8:45, 10:16, 10:19, 10:26, 11:26, 11:27, 12:40, 17:24, 17:28, 23:13, 23:14
owned [1] - 7:34
owner [1] - 4:7
owning [2] - 8:4, 18:6

**P**

p.m [3] - 26:17, 26:36, 26:42
page [1] - 23:32
paid [2] - 12:44, 13:40
Palestine [1] - 15:36
Palestinian [1] - 15:45
part [7] - 5:4, 10:27, 15:5, 20:20, 21:44, 22:39
participation [2] - 1:36, 2:19
particularly [2] - 19:10, 21:12
parties [4] - 2:15, 7:17, 19:22, 26:16
parts [1] - 5:1
passwords [1] - 7:2
paying [1] - 12:42
Payne [2] - 1:19, 1:20
penalty [2] - 10:41, 14:28
pending [1] - 2:6
Penticton [1] - 24:20
people [5] - 11:13, 14:43, 16:2, 22:8, 23:20
per [11] - 2:47, 3:3, 3:4, 3:30, 3:31, 4:28, 4:30, 4:35, 4:42, 14:37
perfectly [1] - 5:18
perhaps [1] - 23:44
Perkins [6] - 3:18, 3:19, 5:33, 9:13, 23:20, 23:35
permission [1] - 7:6
permit [1] - 15:9
person [7] - 3:2, 4:7, 4:8, 25:33, 25:34, 25:37, 25:44
personal [4] - 5:10, 8:44, 11:16, 12:38
personally [1] - 15:47
perspective [2] - 24:28, 26:44
PETITIONER [39] - 1:28, 2:28, 2:30, 2:44, 4:36, 5:29, 6:35, 7:27, 9:42, 10:43, 13:17, 14:10, 14:15, 14:29, 15:11, 15:21, 15:28, 15:34, 15:40, 15:43, 16:24, 16:29, 16:44, 17:6, 17:16, 17:33, 17:44, 19:11, 19:16, 19:46, 20:14, 22:46, 23:34, 25:3, 25:40, 26:1, 26:9, 26:24, 27:3
photos [3] - 9:24, 11:25, 11:26
physical [1] - 17:14
picture [1] - 17:28
pictures [7] - 6:9, 8:17, 8:18, 8:33, 11:13, 17:39, 17:47
piece [1] - 25:23
piggyback [2] - 24:27, 24:35
place [1] - 25:42
plan [2] - 8:8, 8:14
planning [1] - 13:15
point [7] - 4:32, 16:4, 16:35, 19:28, 19:36, 19:41, 26:33
points [1] - 19:2
position [1] - 1:36
possess [1] - 8:32
possibly [1] - 24:44
post [3] - 7:7, 8:28, 17:31
posting [2] - 11:11, 11:12
posts [1] - 8:13
potentially [1] - 23:46
power [1] - 18:14
preference [2] - 25:39, 25:43
prejudice [1] - 4:26
prepare [5] - 20:18, 20:24, 20:25, 25:8, 25:14
prepared [1] - 25:11
present [1] - 7:22
pretty [2] - 2:46, 10:37
preventing [1] - 22:20
previous [3] - 8:36, 22:6, 22:41
pro [1] - 15:45
pro-Palestinian [1] - 15:45
problem [4] - 5:23, 7:25, 9:5, 13:35
proceed [8] - 1:33, 2:24, 2:40, 14:31, 15:31, 18:19, 18:39, 25:8
proceeded [3] - 15:4, 15:32, 16:17
proceeding [4] - 7:15, 7:17, 23:6
PROCEEDINGS [2] - 1:4, 27:8
proceedings [4] - 4:44, 12:47, 28:3, 28:6
proceeds [1] - 4:17
process [2] - 3:44, 3:45
produced [1] - 7:29
products [2] - 21:39, 21:40
professional [1] - 2:12
promote [4] - 11:41, 11:47, 12:1, 12:40
promoting [4] - 6:11, 8:13, 11:44, 21:38
promotion [1] - 8:18
proper [11] - 4:38, 9:38, 12:4, 14:30, 15:15, 15:19, 15:23, 16:31, 18:18, 22:8, 26:3
properly [6] - 19:28, 19:29, 20:1, 20:28, 22:6, 24:16

property [1] - 7:33
protest [1] - 6:25
prove [1] - 5:36
provide [5] - 6:4, 14:32, 19:36, 23:30, 26:22
provided [2] - 7:39, 19:41
providing [1] - 7:1
pull [1] - 17:38
purported [1] - 3:8
pursuant [1] - 22:8
pursue [1] - 19:27
pushing [1] - 18:47
put [4] - 9:37, 16:22, 17:43, 21:5
putting [1] - 21:30

Q

questions [1] - 15:14
quickly [1] - 20:5
quite [2] - 2:16, 7:20
quote [1] - 21:36

R

raise [1] - 22:44
raised [3] - 12:21, 19:8, 22:34
Ralph [1] - 1:20
RE [4] - 2:27, 18:43, 20:38, 25:26
really [5] - 12:6, 14:18, 18:12, 18:13, 18:24
reason [6] - 3:34, 6:22, 9:20, 15:46, 18:28, 20:25
reasons [2] - 4:40, 19:33
receive [2] - 4:4, 17:40
received [3] - 4:2, 4:17, 8:37
recent [1] - 12:19
recently [1] - 3:12
recommend [2] - 16:25, 16:30
reconsider [1] - 7:23
record [7] - 1:23, 1:41, 1:45, 16:10, 20:46, 26:36, 26:42
recorded [1] - 28:6
recording [1] - 28:6
recourse [1] - 11:17
recurring [1] - 15:21
references [1] - 5:8
referring [1] - 21:27
refuse [1] - 9:4
refused [1] - 8:22
regard [2] - 2:7, 5:17
regardless [1] - 3:6
registrar [3] - 20:29, 24:41, 26:39
reinstated [1] - 7:10
related [1] - 24:1
relates [1] - 23:47
relation [1] - 20:44
relief [7] - 6:23, 6:24, 11:37, 13:26, 14:33, 15:3, 15:7
reluctantly [1] - 24:18
remain [1] - 1:43
remains [1] - 5:24
remotely [4] - 24:16, 24:19, 24:21, 24:24
remove [6] - 2:47, 3:3, 3:33, 3:34, 8:23, 8:33, 9:3, 9:24
removed [5] - 1:45, 1:47, 3:7, 4:41, 6:15
removing [1] - 3:44
reopen [3] - 21:19, 22:4, 22:31
REPORTER [1] - 28:1
Reporter [1] - 28:15
representations [1] - 24:18
representing [2] - 1:25, 8:41
represents [1] - 5:39
request [1] - 7:11
required [1] - 20:27
requires [3] - 3:30, 4:28, 4:34
respect [7] - 7:18, 9:21, 10:45, 12:36, 14:3, 19:17, 19:23
respectful [1] - 22:36
respond [1] - 23:25
respondents [1] - 1:17
response [2] - 2:22, 22:28
retain [2] - 11:34, 20:14
retained [2] - 1:39, 21:3
return [4] - 5:5, 6:46, 12:12, 23:42
returned [1] - 5:11
revisit [1] - 22:19
revoked [1] - 6:13
rhetoric [1] - 15:39
rights [1] - 11:18
road [1] - 20:5
Robin [1] - 1:19
Rodriguez [1] - 1:19
Rohleder [1] - 1:19
ruin [1] - 11:6
Rule [1] - 22:11
ruled [2] - 13:24, 21:42
Rules [1] - 22:12
run [4] - 10:22, 10:25, 20:2, 21:3
running [4] - 3:24, 11:10, 14:43, 20:6

S

S-h-i-r-r-e-f-f [1] - 1:13
sales [1] - 12:43
satisfied [1] - 22:5
SAV [6] - 8:14, 8:32, 9:20, 10:14, 12:40, 21:28
saw [2] - 17:16, 17:20
schedule [1] - 24:19
scheduled [1] - 24:46
SCHEDULING [1] - 25:26
scheduling [5] - 20:30, 23:42, 24:12, 24:18, 24:31
Scott [2] - 1:19, 6:18
screen [1] - 17:46
screwed [2] - 11:1, 23:9
SEC [1] - 12:26
second [3] - 5:38, 7:5, 21:17
see [7] - 2:10, 2:22, 9:45, 20:31, 23:32, 24:41, 27:1
seek [5] - 5:20, 7:18, 11:36, 19:22, 24:30
seeking [3] - 2:23, 7:20, 7:22
seem [3] - 2:34, 4:24, 18:29
seize [1] - 24:30
seized [2] - 22:37, 25:18
selling [1] - 11:15
send [2] - 9:12, 9:13
sense [1] - 16:29
sent [1] - 21:12
separate [2] - 8:6, 16:3
served [1] - 26:16
set [7] - 19:9, 19:33, 19:42, 23:44, 24:4, 25:23, 26:40
setting [1] - 26:40
seven [1] - 13:21
Sex [2] - 21:29, 21:32
shall [1] - 6:45
shape [2] - 3:28, 9:15
shareholder [18] - 3:4, 3:5, 3:14, 3:17, 3:30, 4:28, 5:31, 6:24, 9:9, 12:14, 13:27, 13:44, 14:38, 14:45, 16:15, 18:20, 23:1, 23:17
shareholders [7] - 3:11, 3:38, 3:43, 12:23, 20:2, 20:26, 23:39
shares [5] - 12:17, 12:18, 13:45, 14:46, 14:47
SHERRI [1] - 26:31
SHIRREFF [13] - 1:12, 1:34, 2:14, 18:44, 18:46, 19:17, 20:8, 20:12, 20:33, 25:1, 25:35, 26:38, 26:45
Shirreff [14] - 1:13, 1:30, 2:10, 18:38, 19:14, 20:7, 20:11, 20:32, 24:13, 25:34, 26:27, 26:35, 26:41, 26:44
Shirreff's [4] - 2:25, 2:41, 22:26, 24:17
shots [1] - 17:46
show [10] - 5:36, 8:38, 9:43, 11:13, 17:14, 17:38, 21:12, 22:15, 23:16
side [1] - 26:23
signed [3] - 2:8, 3:38, 18:21
simple [1] - 2:46
simply [3] - 1:44, 7:31, 14:6
single [4] - 8:28, 12:44, 13:33, 17:46
sink [1] - 12:33
sit [1] - 21:8
sits [1] - 19:4
sitting [2] - 24:20, 24:47
situation [1] - 14:33
six [4] - 3:19, 12:19, 14:35, 18:15
skeptical [1] - 24:16
skill [1] - 28:7
Snapchat [1] - 8:3
social [11] - 3:47, 4:6, 5:6, 5:8, 8:3, 8:12, 8:39, 16:17, 19:20, 20:21, 24:1
sole [2] - 3:33, 7:10
solely [1] - 19:20
solution [1] - 21:47
somewhere [1] - 2:3
sorry [7] - 1:28, 3:35, 4:36, 15:12, 15:17, 16:27
sort [2] - 17:42, 18:36
sorts [1] - 4:19
sound [1] - 28:6
sounds [2] - 17:41, 22:25
speaking [1] - 19:20
specific [1] - 20:3
specifically [2] - 5:8, 9:7
spending [1] - 13:19
spent [8] - 2:33, 8:11, 10:46, 13:21, 14:35, 15:5, 17:45, 18:15
spot [3] - 9:16, 10:46, 12:29
standards [1] - 28:8
standing [1] - 16:3
stands [1] - 21:29
start [2] - 8:34, 11:39
started [7] - 4:13, 7:32, 8:7, 8:11, 8:35, 13:9, 21:43
starting [2] - 10:34, 19:28
statements [1] - 22:39
States [6] - 6:34, 6:39, 7:43, 9:32, 15:17, 15:22
stay [3] - 5:20, 5:26, 7:20
STENE [1] - 28:14
steps [1] - 5:17
still [3] - 1:24, 1:40, 7:24
stone [1] - 26:40
stop [8] - 4:31, 6:31, 10:7, 10:8, 10:30, 11:23, 12:47, 17:35
strong [2] - 4:41, 4:43
subject [2] - 7:5, 20:9
submission [3] - 19:14, 22:37, 23:43
SUBMISSIONS [3] - 2:27, 18:43, 20:38
submit [6] - 9:43, 14:31, 18:1, 18:17, 18:19, 23:28
submitted [2] - 1:22, 17:47
substantial [1] - 21:44
successful [1] - 7:10
successfully [1] - 5:27
sue [1] - 11:17
sued [2] - 16:14, 16:15
suing [1] - 5:45
superceded [1] - 24:37
support [1] - 15:35
suppose [1] - 1:44

supposed [1] - 23:36
Supreme [3] - 1:6, 6:38, 25:32
swear [1] - 26:18
swore [2] - 21:33, 21:42
system [1] - 4:27

T

tab [2] - 21:35, 23:26
table [1] - 24:28
tackle [1] - 27:1
tag [1] - 12:38
Teams [3] - 25:38, 25:43, 25:45
technically [1] - 1:40
ten [1] - 24:22
term [4] - 7:5, 7:9, 7:14, 19:21
terms [5] - 19:40, 21:18, 22:44, 23:47, 24:1
testimony [1] - 22:22
TH [1] - 15:41
theirs [2] - 17:33, 17:34
theme [1] - 15:21
therefore [1] - 7:33
they've [11] - 6:16, 7:35, 8:4, 8:9, 8:22, 10:10, 12:15, 12:27, 13:42, 14:35, 14:40
thinking [4] - 20:12, 20:13, 20:31, 24:14
third [1] - 12:2
Thomas [1] - 1:20
three [14] - 3:47, 5:35, 6:26, 7:4, 7:13, 7:32, 8:7, 9:11, 11:43, 13:9, 18:10, 19:2, 25:1
Tik [1] - 8:2
timestamp [2] - 28:3, 28:4
timing [3] - 20:43, 21:18, 22:45
TO [1] - 27:8
today [26] - 1:42, 1:45, 5:4, 5:23, 5:28, 9:39, 10:34, 10:41, 15:8, 17:41, 18:4, 18:39, 19:42, 20:4, 21:24, 21:47, 22:3, 22:16, 22:24, 23:44, 24:12, 24:20, 24:29, 24:32, 25:39, 26:46
today's [1] - 24:8
Tok [1] - 8:2
tons [1] - 6:16
took [1] - 6:10
top [1] - 24:27
total [1] - 16:29
tough [1] - 9:16
track [1] - 16:10
trade [1] - 11:13
trademarked [2] - 10:14, 10:15
trademarking [1] - 10:17
transcribed [1] - 28:7
transcript [1] - 28:5
transfer [2] - 7:4, 7:12
transferred [1] - 4:5
trespass [1] - 25:7
Trevor [1] - 1:21
trial [1] - 24:21
tried [1] - 18:14
true [1] - 28:5
trust [3] - 7:44, 16:13, 18:26
truth [1] - 22:46
try [1] - 26:2
trying [12] - 3:46, 9:2, 10:8, 10:18, 11:2, 11:38, 12:31, 13:1, 15:5, 16:38, 21:32
turn [1] - 5:44
tweets [2] - 15:46, 16:17
two [11] - 5:1, 5:25, 6:32, 12:15, 20:13, 20:42, 21:11, 21:21, 23:20, 23:39
tying [1] - 13:5

U

unanimously [1] - 3:39
under [3] - 18:20, 22:12, 22:39
unequivocally [3] - 11:5, 16:5, 16:14
unethical [2] - 14:13, 17:2
unfortunately [2] - 2:31, 6:36
United [6] - 6:34, 6:39, 7:43, 9:32, 15:16, 15:22
unless [2] - 5:25, 8:42
up [14] - 8:26, 9:18, 11:1, 13:7, 13:28, 16:3, 16:34, 16:37, 17:38, 18:21, 21:4, 21:10, 22:15, 23:10
upset [1] - 25:13
US [12] - 9:2, 10:29, 11:3, 11:6, 12:8, 13:40, 14:42, 17:7, 17:10, 17:24, 18:31, 22:4
useless [1] - 2:45
user [1] - 7:2
utmost [1] - 10:44

V

valid [2] - 5:24, 19:29
valuable [1] - 11:7
Vancouver [5] - 1:2, 1:7, 24:43, 24:47, 25:32
Vape [2] - 21:29, 21:33
vape [19] - 4:12, 8:8, 8:9, 8:14, 8:33, 8:36, 10:6, 10:9, 10:14, 11:15, 11:39, 11:41, 11:44, 12:1, 12:35, 12:37, 12:39, 21:27, 23:13
various [1] - 26:19
versus [1] - 1:8
vet [1] - 16:42
victim [1] - 13:25
video [1] - 11:26
videos [1] - 6:11
view [3] - 20:32, 22:1, 22:29
views [1] - 20:9
vote [15] - 3:4, 3:5, 3:18, 3:30, 3:43, 4:29, 4:42, 12:17, 12:20, 12:22, 12:23, 13:45, 14:38, 14:45, 14:46
voted [2] - 3:39

W

waiting [2] - 1:24, 25:5
wants [2] - 21:5, 21:27
waste [1] - 18:28
wasted [3] - 17:11, 18:23
weeks [1] - 20:13
weird [2] - 10:46, 12:29
whatsoever [3] - 4:3, 5:41, 10:4
whole [1] - 21:43
willfully [1] - 17:3
wish [7] - 1:33, 1:44, 15:10, 24:30, 25:38, 26:7, 26:28
wishes [1] - 26:14
withdrawing [1] - 2:4
wondering [1] - 2:35
works [1] - 4:27
world [2] - 10:13, 11:10
written [1] - 7:6

Y

year [10] - 5:42, 6:13, 7:37, 8:24, 9:29, 11:23, 12:43, 14:21, 17:34, 23:6
years [9] - 3:47, 5:35, 6:27, 7:32, 8:7, 11:43, 13:9, 14:35, 18:10
yield [1] - 13:37
yourself [1] - 18:27

Z

zero [2] - 4:2, 19:5

This is Exhibit "I" referred to in the affidavit
of Dan Bilzerian affirmed before me on
February 25, 2025 at Las Vegas, Nevada

[signature]
A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br>*Plaintiff,*<br>v.<br>**PAUL A. BILZERIAN,** *et al.*,<br>*Defendants.* | **Case No. 1:89-cv-1854-RCL** |

**MEMORANDUM OPINION**

In 2001, this Court enjoined defendant Paul Bilzerian and his associates from commencing or causing the commencement of any legal proceedings in any Court other than this Court or the D.C. Circuit unless he first receives permission to do so from this Court. Bilzerian has since renounced his American citizenship and taken up residence in St. Kitts and Nevis. Intervenor Kevin Horstwood, also a resident of St. Kitts, alleges that Bilzerian, operating under the guise of his son Adam and various corporate entities, has violated the injunction by instigating legal proceedings against Horstwood in the Eastern Caribbean Supreme Court, which has jurisdiction over St. Kitts & Nevis. The Court ordered Bilzerian to show cause in writing as to why he should not be held in contempt. In response, Bilzerian argues first that the injunction cannot reach disputes in foreign courts between foreign nationals; second, that the Court should exercise its discretion to relieve Bilzerian of the injunction; third, that the Court should reconsider its Order permitting Horstwood to intervene; and fourth, that in any event Horstwood has not demonstrated that Bilzerian has violated the injunction.

None of Bilzerian's attacks on the injunction itself are meritorious. Moreover, Horstwood's Motion for an Order to Show Cause and its accompanying exhibits provide clear and



AUTHENTICATED U.S. GOVERNMENT INFORMATION GPO

convincing evidence that Bilzerian has indeed failed to comply with the injunction by causing the commencement of legal proceedings against Horstwood. Therefore, and for the reasons explained herein, the Court will find Bilzerian in civil contempt of this Court's injunction and order him to withdraw any and all lawsuits against Horstwood, his attorneys, and any businesses that Horstwood purports to own. Those lawsuits may be refiled, if at all, only with leave of this Court.

## I. Background

In 1989, a jury in the Southern District of New York convicted Bilzerian of various financial crimes including securities fraud, making false statements to the Securities and Exchange Commission ("SEC"), and conspiracy to defraud the Internal Revenue Service ("IRS") and SEC. *See United States v. Bilzerian*, 926 F.2d 1285, 1289 (2d Cir. 1991). For those convictions, he was initially sentenced to four years' imprisonment[1] and a fine of $1.5 million. *Id.* Bilzerian's entanglement with this Court began shortly after his conviction, when the SEC filed a 74-page civil complaint against him. *See generally* Compl., ECF No. 1. Judge Stanley S. Harris ultimately ordered Bilzerian to disgorge the unlawfully obtained proceeds of his actions, to the tune of a further $62 million. *See SEC v. Bilzerian*, 814 F. Supp. 116, 124 (D.D.C. 1993); *SEC v. Bilzerian*, No. 89-cv-1854-SSH, 1993 WL 542584, at *1 (D.D.C. June 25, 1993); *SEC v. Bilzerian*, 127 F. Supp. 2d 232, 232 (D.D.C. 2000). Several years later, Bilzerian had still failed to satisfy this judgment, leading Judge Harris in 2000 to hold him in contempt and appoint a receiver to collect and liquidate his assets in order to pay off his judgment debts. *See SEC v. Bilzerian*, 112 F. Supp. 2d 12 (D.D.C. 2000) (holding Bilzerian in contempt); *SEC v. Bilzerian*, 127 F. Supp. 2d at 232 (appointing a receiver).

[1] Bilzerian's prison sentence was later reduced to 20 months. *SEC v. Bilzerian*, 613 F. Supp. 2d 66, 68 (D.D.C. 2009).

In the months that followed, Bilzerian initiated an unrelenting campaign of vexatious and frivolous litigation in various courts calculated to forestall and frustrate the receiver's efforts to process his assets. *SEC v. Bilzerian*, 815 F. Supp. 2d 324, 325–26 (D.D.C. 2011). In response, in July 2001, this Court issued an injunction that provides as follows:

> Defendant Paul A. Bilzerian, his agents, servants, employees, attorneys, and those persons in active concert or participation with them, who receive actual notice of this Order by personal service or otherwise, are prohibited from filing or causing the filing of any complaint, proceeding or motion in the United States Bankruptcy Court for the Middle District of Florida, or from otherwise commencing or causing the commencement of proceedings in any court, other than in this Court or in appeals of this Court's Orders to the United States Court of Appeals for the District of Columbia, without prior application to and approval of this Court . . . .

Order of July 19, 2001, ECF No. 416 (the "2001 injunction"). The U.S. Court of Appeals for the District of Columbia Circuit affirmed that injunction on appeal. *See SEC v. Bilzerian*, 75 Fed. App'x 3 (D.C. Cir. 2003). Moreover, in 2009, this Court held Bilzerian, his then-associate David Hammer, and certain corporate entities affiliated with Bilzerian in civil contempt of the 2001 injunction. *SEC v. Bilzerian*, 613 F. Supp. 2d 66 (D.D.C. 2009). On appeal, the D.C. Circuit affirmed this Court's judgment of contempt. *SEC v. Bilzerian*, 410 Fed. App'x 346 (D.C. Cir. 2010). Then in 2017, Bilzerian asked this Court for relief from the 2001 injunction, *see* Motion for Relief from Judgment, ECF No. 1215, which this Court denied, *see* Order of March 27, 2018, ECF No. 1219. That denial of reconsideration was then affirmed by the D.C. Circuit. *See SEC v. Bilzerian*, 811 Fed. App'x 3 (D.C. Cir. 2020).

Having now survived appeal three times—at its issuance, upon enforcement, and after denial of a motion for reconsideration—there remains no doubt that the 2001 injunction is a lawful exercise of this Court's equitable authority. But the unusual factual circumstances of this dispute, detailed in the following section, raise novel challenges about the scope of the injunction and this Court's ability to enforce it in a foreign jurisdiction through its contempt powers.

## II. Horstwood's Allegations

Over the course of more than 90 pages of narrative and more than 700 pages of exhibits, consisting mostly of court documents and email correspondence between Horstwood and Bilzerian, Horstwood's Motion for an Order to Show Cause, ECF No. 1248, spins a sordid tale of financial villainy, intrigue, extortion, and even murder. Bilzerian wholeheartedly denies Horstwood's account, contending that Horstwood is nothing more than a delinquent debtor who borrowed irresponsibly and has now concocted a fictional story to turn the Court against Bilzerian and thus evade accountability for his contractual defaults. Bilzerian does not, however, dispute the veracity of Horstwood's exhibits themselves, which the Court may therefore treat as conceded for purposes of these proceedings. *See Harris v. City of Phila.*, 47 F.3d 1333, 1340 (3d Cir. 1995) ("Because the relevant facts are undisputed, the only question remaining is whether those facts justified a finding of contempt. In such a case, no evidentiary hearing is necessary.") (citing *Alexander v. Chi. Park Dist.*, 927 F.2d 1014, 1025 (7th Cir. 1991)); *In re Roth*, 935 F.3d 1270, 1728 (11th Cir. 2019) ("In civil contempt proceedings, when there are no disputed factual matters that require an evidentiary hearing, the court might properly dispense with the hearing prior to finding the defendant in contempt . . . .") (quotations omitted).

Most of the conduct alleged in Horstwood's Motion, however salacious it may be, has no relevance to the 2001 injunction. The sole factual inquiry for the Court in these contempt proceedings is whether Bilzerian instigated litigation in a court other than this one without this Court's permission. Therefore, the Court will not reach any conclusions about the overall truthfulness of Horstwood's or Bilzerian's account. Nevertheless, to adequately contextualize the Court's findings of fact related to Horstwood's contempt allegations, the Court will present a

greatly distilled summary of events as they are alleged in Horstwood's Motion.[2] If a fact stated herein is accompanied by a citation to a specific exhibit from Horstwood's Motion, that indicates that the Court has found it to be both relevant to the contempt determination and proven by clear and convincing evidence.

Horstwood, an English architect, moved to St. Kitts in 2004 and started a business called Caribbean Building Systems ("CBS"). Mot. for Order to Show Cause at 3. He purchased a hotel and restaurant property known as the Rawlins Plantation Inn ("Rawlins"). *Id.* In 2008, wishing to expand his business, he sought to purchase the nearby Golden Lemon Inn & Villas ("Golden Lemon"). He put down a deposit of roughly $1.1 million, and hired an attorney, Vernon Veira, to assist in closing the transaction. *Id.* at 3–4. The Golden Lemon deal was set to close on April 1, 2009. Veira was supposed to appear at the closing with a check for approximately $3 million drawn on Horstwood's client trust account. But Veira never showed up, and Horstwood was subsequently unable to reach him. *Id.*

The next day, Bilzerian, then a stranger to Horstwood, called and introduced himself as a friend of Veira's and as the president of International Investors Group, Inc. ("IIG"). *Id.* at 4. He informed Horstwood that Veira had "misappropriated" all the money in Horstwood's client trust account but promised that IIG would "refinance" Veira so that he could repay his creditors. *Id.* at 4. Bilzerian further assured Horstwood that he would also assist in the closure of the Golden Lemon deal, so long as Horstwood did not alert the authorities about Veira's misconduct. *Id.* at 4–5.

---

[2] Because the email exchanges affixed to Horstwood's Motion are so voluminous, summarizing their contents would make for an unreasonably long and rambling factual exposition. *See generally* Mot. for Order to Show Cause 572–824. It suffices to say that these emails, taken as a whole, corroborate Horstwood's claims that Paul Bilzerian, rather than his son Adam, played the leading role in the financial dealings at the core of the St. Kitts litigation.

Bilzerian then concocted a scheme whereby Veira's assets would be put into a trust, of which Bilzerian would be the trustee; Bilzerian would then "liquidate or leverage" those assets to obtain sufficient liquidity for Horstwood's acquisition of the Golden Lemon. *Id.* at 6. However, Bilzerian's company, IIG, was unwilling to lend money solely against Veira's assets, and asked Horstwood to sign a personal guarantee for the proposed loan. *Id.* at 7. Horstwood did not wish to sign such a guarantee, so instead he made a renewed offer to purchase the Golden Lemon: Horstwood would pay an additional $350,000 in addition to the money he had already paid, and Horstwood's company CBS would take on roughly $4 million in mortgage debt to the Golden Lemon's bank, and in return Horstwood would become the sole equity holder in the Golden Lemon. *Id.* at 8. However, after the loss of the funds in his client trust account, Horstwood did not have the $350,000 that would be required to close this deal. Bilzerian, knowing of Horstwood's financial distress, offered to make him a loan to cover the shortfall. *Id.* at 8. On December 2, 2009, Horstwood executed the deal to acquire the Golden Lemon, anticipating the forthcoming loan from Bilzerian. *Id.* at 8–10.

Horstwood was surprised when, about one week later, another of Bilzerian's companies, International Investments Ltd. ("IIL")[3], sent him the loan terms: a 100% per annum interest rate, a 200% per annum penalty interest rate, and a blanket security interest in Horstwood's companies as collateral in case of default. *Id.* at 10. Bilzerian verbally assured Horstwood that these were IIL's standard terms and promised that he would never actually foreclose on Horstwood's companies. *Id.* at 10. Faced with the Hobson's choice of either agreeing to this loan or defaulting on the Golden Lemon deal (and thus forfeiting the money he had already paid as a deposit), and in

[3] It should be noted that Veira, Bilzerian's "friend" who disappeared with Horstwood's client trust account, was one of IIL's directors. *See* Memorandum to Registrar of Companies, Mot. for Order to Show Cause ex. KAH E-25, at 683.

reliance on Bilzerian's representations, Horstwood accepted. *Id.* at 10, 12. To make matters worse, Horstwood claims he later discovered that Bilzerian had unlawfully appropriated and laundered the $350,000 in funds that were lent to him. *Id.* at 16.[4]

From this point on, Horstwood indicates that he felt as though Bilzerian was holding him hostage—he was locked into a deal for which his own funds were inadequate, and he was entirely dependent on Bilzerian's promise of financing. *Id.* at 13. Bilzerian wielded this power over Horstwood to extract various concessions. For example, in January 2010, Bilzerian forced Horstwood to sign a set of replacement loan documents that named "ABilzerian" (referring to Adam Bilzerian, Paul's son) as the lender, instead of Bilzerian's firm IIL. *Id.* at 14–15.

Horstwood intended to pay back Bilzerian's loan as soon as possible, but lacked the requisite cash, so he attempted to sell some of the villa properties that he had acquired as part of the Golden Lemon deal. *Id.* at 16. But Bilzerian allegedly preferred that Horstwood default on the loan so that Bilzerian could instead take over Horstwood's business interests. So, Bilzerian demanded extensive information about each potential villa buyer, spoke to them behind Horstwood's back, and subjected each potential sale to intense scrutiny, in an insidious campaign to undermine the villa transactions. *Id.* at 18. Bilzerian's intensive badgering of Horstwood and the prospective buyers succeeded in frustrating the villa sales, and impaired Horstwood's ability to fulfill his duties to his clients.

The loan came due in January 2011, and Horstwood was unable to pay. *Id.* at 18. Bilzerian summoned Horstwood to his condominium to force him to sign a forbearance agreement, which offered Horstwood additional time to pay back the loan but would saddle him with even more

---

[4] An audit report compiled by Deloitte suggests that Bilzerian and IIL were the beneficiaries of unauthorized payments from Carpathian Resources Limited, a then-publicly-traded Australian corporation. *See generally* Deloitte Report, Mot. for Order to Show Cause ex. KAH E-23, at 662.

oppressive terms. *Id.* at 18–19, 21. Horstwood refused to sign it on the spot, instead asking Bilzerian to send the agreement to Nigel Calvert, Horstwood's lawyer in London. *Id.* at 19. Bilzerian became agitated and threatened that if Horstwood did not sign, he would foreclose on Horstwood's shares and take his companies. *Id.* Horstwood ran out of the room without signing. *Id.* He sought out advice from certain prominent locals who patronized his businesses, including Ambassador Wendel Lawrence and the Prime Minister of St. Kitts; the latter agreed to speak with Bilzerian on Horstwood's behalf, and even mediated a meeting between them later that month. *Id.* at 19, 22.

Nevertheless, Bilzerian continued to hound Horstwood with menacing calls and emails. Bilzerian threatened him with foreclosure and worse, saying: "[Y]ou don't realize how rich and powerful my friends are, we can get rid of you Kevin anytime that we want to[.]" *Id.* at 21. Horstwood gave in and signed the forbearance agreement. *Id.* at 21–22. Even after the agreement was signed, Bilzerian continued tampering with the villa sales. This, coupled with complications with the banks involved in the villa sales, forced Horstwood to sign yet another draconian forbearance agreement a few months later. *Id.* at 28–29. He would eventually acquiesce to a third one in June 2011, and a fourth in July. *Id.* at 35, 47.[5]

In May 2011, Horstwood became hopeful that he would reach a villa deal with a Trinidadian businessman called Rolph Hive and a Kittitian developer named Sebastian Mottram. *Id.* at 29, 35. Mottram "unexplainably" withdrew from the deal in June before it could come to fruition. *Id.* at 39. Horstwood met with Hive later that month to discuss the potential deal, during

[5] In pressuring Horstwood to sign the third forbearance agreement, Bilzerian remarked that his son, Dan Bilzerian, "has a large gun collection" and that he "[couldn't] imagine why anyone would be without a gun on St. Kitts." Mot. for Order to Show Cause at 34–35. Horstwood attests that Bilzerian's repeated allusions to his son's collection of weaponry and military experience were insinuations that Dan would kill Horstwood if he failed to comply, and effectively intimidated him into signing.

which Bilzerian sent Horstwood impatient messages demanding an update on the prospective deal. *Id.* at 41. Horstwood told Hive the entire story. Hive advised Horstwood that Bilzerian was "railroading" him and told him not to respond to Bilzerian's messages, so Horstwood sent Bilzerian only a short and vague reply. *Id.* at 41–42. Bilzerian responded that if Horstwood did not contact him right away, he would "have no choice to proceed in another direction." *Id.* at 42.

This was not an empty threat: The next day, Horstwood received a demand letter from "adambilzerian@gmail.com" for nearly $1.8 million, the amount supposedly owed on Horstwood's loans. *Id.* Horstwood believes that Paul Bilzerian was in fact behind this demand letter and the ensuing email exchanges, despite the email account's name suggesting that it belongs to Adam Bilzerian. *Id.* at 42–43. In August 2011, after further meddling by Paul Bilzerian, Hive dropped out of the deal. *Id.* at 49.

Later that month, Paul Bilzerian called Horstwood to his condo and presented him with a document that would transfer ownership of Horstwood's companies to Adam Bilzerian. *Id.* at 50. Bilzerian once again peppered Horstwood with insults and threats until, fearing for his personal safety, Horstwood signed the document. *Id.* at 51.

In October 2011, Bilzerian began asking Horstwood to provide him with a set of keys for the Golden Lemon Inn. *Id.* at 52. Horstwood was determined not to let Bilzerian take over, so he made up excuses to avoid handing over the keys, and simultaneously began strategizing with his English attorney Calvert about mounting a legal opposition to Bilzerian. *Id.* at 53. Bilzerian became frustrated with Horstwood, threatening that if Horstwood did not become more responsive to his requests, he would "assume you no longer wish to communicate with me and advise Adam to act accordingly." Email of Oct. 20, 2011, Mot. for Order to Show Cause ex. KAH E-80, at 824.

When the owner of "adambilzerian@gmail.com" discovered that Horstwood was in communication with Calvert, he sent Calvert an email asserting that Adam Bilzerian was now the owner of Horstwood's companies, pursuant to the document that Horstwood had signed in August. Mot. for Order to Show Cause at 54. With Calvert's advice, Horstwood sent a cease-and-desist letter to Adam Bilzerian, requesting that he refrain from asserting that he owned the companies. *Id.*

In November 2011, a lawsuit (the "2011 suit") was filed in the Eastern Caribbean Supreme Court, with Adam Bilzerian as nominal claimant and Horstwood as defendant, which sought to establish Adam Bilzerian as the owner of the companies. *Id.* at 55. Horstwood contends that Paul Bilzerian was the driving force behind the 2011 suit. In 2015, Adam Bilzerian would eventually file a Power of Attorney appointing Paul Bilzerian as his attorney-in-fact in the 2011 suit and in other litigation. *See* 2015 Power of Attorney, Mot. for Order to Show Cause ex. KAH C-4, at 112. Paul Bilzerian effectively took control of this litigation, filing applications and affidavits with the Court and appealing adverse decisions on his son's behalf. *See, e.g.*, Aff. in Support of Request for Written Decision, Mot. for Order to Show Cause ex. KAH C-5, at 116.

In December 2011, Horstwood's relationship with Bilzerian, and his fortunes, took a dramatic turn for the worse. Shortly after Horstwood's initial appearance in the 2011 suit, and evidently upset by Horstwood's intention to defend his claim to the companies, Bilzerian visited the Golden Lemon, along with Adam and his wife, Terri. There, Paul Bilzerian threatened Horstwood, then began throwing punches at him, one of which struck Horstwood in the lip. *Id.* at 55. After Bilzerian returned to the car, Adam apologized to Hortswood, and admitted that he had no interest in the Golden Lemon—that, indeed, the entire thing had been orchestrated by his father to develop the property. *Id.* Horstwood responded that he knew about the illicit provenance of

the funds Bilzerian had lent him in Adam's name. *Id.* at 56. Adam appeared surprised and quickly left. After he had gone, Mathew Murphy, one of Horstwood's staff who had witnessed the altercation, advised Horstwood to call the police, and said that he would corroborate Horstwood's account. *Id.*

Horstwood did, indeed, call the police. *Id.* at 57. But then, a few days later, Murphy was found murdered in a cane field. *Id.* The next day, Horstwood went to the police office to make a statement, convinced that Bilzerian was responsible for Murphy's murder. *Id.* at 57–60. However, while Horstwood was giving his account, the inspector with whom Horstwood was speaking received two mysterious phone calls; his demeanor changed abruptly, and he began questioning Horstwood. *Id.* at 60–61. Much to Horstwood's surprise, he was immediately arrested and incarcerated in connection with Murphy's murder. *Id.* at 61. Horstwood believes that Bilzerian used his political connections to frame him.

In January 2012, with Horstwood indisposed, Bilzerian moved for summary judgment in the 2011 suit, seeking the entirety of Horstwood's equity in his companies. *Id.* at 62. Horstwood claims that, due to allegedly deficient service of the motion and an utter lack of cooperation from the prison officials, he was unable to file an affidavit in his defense. *Id.* at 63. In March 2012, summary judgment was entered against Horstwood in his absence, of which he was not notified until much later. *Id.* at 65–66.

Horstwood was incarcerated for nearly four years without trial. *Id.* at 66. Finally, after a change of government in St. Kitts, the new Director of Public Prosecutions reviewed Horstwood's file and concluded that there was no evidentiary basis upon which to prosecute Horstwood for the Murphy murder. *Id.* at 66. Horstwood was finally released in November 2015. *Id.* at 67.

After his incarceration, Horstwood continued to seek legal assistance to fight back against Bilzerian's efforts to take over his companies. In March 2017, after several years of litigation and with the assistance of an attorney named Terrence V. Byron, Horstwood finally succeeded in having the summary judgment against him in the 2011 suit set aside. *Id.* at 72.

As a result, another lawsuit in Adam Bilzerian's name (the "2017 suit") was filed in the same court the following week against Byron, his law firm, and Horstwood, alleging that Byron's participation in Horstwood's case was improper. *Id.* at 73. Another Power of Attorney was filed almost immediately, under which Bilzerian proceeded to prosecute this claim himself, appearing in person at each hearing as Adam Bilzerian's attorney, and drafting and filing motions and affidavits bearing his own signature. *Id.* at 73; *see* 2017 Power of Attorney, Mot. for Order to Show Cause ex. KAH C-9, at 140; Order of Aug. 14, 2017, Mot. for Order to Show Cause ex. KAH C-8, at 135 (noting Bilzerian's appearance "by virtue of power of attorney for Adam Bilzerian"). Also named as claimants in the 2017 suit are Horstwood's companies, which Adam Bilzerian still purported to own pursuant to the August 2011 agreement that Horstwood had signed, and which Bilzerian purported to represent. *See* Order of Feb. 28, 2019, Mot. for Order to Show Cause ex. KAH C-10, at 145 (noting Paul Bilzerian as representative for all three claimants).

Bilzerian's conduct in the 2017 suit is familiar to this Court: he moved multiple times for recusal of the judge, leading the judge to chide him for his many frivolous motions, which were seemingly designed for the sole purpose of prolonging the litigation. Mot. for Order to Show Cause at 76–77; *see generally* Judgment of July 25, 2019, Mot. for Order to Show Cause ex. KAH C-18, at 263–89. In May 2023, Bilzerian amended his claim in the 2017 suit, removing Adam and CBS as claimants and Horstwood as defendant, leaving a dispute between only himself (in his capacity as a director of the Lemon Grove company), Byron, and Byron's law firm. Mot. for Order

to Show Cause at 81; Amended Claim Form, Mot. for Order to Show Cause ex. KAH C-25, at 361–368.

Additionally, in 2016, Bilzerian had filed another lawsuit (the "2016 suit") in the same court on Adam Bilzerian's behalf against Horstwood, this one a breach of contract action seeking $10 million in damages. *Id.* at 81–82. In that case as well, Bilzerian is listed as "appearing for Adam Bilzerian in person," pursuant to his power of attorney. *Id.* at 82–83. The judge in that case offered this rather telling reflection:

> "Then there is the question as to what role Paul Bilzerian has played in all of the events. Can he continue to hide behind the cloak or take shelter from the fact that he is not named as a party to these proceedings? Should Paul Bilzerian for the purpose of these proceedings, be regarded a 'party' by virtue of the definition of 'party' given by [Civil Procedure Rules] 2.4? If not, should he be made a party to these proceedings?"

Judgment, Mot. for Order to Show Cause ex. KAH C-27, at 381. In the 2016 suit, Bilzerian also moved to substitute Bilzerian's company, IIL, as the claimant instead of Adam Bilzerian. Mot. for Order to Show Cause at 89–90. Horstwood objected to this substitution, arguing that allowing the case to proceed in the name of Bilzerian's company would be in violation of the 2001 injunction. *Id.* at 89. In Bilzerian's response, he argued first that the 2001 injunction is unenforceable outside of the United States, and second that it is irrelevant because Bilzerian was not a named party to the suit. *See* Bilzerian's Affidavit in Response, Mot. for Order to Show Cause ex. KAH C-39, at 556. The judge granted the request to swap claimants but did not explicitly engage with either party's arguments about the applicability of the 2001 injunction, reasoning only that the request satisfied the requirements of the court's Civil Procedure Rules. *See* Order of June 23, 2023, Mot. for Order to Show Cause ex. KAH C-40, at 561.

Horstwood submitted a paper copy of his Motion for an Order to Show Cause to this Court in July 2023, contending that Bilzerian violated the 2001 injunction by filing the three

aforementioned lawsuits against him. The Court instructed him that he first needed to file a Motion for Post-Judgment Intervention, which he did in April 2024. ECF No. 1240. That Motion was granted, *see* Order of June 18, 2024, ECF No. 1247, and his Motion for an Order to Show Cause was subsequently added to the docket. Bilzerian filed a Motion to Strike, ECF No. 1249. The Court simultaneously denied Bilzerian's Motion and granted Horstwood's Motion in September 2024, ordering Bilzerian to show cause in writing why he should not be held in contempt of the 2001 injunction. *See* Order of Sept. 20, 2024, ECF No. 1251. Bilzerian filed his response in October, in which he argues: 1) that the 2001 injunction does not apply to foreign disputes between foreign nationals; 2) that the Court should dissolve the 2001 injunction; 3) that the Court should reconsider its order permitting Horstwood to intervene; and 4) that, in any event, he did not cause the commencement of legal proceedings in violation of the 2001 injunction. See Response to Order to Show Cause, ECF No. 1252. Bilzerian's response is now ripe for this Court's review.

## III. Legal Standards

### A. Contempt

The power to punish parties for contempt is inherent in all courts, and its existence is essential to a court's ability to enforce judgments and orders. *Broderick v. Donaldson,* 437 F.3d 1226, 1234 (D.C. Cir. 2006) (quoting *Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1874)).

Civil contempt is designed to coerce compliance with a court order or to compensate a complainant for losses sustained. *In re Fannie Mae Secs. Litig.*, 552 F.3d 814, 823 (D.C. Cir. 2009). Civil contempt "will lie only if the putative contemnor has violated an order that is clear and unambiguous, and the violation must be proved by clear and convincing evidence." *Broderick,* 437 F.3d at 1234 (quotation omitted). Clear and convincing evidence in the context of civil

contempt means "a quantum of proof adequate to demonstrate to a 'reasonable certainty' that a violation has occurred." *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002).[6]

**B. Motion to Modify or Dissolve an Injunction**

As part and parcel of its inherent equitable powers, and pursuant to Federal Rule of Civil Procedure 60(b), a court "may relieve a party . . . from a final judgment, order, or proceeding" either because "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; [] applying it prospectively is no longer equitable; or . . . any other reason that justifies relief." Fed. R. Civ. P. 60(b)(5)–(6); *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions . . . ."). "[W]hether because of subsequent legislation, a change in the decisional law, or a change in the operative facts," Charles A. Wright & Arthur R. Miller, 11 Fed. Prac. & Proc. Civ. § 2863 (3d ed. 2024), the Court may decide that continued enforcement of an injunction would be "detrimental to the public interest" and modify it accordingly. *Horne v. Flores*, 557 U.S. 433, 447 (2009) (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (2009)). The party seeking relief from an injunction bears the initial burden "of establishing that changed circumstances warrant relief . . . ." *Id.* (citing *Rufo*, 502 U.S. at 383).

---

[6] The purpose of criminal contempt, on the other hand, is "punitive, to vindicate the authority of the court." *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441 (1911). Criminal contempt is also "a crime in the ordinary sense . . . ." *Bloom v. Illinois*, 391 U.S. 194, 201 (1968). Therefore, a party subject to criminal contempt proceedings is entitled to the full scope of constitutional protections ordinarily afforded in a criminal case, including the right to proof beyond a reasonable doubt and, if faced with the possibility of imprisonment exceeding six months, a trial by jury. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826–27 (1994) (collecting cases). This Opinion contemplates only whether Bilzerian is in civil contempt of the 2001 injunction.

### C. Motion for Reconsideration

"[D]istrict courts retain 'broad discretion to grant or deny a motion for reconsideration,'" and will grant such a motion if, in their discretion, they find "that 'justice [so] requires.'" *Cobell v. Norton*, 355 F. Supp. 2d 531, 539 (D.D.C. 2005) (Lamberth, J.) (first quoting *Cobell v. Norton*, 226 F. Supp. 2d 175, 177 (D.D.C. 2002), then quoting *Cobell v. Norton*, 224 F.R.D. 266, 272 (D.D.C. 2004)). However, "[m]otions for reconsideration are disfavored," *Wright v. FBI*, 598 F. Supp. 2d 76, 77 (D.D.C. 2009) (quotations omitted), and in the interest of judicial efficiency and finality, they generally "may not be used to 'relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment.'" *2910 Ga. Ave. LLC v. Dist. of Columbia*, 59 F. Supp. 3d 48, 49 (D.D.C. 2014) (quoting *Jung v. Ass'n. of Am. Med. Colls.*, 226 F.R.D. 7, 9 (D.D.C. 2005)). "[T]he moving party has the burden to demonstrate 'that reconsideration is appropriate.'" *United States v. All Assets Held at Bank Julius*, 502 F. Supp. 3d 91, 95 (D.D.C. 2020) (quoting *FBME Bank Ltd. v. Mnuchin*, 249 F. Supp. 3d 215, 222 (D.D.C. 2017)). Some circumstances in which reconsideration may be warranted include where the Court has "patently misunderstood a party, has made a decision outside the adversarial issues presented to the Court by the parties, has made an error not of reasoning but of apprehension, or where a controlling or significant change in the law or facts [has occurred] since the submission of the issue to the Court." *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quoting *Cobell*, 224 F.R.D. at 272).

## IV. The Court Has Jurisdiction to Enforce Its Injunction

Bilzerian's Response to the Order to Show Cause contends that the 2001 injunction must be understood to apply only to "any court *in the United States* . . . ." Def.'s Opp'n at 2 (emphasis added). That is, of course, not what the Order says. The 2001 injunction contains no language—and Bilzerian identifies none—that could possibly be construed to limit its territorial scope to the

United States; to the contrary, by its express terms, it requires Bilzerian to refrain from commencing proceedings "in *any* court" without first securing this Court's approval. Order of July 19, 2001 (emphasis added).[7] But Bilzerian takes the position that a literal reading of the injunction, which would require him to seek permission prior to commencing legal proceedings in "any court on planet earth," would be "too broad, especially when applied to a foreign citizen bringing an action against another foreign citizen in a foreign court that has no connection to the parties in the underlying case or to any citizen or agency of the United States." *Id.* Giving Bilzerian the benefit of the doubt, the Court interprets this as a legal challenge either to the Court's *authority* to issue an injunction impairing his ability to litigate in foreign forums, or to the Court's jurisdiction to *enforce* its injunction under the circumstances of the case, rather than merely registering a grievance about the breadth of the Order. Nevertheless, these arguments are unpersuasive.

Since at least the 19th century and up to the present day, American courts have recognized their own power to issue an injunction that is effective outside of the court's own territorial jurisdiction, so long as the party to be enjoined is properly before the court and the injunction does not unduly impinge on a foreign jurisdiction's sovereignty. *See Steele v. Bulova Watch Co.*, 344 U.S. 280, 289 (1952) ("Where . . . there can be no interference with the sovereignty of another nation, the District Court in exercising its equity powers may command persons properly before it

---

[7] Bilzerian does not explicitly invoke the "presumption against extraterritorial application," but the Court nevertheless feels compelled to explain why, even if he had done so, it would make no difference. The presumption against extraterritoriality operates as a "canon of *statutory* interpretation . . . ." *Kiobel v. Royal Dutch Petrol. Co.*, 569 U.S. 108, 115 (2013) (emphasis added). Here, the Court is not interpreting an act of Congress, but rather its own order. "Trial courts are in the best position to interpret their own orders and are entitled to inherent deference when they construe those orders." *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 42, 49 (D.D.C. 2001) (collecting cases).

to cease or perform acts outside its territorial jurisdiction.").[8] Relying on this principle, American courts have occasionally issued so-called anti-suit injunctions, which are used to forbid a party subject to their jurisdiction from pursuing litigation in a foreign forum. *See, e.g.*, *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 926 (D.C. Cir. 1984) ("It is well settled that English and American courts have power to control the conduct of persons subject to their jurisdiction to the extent of forbidding them from suing in foreign jurisdictions."); *Balt. & O.R. Co. v. Kepner*, 314 U.S. 44, 55 (1941) (Frankfurter, J., dissenting) (noting the undisputed "historic power of courts of equity to prevent a misuse of litigation by enjoining resort to vexatious and oppressive foreign suits," and collecting cases); *accord* George A. Bermann, *The Use of Anti-Suit Injunctions in International Litigation*, 28 Colum. J. Transnat'l L. 589, 590 (1990) ("Generally

---

[8] *See also Phelps v. McDonald*, 99 U.S. 298, 308 (1878) ("Where the necessary parties are before a court of equity, it is immaterial that the *res* of the controversy . . . is beyond the territorial jurisdiction of the tribunal. It has the power to compel the defendant to do all things necessary . . . to give full effect to the decree against him. . . . [S]uch courts consider the equities between the parties, and decree *in personam* according to those equities, and enforce obedience to their decrees by process *in personam*.").

In early American jurisprudence, this principle sometimes arose in the context of injunctions preventing a litigant from pursuing a legal action in another state. *See, e.g.*, *Cole v. Cunningham*, 133 U.S. 107, 118–121 (1890) (collecting English and early American authorities, as well as state court decisions, for the proposition that courts of equity may enjoin parties from prosecuting actions in other jurisdictions). In *Cole*, the Court emphasized that such suits come within the jurisdiction of an equity court acting *in personam* because they are "not directed to the courts of the other state, but simply to the parties litigant; and, although the power should be exercised . . . with a just regard to the comity which ought to prevail among co-ordinate sovereigns, yet its existence cannot at this day be denied." *Id.* at 121. Decades later, the Supreme Court appeared to disavow the distinction between enjoining *parties* and enjoining *foreign courts* in *Donovan v. City of Dallas*: "[W]here the jurisdiction of a court, and the right of a plaintiff to prosecute his suit in it, have once attached, that right cannot be arrested or taken away by proceedings in another court. The fact, therefore, that an injunction issues only to the *parties* before the court, and not to the *court*, is no evasion of the difficulties that are the necessary result of an attempt to exercise that power over a party who is a litigant in another and independent forum." 377 U.S. 408, 413 (1964) (quoting *Peck v. Jenness*, 48 U.S. (7 How.) 612, 625 (1849) (emphasis added). But *Donovan*'s reference to the "difficulties" associated with inter-forum anti-suit injunctions does not appear to be a statement about the jurisdiction of the enjoining court. Rather, it seems to be an allusion to a more prudential concern: the fact that inter-forum anti-suit injunctions raise potential comity concerns. As the Court will go on to discuss, comity is indeed an important consideration that a Court must take into account before issuing or enforcing an injunction that has the effect of burdening litigation in another forum—but it is *not* a jurisdictional matter. *Cole*, 133 U.S. at 113 (holding that comity considerations "[do] not reach to the jurisdiction of the court, a rule of comity being a self-imposed restraint upon an authority actually possessed"); *see also Steelman v. All Continent Corp.*, 301 U.S. 278, 291 (1937) (upholding an inter-forum anti-suit injunction, rejecting the proposition that "the restraint of a proper party is legally tantamount to the restraint of the court itself," and collecting cases). It also bears mention that *Donovan* arose from a state court attempting to enjoin a litigant from suing in federal court, a forum provided by Congress. Thus, *Donovan* was infused with federalism and separation-of-powers considerations absent from the case at hand, which concerns only the relationship between the courts of co-equal sovereigns.

speaking, American courts do not consider it improper to order a person subject to their personal jurisdiction to perform, or refrain from performing, a specified act outside the forum, provided they have a sufficient interest in the performance of that act and intervention is warranted."). The 2001 injunction is akin to an anti-suit injunction, but less extreme: Bilzerian may undertake legal action in foreign jurisdictions but must secure the permission of this Court first.

It is undisputed that Bilzerian was properly subject to this Court's jurisdiction when the 2001 injunction was issued. He remains so today because "[c]ivil contempt proceedings are considered to be a part of the action that is the source of the order that is the subject of the noncompliance." Charles A. Wright & Arthur R. Miller, 4 Fed. Prac. & Proc. § 1017 (4th ed. 2024). Because these contempt proceedings are a continuation of an extant case in which Bilzerian is a party, rather than a new proceeding unto themselves, there is no need to assess the Court's personal jurisdiction anew. Moreover, even if the underlying case had ended, "[a] district court retains jurisdiction to enforce the terms of a previously entered injunction." *Am. Mining Cong. v. U.S. Army Corps of Eng'rs*, 120 F. Supp. 2d 23, 27 (D.D.C. 2000) (collecting cases); *see also Marshall v. Loc. Union No. 639, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am., Inc.*, 593 F.2d 1297, 1302 (D.C. Cir. 1979) ("The power of a federal court to protect and enforce its judgments is unquestioned."). And when a court issues an order to "cease or perform acts outside the territorial jurisdiction of the court," that order, like any other, "can be enforced through contempt proceedings." *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 717 (E.D. Va. 2012), *vacated on other grounds*, 564 Fed. App'x 710 (4th Cir. 2014). The Court is accordingly satisfied that the instant contempt proceedings suffer from no jurisdictional deficiency.

Nevertheless, the Court must consider whether there are prudential reasons not to move forward with contempt proceedings against Bilzerian. The 2001 injunction is not a true anti-suit injunction, insofar as it still permits litigation with leave of this Court. Nevertheless, Horstwood's requested relief is an end to Bilzerian's St. Kitts lawsuits against him. Thus, the civil contempt proceedings at hand demonstrate that, like an archetypical anti-suit injunction, the 2001 injunction has the potential to burden foreign litigation. Therefore, the Court will assess this application of the 2001 injunction using the same prudential factors that it would consider before issuing an international anti-suit injunction. First, the court must assure itself that enforcement of the injunction is "required to prevent an irreparable miscarriage of justice," whether because it is "necessary to protect the jurisdiction of the enjoining court, or to prevent the litigant's evasion of the important public policies of the forum." *Laker Airways*, 731 F.2d at 927.[9] Second, the Court must consider whether the "domestic interests" identified in the first step "outweigh concerns of international comity." *NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088, 1107 (D.C. Cir. 2024) (quoting *Goss Int'l Corp. v. Man Roland Druckmaschinen Aktiengesellschaft*, 491 F.3d 355, 361 & n.4 (8th Cir. 2007)). In Bilzerian's case, the Court finds that both requirements are met.[10]

---

[9] The *Laker Airways* court analyzed the anti-suit injunction in that case for both its jurisdiction-protecting and public policy-advancing properties, but the disjunctive language in this quotation clearly indicates that *either* purpose is sufficient by itself to support the use of an anti-suit injunction. The Fifth and First Circuits have expressed a similar view. *See In re Unterweser Reederei Gmbh*, 428 F.2d 888, 890 (5th Cir. 1970), *aff'd on rehearing en banc*, 446 F.2d 907 (1971), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 92 (1972) (permitting foreign litigation to be enjoined if it would "(1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's in rem or quasi in rem jurisdiction; or (4) where the proceedings prejudice other equitable considerations"); *see also Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 19 (1st Cir. 2004) ("[W]e agree that either the preservation of jurisdiction or the safeguarding of important national policies may afford a sufficient basis for the issuance of an international antisuit injunction.").

[10] Some courts have additionally held that an anti-suit injunction requires that the suit in which the injunction is sought and the suit to be enjoined must share the same parties and issues. *See, e.g.*, *Quaak*, 361 F.3d at 18 ("The gatekeeping inquiry is, of course, whether parallel suits involve the same parties and issues. Unless that condition is met, a court ordinarily should go no further and refuse the issuance of an international antisuit injunction."). It is not clear that such a requirement would be implicated here because, to reiterate, the 2001 injunction is not, strictly speaking, an

First, the 2001 injunction was calculated to prevent Bilzerian's continued subversion of vital policy interests. Bilzerian perpetrated enormously grave violations of federal securities laws and has deployed abusive litigation tactics to evade accountability for those violations up to the present day. A recent indictment filed in the Central District of California, charging Bilzerian with wire fraud and conspiracy, estimates that the outstanding civil judgments against him are now worth a staggering $180 million, of which a meager $547,000 has been recovered. *See* Indictment ¶ 1.c, *United States v. Bilzerian*, No. 24-cr-0569-MEMF (C.D. Cal. Sept. 26, 2024), Notice of Recently Filed Actions ex. 1, ECF No. 1253. It goes without saying that enforcement of federal securities law, particularly against such costly violations as Bilzerian's, is an important public interest. Just as damning, however, is the fact that Bilzerian manipulated U.S. bankruptcy proceedings as part of his ongoing plot to dodge responsibility for his civil judgments. *See SEC v. Bilzerian*, 815 F. Supp. 2d at 325–26. The vindication of not one, but two critically important federal statutory schemes—securities law and bankruptcy—undoubtedly provides a sufficient public policy rationale to justify the extraterritorial enforcement of the 2001 injunction. *Cf. Laker Airways*, 731 F.2d at 932 (acknowledging that American antitrust statutes are of "admitted economic importance to the United States," and therefore sufficient to warrant the issuance of an anti-suit injunction).[11]

---

"international antisuit injunction." Moreover, although the D.C. Circuit in *Laker Airways* noted the requirement of "duplication of parties and issues," it articulated this requirement during its discussion of whether the anti-suit injunction was necessary to protect the issuing court's jurisdiction. At most, then, this Circuit's precedent suggests that identity of parties is required if an international anti-suit injunction is issued to protect the enjoining court's jurisdiction. The 2001 injunction, by contrast, was issued to advance the important public policy concerns of the United States. Thus, even if the 2001 injunction were considered an anti-suit injunction, there is no binding authority to suggest that "duplication of parties and issues" is necessary in this case. It is hard to imagine how the "duplication of parties" requirement could even be applied to a permanent injunction stemming from a dispute involving a public authority, rather than two private parties—and even harder to imagine how the injunction could have survived appeal three times if it were deficient in this regard.

[11] The fact that Bilzerian's particular dispute with Horstwood does not directly implicate either of these policy areas is inapposite. By its own terms, the 2001 injunction encompasses the commencement of any type of proceedings.

Turning to the second prudential factor, the 2001 injunction does not substantially infringe on international comity. "Comity defines the 'extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation." *Kurd v. Republic of Turkey*, 438 F. Supp. 3d 69, 92 (D.D.C. 2020) (quoting *Hilton v. Guyot*, 159 U.S. 113, 163 (1895)). International comity has been described as "a complex and elusive concept," *Laker Airways*, 731 F.2d at 937, which demands "due regard both to international duty and convenience, and to the rights of [the forum state's] own citizens, or of other persons who are under the protection of its laws." *Hilton*, 159 U.S. at 113. Because "comity varies according to the factual circumstances surrounding each claim for its recognition," *Laker Airways*, 731 F.2d at 937, the Court must undertake a "particularized analysis of the respective interests of the foreign nation" and the forum nation. *Société Nationale Industrielle Aérospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 543–44 (1987).

As already described, the 2001 injunction serves important American interests in the integrity of its securities and bankruptcy laws. On the other side of the scale, it does next to nothing to hamper the interests of St. Kitts & Nevis or its citizens. First, the 2001 injunction is intended to *prevent* a single individual from initiating vexatious lawsuits. That is a far less egregious affront

---

The injunction's wide scope was a deliberate choice: based on Bilzerian's past behavior, the Court felt that it could not reasonably predict the lengths to which he might go to dodge responsibility for his actions. *See, e.g., SEC v. Bilzerian*, 815 F. Supp. 2d at 326 (noting that Bilzerian used a bankruptcy proceeding in the name of his wife, Terri, to shield the assets of an entity in which he had a financial interest). The Court accordingly ordered him to seek permission before commencing *any* type of proceeding in *any* forum, so that the Court could smoke out any frivolous or oppressive lawsuits before they began, lest federal securities or bankruptcy law be further evaded or abused. In other words, the 2001 injunction had to be purposefully inclusive so as to best protect the vital public policy interests underlying its issuance. Its capaciousness is a feature, not a bug. The injunction is meant to be enforced as written; the fact that any *particular* violation of the injunction does not seem to infringe on its motivating policy interests is beside the point.

to the independence and authority of a foreign tribunal than many international anti-suit injunctions, which often order the termination of a specific ongoing foreign proceeding or, worse yet, prevent the enforcement of a foreign court's judgment after the fact.[12, 13] Second, the 2001 injunction does not single out any *particular* foreign country or tribunal, lessening the likelihood that a coordinate sovereign will interpret enforcement of the injunction as an individualized slight. Indeed, the 2001 injunction would have had no international ramifications whatsoever but for Bilzerian's choice to move abroad, a decision that— by his own admission—he made specifically to evade the operation of the injunction.[14] Third, because the 2001 injunction only encompasses suits initiated *by Bilzerian*, it does not interfere with the interests or operations of foreign governments who may wish to proceed against him, nor does it encumber any other litigant in St. Kitts or anywhere else. *Cf. Laker Airways*, 731 F. 2d at 942 (emphasizing that the anti-suit injunction at issue was directed at a suit between private parties, even though it affected the enforcement of UK laws); *NextEra Energy*, 112 F.4th at 1109 ("[A]n anti-suit injunction against a foreign sovereign presents more serious comity concerns than one against a private entity."). Fourth, under the terms of the injunction, Bilzerian is still permitted to litigate in foreign forums;

---

[12] *See, e.g., Microsoft v. Motorola, Inc.*, 871 F. Supp. 2d 1089 (W.D. Wash. 2012) (issuing an injunction prohibiting a patentee from enforcing injunctive relief it had received from a German court); *TCL Commc'n Tech. Holdings, Ltd. v. Telefonaktienbolaget LM Ericsson*, No. 8:14-cv-00341-JVS-AN, 2015 WL 13954417, at *4, 7 (C.D. Cal. 2015) (enjoining already-initiated patent infringement actions in France, the UK, Brazil, Russia, Argentina, and Germany).

[13] Admittedly, litigation has already begun in the Eastern Caribbean Supreme Court in this instance, and the effect of this Court's contempt order will indeed be to command Bilzerian to terminate those proceedings. However, the disruption of extant proceedings was not the purpose of the 2001 injunction; the unfortunate fact that the St. Kitts litigation must now be brought to a halt is properly attributable to Bilzerian's decision to *ignore* the 2001 injunction, not to the injunction itself.

[14] *See* Response to Order to Show Cause 2 ("More than seven years ago, on June 13, 2017, Bilzerian filed a Motion to Terminate the [2001 injunction] which the Securities and Exchange Commission did not oppose. Nonetheless, on May 27, 2018, this Court denied the Motion. This Court should take comfort in knowing that this was the very reason he chose to renounce his United States citizenship.") (citations omitted).

he must simply secure the permission of this Court first.[15] In these respects, the 2001 injunction compares favorably, comity-wise, to a paradigmatic anti-suit injunction.

After weighing the foreign and domestic interests at play, the Court concludes that enforcing the 2001 injunction through contempt proceedings, even in relation to conduct performed in a foreign country, and even when measured against the demanding standard for an anti-suit injunction, is a lawful exercise of the Court's equitable authority.

## V. Bilzerian's Remaining Arguments Against the Injunction Are Meritless

Bilzerian's argues alternatively that the Court should dissolve the 2001 injunction, or otherwise that it should reconsider its Order granting Horstwood's Motion to Intervene. Both of these arguments are easily dispensed with.

First, as noted above, Bilzerian has asked this Court on a prior occasion to release him from the 2001 injunction. *See generally* Mot. for Relief from Judgment. After this Court refused that invitation and Bilzerian appealed, the D.C. Circuit affirmed, holding that Bilzerian had not "demonstrated 'a significant change either in factual conditions or in law' that renders continued enforcement of the filing injunctions entered against him 'detrimental to the public interest,'" as is his burden under Federal Rule of Civil Procedure 60(b). *SEC v. Bilzerian*, 811 Fed. App'x at 4 (quoting *Am. Council for the Blind v. Mnuchin*, 878 F.3d 360, 366 (D.C. Cir. 2017) (internal quotations omitted)). The same is true today: he "now asks this Court to consider *sua sponte* terminating the [2001 injunction]," but does not make even a token effort to explain *why* the Court should do so. Response to Order to Show Cause at 2. Neither does the Court independently perceive any reason to terminate the injunction. Therefore, the injunction will stand.

---

[15] Bilzerian, for his part, is perfectly aware of this: In 2017, he asked this Court for permission to participate in his wife's bankruptcy case in the Middle District of Florida. *See* Motion for Permission to Participate in Bankruptcy Case, ECF No. 1216. Permission was denied in that instance because of his prior efforts to use his wife's bankruptcy proceedings to shield his own assets.

Second, Bilzerian has also urged the Court to reconsider its Order permitting Horstwood to intervene in the case. This request, like the one just discussed, is entirely devoid of reasoning. It does not engage with the legal standard for reconsideration, nor does it present the court with any information suggesting that there has been a "significant change in the law or facts" since Horstwood's motion, that the Court "made a decision outside the adversarial issues presented . . . by the parties," or that the Court made an "error . . . of apprehension" in granting Horstwood's Motion. *Singh v. George Wash. Univ.*, 383 F. Supp. 2d 99, 101 (D.D.C. 2005) (quoting *Cobell*, 224 F.R.D. at 272). Instead, it merely directs the Court's attention to "the reasons set forth in Bilzerian's Opposition to Horstwood's Motion to Intervene and Bilzerian's SurReply." Response to Order to Show Cause at 2 (citations omitted). In other words, Bilzerian is asking the Court to consider the very same arguments that it has already considered and rejected. Absent any stated reason to do so, the Court declines to reconsider its Order permitting Horstwood to intervene.[16, 17]

## VI. Bilzerian Is in Civil Contempt of the 2001 injunction

To reiterate, civil contempt requires "an order that is clear and unambiguous" and a "violation . . . proved by clear and convincing evidence." *Broderick*, 437 F.3d at 1234. As for the first requirement, there may have been a non-frivolous *legal* question prior to this Opinion as to whether the Court had the authority to enforce its injunction in a foreign jurisdiction. However,

---

[16] Bilzerian claims obliquely that Horstwood "[l]acks [s]tanding to [i]ntervene in this [c]ase." Response to Order to Show Cause at 2. It is unclear whether Bilzerian is referring to the doctrine of Article III standing. If he is, then it bears mention that the Court has already concluded that "Horstwood has satisfied the requisites of Article III standing." *See* Order Granting Motion for Post-Judgment Intervention 2, ECF No. 1247. Again, Bilzerian has provided the Court with no reason to disturb this holding.

[17] What's more, as this Court has explained to Bilzerian before, even if Horstwood should not have been permitted to intervene, the Court has inherent authority to initiate orders to show cause; even if the decision to allow Horstwood to join the suit was erroneous, Bilzerian would nevertheless be obliged to defend the show cause order. *SEC v. Bilzerian*, 613 F. Supp. 2d at 72.

the *terms of the injunction itself* were always "clear and unambiguous"[18]: Bilzerian is not to commence or cause the commencement of proceedings in any court beside the D.C. District Court or the D.C. Circuit without this Court's permission, period.

It is enough, for purposes of this Opinion, that the meaning of the 2001 injunction is "clear and unambiguous" in an objective sense; civil contempt does not require that a violation be subjectively willful or knowing. *See N.L.R.B. v. Blevins Popcorn Co.*, 659 F.2d 1173, 1184 (D.C. Cir. 1981) ("In civil contempt proceedings . . . the intent of the recalcitrant party is irrelevant."). But even so, Bilzerian's behavior further suggests that he *subjectively* understood the 2001 injunction's requirements and chose to proceed in spite of that knowledge. Specifically, Bilzerian notified the Court of his change of residence in May 2017, then asked the Court to release him from the injunction the following month. *Compare* Notice of Change of Address, ECF No. 1212 (May 2017), *with* Mot. for Relief from Judgment, ECF No. 1215 (June 2017). If Bilzerian sincerely believed the 2001 injunction did not apply by virtue of his relocation to St. Kitts and change of citizenship, the latter motion would have been superfluous. Moreover, Bilzerian's own court filings evince his understanding that the 2001 injunction applies anywhere he may go. *See* Mot. for Permission to File Motions 1, ECF No. 888 ("On July 5, 2001 and July 19, 2001, this Court entered *ex parte* injunctions, that permanently enjoin me from commencing any proceeding in any court ('Permanent Injunctions')."). Thus, the requirement of a "clear and unambiguous order" is easily met here.

The only remaining question for purposes of civil contempt is whether Horstwood has provided clear and convincing evidence that Bilzerian violated the injunction by commencing or

---

[18] An order does not fail the "clear and unambiguous" prong of the civil contempt analysis merely because the subject believes that the order is legally defunct. *See Powell v. United States*, 226 F.2d 269, 276 (D.C. Cir. 1955) ("It is, of course, well-established . . . that a person must comply with an order of a court whether the order is valid or invalid, until judicial action stays or sets aside the order.").

causing the commencement of proceedings without the Court's permission. Despite the tortuous factual background of this dispute, the answer is straightforward: yes, he did.

To "cause" means, simply, "[t]o bring about or effect." *Cause*, Black's Law Dictionary (12th ed. 2024). Thus, one can "cause" the commencement of a legal proceeding without being a named party in that proceeding. For example, a lawyer (or someone acting as a lawyer) who initiates a legal action, whether by filing it or by substantially assisting the filer, has "caus[ed] the commencement" of that proceeding. Likewise, if a non-litigant with a strong personal interest in a hypothetical lawsuit successfully spurs somebody else to take that case to court, that non-litigant has "caus[ed] the commencement" of that proceeding, even though he may not be the named plaintiff himself. Indeed, the Court made it clear to Bilzerian that the 2001 injunction incorporates a broad understanding of the word "cause" when, in its 2009 civil contempt proceedings, it summarized the injunction as follows: "Paul Bilzerian is to play *no role* in the commencing of a lawsuit." *SEC v. Bilzerian*, 613 F. Supp. 2d at 71 (emphasis added).

Horstwood has shown by clear and convincing evidence that Bilzerian has caused the commencement of legal proceedings. As discussed above, Horstwood's exhibits clearly demonstrate the existence of three separate legal proceedings in which Adam Bilzerian, Horstwood's companies, or both are the nominal claimants. However, Adam Bilzerian's footprint is virtually absent from all of these lawsuits: in each one, Paul Bilzerian took over the litigation entirely from his son, personally handling all of the court appearances and filing of motions and affidavits. *See* Judgment of July 25, 2019, Mot. for Order to Show Cause at 284 ("Mr. Paul Bilzerian has acted as solicitor and advocate without restriction on behalf of his sons and the companies of which he is a director. He has exercised a surprisingly unrestricted right of audience . . . and has acted to all intents and purposes as if he were a person qualified to practice . . . as an

Attorney-at-Law in Saint Christopher and Nevis."). Where the companies are concerned, Bilzerian equally was the driving force behind the litigation, appearing as the representative or director of the companies. His signature is ubiquitous in the litigation record. And it is equally clear that the litigation in St. Kitts primarily, if not entirely, revolves around his own personal dealings. Though the many documents Horstwood signed nominally show Adam Bilzerian as his counterparty, the voluminous body of email exchanges between Paul Bilzerian and Horstwood show that it was Paul Bilzerian who was truly behind these business machinations all along.[19]

It is not clear from the record whether Paul Bilzerian had a direct hand in drafting or filing the complaints that literally initiated each of these three suits. But it *is* clear that he was in complete control of each lawsuit, formally or informally, from the very beginning. The judge in the 2016 suit confirmed as much when, after beholding Bilzerian's predominant role in the case, she inquired semi-rhetorically whether Bilzerian should be made a party to the litigation, or indeed whether he already was one under the definition provided in the local Civil Procedure Rules. Bilzerian's personal control over and centrality to each of the three St. Kitts lawsuits, from start to end, is sufficient to establish that he played a role in their commencement, as he was forbidden to do.

Bilzerian also violated the 2001 injunction when he personally appealed an adverse judgment in the 2011 suit. *See, e.g.*, Aff. in Support of Request for Written Decision, Mot. for Order to Show Cause ex. KAH C-5, at 116 (in which Bilzerian, in a signed affidavit, states he

---

[19] That Adam Bilzerian served mostly as a front for Paul Bilzerian, who remains the real party in interest up to the present day, is further demonstrated by a November 5, 2024 filing in the consolidated 2011 and 2016 suits requesting the substitution of Bilzerian's firm, IIL, for Adam Bilzerian as the claimant. *See* Notice of Filing Foreign Court Documents 3, ECF No. 1255. The document notes that Adam Bilzerian assigned his interests in the matter to IIL. *Id.* at 8. Recall that the loan Horstwood received was *initially* from IIL, before Horstwood signed a set of replacement loan documents identifying Adam Bilzerian as the lender. *See* Loan Documents, Mot. for Order to Show Cause ex. KAH E-12, at 614. Thus, the loan at issue in the St. Kitts litigation originated with Bilzerian's company, was transferred to Adam Bilzerian, and has now been transferred back again.

appealed a 2015 decision by Justice Carter); Horstwood's Opposition to Appeal, Mot. for Order to Show Cause ex. KAH C-29, at 396 (responding to an interlocutory appeal initiated by Bilzerian). The 2001 injunction includes a specific carve-out for appeals: Bilzerian is not required to seek permission before undertaking "appeals of this Court's Orders to the United States Court of Appeals for the District of Columbia . . . ." This explicitly narrow exception clearly communicates that taking an appeal constitutes the "commencement of proceedings" within the meaning of the 2001 injunction. If Bilzerian does so in an appellate court other than the D.C. Circuit, he must first secure this Court's permission. In this case, he failed to do so.[20]

Bilzerian, for his part, does not substantially deny his role in the St. Kitts litigation; his sole argument is that he was not personally named as a party in any of the actions, and that he merely "assisted his sons and their attorneys . . . through powers of attorney." Response to Mot. for Order to Show Cause at 4. As a legal matter, this defense rests on an interpretation of the 2001 injunction—i.e., that it only encompasses named parties—that is both too narrow for its plain language to bear, and that is irreconcilable with this Court's prior admonition that Bilzerian must "play no role" in the initiation of a lawsuit. And as a factual matter, Bilzerian's defense abjectly understates his role in the three lawsuits. Each lawsuit revolved around financial machinations in which Bilzerian was the principal player. Each lawsuit came to be personally dominated by Bilzerian himself. The 2011 suit followed suspiciously soon after Bilzerian threatened that he would "advise Adam" to act against Horstwood. Email of Oct. 20, 2011. The 2017 suit is even

[20] Bilzerian also violated the injunction when, in 2023, Bilzerian filed an amended claim in his 2017 lawsuit which removed Adam Bilzerian as a claimant, leaving only the Lemon Grove Company, for whom Bilzerian appeared as a representative and director. *See* Judgment of Mar. 23, 2023, Mot. for Order to Show Cause ex. KAH C-24, at 346–48. Adam Bilzerian evidently had no say in the matter because Paul Bilzerian was acting pursuant to his power of attorney. Bilzerian cannot circumvent the 2001 injunction by taking over litigation formally commenced by somebody else after the fact, particularly where he controls the decisions of that person.

more damning: as noted above, the Power of Attorney in that case was filed virtually immediately, giving Bilzerian control over the litigation from the very beginning.

In 2009, this Court found that Bilzerian was in contempt in part because the record demonstrated that he "was threatening litigation" and "advising the plaintiffs' attorneys," which together demonstrated that he had "exercise[ed] control over the litigation in an effort to cause a lawsuit to be commenced . . . ." *SEC v. Bilzerian*, 613 F. Supp. 2d at 71. The same indicators of contempt, and more, are present here.

It strains credulity to imagine that Bilzerian played no role in the commencement of these actions. Still, Bilzerian would have the Court believe that this is all a coincidence—he merely served in an advisory role in each of the lawsuits. In other words, he asks the Court to accept that Adam Bilzerian initiated these legal actions wholly of his own accord; that Adam did not coordinate in advance with Paul Bilzerian; and that Paul Bilzerian merely stepped in after the fact as a counsellor or assistant. That, simply put, is nonsense. Horstwood has compiled an extensive record showing Bilzerian's intimate involvement in the St. Kitts litigation, which Bilzerian has not refuted. The Court need not approach that record with childlike naivete or eschew its common sense. Paul Bilzerian played a role in the commencement of all three lawsuits.

Bilzerian attaches roughly 200 pages of exhibits to his response, which largely detail the many disadvantageous agreements that Horstwood signed throughout their relationship. *See* Exhibits to Response, Response to Order to Show Cause Attach. 1, ECF No. 1254-1. Those exhibits may constitute evidence against Horstwood in a hypothetical lawsuit about the ownership of Horstwood's companies or the debt that Horstwood owes to Adam Bilzerian. But those questions are not relevant to this Opinion. The narrow issue here is whether Bilzerian caused the commencement of legal proceedings without the permission of this Court, in violation of the 2001

injunction. Whether those unpermitted proceedings are meritorious is entirely beside the point. If Bilzerian has a real case, whether against Horstwood or anybody else, he need only secure leave of this Court to pursue it. Here, he did not.

In summary, the Court finds by clear and convincing evidence that, both by causing the commencement of new legal actions on behalf of his son and his companies, and by pursuing appeals of adverse judgments arising from those suits, all without leave of this Court, Bilzerian violated the terms of the 2001 injunction. Given the strength of the undisputed evidence, there is no need at this time for additional in-person proceedings to determine whether Bilzerian is in contempt. Nor, to reiterate, is there any reason to determine the truth or falsity of the remainder of Horstwood's saga. Unless this Court has reason to take it up at a later time, that task is best left to the courts of St. Kitts in a hypothetical future proceeding on the merits of his claims against Horstwood—provided that Bilzerian first secures this Court's permission, of course.

The Court therefore holds that Bilzerian is in civil contempt of the 2001 injunction.

* * *

## VII. Conclusion

Horstwood's requested relief is that Bilzerian be ordered to dismiss any of his lawsuits still pending against Horstwood in St. Kitts. Accordingly, this Court will **ORDER** Bilzerian, as well as his attorneys and associates (to include Adam Bilzerian, IIL, IIG and any other firm that Bilzerian purports either to own or to serve as a director) to dismiss all pending lawsuits against Horstwood in St. Kitts and in any other domestic or foreign forum. The Court will also **ORDER** Bilzerian to provide a copy of the accompanying order to Adam Bilzerian, Dan Bilzerian, and his associates and attorneys, so that they may be made aware that the 2001 injunction continues to have force outside the territorial limits of the United States.

Bilzerian and his associates are advised that further contumacy may be met with the initiation of criminal contempt proceedings.

Date: 1-24-25

Royce C. Lamberth
Royce C. Lamberth
United States District Judge

This is Exhibit "J" referred to in the affidavit of Dan Bilzerian affirmed before me on February 25, 2025 at Las Vegas, Nevada

A commissioner/notary in the State of Nevada

ALLANA HILL
Notary Public, State of Nevada
No. 23-8850-01
My Appt. Exp. Nov. 10, 2027

Meta

## Platform Terms

1. Introduction
2. Intellectual Property Rights
3. Data Use
4. Privacy Policy
5. Service Providers and Tech Providers
6. Data Security
7. Compliance Review Rights and Suspension and Termination of these Terms
8. Notice
9. Indemnification
10. International Transfers
11. General
12. Glossary

*Last updated February 3, 2025*

# Meta Platform Terms

## 1. Introduction

a. The Meta for Developers Platform ("Platform") is the set of APIs, SDKs, tools, plugins, code, technology, content, and services that enables others, including app developers and website operators, to develop functionality, retrieve data from Meta and any other Meta Products, or provide data to us.

b. To use Platform (including to Process any Platform Data), you agree to these Platform Terms ("Terms"), as well as all other applicable terms and policies. This may include the Meta Terms of Service, the Instagram Terms of Use, the Meta Commercial Terms, the Business Tools Terms, and any Meta Product terms that are applicable.

c. You must also comply with the applicable requirements in our Developer Policies and those made available on our Developer Site, including in our Documentation (collectively, the "Developer Docs") and all applicable laws and regulations, including with respect to your collection, use, or other processing of Platform Data.

d. These Terms will start when you accept them or otherwise start accessing or using Platform, whichever date is earlier. If you are accepting these Terms or accessing or using Platform on behalf of an entity, you represent and warrant that you have the authority to bind

Meta

e. If you fail to comply with these Terms or any other applicable terms or policies, we may suspend
described below.

f. Capitalized terms not otherwise defined herein (including in Section 12 ("Glossary") have the mea
policies, including our Terms of Service and our Meta Commercial Terms. The term "including" mea

## 2. Intellectual Property Rights

a. **Our License to You.** Subject to your compliance with these Terms and all other applicable terms
non-exclusive, non-sublicensable (except to Service Providers as described below), non-transferal
access, and integrate with Platform, but only to the extent permitted in these Terms and all other a
not sell, transfer, or sublicense Platform to anyone. Except as expressly licensed herein, you will no
translate, create derivative works of, reverse engineer, or otherwise exploit Platform or any aspect
all rights, title, and interest (including the right to enforce any such rights) not expressly granted in

b. Your License to Us

i. *Your Content:*

1. You grant us a non-exclusive, transferable, sublicensable, royalty-free, worldwide lic
run, copy, publicly perform or display, translate, and create derivative works of any info
made available by you or on your behalf (including by your Service Providers or throug
Platform (collectively, "Your Content") for any business purpose in connection with op
Platform or any other Meta Product. This license remains in effect even if you stop usir
license to us includes: the right to incorporate Your Content into other parts of Meta Pr

Meta

2. If you use the Meta Business Tools to send us Business Tool Data, our use of that da
Terms rather than the foregoing license for Your Content.

3. If you owned Your Content before providing it to us, you will continue owning it after
rights granted in these Terms or any other applicable terms or policies and any access
via Platform.

ii. *Your App:*

1. You grant us a non-exclusive, transferable, sublicensable, royalty-free, worldwide lic
run, copy, publicly perform or display, translate, and create derivative works of your Ap
connection with operating, providing, or improving Platform. This license remains in eff
Without limitation, the foregoing license includes the right to frame or link to your App,
around your App, and to analyze your App (including to assess your compliance with th
terms and policies).

2. As between the parties, in connection with Platform, we won't be subject to any terr
App or Your Content (even if we click or tap agreement). Those terms and policies are
rejected and excluded from these Terms.

3. Nothing in these Terms will be interpreted as a representation or agreement that we
developed apps, products, features, or services that are similar to your App or compet

iii. ***Your Name, Trademarks, and Logos:*** You grant us a non-exclusive, transferable, sublicer
to use your name, trademarks, and logos for distribution, marketing, and promotional purpos
Meta Products, in all formats and media. This license remains in effect for existing materials a
Platform.

Meta

i. You will not provide or promote content in your App that infringes upon or otherwise violate party.

ii. You will obtain (and represent and warrant that you own or have secured) all rights necess to (1) grant the licenses, rights, and permissions in these Terms (including those in Section 2 distribute, and deliver all information, data, and other content in your App; and (3) otherwise satisfying all licensing, reporting, and payout obligations to third parties.

iii. If your App contains content submitted or provided by your Users or other third parties, yc and takedown process and otherwise comply with all applicable laws and regulations to resp infringement. Without limiting that compliance, in the United States, you must comply with al Millennium Copyright Act.

## 3. Data Use

a. **Prohibited Practices**. You will not perform, or facilitate or support others in performing, any of tl (collectively, "Prohibited Practices"):

i. Processing Platform Data to discriminate or encourage discrimination in a manner that disa attributes including race, ethnicity, color, national origin, religion, age, sex, sexual orientation disability, medical or genetic condition, or any other categories prohibited by applicable law, Platform Data such as gender or age to improve the applicable User's experience in the App so long as it is compliant with applicable law or regulation.

ii. Processing Platform Data to make eligibility determinations about people, including for hou

Meta

iii. Processing Platform Data to perform, facilitate, or provide tools for surveillance. Surveillar
Platform Data about people, places, groups, or events for law enforcement or national securi

iv. Selling, licensing, or purchasing Platform Data.

v. Processing Platform Data without valid User consent in order to build or augment user pro

vi. Attempting to decode, circumvent, re-identify, de-anonymize, unscramble, unencrypt, or r
Platform Data that is provided to you.

vii. Changing your App's core functionality or data Processing so that Users would view it as
materially changing the scope of Processing of previously collected Platform Data, unless in
App and receive our approval through App Review.

viii. Processing Platform Data for purposes other than the applicable permitted purposes set

b. Additional Terms for Restricted Platform Data

i. You will not request Restricted Platform Data unless it is necessary to meaningfully improve
experience in the specific product or service for which the User shared the data.

ii. It must be clear to the User why you are requesting their Restricted Platform Data in order
experience.

iii. For clarity, your Processing of Restricted Platform Data must comply with the applicable D
of these Terms (including the Prohibited Practices).

c. **Sharing Platform Data.** You may only share Platform Data in compliance with these Terms (inclu

Meta

i. With respect to Platform Data collected as a Tech Provider, solely as described below in Se

ii. With respect to Platform Data not collected as a Tech Provider,

1. when required under applicable law or regulation (you must retain proof of the applic or request and provide it to us if we ask for it);

2. with your Service Provider in order for them to provide the services you requested;

3. when a User expressly directs you to share or expressly consents to your sharing th purposes as specified in the User's direction or consent (you must retain proof of the t and provide it to us if we ask for it); or

4. solely with respect to Platform Data that is not Restricted Platform Data, with other t

a. you first contractually prohibit them from using the Platform Data in a way tha other applicable terms or policies (you must retain proof of the contractual prohi for it); and

b. you ensure that any such third parties comply with these Terms and all other a they were in your place, and you are responsible for their acts and omissions, inc

d. Retention, Deletion, and Accessibility of Platform Data

i. Unless required to keep Platform Data under applicable law or regulation, you must (and m your Service Providers) do the following:

1. Update or delete Platform Data promptly after receiving a request from us or the Us accessible and clearly marked way to ask for their Platform Data to be modified or dele

≡ Meta

a. When retaining the Platform Data is no longer necessary for a legitimate busir
these Terms and all other applicable terms and policies;

b. When you stop operating the product or service through which the Platform D

c. When we request you delete the Platform Data for the protection of Users (wh
discretion);

d. When a User requests their Platform Data be deleted or no longer has an accc
Data has been aggregated, obscured, or de-identified so that it cannot be assoc
or device), or for Tech Providers, when a User or the Client requests their Platfor
longer has an account with you;

e. When required by applicable law or regulations; or

f. As required under Section 7 ("Compliance Review Rights and Suspension and

ii. If you are required to keep Platform Data under applicable law or regulation, you must retai
regulatory requirement or request and provide it if we ask for it.

iii. If you have received Platform Data in error, you must immediately report this to us using tl
and provide proof of deletion if we ask for it.

e. Exceptions to Restrictions. The above provisions of Sections 3.a-d do not apply to certain Platf

## 4. Privacy Policy

≡ Meta

App Dashboard.

b. Your privacy policy must clearly explain what data you are Processing, how you are Processing it Processing it, and how Users may request deletion of that data.

c. You may only Process Platform Data as clearly described in your privacy policy and in accordanc regulations, these Terms, and all other applicable terms and policies.

d. Your privacy policy will not supersede, modify, or be inconsistent with these Terms or any other t Platform Data.

## 5. Service Providers and Tech Providers

a. Service Providers

i. You will not use a Service Provider in connection with your use of Platform or Processing of Provider first agrees in writing to do the following:

1. Use Platform and Process Platform Data solely for you and at your direction in order a manner that is consistent with these Terms, all other applicable terms and policies, a other individual or entity and for no other purpose, including for the Service Provider's

2. In the event the Service Provider engages another Service Provider ("Sub-Service P services requested, ensure the Service Provider requires the Sub-Service Provider in v requirements.

≡ Meta

iii. When you cease using a Service Provider or Sub-Service Provider, you must ensure they i Processing Platform Data and promptly delete all Platform Data in their possession or contro

iv. Upon our request, you must provide a list of your Service Providers and Sub-Service Provi information for each, the types and volume of Platform Data shared, and proof of written agr to demonstrate compliance with this section.

v. We may prohibit your use of any Service Provider or Sub-Service Provider in connection w of Platform Data if we believe that (1) they have violated these Terms or other applicable tern negatively impacting Platform, other Meta Products, Platform Data, or people who use Meta you if we do. Promptly upon such notice, you must stop using that Service Provider or Sub-S your use of Platform or Processing of Platform Data.

vi. We may require that your Service Providers or Sub-Service Providers agree to these Term in order to access Meta Products, Platform, or Platform Data.

b. Tech Providers

i. If you are a Tech Provider, you must comply with the other provisions of these Terms, as wc with respect to your use of Platform and Processing of Platform Data as a Tech Provider. If th more restrictive on you or more protective of us apply.

ii. You, as a Tech Provider, understand and agree to the following:

1. You will only use Platform and Process Platform Data on behalf of and at the directio access it to help such Client to use Platform or Process Platform Data in accordance w applicable terms and policies ("Client's Purpose"), and not for your own purposes or ar

3. You will maintain an up-to-date list of your Clients and their contact information and

4. You will only share Platform Data in compliance with these Terms, applicable law anc terms and policies, and only in the following circumstances:

a. with your applicable Client, so long as you first contractually prohibit such Clie a way that would violate these Terms or any other applicable terms or policies;

b. to the extent required under applicable law or regulation (you must retain proc requirement or request and provide it to us if we ask for it);

c. with your Service Provider solely to the extent necessary for your applicable C

d. with your Client's service provider solely to the extent necessary for such Clie expressly directs you to share the data with such service provider (you must reta direction and provide it to us if we ask for it);

5. We may require that your Clients agree to these Terms or other applicable terms or Products, Platform, or Platform Data through your App.

6. You will promptly terminate a Client's use of our Meta Products, Platform, or Platforr request it because we believe that the Client (a) has acted in a way that would violate t or policies or (b) is negatively impacting Platform, other Meta Products, Platform Data,

7. You will promptly notify a Client of any communication sent to you by Meta concerni Processing of their Platform Data, including requests to exercise their data subject rigl Data.

Meta

## 6. Data Security

a. Data Security Requirements

i. You must always have in effect and maintain administrative, physical, and technical safegu

1. Meet or exceed industry standards given the sensitivity of the Platform Data; and

2. Are designed to prevent any unauthorized (including in violation of these Terms or a Processing (including, for the avoidance of doubt, access, destruction, loss, alteration, compromise) of Platform Data.

ii. You must have an easily accessible way for people to report security vulnerabilities in your address identified deficiencies.

iii. You may use Meta Products to authenticate users, but you must not separately request or credentials for any Meta Products.

iv. You must protect and not transfer, share, or solicit Meta user IDs, access tokens, or app se Service Provider who helps you build, run, or operate your App.

b. Incident Reporting

i. If any of the following incidents happen, you must notify us using this form as soon as prac information we request regarding:

Meta

2. Any incidents that are reasonably likely to compromise the security, confidentiality, c
Service Provider's or Sub-Service Provider's IT Systems.

ii. You must immediately begin remediation of the incident and reasonably cooperate with us, reasonable detail of the impact of the incident upon Platform Data and corrective actions bei about your compliance with any notification or other requirements under applicable laws and

## 7. Compliance Review Rights and Suspension and Termination of these T

a. **App Review.** We may require that you submit your App for our review or approval ("App Review"), its access to any Platform Data) is approved (which will be in our sole discretion), you will ensure th Terms and all other applicable terms and policies, and we may review your App for such complianc discretion. You will cooperate with our reviews and provide any information we request, including a information you provide to us during any such reviews or otherwise in your App Dashboard, which y and accurate.

b. **Regular Monitoring.** We, or third-party professionals working at our direction (including auditors computer forensics analysts) (collectively, "Third-Party Auditors"), may conduct regular monitoring Platform and Processing of Platform Data using technical and operational measures.

c. Auditing Rights

i. We or Third-Party Auditors may conduct an Audit, no more than once a calendar year unles

Meta

ii. Audits will be conducted during normal business hours after providing you with at least 10
will suffice), unless we determine in our sole discretion a Necessary Condition requires more

iii. You will cooperate with the Audits, including by (1) providing all necessary physical and re
Records, and (2) providing information and assistance as reasonably requested (including m
knowledgeable about your or your App's Processing of Platform Data available for our questi

iv. You will also use commercially reasonable efforts to get permission and cooperation from
conduct such Audits with respect to their IT Systems, Records, and applicable personnel.

v. You will remedy any non-compliance revealed by an Audit as soon as reasonably practicab
facts and circumstances), after which we may conduct follow-up Audits to ensure proper ren

vi. If an Audit reveals any non-compliance by you or your Service Provider(s) then you will rei
costs and expenses associated with conducting the Audit and any related follow-up Audits.

vii. After these Terms have ended, our Audit rights under this section will survive until 1 year
affirmatively demonstrate that you have stopped Processing all Platform Data or (ii) when yo
embodiments thereof that are in your and your Service Providers' possession or control have
doubt, nothing in this section limits any other rights or remedies we may have by law, in equit
applicable terms or policies.

d. **Certifications.** From time to time, we may request (in writing or through your App Dashboard, Pl
information, certifications, and attestations relating to your use of Platform or Processing of Platfor
in the requested time frame and form. This may include certifying: (i) your compliance with these T
and policies, and (ii) the purpose or use for the Platform Data you have requested or have access t
complies with these Terms and all other applicable terms and policies. All such certifications and at
authorized representative of yours.

Meta

i. We may take enforcement action against you and your App if we believe, in our sole discret

1. You have not timely responded to our requests related to monitoring or auditing;

2. You or your App has violated or may have violated these Terms or any other applical impacting Platform, other Meta Products, Platform Data, or people who use Meta Prod

3. You have created or maintained App(s) to circumvent, or attempt to circumvent, our circumvent could include creating or maintaining App(s) to bypass any restrictions or e other App(s) or account due to a violation of our terms and policies);

4. It is needed to comply with applicable laws or regulations or otherwise required or re governmental authority; or

5. It is needed to protect the Meta Companies from legal or regulatory liability.

ii. We may take enforcement action at any time, including while we investigate your App(s), w Enforcement can be both automated and manual. It can include suspending or permanently r removing your access and your App's access to Platform, requiring that you stop Processing our agreements with you, or any other action that we consider to be appropriate, including te or your ability to use Meta Products.

iii. We may suspend or end your App's access to any Platform APIs, permissions, or features accessed within a 28-day period with or without notice to you.

## 8. Notice

Meta

## 9. Indemnification

In addition to and without limiting the scope of the "Indemnification" Section in our Meta Commercial Ter
action, or dispute against the Meta Companies related to your use of Platform, your Processing of Platfor
name or logo, products or services, or actions in connection with Platform, you will indemnify and hold th
against all damages, losses, and expenses of any kind (including reasonable legal fees and costs) related
dispute.

## 10. International Transfers — EEA Data Transfers

This section shall apply to the extent that your Processing of Platform Data includes personal data contro
Limited ("Meta Ireland Data") and the transfer of such Meta Ireland Data to a territory outside of the Euro
of such transfer, does not have a positive adequacy decision from the European Commission under Articl
(each an "EEA Data Transfer").

Whenever there is an EEA Data Transfer, your use of Meta Ireland Data is subject to your compliance with
controller to controller transfers (Module One). In each case, you agree that for the purposes of Section I
Option 1 and Option (b) shall apply respectively and the Member State shall be Ireland. Nothing in this Se
EEA Data Transfers) is intended to vary or modify the Clauses. For the purposes of the Appendix to the C

Your Rights, Ownership, and Obligations

Meta

b. For the purposes of Annex I(B) to the Clauses:

i. "Categories of data subjects" are the Users who visit, access, use, or otherwise interact wi
services of Meta Platforms Ireland Limited;

ii. "Categories of personal data" are Meta Ireland Data, which includes profile information, ph
communications between Users, information about use of the App and other products and se
information, information about visits to third-party websites or Apps that use a "like" or "con
integration, information from third-party partners or the Meta Companies, or as otherwise se

iii. "Sensitive data" is personal data about a person's racial or ethnic origin, political opinions
trade-union membership, genetic data, biometric data for the purpose of uniquely identifying
health or data concerning a natural person's sex life or sexual orientation, criminal conviction
offence;

iv. "Frequency of the transfer" is on a continuous basis to the extent required to fulfill the pur
below;

v. "Nature and purpose of the data transfer(s)" is the provision of the App and other product
pursuant to the applicable terms and conditions and Privacy Policy of you and/or your Client;

vi. "Period for which personal data will be retained" is as set out in Section 3.d.i.2 unless app
Data be retained for a longer period, in which case you shall only retain such Meta Ireland Da
applicable laws and subject always to Section 10.d.

c. For the purposes of Annex I(C) to the Clauses, the competent supervisory authority will be the D
and

≡ Meta

This Section 10A shall apply to the extent that your Processing of Platform Data includes personal data c
is subject to the UK GDPR (as defined in the UK's Data Protection Act 2018 ("DPA")) ("UK Data") and the
territory outside of the United Kingdom that, at the time of such transfer, does not have a positive adequ
State in accordance with the relevant provisions of the UK GDPR and the DPA ("UK Data Transfer").

Whenever there is a UK Data Transfer, your use of UK Data is subject to your compliance with the Approv
incorporated by reference into these Terms and is deemed to have been entered into and completed as s
10A (International transfers – UK Data Transfers) is intended to vary or modify the Approved Addendum.
have the meanings given to them in the Approved Addendum. For the purpose of the Approved Addendu

a. In Table 1 of the Approved Addendum, the parties' details are as follows:

i. Meta Platforms, Inc. is the "data exporter" and you are the "data importer" as defined in th

ii. The parties details and key contact information are:

Meta Platforms, Inc., 1 Meta Way, Menlo Park, CA 94205, USA, and the contact person
exporter to the data importer from time to time.

Developer's details and key contact information are your details notified to Meta Platfo

iii. The parties agree that execution of these Terms by the parties shall constitute execution c

b. For the purposes of Table 2 of the Approved Addendum, the selected modules of the Approved I
to controller).

Meta

these Terms.

ii. Annex 1B: Description of Transfer: The information in Section 10.b shall apply, albeit refere
Limited" shall be replaced with "Meta Platforms, Inc." and references to "Meta Ireland Data"

iii. Annex II: Technical and organizational measures: For the purposes of Annex II, you will imp
Technical and Organisational Measures

d. In Table 4 of the UK Addendum, the data exporter may end the UK Addendum in accordance wit

## 11. General

a. In accordance with our Terms of Service, you will not transfer any of your rights or obligations un
without our prior written consent. Transferring can include assignment, acquisition, merger, change
Any unpermitted transfer will be considered null and void. For any permitted transfer, the new own
Processing Platform Data subject to these Terms.

b. You also must comply with all applicable laws and regulations (including the Children's Online Pri
the Video Privacy Protection Act ("VPPA")).

c. If there is any conflict between these Terms and any other applicable online terms, the terms tha
App or more protective of us apply. If you have previously agreed to our Supplemental Terms for Ex

Meta

d. We reserve the right to amend these Terms and will use commercially reasonable efforts to provi material amendments. Your continued use of or access to Platform after any such amendment will these Terms as amended.

e. From time to time, we may need to modify, change, suspend, or discontinue the availability of Pl services, including for safety and security reasons or to otherwise protect our legitimate interests. suspensions, or discontinuances may include, but are not limited to, imposing limits on certain feat access to parts or all of our APIs or websites, and discontinuing any support or modification for Pla to provide for you. If we elect to discontinue the availability of the entirety of Platform, we will use c provide you with prior notice.

f. We do not guarantee that Platform will always be free.

g. We can issue a press release or otherwise make public statements or disclosures describing our Platform.

h. When these Terms have ended, all rights granted to you under these Terms will immediately sto Platform. The following Sections will remain in effect after these Terms have ended: Section 2.b, Se Section 5, Section 6, Section 7, Section 9, Section 10, Section 10A, Section 11, and Section 12.

## 12. Glossary

a. "App" means any technical integration with Platform or to which we have assigned an App identi SDKs, tools, plugins, bots, websites, applications, specifications, and other technology made avail connection with Platform is considered part of your App.

Meta

superseded by the Information Commissioner.

c. "Audit" means a review, inspection, or audit of your and your Service Providers' IT Systems or Re

d. "Clauses" means the standard contractual clauses annexed to European Commission Decision (E

e. "Client" means the User of a Tech Provider's App.

f. "Developer" means the person or entity that creates or operates an App.

g. "Developer Docs" has the meaning given in Section 1.c ("Introduction").

h. "IT Systems" means information technology systems (real and virtual), networks, technologies, a remote access to data centers and cloud facilities) that Process Platform Data.

i. "Necessary Condition" means any of the following:

i. it is required by applicable law, rule, or regulation or otherwise required or requested by a c

ii. we suspect that you or your App have Processed Platform Data in violation of these Terms

iii. you enter into a change of control transaction or transfer (or request to transfer) any of yo Terms or other applicable terms or policies;

iv. we determine in our sole discretion it is necessary to ensure that you and your App have d with these Terms and all other applicable terms and policies; or

v. we determine in our sole discretion it is necessary to ensure proper remediation of any nor

Meta

k. "Platform Data" means any information, data, or other content you obtain from us, through Platfc directly or indirectly and whether before, on, or after the date you agree to these Terms, including ( derived from such data. Platform Data includes all Meta Product access tokens, app secrets, Meta pictures and usernames.

l. "Process" means any operation or set of operations performed on data or sets of data, whether c use, collection, storage, sharing, or transmission.

m. "Prohibited Practices" has the meaning given in Section 3.a ("Prohibited Practices").

n. "Records" mean books, agreements, access logs, third-party reports, policies, processes, and o of Platform Data.

o. "Restricted Platform Data" means Platform Data that (i) reasonably can be used to identify a par using the permissions listed here; or (iii) we otherwise designate as Restricted. Notwithstanding th does not include data that can be accessed using the permissions listed here.

p. "SDKs" means any object code, source code, or documentation you receive from us that helps y with the Platform.

q. "Service Provider" means an entity you use to provide you services in connection with Platform (

r. "Tech Provider" means a Developer of an App whose primary purpose is to enable Users thereof Platform Data.

s. "Third-Party Auditors" has the meaning given in Section 7.b ("Regular Monitoring").

t. "User" means the end user of an App (whether a person or an entity).

This is Exhibit "....G........" referred to in the affidavit
of .Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

**From:** Scott Rohleder
**To:** "Lu Galasso"; TOM KOFMAN
**Subject:** Audit Committee Letter
**Date:** Sunday, June 7, 2020 11:36:00 AM

Dear Lu and Tom:

I was part of a phone call with the two of you and Erez Bahar of Davidson and Company who had expressed concerns over certain Ignite expenditures in which they are seeking additional board approval regarding the previous payments of the expenses.

I can appreciate Davidson's concern as the people knowledgeable with the transactions, including Todd Thompson, President; Jim McCormick, President; Don Weinstein, VP Finance; and Eddie Mattei, CFO are no longer employed with the company which made it difficult for them to obtain the assurances they need. This is also true of our prior Chief Marketing Officer, Jonathan Anastas as well as our former Chief Operating Officer, Shannon Bard.

Furthermore, Our Acting President, Curtis Heffernan, started with the company in late March of 2019, but his responsibilities as Acting President did not begin until the last quarter of 2019. Hence, he has limited knowledge of the transactions and only has had approval authority for just a few months of the audit period. Carrie Magee, the company Controller, also has limited tenure with the company, so her direct knowledge with transactions is also limited.

It is not fair to Curtis or Carrie to be asked to attest and ratify company expenses that preceded their employment with the company nor were they involved with transactions in which they would have the authority to approve them.

With this vacuum within the company, the only one with knowledge of these transactions is me. I have obtained this knowledge as follows:

- I was the company's first CFO up until Eddie Mattei was hired in late 2018.
- I have served as a director of the company since inception until I retired as a director in 2020.
- I served on the audit committee during my tenure as a director which included the 2019 audit period.
- I continue to serve as a financial consultant with the company, and I was awarded an option to acquire 500,000 shares of Ignite as compensation.
- I have worked with and advised all three presidents noted above along with Eddie Mattei and other members of management.
- I have advised management on a variety of decisions and have been asked to participate in their management meetings on several occasions.

I have had the opportunity to review the list of transactions provided by Davidson. I spent more than 5 hours investigating and reviewing the individual transactions and further inquired about details of the transactions along with also reviewing some invoices.

I have previously shared my findings with both of you and concluded that based upon my previous knowledge of the expenditures, I am 100% comfortable attesting that the transactions within the lengthy list were in fact Ignite expenses, and I am happy to provide a written statement to that effect to Davidson.

Regards,

Scott

**From:** Scott Rohleder
**To:** "Lu Galasso"; TOM KOFMAN
**Subject:** Ignite "Significant Unusual Transactions"
**Date:** Sunday, June 7, 2020 11:40:00 AM
**Attachments:** Wire for yacht .msg

---

Dear Lu and Tom:

As a follow up to our discussions that last two days, I spent several hours analyzing the expenditures that we have been discussing and getting more information.

Although I still hold firm with the analysis that I previously gave you, and regardless of the fact that all of the expenditures were approved, I have gotten Dan to agree to absorb the costs of most of the "significant unusual transactions" directed at him. The ones specifically agreed to are:

1. The purchase of a $15,000 ping pong table
2. The purchase of $24,000 in glass bongs
3. The purchase of $65,000 of multiple glass bongs
4. The purchase of a $50,000 bed frame
5. The purchase of the $25,000 theatre projector
6. The purchase of the $88,000 vault.

These amounts total $267,000.

This was not easy. I have shared with you several of the reasons why Dan does not agree with this solution, but he has always taken Ignite's interest over his own.

Since Dan controls two entities, (30 Meadowhawk Lane, LLC and Goat Airways) that are owed in excess of $300,000 by Ignite, the $267,000 will be offset against these balances, and we will prepare a bill of sale.

There are specific other "significant unusual transactions" that targeted Dan in which the justifications far outweigh asking Dan to reimburse those expenditures. The specific items are:

- The yacht rental. There was significant management discussion over this rental, and Dan agreed to pay for half of it as evidenced in the attached email. Jim McCormick approved the transaction and Eddie Mattie wired Ignite's portion of the obligation. Davidson's comment that Jeremy Guymon authorized the expenditure for Ignite is false and misleading.

- The letter comment that the company paid $102,000 GBP for a two night stay in London for the UK Launch Party is true. However, this expenditure was for lodging of several Ignite personnel and management as well as the launch after party at the Mandrake Hotel. Then expenditures for this launch were approved by management, and the statement makes an assumption that these were costs only associated with Dan which is absolutely false and misleading. In fact, Dan was furious over this charge as he believed he could have gotten substantial discounts or even eliminated the charges if he had contacted the hotel

- Game Room creation ($45,000)

- Paint Ball field creation ($75,000)

- Rock Climbing wall ($40,000)

- Pool branding to Ignite ($31,000)

The last four are not justified for the following reasons:

1. Management discussion and approvals were received to move forward with these projects. The Twitch marketing channel drove these purchasing decisions. (As mentioned previously, marketing dollars were being spent on Twitch as an alternative social media option to allow Dan's access to his followers should his Facebook or Instagram accounts get suspended).

Since this was a live broadcast to showcase Dan's lifestyle, the push was to brand everything Ignite. These were ongoing decisions made that included Michael Feder, CMO Jonathan Anastas; VP Marketing, Spence Bovee, COO Shannon Bard and Jim McCormick.

2. Dan received push back from management on the creation of the rock climbing wall, so he contributed half of the cost of its development which satisfied management's objections.

3. Dan agreed with management to terminate the Patrick Lane lease in a cost savings measure for the company and agreed to use the facility for photo shoots and Ignite events such as a major alcohol distributor event held in January 2020 to introduce the Ignite Beverage line (water, energy drinks, vodka and tequila). The expenditures noted above continue to be used in a variety of social media posts and other forms of marketing. Had Dan not agreed with management, then Ignite would be carrying these costs along with the costs of the triple net lease.

4. As Ignite has evolved, Dan has personally absorbed a significant amount of marketing costs that he has creatively wanted, but he and management recognized that cash flow would not support some of the expenditures, and even if they did, the justification would not make sense. For example:
   - Dan has branded his Baja Race Truck ($500,000) Ignite. Ignite did not pay for that.
   - Dan has branded a motorcycle, all of his off road vehicles and an Army truck Ignite. This is about $400,000 in vehicles that were never paid for by Ignite nor did Ignite pay for the rebranding.

   These vehicles are actively used in a variety of social media posts at no cost to Ignite.

5. We should also keep in mind and the perspective that if Ignite hired Dan as an influencer, we would be spending $50,000 to $100,000 <u>per social media post</u>. Within that view, we have gotten more than our money's worth, and the few costs that Dan has justifiably denied pales in comparison. Dan has done his part. He has made the Ignite brand valuable and known to 69% of the CBD users alone.

Regards,

Scott

This is Exhibit "...H........" referred to in the affidavit
of .Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025..............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 20, 2026

**International Investments, Ltd.**
**858 Zenway Blvd**
**Basseterre, St Kitts**
**(869) 466-8000**

June 1, 2024

Mr. Dan Bilzerlan
5990 W. Patrick Lane
Las Vegas, NV 89118

Re: Demand for Your Resignation

Dear Mr. Bilzerian:

I am writing this letter demanding your immediate resignation as a director of Ignite International Brands Ltd, and any and all subsidiaries where you hold any position, at the request of the majority of the Ignite International Brands, Ltd ("Ignite") shareholders, Ignite's primary lender, Ignite management, and Ignite's former directors.

You have severely breached your fiduciary duty to Ignite and caused enormous damage to this lifestyle brand by making ridiculous political statements including:

1. On Twitter: "In case y'all were confused on where I stand, let me be clear, Fuck Israel."
2. On Facebook: "Israel is a parasitic organism living off of America while providing us zero benefit. We are funding their war crimes and they've compromised our government."

Even worse, because you manage the Ignite social media pages, you have "liked" your inflammatory comments on behalf of Ignite. Ignite's management and employees unanimously disagree with the fact that you thrust Ignite into the middle of this very contentious issue with your comments, especially since you did it while we are in the middle of a sale process. You have deeply embarrassed and offended Ignite's distributors, Ignite's customers, Ignite's shareholders, and Ignite's management and employees, the very people that have worked tirelessly to expand the brand globally and make Ignite a success.

Based on the opinion of Ignite's investment banker, your actions have diminished the value of Ignite by at least 50% and, if you don't resign promptly, the damage with be much greater as the company loses more and more distributors, retailers and customers.

Your reckless actions have resulted in the following backlash which are just a small sample of the negative reports that Ignite is receiving:

- Summit Wine and Spirits, Ignite's Nevada distributor, has reported a backlash in which key accounts PKWY Tavern and Lee's Liquors, have ceased to do business with Ignite and have told Summit to pick up products previously sold to them.
- Ignite's general counsel, Kim Stein, has threatened to resign as counsel and has indicated that her affiliation with Ignite has damaged her business and reputation and has offended her and her family and friends.
- Ignite's investment banker, JD Ford and Company, has made it clear that on the eve of marketing the company for sale, the value of the company has been reduced "by at least 50%". Without your resignation as the company director, it is unlikely that JD Ford will continue forward marketing the company for sale and, even if it did, that a buyer could be found.
- International Investments, Ltd. ("II"), the company I represent, is the second largest shareholder and the only lender to Ignite which is owed $21,548,361. Further II has lent you, Mr. Bilzerian, $2,400,000. Of that amount, $1,500,000 is in default with the balance coming due in the next couple months. Given your failure to pay your debt, and now your reckless social media statements damaging the brand, II has no choice but to sue and obtain a judgment which would bring even more embarrassment to Ignite if you were to remain as a director.

**<u>Our demand is for you to immediately resign as the Director and Chairman of Ignite International Brands, Ltd. Further, you must provide all passwords and access to any Ignite social media accounts under your control. If you do not comply by 9:00 am EST on June 3, 2024, we will be forced to take legal action which will only cause yet more damage to the brand and the Company.</u>**

To be very clear, the following have provided me their consent to include them in support of this demand letter:

Ignite Shareholders representing 51.8% of the shares:

- International Investments, Ltd. 24.95% ownership
- Atlas Investments, Ltd 10.74% ownership
- Vulcan Enterprises, SKN 8.24% ownership
- Veritas Investments, Ltd 5.68% ownership
- Cordell Companies 1.56% ownership
- Scott Rohleder, CEO .63% ownership

Ignite Management:

- Scott Rohleder, President and CEO
- Michalis Voulelis, EVP of Global Sales

- Rupy Dhadwar, CFO
- Greg Solomon, VP of Marketing
- Ethan Hughes, VP of Business Development
- Kelly Young, VP of Sales, EU and UK
- Rodrigo Costa, VP of Sales, Brazil
- Jamshid Inogamov, VP of Sales, Russia and CIS
- Michael Yanni, VP US Sales
- Roberto Duque, VP of Business Development

Ignite Former Directors:

- Greg Gilpin-Payne
- Robin Rodriguez
- Tom Bunker
- Ralph Payne

I will re-emphasize that we demand you provide Scott Rohleder with your letter of resignation not later than 9:00 am EDT on June 3, 2024.

Please reply as soon as possible so that we can attempt some damage control and succeed in monetizing this asset.

Sincerely,

Greg Gilpin-Payne
President

cc: Jason Verona

This is Exhibit "....I........" referred to in the affidavit
of Dan Bilzerian........................................ sworn
(or ~~affirmed)~~ before me on 03/MAR/2025

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

Number: BC0288899

***BUSINESS CORPORATIONS ACT***

**ARTICLES**

**of**

~~ALQ GOLD CORP.~~ ~~GREEN AXIS CAPITAL CORP.~~
~~ALPHA GOLD CORP.~~
(the "**Company**")

IGNITE INTERNATIONAL BRANDS, LTD.

**PART 1**

**INTERPRETATION**

**Definitions**

1.1 In these Articles, unless the context otherwise requires:

(a) "**Act**" means the *Business Corporations Act* (British Columbia) from time to time in force and all amendments thereto and includes all regulations and amendments thereto made pursuant to that Act;

(b) "**board of directors**", "**directors**" and "**board**" mean the directors or sole director of the Company for the time being;

(c) "**Interpretation Act**" means the *Interpretation Act* (British Columbia) from time to time in force and all amendments thereto and includes all regulations and amendments thereto made pursuant to that Act;

(d) "**legal personal representative**" means the personal or other legal representative of the shareholder;

(e) "**registered address**" of a shareholder means the shareholder's address as recorded in the central securities register;

(f) "**seal**" means the seal of the Company, if any;

(g) "**share**" means a share in the share structure of the Company; and

(h) "**special majority**" means the majority of votes described in §11.2 which is required to pass a special resolution.

Pursuant to a Plan of Arrangement passed at a meeting of Shareholders on May 29, 2019, by Court Order dated May 30, 2019 and by a Notice of Alteration filed with the Registrar of Companies on May 30, 2019, the Articles of the Company were altered to attach special rights and restrictions to the Subordinate Voting and the Proportionate Voting shares of the Company.

Number: BC0288899

*BUSINESS CORPORATIONS ACT*

**ARTICLES**

**of**

~~ALPHA GOLD CORP.~~ ~~GREEN AXIS CAPITAL CORP.~~
~~ALQ GOLD CORP.~~

**TABLE OF CONTENTS**

IGNITE INTERNATIONAL BRANDS, LTD.


PART 1 INTERPRETATION ....... 1
PART 2 SHARES AND SHARE CERTIFICATES ....... 2
PART 3 ISSUE OF SHARES ....... 4
PART 4 SHARE REGISTERS ....... 5
PART 5 SHARE TRANSFERS ....... 5
PART 6 TRANSMISSION OF SHARES ....... 6
PART 7 PURCHASE, REDEEM OR OTHERWISE ACQUIRE SHARES ....... 7
PART 8 BORROWING POWERS ....... 8
PART 9 ALTERATIONS ....... 9
PART 10 MEETINGS OF SHAREHOLDERS ....... 10
PART 11 PROCEEDINGS AT MEETINGS OF SHAREHOLDERS ....... 12
PART 12 VOTES OF SHAREHOLDERS ....... 16
PART 13 DIRECTORS ....... 20
PART 14 ELECTION AND REMOVAL OF DIRECTORS ....... 22
PART 15 ALTERNATE DIRECTORS ....... 24
PART 16 POWERS AND DUTIES OF DIRECTORS ....... 26
PART 17 INTERESTS OF DIRECTORS AND OFFICERS ....... 27
PART 18 PROCEEDINGS OF DIRECTORS ....... 28
PART 19 EXECUTIVE AND OTHER COMMITTEES ....... 31
PART 20 OFFICERS ....... 32
PART 21 INDEMNIFICATION ....... 33
PART 22 DIVIDENDS ....... 35
PART 23 ACCOUNTING RECORDS AND AUDITOR ....... 37
PART 24 NOTICES ....... 37
PART 25 SEAL ....... 39




Articles replaced by special resolutions passed at the Annual General and Special Meeting held on August 28, 2012 and effective on deposit of the minutes at the Company's records office on October 4, 2012 at 12:00 p.m. (Pacific Time)

**Act and Interpretation Act Definitions Applicable**

1.2 The definitions in the Act and the definitions and rules of construction in the Interpretation Act, with the necessary changes, so far as applicable, and except as the context requires otherwise, apply to these Articles as if they were an enactment. If there is a conflict between a definition in the Act and a definition or rule in the Interpretation Act relating to a term used in these Articles, the definition in the Act will prevail. If there is a conflict or inconsistency between these Articles and the Act, the Act will prevail.

## PART 2

## SHARES AND SHARE CERTIFICATES

**Authorized Share Structure**

2.1 The authorized share structure of the Company consists of shares of the class or classes and series, if any, described in the Notice of Articles of the Company.

**Form of Share Certificate**

2.2 Each share certificate issued by the Company must comply with, and be signed as required by, the Act.

**Shareholder Entitled to Certificate, Acknowledgment or Written Notice**

2.3 Unless the shares of which the shareholder is the registered owner are uncertificated shares, each shareholder is entitled, without charge, to (a) one share certificate representing the shares of each class or series of shares registered in the shareholder's name or (b) a non-transferable written acknowledgment of the shareholder's right to obtain such a share certificate, provided that in respect of a share held jointly by several persons, the Company is not bound to issue more than one share certificate and delivery of a share certificate for a share to one of several joint shareholders or to one of the shareholders' duly authorized agents will be sufficient delivery to all. If a shareholder is the registered owner of uncertificated shares, the Company must send to a holder of an uncertificated share a written notice containing the information required by the Act within a reasonable time after the issue or transfer of such share.

**Delivery by Mail**

2.4 Any share certificate or non-transferable written acknowledgment of a shareholder's right to obtain a share certificate, or written notice of the issue or transfer of an uncertificated share may be sent to the shareholder by mail at the shareholder's registered address and neither the Company nor any director, officer or agent of the Company is liable for any loss to the shareholder because the share certificate, acknowledgement or written notice is lost in the mail or stolen.

**Replacement of Worn Out or Defaced Certificate or Acknowledgement**

2.5 If a share certificate or a non-transferable written acknowledgment of the shareholder's right to obtain a share certificate is worn out or defaced, the Company must, on production of the share certificate or acknowledgment, as the case may be, and on such other terms, if any, as are deemed fit:

(a) cancel the share certificate or acknowledgment; and

(b) issue a replacement share certificate or acknowledgment.

**Replacement of Lost, Stolen or Destroyed Certificate or Acknowledgment**

2.6 If a share certificate or a non-transferable written acknowledgment of a shareholder's right to obtain a share certificate is lost, stolen or destroyed, a replacement share certificate or acknowledgment, as the case may be, must be issued to the person entitled to that share certificate or acknowledgment, if the requirements of the Act are satisfied, as the case may be, if the directors receive:

(a) proof satisfactory to it of the loss, theft or destruction; and

(b) any indemnity the directors consider adequate.

**Splitting Share Certificates**

2.7 If a shareholder surrenders a share certificate to the Company with a written request that the Company issue in the shareholder's name two or more share certificates, each representing a specified number of shares and in the aggregate representing the same number of shares as the share certificate so surrendered, the Company must cancel the surrendered share certificate and issue replacement share certificates in accordance with that request.

**Certificate Fee**

2.8 There must be paid to the Company, in relation to the issue of any share certificate under §2.5, §2.6 or §2.7, the amount, if any, not exceeding the amount prescribed under the Act, determined by the directors.

**Recognition of Trusts**

2.9 Except as required by law or statute or these Articles, no person will be recognized by the Company as holding any share upon any trust, and the Company is not bound by or compelled in any way to recognize (even when having notice thereof) any equitable, contingent, future or partial interest in any share or fraction of a share or (except as required by law or statute or these Articles or as ordered by a court of competent jurisdiction) any other rights in respect of any share except an absolute right to the entirety thereof in the shareholder.

## PART 3

## ISSUE OF SHARES

**Directors Authorized**

3.1 Subject to the Act and the rights, if any, of the holders of issued shares of the Company, the Company may allot, issue, sell or otherwise dispose of the unissued shares, and issued shares held by the Company, at the times, to the persons, including directors, in the manner, on the terms and conditions and for the consideration (including any premium at which shares with par value may be issued) that the directors may determine. The issue price for a share with par value must be equal to or greater than the par value of the share.

**Commissions and Discounts**

3.2 The Company may at any time pay a reasonable commission or allow a reasonable discount to any person in consideration of that person's purchase or agreement to purchase shares of the Company from the Company or any other person's procurement or agreement to procure purchasers for shares of the Company.

**Brokerage**

3.3 The Company may pay such brokerage fee or other consideration as may be lawful for or in connection with the sale or placement of its securities.

**Conditions of Issue**

3.4 Except as provided for by the Act, no share may be issued until it is fully paid. A share is fully paid when:

(a) consideration is provided to the Company for the issue of the share by one or more of the following:

(i) past services performed for the Company;

(ii) property;

(iii) money; and

(b) the value of the consideration received by the Company equals or exceeds the issue price set for the share under §3.1.

**Share Purchase Warrants and Rights**

3.5 Subject to the Act, the Company may issue share purchase warrants, options and rights upon such terms and conditions as the directors determine, which share purchase warrants, options and rights may be issued alone or in conjunction with debentures, debenture stock, bonds, shares or any other securities issued or created by the Company from time to time.

## PART 4

## SHARE REGISTERS

**Central Securities Register**

4.1 As required by and subject to the Act, the Company must maintain in British Columbia a central securities register and may appoint an agent to maintain such register. The directors may appoint one or more agents, including the agent appointed to keep the central securities register, as transfer agent for shares or any class or series of shares and the same or another agent as registrar for shares or such class or series of shares, as the case may be. The directors may terminate such appointment of any agent at any time and may appoint another agent in its place.

## PART 5

## SHARE TRANSFERS

**Registering Transfers**

5.1 A transfer of a share must not be registered unless the Company or the transfer agent or registrar for the class or series of shares to be transferred has received:

(a) except as exempted by the Act, a written instrument of transfer in respect of the share has been received by the Company (which may be a separate document or endorsed on the share certificate for the shares transferred) made by the shareholder or other appropriate person or by an agent who has actual authority to act on behalf of that person:

(b) if a share certificate has been issued by the Company in respect of the share to be transferred, that share certificate;

(c) if a non-transferable written acknowledgment of the shareholder's right to obtain a share certificate has been issued by the Company in respect of the share to be transferred, that acknowledgment; and

(d) such other evidence, if any, as the Company or the transfer agent or registrar for the class or series of share to be transferred may require to prove the title of the transferor or the transferor's right to transfer the share, that the written instrument of transfer and the right of the transferee to have the transfer registered.

**Form of Instrument of Transfer**

5.2 The instrument of transfer in respect of any share of the Company must be either in the form, if any, on the back of the Company's share certificates of that class or series or in some other form that may be approved by the directors from time to time or by the transfer agent or registrar for those shares.

**Transferor Remains Shareholder**

5.3 Except to the extent that the Act otherwise provides, the transferor of a share is deemed to remain the holder of it until the name of the transferee is entered in a securities register of the Company in respect of the transfer.

**Signing of Instrument of Transfer**

5.4 If a shareholder, or the shareholder's duly authorized attorney, signs an instrument of transfer in respect of shares registered in the name of the shareholder, the signed instrument of transfer constitutes a complete and sufficient authority to the Company and its directors, officers and agents to register the number of shares specified in the instrument of transfer or specified in any other manner, or, if no number is specified, all the shares represented by the share certificates or set out in the written acknowledgments deposited with the instrument of transfer, or if the shares are uncertificated shares, then all of the shares registered in the name of the shareholder on the central securities register:

(a) in the name of the person named as transferee in that instrument of transfer; or

(b) if no person is named as transferee in that instrument of transfer, in the name of the person on whose behalf the instrument is deposited for the purpose of having the transfer registered.

**Enquiry as to Title Not Required**

5.5 Neither the Company nor any director, officer or agent of the Company is bound to inquire into the title of the person named in the instrument of transfer as transferee or, if no person is named as transferee in the instrument of transfer, of the person on whose behalf the instrument is deposited for the purpose of having the transfer registered or is liable for any claim related to registering the transfer by the shareholder or by any intermediate owner or holder of the shares transferred, of any interest in such shares, of any share certificate representing such shares or of any written acknowledgment of a right to obtain a share certificate for such shares.

**Transfer Fee**

5.6 There must be paid to the Company, in relation to the registration of a transfer, the amount, if any, determined by the directors.

## PART 6

## TRANSMISSION OF SHARES

**Legal Personal Representative Recognized on Death**

6.1 In case of the death of a shareholder, the legal personal representative of the shareholder, or in the case of shares registered in the shareholder's name and the name of another person in joint tenancy, the surviving joint holder, will be the only person recognized by the Company as having any title to the shareholder's interest in the shares. Before recognizing a

person as a legal personal representative of a shareholder, the Company shall receive the documentation required by the Act.

**Rights of Legal Personal Representative**

6.2 The legal personal representative of a shareholder has the same rights, privileges and obligations that attach to the shares held by the shareholder, including the right to transfer the shares in accordance with these Articles, provided the documents required by the Act and the directors have been deposited with the Company. This §6.2 does not apply in the case of the death of a shareholder with respect to shares registered in the name of the shareholder and the name of another person in joint tenancy.

## PART 7

## PURCHASE, REDEEM OR OTHERWISE ACQUIRE SHARES

**Company Authorized to Purchase, Redeem or Otherwise Acquire Shares**

7.1 Subject to §7.2, the special rights or restrictions attached to the shares of any class or series and the Act, the Company may, if authorized by the directors, purchase, redeem or otherwise acquire any of its shares at the price and upon the terms determined by the directors.

**Purchase When Insolvent**

7.2 The Company must not make a payment or provide any other consideration to purchase, redeem or otherwise acquire any of its shares if there are reasonable grounds for believing that:

(a) the Company is insolvent; or

(b) making the payment or providing the consideration would render the Company insolvent.

**Sale and Voting of Purchased, Redeemed or Otherwise Acquired Shares**

7.3 If the Company retains a share redeemed, purchased or otherwise acquired by it, the Company may sell, gift or otherwise dispose of the share, but, while such share is held by the Company, it:

(a) is not entitled to vote the share at a meeting of its shareholders;

(b) must not pay a dividend in respect of the share; and

(c) must not make any other distribution in respect of the share.

**Company Entitled to Purchase, Redeem or Otherwise Acquire Share Fractions**

7.4 The Company may, without prior notice to the holders, purchase, redeem or otherwise acquire for fair value any and all outstanding share fractions of any class or kind of shares in its authorized share structure as may exist at any time and from time to time. Upon the Company delivering the purchase funds and confirmation of purchase or redemption of the share fractions to the holders' registered or last known address, or if the Company has a transfer agent then to such agent for the benefit of and forwarding to such holders, the Company shall thereupon amend its central securities register to reflect the purchase or redemption of such share fractions and if the Company has a transfer agent, shall direct the transfer agent to amend the central securities register accordingly. Any holder of a share fraction, who upon receipt of the funds and confirmation of purchase or redemption of same, disputes the fair value paid for the fraction, shall have the right to apply to the court to request that it set the price and terms of payment and make consequential orders and give directions the court considers appropriate, as if the Company were the "acquiring person" as contemplated by Division 6, Compulsory Acquisitions, under the Act and the holder were an "offeree" subject to the provisions contained in such Division, *mutatis mutandis*.

## PART 8

## BORROWING POWERS

8.1 The Company, if authorized by the directors, may:

(a) borrow money in the manner and amount, on the security, from the sources and on the terms and conditions that they consider appropriate;

(b) issue bonds, debentures and other debt obligations either outright or as security for any liability or obligation of the Company or any other person and at such discounts or premiums and on such other terms as the directors consider appropriate;

(c) guarantee the repayment of money by any other person or the performance of any obligation of any other person; and

(d) mortgage, charge, whether by way of specific or floating charge, grant a security interest in, or give other security on, the whole or any part of the present and future assets and undertaking of the Company.

8.2 The powers conferred under this Part 8 shall be deemed to include the powers conferred on a company by Division VII of the *Special Corporations Powers Act* being chapter P-16 of the Revised Statutes of Quebec, 1988, and every statutory provision that may be substituted therefor or for any provision therein.

## PART 9

## ALTERATIONS

**Alteration of Authorized Share Structure**

9.1 Subject to §9.2 and the Act, the Company may by ordinary resolution (or a resolution of the directors in the case of §9.1(c) or §9.1(f)):

(a) create one or more classes or series of shares or, if none of the shares of a class or series of shares are allotted or issued, eliminate that class or series of shares;

(b) increase, reduce or eliminate the maximum number of shares that the Company is authorized to issue out of any class or series of shares or establish a maximum number of shares that the Company is authorized to issue out of any class or series of shares for which no maximum is established;

(c) subdivide or consolidate all or any of its unissued, or fully paid issued, shares;

(d) if the Company is authorized to issue shares of a class of shares with par value:

(i) decrease the par value of those shares; or

(ii) if none of the shares of that class of shares are allotted or issued, increase the par value of those shares;

(e) change all or any of its unissued, or fully paid issued, shares with par value into shares without par value or any of its unissued shares without par value into shares with par value;

(f) alter the identifying name of any of its shares; or

(g) otherwise alter its shares or authorized share structure when required or permitted to do so by the Act where it does not specify by a special resolution;

and, if applicable, alter its Notice of Articles and Articles accordingly.

**Special Rights or Restrictions**

9.2 Subject to the Act and in particular those provisions of the Act relating to the rights of holders of outstanding shares to vote if their rights are prejudiced or interfered with, the Company may by ordinary resolution:

(a) create special rights or restrictions for, and attach those special rights or restrictions to, the shares of any class or series of shares, whether or not any or all of those shares have been issued; or

(b) vary or delete any special rights or restrictions attached to the shares of any class or series of shares, whether or not any or all of those shares have been issued,

and alter its Notice of Articles and Articles accordingly.

**Change of Name**

9.3 The Company may by resolution of the directors authorize an alteration to its Notice of Articles in order to change its name or adopt or change any translation of that name.

**Other Alterations**

9.4 If the Act does not specify the type of resolution and these Articles do not specify another type of resolution, the Company may by ordinary resolution alter these Articles.

## PART 10

## MEETINGS OF SHAREHOLDERS

**Annual General Meetings**

10.1 Unless an annual general meeting is deferred or waived in accordance with the Act, the Company must hold its first annual general meeting within 18 months after the date on which it was incorporated or otherwise recognized, and after that must hold an annual general meeting at least once in each calendar year and not more than 15 months after the last annual reference date at such time and place as may be determined by the directors.

**Resolution Instead of Annual General Meeting**

10.2 If all the shareholders who are entitled to vote at an annual general meeting consent in writing by a unanimous resolution to all of the business that is required to be transacted at that annual general meeting, the annual general meeting is deemed to have been held on the date of the unanimous resolution. The shareholders must, in any unanimous resolution passed under this §10.2, select as the Company's annual reference date a date that would be appropriate for the holding of the applicable annual general meeting.

**Calling of Meetings of Shareholders**

10.3 The directors may, at any time, call a meeting of shareholders.

**Notice for Meetings of Shareholders**

10.4 The Company must send notice of the date, time and location of any meeting of shareholders (including, without limitation, any notice specifying the intention to propose a resolution as an exceptional resolution, a special resolution or a special separate resolution, and any notice to consider approving an amalgamation into a foreign jurisdiction, an arrangement or the adoption of an amalgamation agreement, and any notice of a general meeting, class meeting or series meeting), in the manner provided in these Articles, or in such other manner, if any, as may be prescribed by ordinary resolution (whether previous notice of the resolution has been given or not), to each shareholder entitled to attend the meeting, to each director and to the

auditor of the Company, unless these Articles otherwise provide, at least the following number of days before the meeting:

(a) if the Company is a public company, 21 days;

(b) otherwise, 10 days.

**Record Date for Notice**

10.5 The directors may set a date as the record date for the purpose of determining shareholders entitled to notice of any meeting of shareholders. The record date must not precede the date on which the meeting is to be held by more than two months or, in the case of a general meeting requisitioned by shareholders under the Act, by more than four months. The record date must not precede the date on which the meeting is held by fewer than:

(a) if the Company is a public company, 21 days;

(b) otherwise, 10 days.

If no record date is set, the record date is 5 p.m. on the day immediately preceding the first date on which the notice is sent or, if no notice is sent, the beginning of the meeting.

**Record Date for Voting**

10.6 The directors may set a date as the record date for the purpose of determining shareholders entitled to vote at any meeting of shareholders. The record date must not precede the date on which the meeting is to be held by more than two months or, in the case of a general meeting requisitioned by shareholders under the Act, by more than four months. If no record date is set, the record date is 5 p.m. on the day immediately preceding the first date on which the notice is sent or, if no notice is sent, the beginning of the meeting.

**Failure to Give Notice and Waiver of Notice**

10.7 The accidental omission to send notice of any meeting of shareholders to, or the non-receipt of any notice by, any of the persons entitled to notice does not invalidate any proceedings at that meeting. Any person entitled to notice of a meeting of shareholders may, in writing or otherwise, waive that entitlement or may agree to reduce the period of that notice. Attendance of a person at a meeting of shareholders is a waiver of entitlement to notice of the meeting unless that person attends the meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

**Notice of Special Business at Meetings of Shareholders**

10.8 If a meeting of shareholders is to consider special business within the meaning of §11.1, the notice of meeting must:

(a) state the general nature of the special business; and

(b) if the special business includes considering, approving, ratifying, adopting or authorizing any document or the signing of or giving of effect to any document, have attached to it a copy of the document or state that a copy of the document will be available for inspection by shareholders:

(i) at the Company's records office, or at such other reasonably accessible location in British Columbia as is specified in the notice; and

(ii) during statutory business hours on any one or more specified days before the day set for the holding of the meeting.

**Place of Meetings**

10.9 In addition to any location in British Columbia, any general meeting may be held in any location outside British Columbia approved by a resolution of the directors.

## PART 11

## PROCEEDINGS AT MEETINGS OF SHAREHOLDERS

**Special Business**

11.1 At a meeting of shareholders, the following business is special business:

(a) at a meeting of shareholders that is not an annual general meeting, all business is special business except business relating to the conduct of or voting at the meeting;

(b) at an annual general meeting, all business is special business except for the following:

(i) business relating to the conduct of or voting at the meeting;

(ii) consideration of any financial statements of the Company presented to the meeting;

(iii) consideration of any reports of the directors or auditor;

(iv) the setting or changing of the number of directors;

(v) the election or appointment of directors;

(vi) the appointment of an auditor;

(vii) the setting of the remuneration of an auditor;

(viii) business arising out of a report of the directors not requiring the passing of a special resolution or an exceptional resolution;

(ix) any other business which, under these Articles or the Act, may be transacted at a meeting of shareholders without prior notice of the business being given to the shareholders.

**Special Majority**

11.2 The majority of votes required for the Company to pass a special resolution at a general meeting of shareholders is two-thirds of the votes cast on the resolution.

**Quorum**

11.3 Subject to the special rights or restrictions attached to the shares of any class or series of shares, and to §11.4, the quorum for the transaction of business at a meeting of shareholders is at least one person who is, or who represents by proxy, one or more shareholders who, in the aggregate, hold at least 5% of the issued shares entitled to be voted at the meeting.

**One Shareholder May Constitute Quorum**

11.4 If there is only one shareholder entitled to vote at a meeting of shareholders:

(a) the quorum is one person who is, or who represents by proxy, that shareholder, and

(b) that shareholder, present in person or by proxy, may constitute the meeting.

**Persons Entitled to Attend Meeting**

11.5 In addition to those persons who are entitled to vote at a meeting of shareholders, the only other persons entitled to be present at the meeting are the directors, the president (if any), the secretary (if any), the assistant secretary (if any), any lawyer for the Company, the auditor of the Company, any persons invited to be present at the meeting by the directors or by the chair of the meeting and any persons entitled or required under the Act or these Articles to be present at the meeting; but if any of those persons does attend the meeting, that person is not to be counted in the quorum and is not entitled to vote at the meeting unless that person is a shareholder or proxy holder entitled to vote at the meeting.

**Requirement of Quorum**

11.6 No business, other than the election of a chair of the meeting and the adjournment of the meeting, may be transacted at any meeting of shareholders unless a quorum of shareholders entitled to vote is present at the commencement of the meeting, but such quorum need not be present throughout the meeting.

**Lack of Quorum**

11.7 If, within one-half hour from the time set for the holding of a meeting of shareholders, a quorum is not present:

(a) in the case of a general meeting requisitioned by shareholders, the meeting is dissolved, and

(b) in the case of any other meeting of shareholders, the meeting stands adjourned to the same day in the next week at the same time and place.

**Lack of Quorum at Succeeding Meeting**

11.8 If, at the meeting to which the meeting referred to in §11.7(b) was adjourned, a quorum is not present within one-half hour from the time set for the holding of the meeting, the person or persons present and being, or representing by proxy, two or more shareholders entitled to attend and vote at the meeting shall be deemed to constitute a quorum.

**Chair**

11.9 The following individual is entitled to preside as chair at a meeting of shareholders:

(a) the chair of the board, if any; or

(b) if the chair of the board is absent or unwilling to act as chair of the meeting, the president, if any.

**Selection of Alternate Chair**

11.10 If, at any meeting of shareholders, there is no chair of the board or president present within 15 minutes after the time set for holding the meeting, or if the chair of the board and the president are unwilling to act as chair of the meeting, or if the chair of the board and the president have advised the secretary, if any, or any director present at the meeting, that they will not be present at the meeting, the directors present may choose either one of their number or the solicitor of the Company to be chair of the meeting. If all of the directors present decline to take the chair or fail to so choose or if no director is present or the solicitor of the Company declines to take the chair, the shareholders entitled to vote at the meeting who are present in person or by proxy may choose any person present at the meeting to chair the meeting.

**Adjournments**

11.11 The chair of a meeting of shareholders may, and if so directed by the meeting must, adjourn the meeting from time to time and from place to place, but no business may be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place.

**Notice of Adjourned Meeting**

11.12 It is not necessary to give any notice of an adjourned meeting of shareholders or of the business to be transacted at an adjourned meeting of shareholders except that, when a meeting is adjourned for 30 days or more, notice of the adjourned meeting must be given as in the case of the original meeting.

**Decisions by Show of Hands or Poll**

11.13 Subject to the Act, every motion put to a vote at a meeting of shareholders will be decided on a show of hands unless a poll, before or on the declaration of the result of the vote by show of hands, is directed by the chair or demanded by any shareholder entitled to vote who is present in person or by proxy.

**Declaration of Result**

11.14 The chair of a meeting of shareholders must declare to the meeting the decision on every question in accordance with the result of the show of hands or the poll, as the case may be, and that decision must be entered in the minutes of the meeting. A declaration of the chair that a resolution is carried by the necessary majority or is defeated is, unless a poll is directed by the chair or demanded under §11.13, conclusive evidence without proof of the number or proportion of the votes recorded in favour of or against the resolution.

**Motion Need Not be Seconded**

11.15 No motion proposed at a meeting of shareholders need be seconded unless the chair of the meeting rules otherwise, and the chair of any meeting of shareholders is entitled to propose or second a motion.

**Casting Vote**

11.16 In case of an equality of votes, the chair of a meeting of shareholders does not, either on a show of hands or on a poll, have a second or casting vote in addition to the vote or votes to which the chair may be entitled as a shareholder.

**Manner of Taking Poll**

11.17 Subject to §11.18, if a poll is duly demanded at a meeting of shareholders:

(a) the poll must be taken:

(i) at the meeting, or within seven days after the date of the meeting, as the chair of the meeting directs; and

(ii) in the manner, at the time and at the place that the chair of the meeting directs;

(b) the result of the poll is deemed to be the decision of the meeting at which the poll is demanded; and

(c) the demand for the poll may be withdrawn by the person who demanded it.

**Demand for Poll on Adjournment**

11.18 A poll demanded at a meeting of shareholders on a question of adjournment must be taken immediately at the meeting.

**Chair Must Resolve Dispute**

11.19 In the case of any dispute as to the admission or rejection of a vote given on a poll, the chair of the meeting must determine the dispute, and the determination of the chair made in good faith is final and conclusive.

**Casting of Votes**

11.20 On a poll, a shareholder entitled to more than one vote need not cast all the votes in the same way.

**No Demand for Poll on Election of Chair**

11.21 No poll may be demanded in respect of the vote by which a chair of a meeting of shareholders is elected.

**Demand for Poll Not to Prevent Continuance of Meeting**

11.22 The demand for a poll at a meeting of shareholders does not, unless the chair of the meeting so rules, prevent the continuation of a meeting for the transaction of any business other than the question on which a poll has been demanded.

**Retention of Ballots and Proxies**

11.23 The Company must, for at least three months after a meeting of shareholders, keep each ballot cast on a poll and each proxy voted at the meeting, and, during that period, make them available for inspection during normal business hours by any shareholder or proxy holder entitled to vote at the meeting. At the end of such three month period, the Company may destroy such ballots and proxies.

## PART 12

## VOTES OF SHAREHOLDERS

**Number of Votes by Shareholder or by Shares**

12.1 Subject to any special rights or restrictions attached to any shares and to the restrictions imposed on joint shareholders under §12.3:

(a) on a vote by show of hands, every person present who is a shareholder or proxy holder and entitled to vote on the matter has one vote; and

(b) on a poll, every shareholder entitled to vote on the matter has one vote in respect of each share entitled to be voted on the matter and held by that shareholder and may exercise that vote either in person or by proxy.

**Votes of Persons in Representative Capacity**

12.2 A person who is not a shareholder may vote at a meeting of shareholders, whether on a show of hands or on a poll, and may appoint a proxy holder to act at the meeting, if, before doing so, the person satisfies the chair of the meeting, or the directors, that the person is a legal personal representative or a trustee in bankruptcy for a shareholder who is entitled to vote at the meeting.

**Votes by Joint Holders**

12.3 If there are joint shareholders registered in respect of any share:

(a) any one of the joint shareholders may vote at any meeting of shareholders, personally or by proxy, in respect of the share as if that joint shareholder were solely entitled to it; or

(b) if more than one of the joint shareholders is present at any meeting of shareholders, personally or by proxy, and more than one of them votes in respect of that share, then only the vote of the joint shareholder present whose name stands first on the central securities register in respect of the share will be counted.

**Legal Personal Representatives as Joint Shareholders**

12.4 Two or more legal personal representatives of a shareholder in whose sole name any share is registered are, for the purposes of §12.3, deemed to be joint shareholders registered in respect of that share.

**Representative of a Corporate Shareholder**

12.5 If a corporation, that is not a subsidiary of the Company, is a shareholder, that corporation may appoint a person to act as its representative at any meeting of shareholders of the Company, and:

(a) for that purpose, the instrument appointing a representative must be received:

(i) at the registered office of the Company or at any other place specified, in the notice calling the meeting, for the receipt of proxies, at least the number of business days specified in the notice for the receipt of proxies, or if no number of days is specified, two business days before the day set for the holding of the meeting or any adjourned meeting; or

(ii) at the meeting or any adjourned meeting, by the chair of the meeting or adjourned meeting or by a person designated by the chair of the meeting or adjourned meeting;

(b) if a representative is appointed under this §12.5:

(i) the representative is entitled to exercise in respect of and at that meeting the same rights on behalf of the corporation that the representative represents as that corporation could exercise if it were a shareholder who is an individual, including, without limitation, the right to appoint a proxy holder; and

(ii) the representative, if present at the meeting, is to be counted for the purpose of forming a quorum and is deemed to be a shareholder present in person at the meeting.

Evidence of the appointment of any such representative may be sent to the Company by written instrument, fax or any other method of transmitting legibly recorded messages.

**Proxy Provisions Do Not Apply to All Companies**

12.6 If and for so long as the Company is a public company or a pre-existing reporting company which has the Statutory Reporting Company Provisions as part of its Articles or to which the Statutory Reporting Company Provisions apply, then §12.7 to §12.15 are not mandatory, however the directors of the Company are authorized to apply all or part of such sections or to adopt alternative procedures for proxy form, deposit and revocation procedures to the extent that the directors deem necessary in order to comply with securities laws applicable to the Company.

**Appointment of Proxy Holders**

12.7 Every shareholder of the Company entitled to vote at a meeting of shareholders may, by proxy, appoint one or more (but not more than two) proxy holders to attend and act at the meeting in the manner, to the extent and with the powers conferred by the proxy.

**Alternate Proxy Holders**

12.8 A shareholder may appoint one or more alternate proxy holders to act in the place of an absent proxy holder.

**Proxy Holder Need Not Be Shareholder**

12.9 A proxy holder need not be a shareholder of the Company.

**Deposit of Proxy**

12.10 A proxy for a meeting of shareholders must:

(a) be received at the registered office of the Company or at any other place specified, in the notice calling the meeting, for the receipt of proxies, at least the number of business days specified in the notice, or if no number of days is specified, two business days before the day set for the holding of the meeting or any adjourned meeting; or

(b) unless the notice provides otherwise, be received, at the meeting or any adjourned meeting, by the chair of the meeting or adjourned meeting or by a person designated by the chair of the meeting or adjourned meeting.

A proxy may be sent to the Company by written instrument, fax or any other method of transmitting legibly recorded messages, including through Internet or telephone voting or by email, if permitted by the notice calling the meeting or the information circular for the meeting.

**Validity of Proxy Vote**

12.11 A vote given in accordance with the terms of a proxy is valid notwithstanding the death or incapacity of the shareholder giving the proxy and despite the revocation of the proxy or the revocation of the authority under which the proxy is given, unless notice in writing of that death, incapacity or revocation is received:

(a) at the registered office of the Company, at any time up to and including the last business day before the day set for the holding of the meeting or any adjourned meeting at which the proxy is to be used; or

(b) at the meeting or any adjourned meeting by the chair of the meeting or adjourned meeting, before any vote in respect of which the proxy has been given has been taken.

**Form of Proxy**

12.12 A proxy, whether for a specified meeting or otherwise, must be either in the following form or in any other form approved by the directors or the chair of the meeting:

[name of company]
(the "Company")

The undersigned, being a shareholder of the Company, hereby appoints [name] or, failing that person, [name], as proxy holder for the undersigned to attend, act and vote for and on behalf of the undersigned at the meeting of shareholders of the Company to be held on [month, day, year] and at any adjournment of that meeting.

Number of shares in respect of which this proxy is given (if no number is specified, then this proxy is given in respect of all shares registered in the name of the undersigned): ______________________

Signed [month, day, year]

______________________________
[Signature of shareholder]

______________________________
[Name of shareholder—printed]

**Revocation of Proxy**

12.13 Subject to §12.14, every proxy may be revoked by an instrument in writing that is received:

(a) at the registered office of the Company at any time up to and including the last business day before the day set for the holding of the meeting or any adjourned meeting at which the proxy is to be used; or

(b) at the meeting or any adjourned meeting, by the chair of the meeting or adjourned meeting, before any vote in respect of which the proxy has been given has been taken.

**Revocation of Proxy Must Be Signed**

12.14 An instrument referred to in §12.13 must be signed as follows:

(a) if the shareholder for whom the proxy holder is appointed is an individual, the instrument must be signed by the shareholder or the shareholder's legal personal representative or trustee in bankruptcy;

(b) if the shareholder for whom the proxy holder is appointed is a corporation, the instrument must be signed by the corporation or by a representative appointed for the corporation under §12.5.

**Production of Evidence of Authority to Vote**

12.15 The chair of any meeting of shareholders may, but need not, inquire into the authority of any person to vote at the meeting and may, but need not, demand from that person production of evidence as to the existence of the authority to vote.

## PART 13

## DIRECTORS

**First Directors; Number of Directors**

13.1 The first directors are the persons designated as directors of the Company in the Notice of Articles that applies to the Company when it is recognized under the Act. The number of directors, excluding additional directors appointed under §14.8, is set at:

(a) subject to §(b) and §(c), the number of directors that is equal to the number of the Company's first directors;

(b) if the Company is a public company, the greater of three and the most recently set of:

(i) the number of directors set by a resolution of the directors (whether or not previous notice of the resolution was given); and

(ii) the number of directors in office pursuant to §14.4;

(c) if the Company is not a public company, the most recently set of:

(i) the number of directors set by a resolution of the directors (whether or not previous notice of the resolution was given); and

(ii) the number of directors in office pursuant to §14.4.

**Change in Number of Directors**

13.2 If the number of directors is set under §13.1(b)(i) or §13.1(c)(i):

(a) the shareholders may elect or appoint the directors needed to fill any vacancies in the board of directors up to that number; or

(b) if the shareholders do not elect or appoint the directors needed to fill any vacancies in the board of directors up to that number then the directors, subject to §14.8. may appoint directors to fill those vacancies.

**Directors' Acts Valid Despite Vacancy**

13.3 An act or proceeding of the directors is not invalid merely because fewer than the number of directors set or otherwise required under these Articles is in office.

**Qualifications of Directors**

13.4 A director is not required to hold a share as qualification for his or her office but must be qualified as required by the Act to become, act or continue to act as a director.

**Remuneration of Directors**

13.5 The directors are entitled to the remuneration for acting as directors, if any, as the directors may from time to time determine. If the directors so decide, the remuneration of the directors, if any, will be determined by the shareholders.

**Reimbursement of Expenses of Directors**

13.6 The Company must reimburse each director for the reasonable expenses that he or she may incur in and about the business of the Company.

**Special Remuneration for Directors**

13.7 If any director performs any professional or other services for the Company that in the opinion of the directors are outside the ordinary duties of a director, he or she may be paid remuneration fixed by the directors, or at the option of the directors, fixed by ordinary resolution. and such remuneration will be in addition to any other remuneration that he or she may be entitled to receive.

### Gratuity, Pension or Allowance on Retirement of Director

13.8 Unless otherwise determined by ordinary resolution, the directors on behalf of the Company may pay a gratuity or pension or allowance on retirement to any director who has held any salaried office or place of profit with the Company or to his or her spouse or dependants and may make contributions to any fund and pay premiums for the purchase or provision of any such gratuity, pension or allowance.

## PART 14

## ELECTION AND REMOVAL OF DIRECTORS

### Election at Annual General Meeting

14.1 At every annual general meeting and in every unanimous resolution contemplated by §10.2:

(a) the shareholders entitled to vote at the annual general meeting for the election of directors must elect, or in the unanimous resolution appoint, a board of directors consisting of the number of directors for the time being set under these Articles: and

(b) all the directors cease to hold office immediately before the election or appointment of directors under §(a), but are eligible for re-election or re-appointment.

### Consent to be a Director

14.2 No election, appointment or designation of an individual as a director is valid unless:

(a) that individual consents to be a director in the manner provided for in the Act:

(b) that individual is elected or appointed at a meeting at which the individual is present and the individual does not refuse, at the meeting, to be a director; or

(c) with respect to first directors, the designation is otherwise valid under the Act.

### Failure to Elect or Appoint Directors

14.3 If:

(a) the Company fails to hold an annual general meeting, and all the shareholders who are entitled to vote at an annual general meeting fail to pass the unanimous resolution contemplated by §10.2, on or before the date by which the annual general meeting is required to be held under the Act; or

(b) the shareholders fail, at the annual general meeting or in the unanimous resolution contemplated by §10.2, to elect or appoint any directors;

then each director then in office continues to hold office until the earlier of:

(c) when his or her successor is elected or appointed; and

(d) when he or she otherwise ceases to hold office under the Act or these Articles.

**Places of Retiring Directors Not Filled**

14.4 If, at any meeting of shareholders at which there should be an election of directors, the places of any of the retiring directors are not filled by that election, those retiring directors who are not re-elected and who are asked by the newly elected directors to continue in office will, if willing to do so, continue in office to complete the number of directors for the time being set pursuant to these Articles but their term of office shall expire when new directors are elected at a meeting of shareholders convened for that purpose. If any such election or continuance of directors does not result in the election or continuance of the number of directors for the time being set pursuant to these Articles, the number of directors of the Company is deemed to be set at the number of directors actually elected or continued in office.

**Directors May Fill Casual Vacancies**

14.5 Any casual vacancy occurring in the board of directors may be filled by the directors.

**Remaining Directors Power to Act**

14.6 The directors may act notwithstanding any vacancy in the board of directors, but if the Company has fewer directors in office than the number set pursuant to these Articles as the quorum of directors, the directors may only act for the purpose of appointing directors up to that number or of calling a meeting of shareholders for the purpose of filling any vacancies on the board of directors or, subject to the Act, for any other purpose.

**Shareholders May Fill Vacancies**

14.7 If the Company has no directors or fewer directors in office than the number set pursuant to these Articles as the quorum of directors, the shareholders may elect or appoint directors to fill any vacancies on the board of directors.

**Additional Directors**

14.8 Notwithstanding §13.1 and §13.2, between annual general meetings or by unanimous resolutions contemplated by §10.2, the directors may appoint one or more additional directors, but the number of additional directors appointed under this §14.8 must not at any time exceed:

(a) one-third of the number of first directors, if, at the time of the appointments, one or more of the first directors have not yet completed their first term of office; or

(b) in any other case, one-third of the number of the current directors who were elected or appointed as directors other than under this §14.8.

Any director so appointed ceases to hold office immediately before the next election or appointment of directors under §14.1(a), but is eligible for re-election or re-appointment.

**Ceasing to be a Director**

14.9 A director ceases to be a director when:

(a) the term of office of the director expires;

(b) the director dies;

(c) the director resigns as a director by notice in writing provided to the Company or a lawyer for the Company; or

(d) the director is removed from office pursuant to §14.10 or §14.11.

**Removal of Director by Shareholders**

14.10 The Company may remove any director before the expiration of his or her term of office by special resolution. In that event, the shareholders may elect, or appoint by ordinary resolution, a director to fill the resulting vacancy. If the shareholders do not elect or appoint a director to fill the resulting vacancy contemporaneously with the removal, then the directors may appoint or the shareholders may elect, or appoint by ordinary resolution, a director to fill that vacancy.

**Removal of Director by Directors**

14.11 The directors may remove any director before the expiration of his or her term of office if the director is convicted of an indictable offence, or if the director ceases to be qualified to act as a director of a company and does not promptly resign, and the directors may appoint a director to fill the resulting vacancy.

Article 14.12 added to the Articles as approved at the Annual General and Special Meeting of Shareholders held on August 28, 2013 and deposited at the records office on December 12, 2013 See pages 24a - 24d attached

**PART 15**

**ALTERNATE DIRECTORS**

**Appointment of Alternate Director**

15.1 Any director (an "appointor") may by notice in writing received by the Company appoint any person (an "appointee") who is qualified to act as a director to be his or her alternate to act in his or her place at meetings of the directors or committees of the directors at which the appointor is not present unless (in the case of an appointee who is not a director) the directors have reasonably disapproved the appointment of such person as an alternate director and have given notice to that effect to his or her appointor within a reasonable time after the notice of appointment is received by the Company.

Article 14.12 added to the Articles as approved at the Annual General and Special Meeting of shareholders held on August 28, 2013 and deposited at the records office on December 12, 2013



**Nomination of Directors**

14.12

(a) Subject only to the Act, only persons who are nominated in accordance with the following procedures shall be eligible for election as directors of the Company. Nominations of persons for election to the board may be made at any annual meeting of shareholders, or at any special meeting of shareholders (but only if the election of directors is a matter specified in the notice of meeting given by or at the direction of the person calling such special meeting):

(i) by or at the direction of the board or an authorized officer of the Company, including pursuant to a notice of meeting;

(ii) by or at the direction or request of one or more shareholders pursuant to a proposal made in accordance with the provisions of the Act or a requisition of the shareholders made in accordance with the provisions of the Act; or

(iii) by any person (a "Nominating Shareholder") (A) who, at the close of business on the date of the giving of the notice provided for below in this §14.12 and on the record date for notice of such meeting, is entered in the securities register as a holder of one or more shares carrying the right to vote at such meeting or who beneficially owns shares that are entitled to be voted at such meeting and (B) who complies with the notice procedures set forth below in this §14.12.

(b) In addition to any other applicable requirements, for a nomination to be made by a Nominating Shareholder, such person must have given (i) timely notice thereof in proper written form to the Corporate Secretary of the Company at the principal executive offices of the Company in accordance with this §14.12 and (ii) the representation and agreement with respect to each candidate for nomination as required by, and within the time period specified in §14.12(e).

(c) To be timely under §14.12(b)(i), a Nominating Shareholder's notice to the Corporate Secretary of the Company must be made:

(i) in the case of an annual meeting of shareholders, not less than 30 nor more than 65 days prior to the date of the annual meeting of shareholders; provided, however, that in the event that the annual meeting of shareholders is called for a date that is less than 40 days after the date (the "Notice Date") on which the first public announcement of the date of the annual meeting was made, notice by the Nominating Shareholder may be made not later than the tenth (10th) day following the Notice Date; and

(ii) in the case of a special meeting (which is not also an annual meeting) of shareholders called for the purpose of electing directors (whether or not called for other purposes), not later than the fifteenth (15th) day following the day on which the first public announcement of the date of the special meeting of shareholders was made.

(iii) Notwithstanding the foregoing, the board may, in its sole discretion, waive any requirement in this §14.12(c).

(d) (To be in proper written form, a Nominating Shareholder's notice to the Corporate Secretary of the Company, under §14.12(b)(i) must set forth:

(i) as to each person whom the Nominating Shareholder proposes to nominate for election as a director (A) the name, age, business address and residence address of the person, (B) the principal occupation or employment of the person, (C) the class or series and number of shares in the capital of the Company which are controlled or which are owned beneficially or of record

by the person as of the record date for the Meeting of Shareholders (if such date shall then have been made publicly available and shall have occurred) and as of the date of such notice, (D) a statement as to whether such person would be "independent" of the Company (within the meaning of sections 1.4 and 1.5 of National Instrument 52-110 – *Audit Committees* of the Canadian Securities Administrators, as such provisions may be amended from time to time) if elected as a director at such meeting and the reasons and basis for such determination and (E) any other information relating to the person that would be required to be disclosed in a dissident's proxy circular in connection with solicitations of proxies for election of directors pursuant to the Act and Applicable Securities Laws; and

(ii) as to the Nominating Shareholder giving the notice, (A) any information relating to such Nominating Shareholder that would be required to be made in a dissident's proxy circular in connection with solicitations of proxies for election of directors pursuant to the Act and Applicable Securities Laws, and (B) the class or series and number of shares in the capital of the Company which are controlled or which are owned beneficially or of record by the Nominating Shareholder as of the record date for the Meeting of Shareholders (if such date shall then have been made publicly available and shall have occurred) and as of the date of such notice.

(e) To be eligible to be a candidate for election as a director of the Company and to be duly nominated, a candidate must be nominated in the manner prescribed in this §14.12 and the candidate for nomination, whether nominated by the board or otherwise, must have previously delivered to the Corporate Secretary of the Company at the principal executive offices of the Company, not less than 5 days prior to the date of the Meeting of Shareholders, a written representation and agreement (in a standard form to be provided by the Company at any time on request) that such candidate for nomination, if elected as a director of the Company, will comply with all publicly disclosed code(s) of conduct, corporate governance, conflict of interest, confidentiality, share ownership, majority voting and insider trading policies and other policies and guidelines of the Company applicable to directors and in effect during such person's term in office as a director or alternatively, such candidate shall notify the Company in writing with reasonable details as to which of such codes, policies, etc that the candidate does not intend to observe and the reasons why. The Company may publicly disclose such candidate's notification.

(f) No person shall be eligible for election as a director of the Company unless nominated in accordance with the provisions of this §14.12; provided, however, that nothing in this §14.12 shall be deemed to preclude discussion by a shareholder (as distinct from nominating directors) at a meeting of shareholders of any matter in respect of which it would have been entitled to submit a proposal pursuant to the provisions of the Act. The chair of the meeting shall have the power and duty to determine whether a nomination was made in accordance with the procedures set forth in the foregoing provisions and, if any proposed nomination is not in compliance with such foregoing provisions, to declare that such defective nomination shall be disregarded.

(g) For purposes of this §14.12:

(i) "Affiliate", when used to indicate a relationship with a person, shall mean a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such specified person;

"Applicable Securities Laws" means the *Securities Act* (British Columbia) and the equivalent legislation in the other provinces and in the territories of Canada, as amended from time to time, the rules, regulations and forms made or promulgated under any such statute and
the published national instruments, multilateral instruments, policies, bulletins and notices of

the securities commissions and similar regulatory authorities of each of the applicable provinces and territories of Canada;

(ii) "Associate", when used to indicate a relationship with a specified person, shall mean (A) any corporation or trust of which such person owns beneficially, directly or indirectly, voting securities carrying more than 10% of the voting rights attached to all voting securities of such corporation or trust for the time being outstanding, (B) any partner of that person, (C) any trust or estate in which such person has a substantial beneficial interest or as to which such person serves as trustee or in a similar capacity, (D) a spouse of such specified person, (E) any person of either sex with whom such specified person is living in conjugal relationship outside marriage or (F) any relative of such specified person or of a person mentioned in clauses (D) or (E) of this definition if that relative has the same residence as the specified person;

(iii) "Derivatives Contract" shall mean a contract between two parties (the "Receiving Party" and the "Counterparty") that is designed to expose the Receiving Party to economic benefits and risks that correspond substantially to the ownership by the Receiving Party of a number of shares in the capital of the Company or securities convertible into such shares specified or referenced in such contract (the number corresponding to such economic benefits and risks, the "Notional Securities"), regardless of whether obligations under such contract are required or permitted to be settled through the delivery of cash, shares in the capital of the Company or securities convertible into such shares or other property, without regard to any short position under the same or any other Derivatives Contract. For the avoidance of doubt, interests in broad-based index options, broad-based index futures and broad-based publicly traded market baskets of stocks approved for trading by the appropriate governmental authority shall not be deemed to be Derivatives Contracts;

(iv) "Meeting of Shareholders" shall mean such annual shareholders meeting or special shareholders meeting, whether general or not, at which one or more persons are nominated for election to the board by a Nominating Shareholder;

(v) "owned beneficially" or "owns beneficially" means, in connection with the ownership of shares in the capital of the Company by a person, (A) any such shares as to which such person or any of such person's Affiliates or Associates owns at law or in equity, or has the right to acquire or become the owner at law or in equity, where such right is exercisable immediately or after the passage of time and whether or not on condition or the happening of any contingency or the making of any payment, upon the exercise of any conversion right, exchange right or purchase right attaching to any securities, or pursuant to any agreement, arrangement, pledge or understanding whether or not in writing; (B) any such shares as to which such person or any of such person's Affiliates or Associates has the right to vote, or the right to direct the voting, where such right is exercisable immediately or after the passage of time and whether or not on condition or the happening of any contingency or the making of any payment, pursuant to any agreement, arrangement, pledge or understanding whether or not in writing; (C) any such shares which are beneficially owned, directly or indirectly, by a Counterparty (or any of such Counterparty's Affiliates or Associates) under any Derivatives Contract (without regard to any short or similar position under the same or any other Derivatives Contract) to which such person or any of such person's Affiliates or Associates is a Receiving Party; provided, however that the number of shares that a person owns beneficially pursuant to this clause (C) in connection with a particular Derivatives Contract shall not exceed the number of Notional Securities with respect to such Derivatives Contract; provided, further, that the number of securities owned beneficially by each Counterparty (including their respective Affiliates and Associates) under a Derivatives Contract shall for purposes of this clause be deemed to include all securities that are

owned beneficially, directly or indirectly, by any other Counterparty (or any of such other Counterparty's Affiliates or Associates) under any Derivatives Contract to which such first Counterparty (or any of such first Counterparty's Affiliates or Associates) is a Receiving Party and this proviso shall be applied to successive Counterparties as appropriate; and (D) any such shares which are owned beneficially within the meaning of this definition by any other person with whom such person is acting jointly or in concert with respect to the Company or any of its securities; and

(vi) "public announcement" shall mean disclosure in a press release reported by a national news service in Canada, or in a document publicly filed by the Company or its agents under its profile on the System of Electronic Document Analysis and Retrieval at www.sedar.com.

(h) Notwithstanding any other provision to this §14.12, notice or any delivery given to the Corporate Secretary of the Company pursuant to this §14.12 may only be given by personal delivery. facsimile transmission or by email (provided that the Corporate Secretary of the Company has stipulated an email address for purposes of this notice, at such email address as stipulated from time to time), and shall be deemed to have been given and made only at the time it is served by personal delivery, email (at the address as aforesaid) or sent by facsimile transmission (provided that receipt of confirmation of such transmission has been received) to the Corporate Secretary at the address of the principal executive offices of the Company; provided that if such delivery or electronic communication is made on a day which is a not a business day or later than 5:00 p.m. (Vancouver time) on a day which is a business day, then such delivery or electronic communication shall be deemed to have been made on the subsequent day that is a business day.

(i) In no event shall any adjournment or postponement of a Meeting of Shareholders or the announcement thereof commence a new time period for the giving of a Nominating Shareholder's notice as described in §14.12(c) or the delivery of a representation and agreement as described in §14.12(c).

**Notice of Meetings**

15.2 Every alternate director so appointed is entitled to notice of meetings of the directors and of committees of the directors of which his or her appointor is a member and to attend and vote as a director at any such meetings at which his or her appointor is not present.

**Alternate for More than One Director Attending Meetings**

15.3 A person may be appointed as an alternate director by more than one director, and an alternate director:

(a) will be counted in determining the quorum for a meeting of directors once for each of his or her appointors and, in the case of an appointee who is also a director, once more in that capacity;

(b) has a separate vote at a meeting of directors for each of his or her appointors and, in the case of an appointee who is also a director, an additional vote in that capacity;

(c) will be counted in determining the quorum for a meeting of a committee of directors once for each of his or her appointors who is a member of that committee and, in the case of an appointee who is also a member of that committee as a directors, once more in that capacity; and

(d) has a separate vote at a meeting of a committee of directors for each of his or her appointors who is a member of that committee and, in the case of an appointee who is also a member of that committee as a director, an additional vote in that capacity.

**Consent Resolutions**

15.4 Every alternate director, if authorized by the notice appointing him or her, may sign in place of his or her appointor any resolutions to be consented to in writing.

**Alternate Director an Agent**

15.5 Every alternate director is deemed to be the agent of his or her appointor.

**Revocation or Amendment of Appointment of Alternate Director**

15.6 An appointor may at any time, by notice in writing received by the Company, revoke or amend the terms of the appointment of an alternate director appointed by him or her.

**Ceasing to be an Alternate Director**

15.7 The appointment of an alternate director ceases when:

(a) his or her appointor ceases to be a director and is not promptly re-elected or re-appointed;

(b) the alternate director dies;

(c) the alternate director resigns as an alternate director by notice in writing provided to the Company or a lawyer for the Company;

(d) the alternate director ceases to be qualified to act as a director; or

(e) the term of his appointment expires, or his or her appointor revokes the appointment of the alternate directors.

**Remuneration and Expenses of Alternate Director**

15.8 The Company may reimburse an alternate director for the reasonable expenses that would be properly reimbursed if he or she were a director, and the alternate director is entitled to receive from the Company such proportion, if any, of the remuneration otherwise payable to the appointor as the appointor may from time to time direct.

## PART 16

## POWERS AND DUTIES OF DIRECTORS

**Powers of Management**

16.1 The directors must, subject to the Act and these Articles, manage or supervise the management of the business and affairs of the Company and have the authority to exercise all such powers of the Company as are not, by the Act or by these Articles, required to be exercised by the shareholders of the Company. Notwithstanding the generality of the foregoing, the directors may set the remuneration of the auditor of the Company.

**Appointment of Attorney of Company**

16.2 The directors may from time to time, by power of attorney or other instrument, under seal if so required by law, appoint any person to be the attorney of the Company for such purposes, and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the directors under these Articles and excepting the power to fill vacancies in the board of directors, to remove a director, to change the membership of, or fill vacancies in, any committee of the directors, to appoint or remove officers appointed by the directors and to declare dividends) and for such period, and with such remuneration and subject to such conditions as the directors may think fit. Any such power of attorney may contain such provisions for the protection or convenience of persons dealing with such attorney as the directors think fit. Any such attorney may be authorized by the directors to sub-delegate all or any of the powers, authorities and discretions for the time being vested in him or her.

## PART 17

## INTERESTS OF DIRECTORS AND OFFICERS

**Obligation to Account for Profits**

17.1 A director or senior officer who holds a disclosable interest (as that term is used in the Act) in a contract or transaction into which the Company has entered or proposes to enter is liable to account to the Company for any profit that accrues to the director or senior officer under or as a result of the contract or transaction only if and to the extent provided in the Act.

**Restrictions on Voting by Reason of Interest**

17.2 A director who holds a disclosable interest in a contract or transaction into which the Company has entered or proposes to enter is not entitled to vote on any directors' resolution to approve that contract or transaction, unless all the directors have a disclosable interest in that contract or transaction, in which case any or all of those directors may vote on such resolution.

**Interested Director Counted in Quorum**

17.3 A director who holds a disclosable interest in a contract or transaction into which the Company has entered or proposes to enter and who is present at the meeting of directors at which the contract or transaction is considered for approval may be counted in the quorum at the meeting whether or not the director votes on any or all of the resolutions considered at the meeting.

**Disclosure of Conflict of Interest or Property**

17.4 A director or senior officer who holds any office or possesses any property, right or interest that could result, directly or indirectly, in the creation of a duty or interest that materially conflicts with that individual's duty or interest as a director or senior officer, must disclose the nature and extent of the conflict as required by the Act.

**Director Holding Other Office in the Company**

17.5 A director may hold any office or place of profit with the Company, other than the office of auditor of the Company, in addition to his or her office of director for the period and on the terms (as to remuneration or otherwise) that the directors may determine.

**No Disqualification**

17.6 No director or intended director is disqualified by his or her office from contracting with the Company either with regard to the holding of any office or place of profit the director holds with the Company or as vendor, purchaser or otherwise, and no contract or transaction entered into by or on behalf of the Company in which a director is in any way interested is liable to be voided for that reason.

**Professional Services by Director or Officer**

17.7 Subject to the Act, a director or officer, or any person in which a director or officer has an interest, may act in a professional capacity for the Company, except as auditor of the Company, and the director or officer or such person is entitled to remuneration for professional services as if that director or officer were not a director or officer.

**Director or Officer in Other Corporations**

17.8 A director or officer may be or become a director, officer or employee of, or otherwise interested in, any person in which the Company may be interested as a shareholder or otherwise, and, subject to the Act, the director or officer is not accountable to the Company for any remuneration or other benefits received by him or her as director, officer or employee of, or from his or her interest in, such other person.

## PART 18

## PROCEEDINGS OF DIRECTORS

**Meetings of Directors**

18.1 The directors may meet together for the conduct of business, adjourn and otherwise regulate their meetings as they think fit, and meetings of the directors held at regular intervals may be held at the place, at the time and on the notice, if any, as the directors may from time to time determine.

**Voting at Meetings**

18.2 Questions arising at any meeting of directors are to be decided by a majority of votes and, in the case of an equality of votes, the chair of the meeting has a second or casting vote.

**Chair of Meetings**

18.3 The following individual is entitled to preside as chair at a meeting of directors:

(a) the chair of the board, if any;

(b) in the absence of the chair of the board, the president, if any, if the president is a director; or

(c) any other director chosen by the directors if:

(i) neither the chair of the board nor the president, if a director, is present at the meeting within 15 minutes after the time set for holding the meeting;

(ii) neither the chair of the board nor the president, if a director, is willing to chair the meeting; or

(iii) the chair of the board and the president, if a director, have advised the secretary, if any, or any other director, that they will not be present at the meeting.

**Meetings by Telephone or Other Communications Medium**

18.4 A director may participate in a meeting of the directors or of any committee of the directors:

(a) in person; or

(b) by telephone or by other communications medium if all directors participating in the meeting, whether in person or by telephone or other communications medium, are able to communicate with each other.

A director who participates in a meeting in a manner contemplated by this §18.4 is deemed for all purposes of the Act and these Articles to be present at the meeting and to have agreed to participate in that manner.

**Calling of Meetings**

18.5 A director may, and the secretary or an assistant secretary of the Company, if any, on the request of a director must, call a meeting of the directors at any time.

**Notice of Meetings**

18.6 Other than for meetings held at regular intervals as determined by the directors pursuant to §18.1, 48 hours' notice or such lesser notice as the Chairman in his discretion determines, acting reasonably, is appropriate in any unusual circumstances of each meeting of the directors, specifying the place, day and time of that meeting must be given to each of the directors by any method set out in §24.1 or orally or by telephone.

**When Notice Not Required**

18.7 It is not necessary to give notice of a meeting of the directors to a director if:

(a) the meeting is to be held immediately following a meeting of shareholders at which that director was elected or appointed, or is the meeting of the directors at which that director is appointed; or

(b) the director has waived notice of the meeting.

**Meeting Valid Despite Failure to Give Notice**

18.8 The accidental omission to give notice of any meeting of directors to, or the non-receipt of any notice by, any director, does not invalidate any proceedings at that meeting.

**Waiver of Notice of Meetings**

18.9 Any director may send to the Company a document signed by him or her waiving notice of any past, present or future meeting or meetings of the directors and may at any time withdraw that waiver with respect to meetings held after that withdrawal. After sending a waiver with respect to all future meetings and until that waiver is withdrawn, no notice of any meeting of the directors need be given to that director and all meetings of the directors so held are deemed not to be improperly called or constituted by reason of notice not having been given to such director. Attendance of a director or alternate director at a meeting of the directors is a waiver of notice of the meeting unless that director or alternate director attends the meeting for the express purpose of objecting to the transaction of any business on the grounds that the meeting is not lawfully called.

**Quorum**

18.10 The quorum necessary for the transaction of the business of the directors may be set by the directors and, if not so set, is deemed to be a majority of the directors or, if the number of directors is set at one, is deemed to be set at one director, and that director may constitute a meeting.

**Validity of Acts Where Appointment Defective**

18.11 Subject to the Act, an act of a director or officer is not invalid merely because of an irregularity in the election or appointment or a defect in the qualification of that director or officer.

**Consent Resolutions in Writing**

18.12 A resolution of the directors or of any committee of the directors may be passed without a meeting:

(a) in all cases, if each of the directors entitled to vote on the resolution consents to it in writing; or

(b) in the case of a resolution to approve a contract or transaction in respect of which a director has disclosed that he or she has or may have a disclosable interest, if each of the other directors who have not made such a disclosure consents in writing to the resolution.

A consent in writing under this §18.12 may be by signed document, fax, email or any other method of transmitting legibly recorded messages. A consent in writing may be in two or more counterparts which together are deemed to constitute one consent in writing. A resolution of the directors or of any committee of the directors passed in accordance with this §18.12 is effective on the date stated in the consent in writing or on the latest date stated on any counterpart and is deemed to be a proceeding at a meeting of directors or of the committee of the directors and to be as valid and effective as if it had been passed at a meeting of the directors or of the committee of the directors that satisfies all the requirements of the Act and all the requirements of these Articles relating to meetings of the directors or of a committee of the directors.

## PART 19

## EXECUTIVE AND OTHER COMMITTEES

**Appointment and Powers of Executive Committee**

19.1 The directors may, by resolution, appoint an executive committee consisting of the director or directors that they consider appropriate, and this committee has, during the intervals between meetings of the board of directors, all of the directors' powers, except:

(a) the power to fill vacancies in the board of directors;

(b) the power to remove a director;

(c) the power to change the membership of, or fill vacancies in, any committee of the directors; and

(d) such other powers, if any, as may be set out in the resolution or any subsequent directors' resolution.

**Appointment and Powers of Other Committees**

19.2 The directors may, by resolution:

(a) appoint one or more committees (other than the executive committee) consisting of the director or directors that they consider appropriate;

(b) delegate to a committee appointed under §(a) any of the directors' powers, except:

(i) the power to fill vacancies in the board of directors;

(ii) the power to remove a director;

(iii) the power to change the membership of, or fill vacancies in, any committee of the directors; and

(iv) the power to appoint or remove officers appointed by the directors; and

(c) make any delegation referred to in §(b) subject to the conditions set out in the resolution or any subsequent directors' resolution.

**Obligations of Committees**

19.3 Any committee appointed under §19.1 or §19.2, in the exercise of the powers delegated to it, must:

(a) conform to any rules that may from time to time be imposed on it by the directors; and

(b) report every act or thing done in exercise of those powers at such times as the directors may require.

**Powers of Board**

19.4 The directors may, at any time, with respect to a committee appointed under §19.1 or §19.2:

(a) revoke or alter the authority given to the committee, or override a decision made by the committee, except as to acts done before such revocation, alteration or overriding;

(b) terminate the appointment of, or change the membership of, the committee; and

(c) fill vacancies in the committee.

**Committee Meetings**

19.5 Subject to §19.3(a) and unless the directors otherwise provide in the resolution appointing the committee or in any subsequent resolution, with respect to a committee appointed under §19.1 or §19.2:

(a) the committee may meet and adjourn as it thinks proper;

(b) the committee may elect a chair of its meetings but, if no chair of a meeting is elected, or if at a meeting the chair of the meeting is not present within 15 minutes after the time set for holding the meeting, the directors present who are members of the committee may choose one of their number to chair the meeting;

(c) a majority of the members of the committee constitutes a quorum of the committee; and

(d) questions arising at any meeting of the committee are determined by a majority of votes of the members present, and in case of an equality of votes, the chair of the meeting does not have a second or casting vote.

## PART 20

## OFFICERS

**Directors May Appoint Officers**

20.1 The directors may, from time to time, appoint such officers, if any, as the directors determine and the directors may, at any time, terminate any such appointment.

**Functions, Duties and Powers of Officers**

20.2 The directors may, for each officer:

(a) determine the functions and duties of the officer;

(b) entrust to and confer on the officer any of the powers exercisable by the directors on such terms and conditions and with such restrictions as the directors think fit; and

(c) revoke, withdraw, alter or vary all or any of the functions, duties and powers of the officer.

**Qualifications**

20.3 No person may be appointed as an officer unless that person is qualified in accordance with the Act. One person may hold more than one position as an officer of the Company. Any person appointed as the chair of the board or as a managing director must be a director. Any other officer need not be a director.

**Remuneration and Terms of Appointment**

20.4 All appointments of officers are to be made on the terms and conditions and at the remuneration (whether by way of salary, fee, commission, participation in profits or otherwise) that the directors thinks fit and are subject to termination at the pleasure of the directors, and an officer may in addition to such remuneration be entitled to receive, after he or she ceases to hold such office or leaves the employment of the Company, a pension or gratuity.

## PART 21

## INDEMNIFICATION

**Definitions**

21.1 In this Part 21:

(a) **"eligible party"**, in relation to a company, means an individual who:

(i) is or was a director, alternate director or officer of the Company;

(ii) is or was a director, alternate director or officer of another corporation

(A) at a time when the corporation is or was an affiliate of the Company, or

(B) at the request of the Company; or

(iii) at the request of the Company, is or was, or holds or held a position equivalent to that of, a director, alternate director or officer of a partnership, trust, joint venture or other unincorporated entity;

and includes, except in the definition of "eligible proceeding", and §163(1)(c) and (d) and §165 of the Act, the heirs and personal or other legal representatives of that individual:

(b) **"eligible penalty"** means a judgment, penalty or fine awarded or imposed in, or an amount paid in settlement of, an eligible proceeding;

(c) **"eligible proceeding"** means a proceeding in which an eligible party or any of the heirs and personal or other legal representatives of the eligible party, by reason of the eligible party being or having been a director, alternate director or officer of, or holding or having held a position equivalent to that of a director, alternate director or officer of, the Company or an associated corporation

(i) is or may be joined as a party; or

(ii) is or may be liable for or in respect of a judgment, penalty or fine in, or expenses related to, the proceeding;

(d) **"expenses"** has the meaning set out in the Act and includes costs, charges and expenses, including legal and other fees, but does not include judgments, penalties, fines or amounts paid in settlement of a proceeding; and

(e) **"proceeding"** includes any legal proceeding or investigative action, whether current, threatened, pending or completed.

**Mandatory Indemnification of Eligible Parties**

21.2 Subject to the Act, the Company must indemnify each eligible party and the heirs and legal personal representatives of each eligible party against all eligible penalties to which such person is or may be liable, and the Company must, after the final disposition of an eligible proceeding, pay the expenses actually and reasonably incurred by such person in respect of that proceeding. Each eligible party is deemed to have contracted with the Company on the terms of the indemnity contained in this §21.2.

**Indemnification of Other Persons**

21.3 Subject to any restrictions in the Act, the Company may agree to indemnify and may indemnify any person (including an eligible party) against eligible penalties and pay expenses incurred in connection with the performance of services by that person for the Company.

**Authority to Advance Expenses**

21.4 The Company may advance expenses to an eligible party to the extent permitted by and in accordance with the Act.

**Non-Compliance with Act**

21.5 Subject to the Act, the failure of an eligible party of the Company to comply with the Act or these Articles or, if applicable, any former *Companies Act* or former Articles does not, of itself, invalidate any indemnity to which he or she is entitled under this Part 21.

**Company May Purchase Insurance**

21.6 The Company may purchase and maintain insurance for the benefit of any eligible party (or the heirs or legal personal representatives of any eligible party) against any liability incurred by any eligible party.

## PART 22

## DIVIDENDS

**Payment of Dividends Subject to Special Rights**

22.1 The provisions of this Part 22 are subject to the rights, if any, of shareholders holding shares with special rights as to dividends.

**Declaration of Dividends**

22.2 Subject to the Act, the directors may from time to time declare and authorize payment of such dividends as they may deem advisable.

**No Notice Required**

22.3 The directors need not give notice to any shareholder of any declaration under §22.2.

**Record Date**

22.4 The directors must set a date as the record date for the purpose of determining shareholders entitled to receive payment of a dividend. The record date must not precede the date on which the dividend is to be paid by more than two months.

**Manner of Paying Dividend**

22.5 A resolution declaring a dividend may direct payment of the dividend wholly or partly in money or by the distribution of specific assets or of fully paid shares or of bonds, debentures or other securities of the Company or any other corporation, or in any one or more of those ways.

**Settlement of Difficulties**

22.6 If any difficulty arises in regard to a distribution under §22.5, the directors may settle the difficulty as they deem advisable, and, in particular, may:

(a) set the value for distribution of specific assets;

(b) determine that money in substitution for all or any part of the specific assets to which any shareholders are entitled may be paid to any shareholders on the basis of the value so fixed in order to adjust the rights of all parties; and

(e) vest any such specific assets in trustees for the persons entitled to the dividend.

**When Dividend Payable**

22.7 Any dividend may be made payable on such date as is fixed by the directors.

**Dividends to be Paid in Accordance with Number of Shares**

22.8 All dividends on shares of any class or series of shares must be declared and paid according to the number of such shares held.

**Receipt by Joint Shareholders**

22.9 If several persons are joint shareholders of any share, any one of them may give an effective receipt for any dividend, bonus or other money payable in respect of the share.

**Dividend Bears No Interest**

22.10 No dividend bears interest against the Company.

**Fractional Dividends**

22.11 If a dividend to which a shareholder is entitled includes a fraction of the smallest monetary unit of the currency of the dividend, that fraction may be disregarded in making payment of the dividend and that payment represents full payment of the dividend.

**Payment of Dividends**

22.12 Any dividend or other distribution payable in money in respect of shares may be paid by cheque, made payable to the order of the person to whom it is sent, and mailed to the registered address of the shareholder, or in the case of joint shareholders, to the registered address of the joint shareholder who is first named on the central securities register, or to the person and to the address the shareholder or joint shareholders may direct in writing. The mailing of such cheque will, to the extent of the sum represented by the cheque (plus the amount of the tax required by law to be deducted), discharge all liability for the dividend unless such cheque is not paid on presentation or the amount of tax so deducted is not paid to the appropriate taxing authority.

**Capitalization of Retained Earnings or Surplus**

22.13 Notwithstanding anything contained in these Articles, the directors may from time to time capitalize any retained earnings or surplus of the Company and may from time to time issue, as fully paid, shares or any bonds, debentures or other securities of the Company as a dividend representing the retained earnings or surplus so capitalized or any part thereof.

PART 23

ACCOUNTING RECORDS AND AUDITOR

**Recording of Financial Affairs**

23.1 The directors must cause adequate accounting records to be kept to record properly the financial affairs and condition of the Company and to comply with the Act.

**Inspection of Accounting Records**

23.2 Unless the directors determine otherwise, or unless otherwise determined by ordinary resolution, no shareholder of the Company is entitled to inspect or obtain a copy of any accounting records of the Company.

PART 24

NOTICES

**Method of Giving Notice**

24.1 Unless the Act or these Articles provide otherwise, a notice, statement, report or other record required or permitted by the Act or these Articles to be sent by or to a person may be sent by:

(a) mail addressed to the person at the applicable address for that person as follows:

(i) for a record mailed to a shareholder, the shareholder's registered address;

(ii) for a record mailed to a director or officer, the prescribed address for mailing shown for the director or officer in the records kept by the Company or the mailing address provided by the recipient for the sending of that record or records of that class;

(iii) in any other case, the mailing address of the intended recipient;

(b) delivery at the applicable address for that person as follows, addressed to the person:

(i) for a record delivered to a shareholder, the shareholder's registered address;

(ii) for a record delivered to a director or officer, the prescribed address for delivery shown for the director or officer in the records kept by the Company or the delivery address provided by the recipient for the sending of that record or records of that class;

(iii) in any other case, the delivery address of the intended recipient;

(c) sending the record by fax to the fax number provided by the intended recipient for the sending of that record or records of that class;

(d) sending the record by email to the email address provided by the intended recipient for the sending of that record or records of that class;

(e) physical delivery to the intended recipient.

**Deemed Receipt of Mailing**

24.2 A notice, statement, report or other record that is:

(a) mailed to a person by ordinary mail to the applicable address for that person referred to in §24.1 is deemed to be received by the person to whom it was mailed on the day (Saturdays, Sundays and holidays excepted) following the date of mailing;

(b) faxed to a person to the fax number provided by that person referred to in §24.1 is deemed to be received by the person to whom it was faxed on the day it was faxed; and

(c) emailed to a person to the e-mail address provided by that person referred to in §24.1 is deemed to be received by the person to whom it was e-mailed on the day that it was emailed.

**Certificate of Sending**

24.3 A certificate signed by the secretary, if any, or other officer of the Company or of any other corporation acting in that capacity on behalf of the Company stating that a notice, statement, report or other record was sent in accordance with §24.1 is conclusive evidence of that fact.

**Notice to Joint Shareholders**

24.4 A notice, statement, report or other record may be provided by the Company to the joint shareholders of a share by providing such record to the joint shareholder first named in the central securities register in respect of the share.

**Notice to Legal Personal Representatives and Trustees**

24.5 A notice, statement, report or other record may be provided by the Company to the persons entitled to a share in consequence of the death, bankruptcy or incapacity of a shareholder by:

(a) mailing the record, addressed to them:

(i) by name, by the title of the legal personal representative of the deceased or incapacitated shareholder, by the title of trustee of the bankrupt shareholder or by any similar description; and

(ii) at the address, if any, supplied to the Company for that purpose by the persons claiming to be so entitled; or

(b) if an address referred to in §(a)(ii) has not been supplied to the Company, by giving the notice in a manner in which it might have been given if the death, bankruptcy or incapacity had not occurred.

**Undelivered Notices**

24.6 If on two consecutive occasions, a notice, statement, report or other record is sent to a shareholder pursuant to §24.1 and on each of those occasions any such record is returned because the shareholder cannot be located, the Company shall not be required to send any further records to the shareholder until the shareholder informs the Company in writing of his or her new address.

## PART 25

## SEAL

**Who May Attest Seal**

25.1 Except as provided in §25.2 and §25.3, the Company's seal, if any, must not be impressed on any record except when that impression is attested by the signatures of:

(a) any two directors;

(b) any officer, together with any director;

(c) if the Company only has one director, that director; or

(d) any one or more directors or officers or persons as may be determined by the directors.

**Sealing Copies**

25.2 For the purpose of certifying under seal a certificate of incumbency of the directors or officers of the Company or a true copy of any resolution or other document, despite §25.1, the impression of the seal may be attested by the signature of any director or officer or the signature of any other person as may be determined by the directors.

**Mechanical Reproduction of Seal**

25.3 The directors may authorize the seal to be impressed by third parties on share certificates or bonds, debentures or other securities of the Company as they may determine appropriate from time to time. To enable the seal to be impressed on any share certificates or bonds, debentures or other securities of the Company, whether in definitive or interim form, on which facsimiles of any of the signatures of the directors or officers of the Company are, in accordance with the Act or these Articles, printed or otherwise mechanically reproduced, there may be delivered to the person employed to engrave, lithograph or print such definitive or interim share certificates or bonds, debentures or other securities one or more unmounted dies reproducing the seal and such persons as are authorized under §25.1 to attest the Company's seal may in writing authorize such person to cause the seal to be impressed on such definitive or interim share certificates or bonds, debentures or other securities by the use of such dies. Share certificates or bonds, debentures or other securities to which the seal has been so impressed are for all purposes deemed to be under and to bear the seal impressed on them.

# SPECIAL RIGHTS AND RESTRICTIONS FOR PROPORTIONATE VOTING SHARES

1. **NUMBER AND DESIGNATION .**

(a) The Corporation shall have authority to issue up to an unlimited number of Proportionate Voting Shares, which are hereby designated "***Proportionate Voting Shares***".

(b) **Proportionate Voting Shares may be issued in fractions and shall be rounded up to three decimal places.**

(c) Rank:

(i) All Proportionate Voting Shares shall be identical with each other in all respects.

(ii) The Proportionate Voting Shares shall rank *pari passu* to the Subordinate Voting Shares as to dividends and upon liquidation, as described below. Any amounts herein shall be subject to appropriate adjustments in the event of any stock splits, consolidations or the like.

2. **DIVIDEND RIGHTS.**

The holders of Proportionate Voting Shares (the "***Proportionate Voting Shareholders***") shall have the right to receive dividends, out of any cash or other assets legally available therefor, *pari passu,* on an as converted basis, (assuming conversion of all Proportionate Voting Shares into Subordinate Voting Shares at the applicable Proportionate Voting Share Conversion Ratio and without regard to any conversion limitations set forth in Section 6 hereof) as to dividends and any declaration or payment of any dividend on the Subordinate Voting Shares.

3. **LIQUIDATION RIGHTS.**

(a) In the event of any Liquidation Event, either voluntary or involuntary, the Proportionate Voting Shareholders and holders of the Subordinate Voting Shares shall be entitled to receive the assets of the Corporation, or other consideration payable or distributable as a result of the Liquidation Event, available for distribution to shareholders, distributed among the Proportionate Voting Shareholders and holders of the Subordinate Voting Shares on a pro rata basis, based on (i) the number of Proportionate Voting Shares (on an as converted basis, assuming conversion of all Proportionate Voting Shares into Subordinate Voting Shares at the applicable Proportionate Voting Share Conversion Ratio and without regard to any conversion limitations set forth in Section 6 hereof); and (ii) the number of Subordinate Voting Shares, in each case, issued and outstanding on the record date.

(b) For purposes of this Section 3, a "***Liquidation Event***" shall mean (i) any voluntary or involuntary liquidation, dissolution or winding up of the Corporation, including any event determined by the Board of Directors of the Corporation to constitute a Liquidity Event

requiring the liquidation, dissolution or winding up of the Corporation; (ii) the acquisition of the Corporation by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation but, excluding any transaction effected exclusively for the purpose of changing the domicile of the Corporation or determined by the Board of Directors of the Corporation not to constitute a Liquidation Event); (iii) a sale of all or substantially all of the assets of the Corporation; unless, in the case of (ii) or (iii), the Corporation's shareholders of record as constituted immediately prior to such acquisition or sale will, immediately after such acquisition or sale (by virtue of securities issued as consideration for the Corporation's acquisition or sale or otherwise) hold at least 50% of the voting power of the surviving or acquiring entity or the Board of Directors of the Corporation otherwise determines that such transaction does not to constitute a Liquidation Event.

4. **VOTING RIGHTS.**

(a) The Proportionate Voting Shares shall have one vote for each Subordinate Voting Share into which such Proportionate Voting Shares could then be converted at the applicable Proportionate Voting Conversion Ratio and without regard to any conversion limitations set forth in Section 6 hereof, and with respect to such vote, Proportionate Voting Shareholders shall have full voting rights and powers equal to the voting rights and powers of the holders of Subordinate Voting Shares, and shall be entitled, notwithstanding any provision hereof, to notice of any shareholders' meeting and shall be entitled to vote, together with holders of Subordinate Voting Shares, with respect to any question upon which holders of Subordinate Voting Shares have the right to vote. Fractional votes shall not, however, be permitted and any fractional voting rights available on an as converted basis (after aggregating all Subordinate Voting Shares into which Proportionate Voting Shares could be converted) shall be rounded down to the nearest whole number. Except as provided by law or by the provisions of Section 4(b) below, the Proportionate Voting Shares shall vote together as a single class with the Subordinate Voting Shares.

(b) In addition to any other rights provided by law, the Corporation shall not amend, alter or repeal the preferences, special rights or other powers of the Proportionate Voting Shares or any other provision of the Corporation's constating documents that would adversely affect the rights of Proportionate Voting Shareholders, without the written consent or affirmative vote of the holders of at least 66-2/3% of the then outstanding aggregate number of Proportionate Voting Shares, given in writing or by vote at a meeting, consenting or voting (as the case may be) separately as a class of the holders of Proportionate Voting Shares (a "***Proportionate Voting Super Majority Vote***").

5. **CONVERSION.**

Subject to the Conversion Restrictions set forth in Section 6, the Proportionate Voting Shares shall have conversion rights as follows (the "***Conversion Rights***"):

(a) **Right to Convert.** Each Proportionate Voting Share shall be convertible, at the option of the Proportionate Voting Shareholder thereof, at any time after the date of issuance of such Proportionate Voting at the office of the Corporation or any transfer agent for such shares, into such number of fully paid and nonassessable Subordinate Voting Shares as is

determined by multiplying each Proportionate Voting Share being converted by the Proportionate Voting Share Conversion Ratio applicable to such Proportionate Voting, determined as hereafter provided, in effect on the date the Proportionate Voting Share is surrendered for conversion. The initial "***Proportionate Voting Share Conversion Ratio***" for each Proportionate Voting Share shall be as follows: each Proportionate Voting Share shall be convertible into two hundred (200) Subordinate Voting Shares; *provided, however*, that the applicable Proportionate Voting Share Conversion Ratio shall be subject to adjustment as set forth in subsections 5(d) and 5(e).

(b) **Automatic Conversion.** Each Proportionate Voting Share shall automatically be converted without further action by the Proportionate Voting Shareholder into Subordinate Voting Shares at the applicable Proportionate Voting Share Conversion Ratio immediately upon the earlier of:

(i) a Liquidation Event;

(ii) the date specified by the written consent or affirmative Proportionate Voting Super Majority Vote of the then outstanding aggregate number of Proportionate Voting Shares voting as a separate class; or

(iii) a Mandatory Conversion pursuant to Section 7.

(c) **Mechanics of Conversion.** Before any Proportionate Voting Shareholder shall be entitled to convert Proportionate Voting Shares into Subordinate Voting Shares, the Proportionate Voting Shareholder shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for Subordinate Voting Shares, and shall give written notice to the Corporation at its principal corporate office, of the election to convert the same and shall state therein the name or names in which the certificate or certificates for Subordinate Voting Shares are to be issued (each, a "***Conversion Notice***"). The Corporation shall (or shall cause its transfer agent to), as soon as practicable thereafter, issue and deliver at such office to such Proportionate Voting Shareholder, or to the nominee or nominees of such holder, a certificate or certificates for the number of Subordinate Voting Shares to which such holder shall be entitled as aforesaid. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the Proportionate Voting Shares to be converted, and the Proportionate Voting Shareholder or Proportionate Voting Shareholders entitled to receive the Subordinate Voting Shares issuable upon such conversion shall be treated for all purposes as the record holder or holders of such Subordinate Voting Shares as of such date.

(d) **Adjustments for Distributions.** In the event the Corporation shall declare a distribution to holders of Subordinate Voting Shares payable in securities of other persons, evidences of indebtedness issued by the Corporation or other persons, assets (excluding cash dividends) or options or rights not otherwise causing adjustment to the Proportionate Voting Share Conversion Ratio (a "***Distribution***"), then, in each such case for the purpose of this subsection 5(d), the Proportionate Voting Shareholders shall be entitled to a proportionate share of any such Distribution as though they were the holders of the number of Subordinate Voting Shares into which their Proportionate Voting Shares are convertible as of the record date fixed

for the determination of the holders of Subordinate Voting Shares entitled to receive such Distribution.

(e) **Recapitalizations; Stock Splits.** If at any time or from time-to-time, the Corporation shall (i) effect a recapitalization of the Subordinate Voting Shares; (ii) issue Subordinate Voting Shares as a dividend or other distribution on outstanding Subordinate Voting Shares; (iii) subdivide the outstanding Subordinate Voting Shares into a greater number of Subordinate Voting Shares; (iv) consolidate the outstanding Subordinate Voting Shares into a smaller number of Subordinate Voting Shares; or (v) effect any similar transaction or action not otherwise causing adjustment to the Proportionate Voting Share Conversion Ratio (each, a "***Recapitalization***"), provision shall be made so that the Proportionate Voting Shareholders shall thereafter be entitled to receive, upon conversion of Proportionate Voting Shares, the number of Subordinate Voting Shares or other securities or property of the Corporation or otherwise, to which a holder of Subordinate Voting Shares deliverable upon conversion would have been entitled on such Recapitalization. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 5 with respect to the rights of the Proportionate Voting Shareholders after the Recapitalization to the end that the provisions of this Section 5 (including adjustment of the Proportionate Voting Share Conversion Ratio then in effect and the number of Subordinate Voting Shares acquirable upon conversion of Proportionate Voting Shares) shall be applicable after that event as nearly equivalent as may be practicable.

(f) **No Impairment.** The Corporation will not, by amendment of its Notice of Articles, its Articles or through any reorganization, recapitalization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section 5 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the Proportionate Voting Shareholders against impairment.

(g) **No Fractional Shares and Certificate as to Adjustments.** No fractional Subordinate Voting Shares shall be issued upon the conversion of any Proportionate Voting Shares and the number of Subordinate Voting Shares to be issued shall be rounded down to the nearest whole Subordinate Voting Share. Whether or not fractional Subordinate Voting Shares are issuable upon such conversion shall be determined on the basis of the total number of Proportionate Voting Shares the Proportionate Voting Shareholder is at the time converting into Subordinate Voting Shares and the number of Subordinate Voting Shares issuable upon such aggregate conversion.

(h) **Adjustment Notice.** Upon the occurrence of each adjustment or readjustment of the Proportionate Voting Share Conversion Ratio pursuant to this Section 5, the Corporation, at its expense, shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each Proportionate Voting Shareholder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, upon the written request at any time of any Proportionate Voting Shareholder, furnish or cause to be furnished to such holder a like certificate setting forth (A) such adjustment and readjustment,

(B) the Proportionate Voting Share Conversion Ratio for Proportionate Voting Shares at the time in effect, and (C) the number of Subordinate Voting Shares and the amount, if any, of other property which at the time would be received upon the conversion of a Proportionate Voting Share.

(i) **Effect of Conversion.** All Proportionate Voting Shares that shall have been surrendered for conversion as herein provided shall no longer be deemed to be outstanding and all rights with respect to such shares shall immediately cease and terminate at the time of conversion (the "***Conversion Time***"), except only the right of the holders thereof to receive Subordinate Voting Shares in exchange therefor.

(j) **Notices of Record Date.** Except as otherwise provided under applicable law, in the event of any taking by the Corporation of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend (other than a cash dividend) or other distribution, any right to subscribe for, purchase or otherwise acquire any shares of any class or any other securities or property, or to receive any other right, the Corporation shall mail to each Proportionate Voting Shareholder, at least 20 days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such dividend, distribution or right, and the amount and character of such dividend, distribution or right.

6. **CONVERSION LIMITATIONS.**

Before any Proportionate Voting Shareholder shall be entitled to convert Proportionate Voting Shares into Subordinate Voting Shares, the Board of Directors (or a delegated committee thereof) shall designate an officer of the Corporation to determine if any Conversion Limitation set forth in this Section 6 shall apply to the conversion of Proportionate Voting Shares. For the purposes of this Section 6, each of the following is a "***Conversion Limitation***":

(a) **Foreign Private Issuer Protection Limitation:** The Corporation will use commercially reasonable efforts to maintain its status as a "*foreign private issuer*" (as determined in accordance with Rule 3b-4 ("***Foreign Private Issuer***") under the Securities Exchange Act of 1934, as amended (the "***U.S. Exchange Act***"). Accordingly:

(i) 40% Threshold. Except as provided in Section 7, the Corporation shall not effect any conversion of Proportionate Voting Shares, and the Proportionate Voting Shareholders shall not have the right to convert any portion of the Proportionate Voting Shares pursuant to Section 5 or otherwise, to the extent that after giving effect to such issuance after conversions, the aggregate number of Subordinate Voting Shares and Proportionate Voting Shares held of record, directly or indirectly, by residents of the United States (as determined in accordance with Rule 3b-4 under the U.S. Exchange Act, "***U.S. Residents***") would exceed forty percent (40%) (the "***40% Threshold***") of the aggregate number of Subordinate Voting Shares and Proportionate Voting Shares issued and outstanding (the "***FPI Protective Restriction***").

(ii) Conversion Limitations. Except as otherwise provided herein, in order to effect the FPI Protective Restriction, each Proportionate Voting Shareholder will

be subject to the 40% Threshold, based on the number of Proportionate Voting Shares held by such Proportionate Voting Shareholder as of the date of the initial issuance of any Proportionate Voting Shares and, thereafter, at the end of each fiscal quarter (each, a "***Determination Date***"), for the current fiscal quarter (the "***Relevant Period***"), calculated as follows:

$$X = [(A \times 0.4) - B] \times (C/D)$$

Where on the Determination Date:

X = Maximum Number of Subordinate Voting Shares Available For issuance upon Conversion of Proportionate Voting Shares by the Proportionate Voting Shareholder during the Relevant Period.

A = The number of Subordinate Voting Shares and Proportionate Voting Shares issued and outstanding on the Determination Date.

B = Aggregate number of Subordinate Voting Shares and Proportionate Voting Shares held of record, directly or indirectly, by U.S. Residents on the Determination Date.

C = Aggregate number of Subordinate Voting Shares issuable upon conversion of Proportionate Voting Shares held by the Proportionate Voting Shareholder on the Determination Date.

D = Aggregate number of all Subordinate Voting Shares issuable upon conversion of Proportionate Voting Shares on the Determination Date.

(iii) Determination of FPI Protective Restriction. For purposes of subsections 6(a)(i) and 6(a)(ii), the Board of Directors (or a delegated committee thereof) shall designate an officer of the Corporation to determine as of each Determination Date: (A) the 40% Threshold and (B) the FPI Protective Restriction. To the extent that the FPI Protective Restriction contained in this Section 6(a) applies, the determination of whether Proportionate Voting Shares are convertible shall be in the sole discretion of the Corporation.

(iv) Notice of Conversion Limitation. Upon a determination of the 40% Threshold and the FPI Protective Restriction, the Corporation will provide each Proportionate Voting Shareholder of record notice of the FPI Protective Restriction applicable to holders of Proportionate Voting Shares for the Relevant Period within ten (10) business days of the end of each Determination Date (a "***Notice of Conversion Limitation***"). The FPI Protective Restriction shall be stated as a percentage of the Proportionate Voting Shares issued and outstanding on the Determination Date by holders of Proportionate Voting Shares.

For example, if on a Determination Date (March 31, 2020) the maximum number of Subordinate Voting Shares available for issuance upon conversion of Proportionate Voting Shares by the Proportionate Voting Shareholder holding 1,000 Proportionate Voting Shares is 60,000 Subordinate Voting Shares, the FPI Protective Restriction will apply to 700 Proportionate Voting Shares (70%) and an aggregate of 300 Proportionate Voting Shares (30%) may be converted during the Relevant Period. The Notice of Conversion Limitation would, in this case, state that "Pursuant to Section 6 of the Special Rights and Restrictions for Proportionate Voting Shares of the Corporation, the FPI Protective Restriction applies to 70% of the issued and outstanding Proportionate Voting Shares as of the Determination Date (March 31, 2020) and up to 30% of your Proportionate Voting Shares may be converted into Subordinate Voting Shares during the fiscal quarter ending June 30, 2020."

(v) Disputes. In the event of a dispute as to the number of Subordinate Voting Shares issuable to a Holder in connection with a conversion of Proportionate Voting Shares, the Corporation shall issue to the Holder the number of Subordinate Voting Shares not in dispute and resolve such dispute in accordance with Section 11.

(b) **Board of Director Discretion:**

(i) De Minimis Exceptions. Notwithstanding the Conversion Limitations set forth in Section 6(a), the Board of Directors (or a delegated committee thereof) may establish a *de minimis exception* to permit the conversion of Proportionate Voting Shares by Proportionate Voting Shareholders up to a threshold number of Subordinate Voting Shares during a Relevant Period (a "*de minimis Conversion*"); *provided that* the aggregate number of Subordinate Voting Shares and Proportionate Voting Shares held of record, directly or indirectly, by U.S. Residents would not exceed fifty percent (50%) of the aggregate number of Subordinate Voting Shares and Proportionate Voting Shares issued and outstanding after giving full effect to the de minimis Conversion.

(ii) Sales to Non-U.S. Residents. Notwithstanding the Conversion Limitations set forth in Section 6(a), the Board of Directors (or a delegated committee thereof) may determine that, during any Relevant Period, Proportionate Voting Shareholders may convert any number of Proportionate Voting Shares into Subordinate Voting Shares if the Subordinate Voting Shares are immediately being transferred to a non-U.S. Resident and the Proportionate Voting Shareholder provides to the Corporation such certifications and other documentation as the Board of Directors (or a delegated committee thereof) may establish for the Proportionate Voting Shareholder to properly evidence that the transferee of the Subordinate Voting Shares is a non-U.S. Resident.

(iii) Other Exceptions. Notwithstanding the Conversion Limitations set forth in Section 6(a), the Board of Directors (or a delegated committee thereof) may exercise full discretion to permit the conversion of Proportionate Voting Shares by one or more Proportionate Voting Shareholders if such conversion is

determined to be in the best interests of the Corporation. By way of example and not limiting the discretion set forth in this Section 6(b)(ii), the Board of Directors (or a delegated committee thereof) may determine that it is in the best interest of the Corporation to permit a non-U.S. Resident to convert Proportionate Voting Shares into Subordinate Voting Shares.

7. **MANDATORY CONVERSION.**

(a) Notwithstanding subsection 6(a), the Corporation may require, as to be determined by the Board of Directors, each Proportionate Voting Shareholder to convert all, and not less than all, the Proportionate Voting Shares at the applicable Conversion Ratio (a "***Mandatory Conversion***") if:

(i) the Corporation ceases to be a Foreign Private Issuer; or

(ii) at any time all the following conditions are satisfied (or otherwise waived by the Proportionate Voting Super Majority Vote):

A) the Subordinate Voting Shares issuable upon conversion of all the Proportionate Voting Shares are registered for resale and may be sold by the Proportionate Voting Shareholder pursuant to an effective registration statement and/or prospectus covering the Subordinate Voting Shares under the United States Securities Act of 1933, as amended (the "***U.S. Securities Act***");

B) the Corporation is subject to the reporting requirements of Section 13 or 15(d) of the U.S. Exchange Act; and

C) the Subordinate Voting Shares are listed or quoted (and are not suspended from trading) on a recognized North American stock exchange or by way of reverse takeover transaction on the Toronto Stock Exchange, the TSX Venture Exchange, the Canadian Securities Exchange or Aequitas NEO Exchange (or any other stock exchange recognized as such by the Ontario Securities Commission).

(b) The Corporation will issue or cause its transfer agent to issue each Proportionate Voting Shareholder of record a Mandatory Conversion Notice at least 20 days prior to the record date of the Mandatory Conversion, which shall specify therein, (i) the number of Subordinate Voting Shares into which the Proportionate Voting Shares are convertible and (ii) the address of record for such Proportionate Voting Shareholder. On the record date of a Mandatory Conversion, the Corporation will issue or cause its transfer agent to issue each Proportionate Voting Shareholder of record on the Mandatory Conversion Date certificates representing the number of Subordinate Voting Shares into which the Proportionate Voting Shares are so converted and each certificate representing the Proportionate Voting Shares shall be null and void.

8. **PRE-EMPTIVE RIGHTS.** The Proportionate Voting Shares shall have no preemptive rights.

9. **NOTICES.** Any notice required by the provisions of these Special Rights and Restrictions to be given to the Proportionate Voting Shareholders shall be deemed given if deposited in the Canadian mail, postage prepaid, and addressed to each holder of record at his, her or its address appearing on the books of the Corporation.

10. **STATUS OF CONVERTED PROPORTIONATE VOTING SHARES.** Any Proportionate Voting Shares converted shall be retired and cancelled and may not be reissued as shares of such series or any other class or series.

11. **DISPUTES.** Any Proportionate Voting Shareholder that beneficially owns more than 5% of the issued and outstanding Proportionate Voting Shares may submit a written dispute as to the determination of the Proportionate Voting Share Conversion Ratio or the arithmetic calculation of the Proportionate Voting Share Conversion Ratio, 40% Threshold, or FPI Protective Restriction by the Corporation to the Board of Directors with the basis for the disputed determinations or arithmetic calculations. The Corporation shall respond to the Proportionate Voting Shareholder within five (5) Business Days of receipt, or deemed receipt, of the dispute notice with a written calculation of the Proportionate Voting Conversion Ratio, 40% Threshold, or the FPI Protective Restriction, as applicable. If the Proportionate Voting Shareholder and the Corporation are unable to agree upon such determination or calculation of the Proportionate Voting Share Conversion Ratio or the FPI Protective Restriction, as applicable, within five (5) Business Days of such response, then the Corporation and the Proportionate Voting Shareholder shall, within one (1) Business Day thereafter submit the disputed arithmetic calculation of the Proportionate Voting Share Conversion Ratio or the FPI Protective Restriction to the Corporation's independent, outside accountant. The Corporation, at the Corporation's expense, shall cause the accountant to perform the determinations or calculations and notify the Corporation and the Proportionate Voting Shareholder of the results no later than five (5) Business Days from the time it receives the disputed determinations or calculations. Such accountant's determination or calculation, as the case may be, shall be binding upon all parties absent demonstrable error.

## SPECIAL RIGHTS AND RESTRICTIONS FOR SUBORDINATE VOTING SHARES

An unlimited number of Subordinate Voting Shares, without nominal or par value, having attached thereto the special rights and restrictions as set forth below:

(a) **Voting Rights**. Holders of Subordinate Voting Shares shall be entitled to notice of and to attend at any meeting of the shareholders of the Corporation, except a meeting of which only holders of another particular class or series of shares of the Corporation shall have the right to vote. At each such meeting holders of Subordinate Voting Shares shall be entitled to one vote in respect of each Subordinate Voting Share held.

(b) **Alteration to Rights of Subordinate Voting Shares**. As long as any Subordinate Voting Shares remain outstanding, the Corporation will not, without the consent of the holders of the Subordinate Voting Shares by separate special resolution, prejudice or interfere with any right or special right attached to the Subordinate Voting Shares.

(c) **Dividends**. Holders of Subordinate Voting Shares shall be entitled to receive as and when declared by the directors, dividends in cash or property of the Corporation. No dividend will be declared or paid on the Subordinate Voting Shares unless the Corporation simultaneously declares or pays, as applicable, equivalent dividends (on an as-converted to Subordinate Voting Share basis) on the Proportionate Voting Shares.

(d) **Liquidation, Dissolution or Winding-Up**. In the event of the liquidation, dissolution or windingup of the Corporation, whether voluntary or involuntary, or in the event of any other distribution of assets of the Corporation among its shareholders for the purpose of winding up its affairs, the holders of Subordinate Voting Shares shall, subject to the prior rights of the holders of any shares of the Corporation ranking in priority to the Subordinate Voting Shares be entitled to participate rateably along with all other holders of Proportionate Voting Shares (on an as-converted to Subordinate Voting Share basis) and Subordinate Voting Shares.

(e) **Rights to Subscribe; Pre-Emptive Rights**. The holders of Subordinate Voting Shares are not entitled to a right of first refusal to subscribe for, purchase or receive any part of any issue of Subordinate Voting Shares, or bonds, debentures or other securities of the Corporation now or in the future.

(f) **Subdivision or Consolidation**. No subdivision or consolidation of the Subordinate Voting Shares or Proportionate Voting Shares shall occur unless, simultaneously, the Subordinate Voting Shares and Proportionate Voting Shares are subdivided or consolidated in the same manner or such other adjustment is made so as to maintain and preserve the relative rights of the holders of the shares of each of the said classes.

(g) **Conversion of Subordinate Voting Shares Upon an Offer**. In the event that an offer is made to purchase Proportionate Voting Shares, and the offer is one (assuming the

Special rights and restrictions added to the Articles of the Company pursuant to a Plan of Arrangement passed at a meeting of Shareholders on May 29, 2019, by Court Order dated May 30, 2019 and by a Notice of Alteration filed with the Registrar of Companies on May 30, 2019.

holder is a resident of Ontario regardless of its actual residency) which is required, pursuant to applicable securities legislation and regulations or the rules of a stock exchange, if any, on which the Proportionate Voting Shares are then listed, to be made to all or substantially all the holders of Proportionate Voting Shares in a province or territory of Canada to which the requirement applies (without taking into consideration any statutory or regulatory exemption from such obligation), each Subordinate Voting Share shall become convertible at the option of the holder into Proportionate Voting Shares at the inverse of the Proportionate Voting Share Conversion Ratio (as defined in the special rights and restrictions for Proportionate Voting Shares) then in effect, at any time while the offer is in effect until one day after the time prescribed by applicable securities legislation (or otherwise provided by the offeror) for the offeror to take up and pay for such shares as are to be acquired pursuant to the offer. The conversion right may only be exercised in respect of Subordinate Voting Shares for the purpose of depositing the resulting Proportionate Voting Shares under the offer, and for no other reason. In such event, the transfer agent for the Subordinated Voting Shares shall deposit under the offer the resulting Proportionate Voting Shares, on behalf of the holder. To exercise such conversion right, the holder or his or its attorney duly authorized in writing shall:

(i) give written notice to the transfer agent of the exercise of such right, and of the number of Subordinate Voting Shares in respect of which the right is being exercised;

(ii) deliver to the transfer agent the share certificate or certificates representing the Subordinate Voting Shares in respect of which the right is being exercised, if applicable; and

(iii) pay any applicable stamp tax or similar duty on or in respect of such conversion.

No share certificates representing the Proportionate Voting Shares, resulting from the conversion of the Subordinate Voting Shares will be delivered to the holders on whose behalf such deposit is being made. If Proportionate Voting Shares, resulting from the conversion and deposited pursuant to the offer, are withdrawn by the holder or are not taken up by the offeror, or the offer is abandoned, withdrawn or terminated by the offeror or the offer otherwise expires without such Proportionate Voting Shares being taken up and paid for, the Proportionate Voting Shares resulting from the conversion will be re-converted into Subordinate Voting Shares at the then Proportionate Voting Share Conversion Ratio and a share certificate representing the Subordinate Voting Shares will be sent to the holder by the transfer agent. In the event that the offeror takes up and pays for the Proportionate Voting Shares resulting from conversion, the transfer agent shall deliver to the holders thereof the consideration paid for such shares by the offeror.

This is Exhibit "...J......." referred to in the affidavit
of Dan Bilzerian.................................. sworn
(or affirmed) before me on 03/MAR/2025.............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 20, 2026

International Investments, Ltd.
858 Zenway Blvd
Basseterre, St Kitts
(869) 466-8000

June 2, 2024

Mr. Dan Bilzerian
5990 W. Patrick Lane
Las Vegas, NV 89118

Re: Termination As Director of Ignite International Brands, Ltd. and Subsidiaries

Dear Mr. Bilzerian:

Because you have refused to resign as a Director of Ignite International Brands, Ltd. and its relevant subsidiaries ("Ignite"), as outlined in my letter dated June 1, 2023, based on the authority and consent provided to me by the majority of Ignite shareholders listed below, this letter shall serve as your notice of termination, effective immediately, as Chairman and Director of Ignite International Brands, Ltd and subsidiaries. You are hereby prohibited from representing Ignite, speaking on behalf of Ignite, and taking any action on behalf of Ignite.

Ignite Shareholders consenting to this termination and representing 51.8% of the shares include:

- International Investments, Ltd. 24.95% ownership
- Atlas Investments, Ltd 10.74% ownership
- Vulcan Enterprises, SKN 8.24% ownership
- Veritas Investments, Ltd 5.68% ownership
- Cordell Companies 1.56% ownership
- Scott Rohleder, CEO .63% ownership

You should note that we believe virtually ALL of the other shareholders will support your immediate termination.

Having written the above, it is in the best interest of Ignite and you to amicably transition. Joe Durnford previously provided you a transition plan that would rehabilitate your reputation by resigning to pursue your political interests in stopping the Hamas war and helping the victims. That plan consists of the following:

1. Dan Bilzerian will resign as Chairman to pursue his passion to be an advocate to end the pain and suffering caused by the current Hamas/Israeli War and other similar conflicts. Dan

recognizes that he as founder of Ignite, a lifestyle brand based on fun, cannot engage in politics and as such, desired to follow his passion to help others.

2. Ignite will create a foundation in which Dan will fund shares of Ignite which will benefit the victims of the Hamas/Israeli War as well as victims in other conflicts.
3. Ignite will contribute a percentage of each vape sale to the foundation.
4. Dan will delete his offending posts.
5. Dan will apologize and clarify that his choice of words was wrong, and his intention was to criticize Netanyahu and the Israeli government and not the country and citizens of Israel.

A new Board of Directors is being formed which will be announced shortly so you have until 9:00 am EDT on Monday June 3, 2024 to decide whether you wish to resign and follow Joe Durnford's plan and take the high road.

In any event, we wish you the best as you pursue your passion and desire to do the right thing.

Sincerely,

Greg Gilpin-Payne
President

This is Exhibit ".... K ........" referred to in the affidavit
of Dan Bilzerian ...................................... sworn
(or affirmed) before me on 03/MAR/2025 ..............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-0372-01

ATRÁS

# MARCAS

Consultas Boletin de Recepción Documentos Oficiales

Volver

| Solicitud | Fecha Solicitud | Clase | Denominación | Solicitante/Titular | Registro |
|---|---|---|---|---|---|
| 2003416 | 21/01/2020 | 5 | IGNITE | Ignite International, Ltd. [US] | |
| 2119245 | 08/03/2021 | 34 | IGNITE | Ignite International, Ltd. [US] | 546795 |
| 2227287 | 08/04/2022 | 5 | IGNITE | Ignite International, Ltd. [US] | 587166 |
| 2227292 | 08/04/2022 | 35 | IGNITE | Ignite International, Ltd. [US] | |
| 2227304 | 08/04/2022 | 5 | IGNITE | Ignite International, Ltd. [US] | 587167 |
| 2227311 | 08/04/2022 | 9 | IGNITE | Ignite International, Ltd. [US] | 558207 |
| 2227314 | 08/04/2022 | 35 | IGNITE | Ignite International, Ltd. [US] | 572551 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | [US] | |
| 2227324 | 08/04/2022 | 9 | | Ignite International, Ltd. [US] | 558208 |
| 2227328 | 08/04/2022 | 34 | | Ignite International, Ltd. [US] | 558209 |
| 2227332 | 08/04/2022 | 35 | | Ignite International, Ltd. [US] | 575119 |
| 2276827 | 02/09/2022 | 33 | IGNITE | Ignite International, Ltd. [US] | |
| 2276835 | 02/09/2022 | 32 | IGNITE | Ignite International, Ltd. [US] | 583284 |
| 2352142 | 05/07/2023 | 34 | IGNITE | Ignite International, Ltd. [US] | 586597 |
| 2352147 | 05/07/2023 | 25 | | Ignite International, Ltd. [US] | 586598 |
| 2352151 | 05/07/2023 | 32 | | Ignite International, Ltd. [US] | 586599 |
| 2352156 | 05/07/2023 | 33 | | IGNITE INTERNATIONAL, LTD. [US] | 600591 |
| 2488055 | 07/10/2024 | 34 | SEX ADDICT | Ignite International, Ltd. [US] | |
| 24102202 | 18/11/2024 | 5 | SEX ADDICT | Ignite International, Ltd. [US] | |

| | | | | |
|---|---|---|---|---|
| | | | | [US] |
| 24102205 | 18/11/2024 | 35 | SEX ADDICT | Ignite International, Ltd. [US] |
| 24112670 | 17/12/2024 | 33 | SEX ADDICT | Ignite International, Ltd [US] |
| 24112689 | 17/12/2024 | 32 | SEX ADDICT | Ignite International, Ltd [US] |
| 24112693 | 17/12/2024 | 25 | SEX ADDICT | Ignite International, Ltd [US] |
| 24112698 | 17/12/2024 | 3 | SEX ADDICT | Ignite International, Ltd [US] |

La información presentada en este sistema, es una copia de la base de datos, con algunos minutos de diferencia en su actualización.

GOBIERNO DEL PARAGUAY | PARAGUÁI REKUÁI

This is Exhibit "....L........" referred to in the affidavit
of Dan Bilzerian.................................... sworn
(or ~~affirmed~~) before me on 03/MAR/2025..............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

Firstunion

## Firstunion

The Pioneer Enterprise of the Electronic Atomization Industry.

Appliances, Electrical, and Electronics Manufacturing

Shenzhen, Guangdong · 3K followers · 10K+ employees

Message ···

Home About Posts Jobs People

## Overview

First Union Group founded in 2004, is a Shenzhen-based leading company in global electronic vaporization industry.

First Union is committed to providing a one-stop solution for customers with world-leading electronic vaporization technologies.

We are honored to partner with over 200 brands across more than 80 countries and regions worldwide. Empowered by independent research and development capabilities, we have established key technological platforms, including nicotine atomization, non-combustion heating and functional substance atomization, which enable us to cover a wide range of products such as atomized electronic cigarettes, heat-not-burn(HNB) devices, and CBD products.

With seven leading innovation laboratories and six production bases located across key domestic and international markets, First Union has obtained multiple international management system certifications and qualifications, and our products have won various prestigious international design awards.

Our Strength
- OHSAS18001, ISO14001, HACCP, GMP, ISO9001:2008, CE, RoHS certified
- 680 R&D talents; 6700+ patent possession
- 460,000+ square meter factory areas with 10000+ staff
- 300+ electronic cigarette brands serviced around the world
- Internal R&D capability of production line machine automation
- Designated & well secured customized manufacturing areas for clients

Our Core Competencies:
- Customized Integrated Manufacturing Services
- Innovative Design & Secured Engineering solutions
- Excellent Supply Chain Management
- Familiar with government and customer Market Trends
- Well Connected Logistics & Customs Clearance Service

★You can know us more at :
www.chinafirstunion.com
https://www.facebook.com/firstunionofficial
https://www.instagram.com/firstuniontech/

https://twitter.com/firstuniontech
https://www.youtube.com/channel/UCU2vQTvMZ8KDHGuNG9qQIXA

Website
http://www.chinafirstunion.com

Verified page

August 14, 2024

Industry

Appliances, Electrical, and Electronics Manufacturing

Company size

10,001+ employees

260 associated members

Headquarters

Shenzhen, Guangdong

Founded

2004

Specialties

electronic cigarette manufacturer, e cigarette, electronic cigarette supplier, e cig, one stop solution provider, e liquid, vapor cigarette, electronic cigarette, e cig reviews, eGo cigarette, best e cig, e cigar, e cigarette starter kit, e cigarette cartomizer, and e pipe

## Locations (2)

Primary

Headquarter

Tangwei Industry Park, No.1 Jian'an Road, Fuyong Street, Baoan District, Shenzhen, Guangd

Get directions

Antuoshan Factory

Antuoshan Hi-tech Industry, Shajing, Bao'an District, Shenzhen, Guangdong 518104, CN

Get directions

This is Exhibit ".... M......." referred to in the affidavit of Dan Bilzerian.................................. sworn (or affirmed) before me on 03/MAR/2025..............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

7:26

Lifestyle March 25

jakeshields




keshields Paintball wars

Send message...

7:27

Lifestyle April 29

jakeshields



akeshields Fun day at the river with @iamjroc @danbilzerian @eric_xcmma @adventurechild

Send message...


7:29
International May 13
IGNITE
ALTERNATIVE
PRODUCTS EXPO
GNITE BOOTH
PRODUCT
NNOVATIONS!
DAN BILZERIAN
FOUNDER
MEDELLÍN, C
Add to your story
18-19
PLAZA MAYOR
BOOTH #705
Send message...


7:29
International May 25
nossodrinkoficial
IS HERE
Add to your story
Send message...

7:32

**Ignite International**
1.1K posts

osts Replies Highlights Articles Media Likes

1 16 16K

**Ignite International** @Ignite_Intl · 12/24/23 ···
Happy Holidays from @Ignite_Intl 🎄

Your Life, Your Way



3 60 11K

**Ignite International** @Ignite_Intl · 12/23/23 ···
See you soon 2024

FREQUENTLY USED

7:32

**Ignite International**
1.1K posts

Posts | Replies | Highlights | Articles | Media | Likes



1 · 8 · 12K

You reposted
**Ignite International** @Ignite_Intl · 12/15/23
New v80 out now

Your Life, Your Way | ignite.co




1 · 2 · 27 · 17K

You reposted
**Lynnie Marie** @MissLynnieMarie · 1/12/19
The ice castles were dope ❄️🙌 @IgniteCCo @DanBilzerian





**Ignite International** @Ignite_Intl · 12/15/23

New v80 out now

Your Life, Your Way | ignite.co

1 | 2 | 27 | 17K

Post your reply

7:31

**Ignite International**
1.1K posts

osts Replies Highlights Articles Media Likes

You reposted
**Matias Ortiz** @MatiasOrtiz1912 · 8/27/24 ···
Official launch of Ignite Vodka in Brazil is coming soon 🔜 🇧🇷 🍸 🐐

@Ignite_Intl @DanBilzerian @gusttavo_lima




2 2 5 6.3K

You reposted
**Goddess Ellyah** @Goddesselly... · 7/31/24 ···
Something HOT is coming soon 😍

Merch @Ignite_Intl ✨



7:32

**Ignite International**
1.1K posts

osts Replies Highlights Articles Media Likes

From Matias Ortiz

1 17 6.4K

**Ignite International** @Ignite_Intl · 12/15/23 ···
New v80 out now

Your Life, Your Way | ignite.co




1 2 27 17K

You reposted
**Matias Ortiz** @MatiasOrtiz1912 · 12/7/23 ···
#tbt Carnival in the city of Encarnacion, Paraguay ended successfully. Performing brand presence and activation, tastings of Ignite products. Being present at an event of this magnitude helped us get to know businessmen in the area and thus be able to close strategic alliances 🤝



7:32

**Ignite International**
1.1K posts

Posts Replies Highlights Articles Media Likes

You reposted

**Ignite International** @Ignite_Intl · 11/9/23
Dubai

Your Life, Your Way | #TBT




1 19 269 24K

**Ignite International** @Ignite_Intl · 11/11/23
Thank you for your service



7:32

**Ignite International**
1.1K posts

osts Replies Highlights Articles Media Likes

**Ignite International** @Ignite_Intl · 11/9/23
Dubai

Your Life, Your Way | #TBT




1 19 269 24K

You reposted
**Matias Ortiz** @MatiasOrtiz1912 · 10/31/23
Taking advantage of the large number of people who attended the event, we carried out tastings of the Ignite products, the already well-known nicotine vapes, launching the vodka and tequila on the market, having a more than positive acceptance
@Ignite_Intl x Boss Company PY

7:32

**Ignite International**
1.1K posts

Posts Replies Highlights Articles Media Likes

**Ignite International** @Ignite_Intl · 11/9/23
Dubai

Your Life, Your Way | #TBT




1 19 269 24K

You reposted
**Matias Ortiz** @MatiasOrtiz1912 · 10/31/23
Taking advantage of the large number of people who attended the event, we carried out tastings of the Ignite products, the already well-known nicotine vapes, launching the vodka and tequila on the market, having a more than positive acceptance 💯 🐐
@Ignite_Intl x Boss Company PY

7:32

**Ignite International**
1.1K posts

Posts | Replies | Highlights | Articles | Media | Likes

0:04

3 | 4 | 53 | 9.5K

**Ignite International** @Ignite_Intl · 10/12/23
Your Life, Your Way

ignite.co




From Dan Bilzerian

6 | 69 | 6.3K

**Ignite International** @Ignite_Intl · 10/3/23
Three amigos

Your Life, Your Way | ignite.co

7:33

**Ignite International**
1.1K posts

Posts Replies Highlights Articles Media Likes

From Dan Bilzerian

6 · 69 · 6.3K

**Ignite International** @Ignite_Intl · 10/3/23
Three amigos

Your Life, Your Way | ignite.co




1 · 3 · 24 · 6.3K

**Ignite International** @Ignite_Intl · 10/1/23
Happy October

Your Life, Your Way




7:33
Ignite International
1.1K posts
Posts Replies Highlights Articles Media Likes
1 3 24 6.3K
Ignite International @Ignite_Intl · 10/1/23
Happy October
Your Life, Your Way
0:50
From Dan Bilzerian
2 17 157 10K
Ignite International @Ignite_Intl · 9/28/23
Scorching

7:33

**Ignite International**
1.1K posts

osts Replies Highlights Articles Media Likes



1 3 24 6.3K

**Ignite International** @Ignite_Intl · 10/1/23
Happy October

Your Life, Your Way



From Dan Bilzerian

2 17 157 10K

**Ignite International** @Ignite_Intl · 9/28/23
Scorching 🥵



7:33

**Ignite International**
1.1K posts

Posts Replies Highlights Articles Media Likes

2 17 157 10K

**Ignite International** @Ignite_Intl · 9/28/23
Scorching 🥵




4 6 156 12K

**Ignite International** @Ignite_Intl · 9/27/23
Your Life, Your Way

ignite.co



7:33

**Ignite International**
1.1K posts

osts Replies Highlights Articles Media Likes



From Dan Bilzerian

6 55 5.6K

**Ignite International** @Ignite_Intl · 9/21/23
📸: Arte Agave 2023 in NYC

Your Life, Your Way | ignitespirits.co | #TBT



5K


7:33
Ignite International
1.1K posts
osts Replies Highlights Articles Media Likes
9 5K
Ignite International @Ignite_Intl · 9/18/23
Your Life, Your Way
ignite.co
From Dan Bilzerian
5 53 6.2K
Ignite International @Ignite_Intl · 9/16/23
InterTabac 2023

7:33

**Ignite International**
1.1K posts

Posts Replies Highlights Articles Media Likes



9 · 5K

**Ignite International** @Ignite_Intl · 9/18/23
Your Life, Your Way

ignite.co



From Dan Bilzerian

5 · 53 · 6.2K

**Ignite International** @Ignite_Intl · 9/16/23
InterTabac 2023 🇩🇪




7:33
Ignite International
1.1K posts
osts Replies Highlights Articles Media Likes
9
5K
Ignite International @Ignite_Intl · 9/18/23
Your Life, Your Way
ignite.co
From Dan Bilzerian
5
53
6.2K
Ignite International @Ignite_Intl · 9/16/23
InterTabac 2023

7:33

**Ignite International**
1.1K posts

osts Replies Highlights Articles Media Likes



9 5K

**Ignite International** @Ignite_Intl · 9/18/23
Your Life, Your Way

ignite.co



From Dan Bilzerian

5 53 6.2K

**Ignite International** @Ignite_Intl · 9/16/23
InterTabac 2023 🇩🇪




7:33
Security
iMessage
now
osts Replies Highlights Articles Media Likes
— Jacques Cousteau
0:17
1 2 13 5.4K
You reposted
Dan Bilzerian @DanBilzerian · 8/18/23
Q: If someone from the 1950s suddenly appeared today, what would be the most difficult thing to explain to them about life today?
in my pocket that is

7:33

← **Ignite International**
1.1K posts

osts | Replies | Highlights | Articles | Media | Likes

45 · 153 · 1.4K · 680K

**Ignite International** @Ignite_Intl · 8/16/23 ···
Best selling vapes in South America.

Your Life, Your Way | ignite.co



2 · 3 · 21 · 5.7K

You reposted
**Dan Bilzerian** @DanBilzerian · 8/15/23 ···
Good to be home



7:34

**Ignite International**
1.1K posts

Posts Replies Highlights Articles Media Likes

**Dan Bilzerian** @DanBilzerian · 7/27/23
Blend up a seedless watermelon add fresh coconut water 50\50. Best tasting and functional intraworkout drink hands down. Could add sea salt and fresh mint leaves

47 75 1.6K 566K

**Ignite International** @Ignite_Intl · 7/27/23
👋 👋

#TBT to CHAMPS arrival in Vegas 🥵



4 42 7.4K

**Ignite International** @Ignite_Intl · 7/25/23
hyp-no-tize: to capture the whole attention of someone 😏

7:34

**Ignite International**
1.1K posts

Posts Replies Highlights Articles Media Likes

4 42 7.4K

**Ignite International** @Ignite_Intl · 7/25/23
hyp·no·tize: to capture the whole attention of someone 😏




2 8 45 18K

**Ignite International** @Ignite_Intl · 7/24/23
Cheers to National Tequila Day!

Bring our award-winning selection into your world ⤵️

bit.ly/IgniteTequila | #NationalTequilaDay

7:34

**Ignite International**
1.1K posts

osts Replies Highlights Articles Media Likes

**Dan Bilzerian** @DanBilzerian · 7/20/23
Nothing feels better than winning when people are patiently waiting to see you fail. Ignite vapes now in SA, Africa, EU, UAE, and Russia.



86 273 3.1K 922K

**Ignite International** @Ignite_Intl · 12/13/22
Save the date- See you soon Texas!



7:34

**Ignite International**
1.1K posts

osts Replies Highlights Articles Media Likes

You reposted

**Dan Bilzerian** @DanBilzerian · 11/24/22
I'm thankful that I've been able to turn all of my dreams into reality



151 627 6.8K

**Ignite International** @Ignite_Intl · 11/1/22
Your life, your way




7:34
Ignite International
1.1K posts
osts
Replies
Highlights
Articles
Media
Likes
0:29
5
11
150
You reposted
Dan Bilzerian @DanBilzerian · 11/1/22
After witnessing all these wack ass Halloween parties, it's clear imma have to come back and do it right w
@Ignite_intl

7:34

**Ignite International**
1.1K posts

Posts | Replies | Highlights | Articles | Media | Likes

**Ignite International** @Ignite_Intl · 7/22/21
THE SETUP by Dan Bilzerian is Available Now for Preorder. Ignite.co




6 · 10 · 108

**Ignite International** @Ignite_Intl · 6/21/21
ignitecbd.co/blogs/unapolog...

#ignite #gummy #broadspectrum #isolate #wellness #igniteyourhealth



7:35

**Ignite International**
1.1K posts

Posts | Replies | Highlights | Articles | Media | Likes

1 3

**Ignite International** @Ignite_Intl · 10/21/20
ZRO delivers an eye-opening burst of smooth, sustained, and controlled "feel good" energy
#igniteyoursenses
bit.ly/3l1W4wr




2 18

**Ignite International** @Ignite_Intl · 10/20/20
wearignite.co/collections/wo...

This is Exhibit "....N......." referred to in the affidavit
of Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025.............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026


358
PREMIUM VODKA
VODKA
IGNITE
"IT'S A LIFESTYLE."
– DAN BILZERIAN

This is Exhibit "....O......." referred to in the affidavit
of Dan Bilzerian.................................... sworn
(or affirmed) before me on 03/MAR/2025.............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada
LL

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

**JAKUB P. MEDRALA, ESQ.**
Nevada Bar No. 12822
**The Medrala Law Firm, Prof. LLC**
615 S. 6th Street
Las Vegas, Nevada 89101
(702) 475-8884
(702) 938-8625 Facsimile
jmedrala@medralaw.com
*Attorney for Plaintiff*
*Dan B. Bilzerian*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DAN BRANDON BILZERIAN, an Individual,<br><br>Plaintiff,<br><br>vs.<br><br>IGNITE INTERNATIONAL BRANDS, LTD., a Foreign Corporation; IGNITE INTERNATIONAL, LTD., a Foreign Corporation; PAUL BILZERIAN, an Individual; SCOTT ROHLEDER, an Individual; RUPY DHADWAR, an Individual,<br><br>Defendants. | **COMPLAINT**<br>**JURY TRIAL DEMANDED**<br><br>Case No.: 2:24-cv-2101 |

Plaintiff DAN BRANDON BILZERIAN ("Plaintiff" or "Dan") complains against Defendants IGNITE INTERNATIONAL BRANDS, LTD., IGNITE INTERNATIONAL, LTD., PAUL BILZERIAN, SCOTT ROHLEDER, and RUPY DHADWAR (collectively "Defendants") as follows:

**I.**

**NATURE OF THE ACTION**

This action has its origin in a dispute between the Plaintiff Dan Bilzerian and Defendants Paul Bilzerian ("Paul"), Scott Rohleder ("Rohleder"), and Rupy Dhadwar ("Dhadwar") over

control of Ignite International Brands, Ltd. ("Ignite"); Plaintiff's unlawful removal from Ignite, which was orchestrated by Paul, Rohleder, and Dhadwar; and the subsequent unlawful use of Plaintiff's name and likeness by the individual Defendants and the companies they control.

Plaintiff Bilzerian ("Dan") is the founder of Defendant Ignite and the majority shareholder who was unlawfully pushed out of Ignite through a series of unlawful acts orchestrated by Paul and executed by Rohleder and Dhadwar.

Paul and Rohleder are criminals who were recently indicted (together with Ignite) by the United States of America in the U.S. District Court for the Central District of California (Case No. 2:24-cr-00569). Dhadwar is Ignite's purported CEO; however, his main role at Ignite consists of executing orders from Paul and Rohleder.

Despite the Plaintiff's removal from Ignite, Defendants continued to use and exploit Dan's recognizable likeness for their own benefit while tarnishing his name and reputation on the backdrop of their criminal acts.

## II.

## JURISDICTION AND VENUE

1. Jurisdiction in this case is based on diversity of citizenship of the parties and the amount in controversy. Plaintiff is a resident of Nevada, and Defendants are foreign corporations and residents of foreign states and countries.

2. The amount in controversy exceeds the sum $75,000, exclusive of interest and cost.

3. Additionally, federal jurisdiction in this case is appropriate because this case centers on federal questions. Among other causes of action, Plaintiff brings this complaint pursuant to 17 U.S.C. § 501 and 15 U.S.C. § 1125. Federal district courts have original jurisdiction over such claims pursuant to 28 U.S.C. § 1338.

4. This Court has personal jurisdiction over Defendants because they are either a foreign corporation or residents of foreign states and/or countries with sufficient contacts with the U.S. to render jurisdiction proper in any U.S. court, including the United States District Court for the District of Nevada. Defendants purposefully availed themselves for doing business in the United States and are subject to jurisdiction in any U.S. court.

5. In addition, this Court has personal jurisdiction over Defendants because the claims in this Complaint relate to their maintenance and operation of many websites and social media accounts that are interactive and fully accessible to residents of this District.

6. Defendants have a large portion of customers in the United States, and much of the content distributed by Defendants on the World Wide Web originates from the U.S., including Plaintiff's content.

7. The illegal use of Plaintiff's name and likeness, as well distribution of his works takes place partially, if not entirely in the U.S.

8. Venue is proper under 28 U.S.C. § 1391(b) and (c).

## III.

## PARTIES

9. Plaintiff Dan is a resident of Nevada. Plaintiff is a world-famous professional poker player and social media influencer who gained fame for portraying a distinct, extravagant lifestyle, as well as founding Ignite. He is the son of Defendant Paul.

10. Defendant Ignite International Brands, Ltd. ("Ignite") is a Canadian corporation with a principal place of business in the State of Texas. Ignite sells electronic cigarettes, apparel, alcohol, water bottles, and other brand products.

11. Defendant Ignite International, Ltd. ("Ignite US") is a Wyoming corporation domiciled in California and Texas, and it is a wholly owned subsidiary of Ignite. Upon

information and belief, Ignite US, together with Ignite, markets Ignite's products and is a licensor of Ignite's intellectual property rights.

12. Defendant Paul Bilzerian ("Paul") is a resident of St. Kitts and Nevis, and he was previously an American businessman and corporate raider. In 1989, Paul was convicted for securities fraud in the U.S. District Court for the Southern District of New York and sentenced to prison.

13. In 1993, the United States Securities and Exchange Commission ("SEC") obtained civil judgments against defendant Paul for his fraudulent activities. Upon information and belief, Paul controls some of Ignite's shareholders, including International Investments, Ltd. ("International Investments").

14. Defendant Rohleder is a resident of Florida. He is Paul's "right-hand" and a proxy in the United States. At various times, Rohleder served as a CEO of Ignite. Rohleder acts at the direction and for the benefit of Paul.

15. Paul, Rohleder, and Ignite were recently indicted by the United States of America in the U.S. District Court for the Central District of California for their role in a conspiracy to defraud the United States, wire fraud, and securities fraud, to name a few.

16. Defendant Dhadwar is a citizen of Canada. He is the purported CEO of Ignite and a puppet of Rohleder and Paul. At all times relevant here, he acted at the direction and for the benefit of Paul and Rohleder.

## IV.

## GENERAL ALLEGATIONS

17. Plaintiff Dan is an internationally known poker player, businessman, and a social media influencer. He gained international fame for portraying a distinct, extravagant lifestyle, as well as founding Ignite. He is regularly offered from hundreds of thousands to millions of dollars

to promote lifestyle brands and makes a large part of his income from utilizing his public image.

18. In 2017, Dan founded Ignite. Ignite is a lifestyle brand selling disposable vapes, spirits, and apparel. While not directly involved in Ignite's operations, Dan's name, likeness, and personality became the essence of Ignite's brand, including all of the social media and other advertising and promotion.

19. Until December 2023, Dan served as the nominal CEO of Ignite. However, he was not directly involved in Ignite's operations and had a dispute with other Ignite shareholders—who later turned out to be Paul's agents—over the course of Ignite's business, the quality of Ignite's products, and Ignite's leadership. In essence, Dan complained about the mismanagement of Ignite and Rohleder and Paul's behind-the-scenes acts that caused harm to Ignite's business.

20. During the same time, he was threatened by Rohleder and Paul's other agents that he would be fired from the position of Ignite's CEO.

21. In response, on December 18, 2023, Dan expressly advised the then-board of directors of Ignite that if they fired him as the CEO of Ignite, they would "lose the multimillion-dollar benefit of [his] social media posting" and "lose the rights to use [his] name and likeness."

22. Despite this, on December 21, 2023, Ignite's board of directors, which was controlled by Rohleder and Paul, terminated Dan as the CEO of Ignite. At the regularly-scheduled board meeting where this occurred, Dan again told the board that Ignite had no right to use his name, likeness, and image.

23. In June 2024, Rohleder and Paul took things even further. On June 2, 2024, they purported to remove Dan from the position of chairman of the board with Ignite and unilaterally and unlawfully seize control of Ignite's operations. This was done without the necessary 67% shareholder vote to remove a director.

24. Despite this, Ignite and the remaining Defendants continued to use Dan's name, image, and likeness, as well as copyrighted photographs, without his permission and without providing him with any compensation.

25. Among other things, the Defendants, without Dan's consent:

- Kept his name and image on numerous Ignite websites within their control, making him a central component of the Ignite brand, despite not compensating him for this and unlawfully removing him from Ignite;
- Crated an Instagram account called @ignite.intl (which the Defendants, and not Dan, control) and posted and pinned Dan's name, likeness, and image in various "stories" on that account;
- Used Dan's name and image to promote sales of vapes, alcohol, clothing, and other products;
- Used photographs personally taken by Dan on social media accounts; and
- Attempted to seize, through Canadian court proceedings, Dan's Instagram account.

26. Moreover, because of Rohleder and Paul's criminal acts, on September 26, 2024, Ignite, Paul. and Rohleder were indicted by the United States of America in the U.S. District Court for the Central District of California (Case No. 2:24-cr-00569).

27. In addition, on September 27, 2024, Ignite, Paul, Rohleder, and its proxies Paul Dowdall, John Schaefer, and International Investment, were sued by the SEC in the United States District Court for the Southern District of New York (Case No. 1:24-cv-07331).

28. The indictment and the SEC lawsuit received extensive media coverage throughout the United States and the world.

29. This coverage, despite the lack of Dan's involvement in any criminal activities

perpetuated by Rohleder, Paul, and their proxies, brought Dan negative press specifically because of his affinity with Ignite's brand and his continued presence on Ignite's websites, social media, and marketing materials.

30. After the indictment, Rohleder resigned from the purported position of Ignite's CEO and appointed to this position his and Paul's puppet, Dhadwar, whose actions remain fully and illegally controlled by Rohleder and Paul.

31. Due to Ignite's continuing refusal to cease from using Dan's name and likeness, among other things, on November 4, 2024, through his counsel, Dan again demanded that Ignite cease and desist from using his name and likeness and otherwise exploiting his intellectual property rights, to no avail.

32. Dhadwar, now the purported CEO of Ignite, decided to continue to unlawfully exploit Dan's name and likeness and refused to remove it from Ignite's marketing materials.

33. Moreover, because of his unlawful removal from Ignite, Dan decided to pursue alternative business opportunities, which included, among other things, selling lifestyle products under his own, separate brands.

34. In response, Ignite, Paul, Rohleder, and Dhadwar engaged in a smear campaign against Dan in which they represented, and continue to represent, to potential suppliers and distributors of Dan's companies that Dan is legally prevented from competing in any way with Ignite's business.

35. Ignite, Paul, Rohleder, and Dhadwar have falsely represented to Dan's potential suppliers and distributors that Dan is allegedly subject to a noncompete agreement with Ignite that prevents him from conducting any business that is similar to Ignite's business.

36. These representations are utterly false and their sole aim is to discourage anyone from working with Dan or his entities and to prevent Dan from seizing any business opportunities

outside of Ignite.

V.

**FIRST CLAIM FOR RELIEF—MISAPPROPRIATION OF PLAINTIFF'S STATUTORY AND COMMON LAW RIGHT OF PUBLICITY**

37. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

38. Plaintiff is a universally known and highly recognizable personality who has received widespread recognition for his distinct lifestyle and social media presence that has been viewed by tens of millions of people throughout the United States and all over the world.

39. Through his hard work and use of his talents in the field of entertainment, Dan's likeness and persona have become very valuable and are invested with substantial goodwill in the eyes of the public. Accordingly, Dan licenses the right to use of his name and likeness for use in the United States and throughout the world—a property right with substantial commercial value—which he does not agree to transfer, in whole or in part, to Defendants for any purposes.

40. Defendants' use of Dan's likeness on their websites, social media posts, or other marketing materials without Dan's consent constitutes a violation and misappropriation of Plaintiff's common law right of publicity in that said Defendants, and each of them, misappropriated Dan's photograph, likeness, and persona and used it in a prominent and clearly recognizable manner for commercial purposes to advertise and promote Ignite and to generally promote and enhance Defendants' goodwill and increase their profits.

41. Defendants' misappropriation of Plaintiff's valuable publicity and property rights, as set forth herein above in violation of Nevada Revised Statutes ("NRS") 597.700 et seq. and other applicable law, has resulted in a dilution of the value of the aforesaid publicity and property rights, thereby diminishing the value of said publicity and property rights, all to the detriment and damage of Plaintiff and has resulted in the unjust enrichment of all of the

Defendants.

42. Unless temporarily, preliminarily, and permanently enjoined and restrained by order of this Court, Defendants' continued acts will cause Plaintiff severe and irreparable injury, which cannot adequately be compensated by monetary damages.

43. By reason of the foregoing, Plaintiff is entitled to preliminary and permanent injunctive relief, enjoining the further commercial exploitation of his name, likeness, and identity by any of the Defendants, including but not limited to an injunction against any further broadcast, exploitation or use of Dan's name, likeness, persona, or pictures.

44. As a direct and proximate result of the aforesaid wrongful acts of Defendants, and each of them, Plaintiff has been damaged in an amount that is not yet fully ascertainable but which is in excess of the jurisdictional limit of $75,000.

45. The wrongful conduct of Defendants, and each of them, was fraudulent, oppressive, and malicious and done with conscious disregard for the rights of Plaintiff. Therefore, Plaintiff is entitled to recover from Defendants, and each of them, exemplary and punitive damages.

## VI.

## SECOND CLAIM FOR RELIEF—UNFAIR COMPETITION AND DECEPTIVE TRADE PRACTICES

46. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

47. By virtue of the manner in which Defendants, and each of them, have improperly exploited the name, likeness, and identity of Dan, Defendants, and each of them, have committed acts of unfair, deceptive, confusing, untrue, and/or misleading advertising, unfair competition, and unfair business practices, and the acts of Defendants described herein above constitute unfair competition, deceptive trade practices, and false advertising in violation of, among other things,

NRS 598.0915(2), (3), and (5). In doing the things alleged, Defendants have misled or at least substantially confused the general public.

48. The conduct of Defendants alleged herein is such that Defendants falsely, unfairly, deceptively, unlawfully, and/or misleadingly stated, suggested, or implied that Dan endorsed the Defendants and/or their products and merchandise and that Dan consented to the exploitation of his name, likeness, and identity in the manner alleged in this Complaint, all in a manner likely to mislead the general public.

49. The use of his name, likeness, and identity in this context unlawfully and falsely misled, deceived, substantially confused, and/or misinformed the general public.

50. Defendants, and each of them, knew that their conduct alleged herein would mislead, deceive, substantially confuse, and/or misinform the general public, all for the Defendants' pecuniary gain and to enhance Defendants' goodwill through association with and the apparent endorsement by Dan.

51. As a direct and proximate result of the conduct of Defendants, and each of them, as alleged herein, Defendants have earned profits in an amount that has yet to be ascertained and have otherwise indirectly benefited or profited from the commercial use of Dan's name, likeness, and persona without his consent. Plaintiff is entitled to receive said profits and benefits that each of the Defendants should be required to disgorge, as a result of the conduct alleged in this complaint.

52. As a result of Defendants' wrongful conduct as alleged herein, Plaintiff seeks disgorgement from Defendants, and each of them, of any and all profits or other consideration obtained by or earned by each the Defendants as a proximate result of their deceptive trade practices, false advertising, and unfair competition in violation of NRS 598.0915 and other applicable statutes and common law. Plaintiff alleges that the amount of the wrongfully obtained

revenues is not yet fully ascertainable but is believed to be well in excess of the jurisdictional limit of $75,000.

53. Any continued, unauthorized commercial use by Defendants of Dan's name, likeness, or persona that is deceptive, misleading, and confusing to the viewing public will cause Plaintiff irreparable harm and cannot be adequately compensated in money damages. As a result of Defendants' wrongful conduct, Plaintiff seeks issuance of and is entitled to temporary, preliminary, and permanent injunction, enjoining Defendants, and each of them, and their agents and employees, from engaging in the conduct alleged herein constituting unlawful and unfair business practices, including but not limited to, Defendants' use of Dan's name, likeness, and identity for commercial purposes in a manner that is misleading and confusing to potential customers that injures Plaintiff and that unjustly enriches Defendants.

54. The aforementioned acts of Defendants, and each of them, were done knowingly, intentionally, or with a conscious or reckless disregard of Plaintiff's rights and with the intent to vex, injure, or annoy Plaintiff, such as to constitute oppression, fraud, or malice, thus entitling Plaintiff to exemplary and punitive damages in an amount appropriate to punish or make an example of Defendants, and each of them, and to deter such conduct in the future, the exact amount of such damages subject to proof at the time of trial.

## VII.

## THIRD CLAIM FOR RELIEF—VIOLATION OF 15 U.S.C. § 1125(a) (LANHAM ACT)

55. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

56. Defendants, and each of them, violated Section 43 of the Lanham Act, 15 U.S.C. § 1125(a) and (c), by expressly and impliedly making false designations or representations of origin when engaging in the following acts, including (1) misappropriating Dan's photograph, likeness, and persona in advertising and promoting Ignite after December 21, 2023, including on

Ignite's websites, social media, and marketing materials, and (2) misappropriating Dan's photograph, likeness, and persona in generally enhancing the goodwill of Defendants.

57. As set forth above, Defendants, and each of them, have intentionally and knowingly misappropriated, exploited, and used Plaintiff's above-described valuable property in connection with the goods and services advertised and promoted by Defendants for their own gain, profits, promotion, and benefit.

58. Defendants' misappropriation of Plaintiff's valuable publicity and property rights as set forth above constitutes false and deceptive advertising and promotion that was intended to cause, and has caused, confusion and deception of the consuming public by falsely and fraudulently suggesting and representing by the aforesaid misappropriation, among other things, that after December 21, 2023, Dan endorsed, sponsored, sanctioned, authorized, or approved of Defendants' use of Dan's image and identity in Defendants' business enterprises and activities.

59. Defendants' misappropriation of Plaintiff's valuable publicity and property rights, as set forth hereinabove, has resulted in a dilution of the value of the aforesaid publicity and property rights, thereby diminishing the value of the aforesaid valuable publicity and property rights, all to the detriment and damage of Plaintiff.

60. As a direct and proximate result of the aforesaid wrongful acts of Defendants, and each of them, Plaintiff has suffered damage in an amount that is not yet fully ascertainable but which is in excess of the jurisdictional limit of $75,000.

61. Plaintiff is entitled pursuant to 15 U.S.C. § 1117(a) to three (3) times Defendants' profits, or actual damages, whichever is greater, plus costs of suit.

///

///

///

## VIII.

## FOURTH CLAIM FOR RELIEF—VIOLATION OF 15 U.S.C. § 1125(c)

## (LANHAM ACT)

62. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

63. Dan's name and likeness, as well as other aspects of his identifiable persona, have, through regular, frequent, but carefully monitored and controlled commercial use, become famous trademarks and service marks.

64. Defendants have knowingly and willfully traded on and intended to trade on Dan's reputation and willfully and intentionally diluted Dan's trademarks and service marks by unlawfully using Dan's name, likeness, and distinctive marks to market, promote, and advertise Defendants' products and services and to enhance Defendants' goodwill.

65. Defendants' wrongful conduct and misappropriation and use of Dan's name, likeness, persona, and distinctive marks lessen the ability or capacity of the trademarks to identify, differentiate, and distinguish the services and/or goods advertised, sponsored, or offered by, or in conjunction with, Plaintiff.

66. Defendants' conduct is wrongful and in violation of 15 U.S.C. § 1125(c).

67. Through their wrongful conduct as alleged above, Defendants have damaged Plaintiff's business reputation and have diluted the quality as well as the uniqueness and distinctiveness of Dan's name, likeness, image, and distinctive marks. Defendants' wrongful conduct in violation of 15 U.S.C. § 1125(c) has damaged and caused irreparable injury to Plaintiff.

68. Plaintiff is entitled to a preliminary and permanent injunction issued against Defendants, and each of them, to enjoin and prohibit any continued use, exploitation, or dilution of Dan's name, likeness, image, or distinctive marks, all as provided in 15 U.S.C. § 1125(c).

69. Based on the intentional and willful conduct of Defendants, Plaintiff is entitled to three times the amount of Defendants' profits or three times the amount of Plaintiff's damages, whichever is greater, together with reasonable attorney fees pursuant to 15 U.S.C. § 1117(a) and (b); and, based on Defendants' willful conduct in violation of § 1125(c), Defendants should be ordered to turn over all tangible items that are in the possession of any of the Defendants and that bear the trademarks.

## IX.

## FIFTH CLAIM FOR RELIEF—ACCOUNTING

70. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

71. Based on the wrongful conducts of Defendants, and each of them, as alleged above, Plaintiff is entitled to a full accounting from each of the Defendants regarding each and every unauthorized use of Dan's name and/or likeness and identity for a commercial purpose and a full accounting regarding the gross revenue received by each of the Defendants as a direct or indirect result of said unauthorized and wrongful acts of each of the Defendants as alleged above.

## X.

## SIXTH CLAIM FOR RELIEF—UNJUST ENRICHMENT

72. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

73. As a result of the wrongful acts and conduct of Defendants, and each of them, as alleged above, Defendants have been unjustly enriched and should be required and ordered to disgorge to Plaintiff all of the revenues and profits received by each of the Defendants as a direct or indirect result of Defendants' wrongful conduct.

///

///

XI.

## SEVENTH CLAIM FOR RELIEF—INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

74. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

75. When the Defendants learned that the Plaintiff launched separate brands and business ventures from Ignite, they engaged in a campaign aimed at disrupting Dan's relationships with suppliers and distributors by misrepresenting to them that neither Dan nor his business ventures can enter into any business relationships with such distributors or suppliers because of Dan's alleged noncompete agreement with Ignite.

76. The Defendants specifically stated to such suppliers and distributors that Dan cannot produce or sell any products or services that compete in any way with Ignite, and they threatened that anyone who facilitates such competing ventures will be sued by Ignite.

77. The Defendants made such false representations with the intent to harm Dan and prevent him from entering into any business relationships with suppliers or distributors of his products.

78. Through their wrongful conduct as alleged above, Defendants have damaged Plaintiff's prospective business relationships and caused irreparable injury to the Plaintiff.

79. Plaintiff is entitled to a preliminary and permanent injunction issued against Defendants, and each of them, to enjoin and prohibit any continued representations to anyone that Dan cannot compete with Ignite's business.

80. As a direct and proximate result of the aforesaid wrongful acts of Defendants, and each of them, Plaintiff has been damaged in an amount that is not yet fully ascertainable but which is in excess of the jurisdictional limit of $75,000.

81. Plaintiff is informed and believes and thereon alleges that the wrongful conduct of Defendants, and each of them, was fraudulent, oppressive, and malicious and done with conscious disregard for the rights of Plaintiff. Therefore, Plaintiff is entitled to recover from Defendants, and each of them, exemplary and punitive damages.

## XII.

## EIGHTH CLAIM FOR RELIEF—DECLARATORY RELIEF

82. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

83. Despite the lack of any enforceable noncompete agreement, or other legal mandate, Defendants contest and publicly misrepresent that Dan is prevented from conducting any business activities that compete with Ignite's business.

84. As a result, Plaintiff is entitled to a declaration by this Court, in accordance with NRS 30.040, that Dan is not prevented from conducting any business activities that compete with Ignite's or other businesses of the Defendants.

## XIII.

## NINTH CLAIM FOR RELIEF—COPYRIGHT INFRINGEMENT

85. Plaintiff repeats and incorporates the allegations above as fully set forth herein.

86. Plaintiff is the copyright owner of the various pictures and videos unlawfully used on Ignite's websites and social media platforms that are controlled by the Defendants.

87. Defendants have violated the exclusive rights of the Plaintiff as copyright owner as that term is used in 17 U.S.C. § 501.

88. Defendants have violated the copyright owner's exclusive rights to reproduce such pictures and videos and other materials of Plaintiff to prepare derivative works and to distribute copies as defined in 17 U.S.C. § 106(1)-(3).

89. Upon information and belief, Defendants have infringed on the copyright protection of other works belonging to Plaintiff.

90. Plaintiff seeks an injunction prohibiting Defendants from infringing on Plaintiff's copyrights pursuant to 17 U.S.C. § 502.

91. Plaintiff seeks monetary damages as provided for by statute. 17 U.S.C. § 504.

92. The exact amount of damages is presently unknown; however, upon information and belief, the infringement was substantial, ongoing, and willful. Accordingly, statutory damages of $150,000 per work infringed upon may be appropriate if actual damages are found to be less than this amount. 17 U.S.C. § 504(c)(2).

93. Plaintiff seeks an award of attorney fees as allowed by statute. 17 U.S.C. § 505.

## XIV.

## JURY DEMAND

94. Pursuant to Fed. R. Civ. P. 38, Plaintiffs demand trial by jury on all issues raised in this action.

**WHEREFORE**, the Plaintiffs pray that this Court enter a judgment:

1. Awarding Plaintiff injunctive relief banning Defendants' continued infringement of the Plaintiff's right of publicity, trademarks, and copyrights;

2. Awarding Plaintiff injunctive relief banning Defendants' continued interference with the Plaintiff's prospective economic advantage;

3. Awarding Plaintiff economic damages in excess of $75,000, the exact amount to be determined at trial;

4. Awarding Plaintiff noneconomic damages in excess of $75,000, the exact amount to be determined at trial;

5. Awarding Plaintiff treble damages;

6. Awarding Plaintiff exemplary or punitive damages;

7. Awarding Plaintiff pre-judgment and post-judgment interest;

8. Awarding Plaintiff reasonable attorney fees and costs incurred in the prosecution of this action;

9. Awarding Plaintiff a declaratory judgment finding that he is not prevented from competing with Ignite or any of the other Defendants; and

10. Granting such other relief as the Court may deem just and proper.

DATED this 12th day of November, 2024.

THE MEDRALA LAW FIRM, PLLC

/s/ Jakub P. Medrala

**JAKUB P. MEDRALA, ESQ.**
Nevada Bar No. 12822
615 S. 6th Street
Las Vegas, Nevada 89101
*Attorney for Plaintiff*
*Dan B. Bilzerian*

This is Exhibit "...P........" referred to in the affidavit
of .Dan Bilzerian.................................... sworn
(or ~~affirmed~~) before me on 03/MAR/2025..............................

A Commissioner for taking affidavits for ~~British Columbia~~ Nevada

LILIA LISCOVSCHI
NOTARY PUBLIC
STATE OF NEVADA
APPT. NO. 22-9372-01
MY APPT. EXPIRES MARCH 29, 2026

WARNING: This product contains nicotine. Nicotine is an addictive chemical.



# DISCOVER THE V80 VAPE DEVICE: IGNITE'S NEWEST VAPE REVOLUTION

March 12, 2024 4 min read



Our customers loved the V60, so we decided to kick it up a notch and introduce a bigger and better vape to our collection—theV80 Vape! This vape provides a next-level vaping experience and is available in 15 different delicious and smooth flavors. The sleek design and unmatched performance puts the V80 vape in a league of its own. It's smooth, sleek, and discreet—everything you need.

Ready to trade in one of our competitor's vapes or level up from one of ours? Here's everything you need to know about the product features and flavors of our newest electronic vapedevice.

## PRODUCT DESCRIPTION

The V80 vapedeviceis a game-changing vape with superior performance. It features a 550 mAh rechargeable battery and has up to 8000+ puffs. It's made withtobacco-derived nicotineand comes in over 15 different vape flavors.

Just like any of our otherelectronicvape devices,it's designed with superior components built to last. From the heating elements and coil to the richvape flavorswe offer.

The best part? All IGNITE vapes have a defect rate of less than .005%. So you can find comfort in the quality from your first to last puff.

## PRODUCT FEATURES

TheV80is unlike any other vape we've brought to market. There are more puffs, more flavor, and a fresher vaping experience. Here's what you can look forward to:

### NEW CUTTING-EDGE DESIGN

TheV80 vape has a black mirror finish with an ergonomic and discreet design. It's also paired with a PCTG food-grade metal tank. PCTG is a medical-grade plastic. We use PCTG because it's more resistant to cracks and general wear and tear. Better yet, it's also approved by the FDA for use in the food industry.

### CE CERTIFIED

Our newestelectronic vapedevices are also CE-certified, which means they have been assessed and deemed to meet EU safety requirements. Use our vape locator tool tofind avape shop near you.

## ALTITUDE TESTED

OurV80 vape test has also undergone altitude testing. This is a rigorous process where theelectronic vape devicesare tested at different air pressure levels. So whether you're 10,000 feet in the sky, hiking on the weekend, or enjoying a few puffs in the Badwater Basin, you can feel confident ourV80 vapedevice won't leak.

## SMOOTH, DELICIOUS HITS

At IGNITE, we always deliver. We never cut corners or half-ass anything we do, and that's our promise to our customers. When we decided to bring the V80 vape to market, we knew we would need to one-up every other vaping experience (even our own). TheV80 vape offers smooth, delicious hits for over 8000+ Puffs.

## RECHARGEABLE

TheV80 vape is also rechargeable, so you can enjoy each puff as slowly (or quickly) as you want. No reason to rush into it or worry you won't get every last puff. We have you covered. Every puff has an LED goal light on inhale. If the light goes out, you know it's time to recharge. Simply inhale to activate, and enjoy the ride.

## EXPLORE 15VAPE FLAVORS



Our newest electronic vapeis available in over 15 different delicious flavors. Whether you like it smooth and refreshing or sugary and sweet, we have a flavor for you that's ready to ignite your taste buds. TheV80 vape will be available in some of our most popular flavors, including:

- Tobacco
- Menthol
- Banana Ice
- Blueberry Ice
- Grape Ice
- Green Apple
- Icy Mint
- Watermelon Ice
- Strawberry Ice

- Cactus
- Grapefruit Mint
- Blueberry Lemon
- Banana Cherry
- Passion Fruit Sour Kiwi
- Strawberry Kiwi

All 15 flavors are available online but may not be at thevape shops near you.

## IGNITE YOUR LIFE WITH THEV80




TheV80 can now be purchased on our website and can soon be found in select vape shopsnear you.The price starts at $18.99,and the vaping experience will last up to 8000+ puffs. We also offer 10-packvape packs, so you never need to worry about running out or reordering for a while.

We recommend ordering directly online since this is a newelectronic vape,and it's not guaranteed to be at a local vape shop near you just

yet. Most orders ship within two business days, and we offer free shipping on orders over $60.

Ready to level up your vaping experience? Shop the V80 today!

# FAQ

## HOW MUCH IS A VAPE?

Our newestvape deviceis $18.99 or $170.99 for a 10-pack.If you're looking for a more affordable alternative, consider our V35 or V15.

## WHAT TYPE OF BATTERY DOES THE V80 HAVE?

It has a 550 mAh rechargeable battery. A Micro USB-C cable is not included with the purchase.

## IS THEV80 VAPE MADE WITH SYNTHETIC NICOTINE?

No, the V80 is made with tobacco-derived nicotine.

## WHAT IS THE NICOTINE CONTENT?

TheV80 vapehas 5% tobacco-derived nicotine.

## HOW MANY CIGARETTE PACKS IS 8,000 PUFFS EQUIVALENT TO?

It's equivalent to roughly 10 cigarette packs or roughly 200 cigarettes.

## I BOUGHT AV80 VAPEFROM A LOCALVAPE SHOP. HOW DO I KNOW IF IT'S LEGIT?

All of our vapes have anauthentication label on the packaging. Simply scan the QR code or type in the serial number on ourvape verification website to know if it's legit.

IGNITE

## IGNITE INTERNATIONAL BRANDS LTD.

3308 Towerwood Drive
Farmers' Branch, TX 75234-2317
United States

675 Cochrane Drive, East Tower, Suite 639
Markham, Ontario L3R 0B8
Canada

## VAPE

VAPE PENS

VAPE PACKS

## CUSTOMER SERVICE

SHIPPING & RETURNS

PRIVACY POLICY

TERMS OF SERVICE

CONTACT US

RETURNS OR EXCHANGES

WARNING: Electronic Cigarettes and E-liquid products may contain nicotine, a chemical known to the State of California to cause birth defects or other reproductive harm. These products are not smoking cessation products and have not been tested as such. E-liquid products, electronic delivery devices, and accessories are intended for use by adults of legal smoking age (e.g., 21 years or older), and not by children, women who are pregnant or breastfeeding, or persons with or at risk of heart disease, high blood pressure, diabetes or taking medicine for depression or asthma, or who otherwise may be sensitive to nicotine. Nicotine is addictive and habit forming, and it is very toxic by inhalation, in contact with the skin, or if swallowed. Ingestion of the non-vaporized concentrated e-liquid ingredients can be poisonous. Keep away from children and pets. If ingested, immediately consult your doctor or vet. Nicotine can increase your heart rate and blood pressure and cause dizziness, nausea, and stomach pain. Inhalation of this product may aggravate existing respiratory conditions. These e-liquid products have not been evaluated by the Food and Drug Administration nor are they intended to treat, mitigate, prevent or cure any disease or condition.

WARNING: This product contains nicotine. Nicotine is an addictive chemical.

Shop Where to Buy Wholesale About

TE

Search 0 Login

#No2Minors

HOME / UNAPOLOGETIC - THE IGNITE BLOG < PREVIOUS / NEXT >

# THE NEW PUFF IGNITE V150 VAPE

June 20, 2024 3 min read




Introducing theIGNITE V150 disposable vape. This vape offers a next-level vaping experience unlike anything else on the market. It features air switch technology and has a new built-in eco and boost mode, so you can customize your vaping experience to complement your lifestyle. You're also guaranteed up to15,000+ puffs with every vape, so you can keep the experience going for weeks without investing in a replacement.

Here's what you can look forward to with our brand-new IGNITE v150 disposable vape:

## IGNITE V150 DISPOSABLE VAPE FEATURES

With our IGNITE v150 disposable vape, you can expect nothing but the best. This vape is designed with you in mind to ensure you get the best possible IGNITE experience. From the food-grade metal tank to the incredible taste - you can expect nothing but the best.




Here's what you can look forward to:

## ECO & BOOST MODES

We've added an eco & boost mode to our v150 disposable vape.This allows you to customize the vaping experience to align with your lifestyle. You can increase or decrease the nicotine levels to align with how you're feeling.

## SMOOTH, DELICIOUS HITS

At IGNITE, we strive to provide a next-level vaping experience. This vape uses a dual mesh coil to deliver a smooth, delicious hit with every puff you take. It's also paired with air switch technology. So, every puff you take will be as great as the last.

## ALTITUDE TESTED

Some vapes don't perform as well at high altitudes - but not ours. We put the V150 vape through rigorous altitude testing to ensure it performs at any altitude. Whether you're headed to the mountains for

the weekend or want to enjoy a puff or two while snowboarding in Colorado, this is the best vape device for every high-altitude occasion.

## CE CERTIFIED

CE stands for Conformité Européenne. When a product is CE certified, it complies with European health and safety standards. The CE certification is just one of many reasons why we're the best in the industry.

## SLEEK, CUTTING-EDGE DESIGN

Sleek, stylish, and discreet. OurIGNITE v150 disposable vapecomes in a midnight black finish and features an ergonomic design. It's paired with an LCD display screen, so you can keep an eye on the battery and liquid levels while you're on the go.

## SUPERIOR BATTERY LIFE




Enjoy every puff of your newV150 vape.This vape is designed with a superior battery life. Each vape is made with a 650 mAh battery that is rechargeable. When the battery runs out, recharge it to keep the fun going. You can check the LCD display screen to see just how much liquid you have left until you need to buy a new one. If you run out sooner than expected, use ourstore locator to find an IGNITE seller near you.

## SEALED FOR FRESHNESS

All of our IGNITE vapes are sealed for freshness. Once you receive yourV150 vape device, inhale it to activate it and enjoy. When the battery runs low, recharge it to take full advantage of all 15,000 puffs. If you purchased adisposable v150 vape device that wasn't sealed, it may be a counterfeit. Use ouranti-counterfeit tool to verify your vape if you're ensured.

## OVER 20 DIFFERENTV150 VAPE DEVICE FLAVORS

Whether you want something sweet, fruity, subtle, or minty, we have every flavor you can think of. Our newest disposable vape is available in over 20 different potent flavors. Each of our flavors has been tried and tested, so you can feel confident that the taste will satisfy your taste buds.

## IGNITE YOUR LIFE WITH OUR NEWEST V150 VAPE DEVICE

At IGNITE, we strive for nothing but the best. We never cut corners or half-ass anything we do - and that's our promise to our customers. Whether you're new to us or you've been enjoying our vapes for a while, you can feel confident that ourIGNITE v150 disposable vape will meet your standards.

Shop now.

IGNITE

## IGNITE INTERNATIONAL BRANDS LTD.

3308 Towerwood Drive
Farmers' Branch, TX 75234-2317
United States

675 Cochrane Drive, East Tower, Suite 639
Markham, Ontario L3R 0B8
Canada

## VAPE

VAPE PENS

VAPE PACKS

## CUSTOMER SERVICE

SHIPPING & RETURNS

PRIVACY POLICY

TERMS OF SERVICE

CONTACT US

RETURNS OR EXCHANGES

WARNING: Electronic Cigarettes and E-liquid products may contain nicotine, a chemical known to the State of California to cause birth defects or other reproductive harm. These products are not smoking cessation products and have not been tested as such. E-liquid products, electronic delivery devices, and accessories are intended for use by adults of legal smoking age (e.g., 21 years or older), and not by children, women who are pregnant or breastfeeding, or persons with or at risk of heart disease, high blood pressure, diabetes or taking medicine for depression or asthma, or who otherwise may be sensitive to nicotine. Nicotine is addictive and habit forming, and it is very toxic by inhalation, in contact with the skin, or if swallowed. Ingestion of the non-vaporized concentrated e-liquid ingredients can be poisonous. Keep away from children and pets. If ingested, immediately consult your doctor or vet. Nicotine can increase your heart rate and blood pressure and cause dizziness, nausea, and stomach pain. Inhalation of this product may aggravate existing respiratory conditions. These e-liquid products have not been evaluated by the Food and Drug Administration nor are they intended to treat, mitigate, prevent or cure any disease or condition.